No. 23-1177

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

––––––––––––––

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioner*,

v.

EPA et al.,

*Respondents.*

––––––––––––––

On Petition for Review of Final Agency Action
of the Environmental Protection Agency

––––––––––––––

## UNOPPOSED MOTION OF GROWTH ENERGY TO
## INTERVENE IN SUPPORT OF RESPONDENTS

On July 13, 2023, the Center for Biological Diversity petitioned this Court

for review of the final EPA rule entitled *Renewable Fuel Standard (RFS)*

*Program: Standards for 2023-2025 and Other Changes*, 88 Fed. Reg. 44,468 (July

12, 2023) ("2023-25 Rule").  *See* Petition for Review, ECF No. 2008130 (D.C. Cir.

July 13, 2023).  Growth Energy anticipates that the Center's challenge, if

successful, will impair Growth Energy's significant interests in the 2023-25 Rule.

1

Accordingly, Growth Energy respectfully moves to intervene in support of respondents.[1]

The Center and respondents take no position on this motion.

## BACKGROUND

A.    Established by the Clean Air Act, the RFS "requires that increasing volumes of renewable fuel be introduced into the Nation's supply of transportation fuel each year.  Congress enacted those requirements in order to move the United States toward greater energy independence and security and increase the production of clean renewable fuels." *Americans for Clean Energy v. EPA*, 864 F.3d 691, 697 (D.C. Cir. 2017) (cleaned up).  RFS standards define the minimum "demand" for each of four "nested" categories of renewable fuel and exclude competition from non-renewable fuels to that extent.  *Id.* at 705, 710.  Congress prescribed a table of escalating volume requirements through 2022, 42 U.S.C. §7545(*o*)(2)(B)(i), and directed EPA to establish the volume requirements for 2023

_____

[1] If any additional petitions for review of the 2023-25 Rule are filed, Growth Energy requests that its intervention be deemed to include those cases.  *See* D.C. Cir. R. 15(b) ("A motion to intervene in a case before this court concerning direct review of an agency action will be deemed a motion to intervene in all cases before this court involving the same agency action or order, including later filed cases, unless the moving party specifically states otherwise, and an order granting such motion has the effect of granting intervention in all such cases.").

and later years based on EPA's consideration of various statutory factors, §7545(*o*)(2)(B)(ii).

Those factors include: the "rate of future commercial production of renewable fuels"; "the sufficiency of infrastructure to deliver and use renewable fuel"; and "the impact of the production and use of renewable fuels on the environment," "the energy security of the United States," "the infrastructure of the United States," "the cost to consumers of transportation fuel," "job creation, the price and supply of agricultural commodities, rural economic development, and food prices." §7545(*o*)(2)(B)(ii).

B.    The Endangered Species Act ("ESA") states that, generally, "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. §1536(a)(2). Under the Interior Department's implementing regulations, the action agency must determine whether its action "may affect [endangered] species or critical habitat." 50 C.F.R. §402.14(a). "If so, then the agency must engage in either formal or informal consultation with the U.S. Fish and Wildlife Service and National Marine Fisheries Service (Services)." *Growth Energy v. EPA*, 5 F.4th 1, 26 (D.C. Cir. 2021) (citing

3

§402.14(a), (b)(1)).  But "the consultation process terminates and no further action is necessary if the agency determines, with the written concurrence of the relevant Service, that the action 'is not likely to adversely affect' any [endangered] species or critical habitat." *American Fuel & Petrochemical Manufacturers v. EPA*, 937 F.3d 559, 597 (D.C. Cir. 2019) (quoting §402.14(c)).

Additionally, section 7(d) of the ESA states: "After initiation of consultation required under subsection (a)(2), the [action] agency … shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." §1536(7)(d).

C.    In the 2023-25 Rule, EPA set the RFS volume requirements for 2023, 2024, and 2025.  EPA set the "advanced" biofuel requirements to 5.94, 6.54, and 7.33 billion gallons, and the total requirements to 20.94, 21.54, and 22.33 billion gallons.  Rule at 44,470.  Thus, for each of the three years, EPA established an "implied" non-advanced requirement—the difference between the total and advanced requirements—of 15 billion gallons, which could be met with conventional renewable fuel and excess advanced biofuel above the advanced requirement.  *Id.* at 44,489:1, 44,517:2-44,518.  EPA expected that the vast majority of the implied non-advanced requirement and accordingly the total

4

requirement in each of the covered years would be met with ethanol: about 14 billion gallons in all, about 99% of which would be derived from corn and produced domestically.  *Id.* at 44,489:1-2 & n.100, 44,491-93, 44,518.  EPA noted "the importance of ongoing support for corn ethanol" given the associated reduction in greenhouse gas emissions relative to the displaced petroleum, the "increases in … energy security" from displacing "foreign sources of petroleum," and "the economic advantages to the agricultural sector" and related industry, much of which is in "rural" areas.  *Id.* at 44,517:2-3.

Long before issuing the 2023-25 Rule, EPA commenced consultation with the Services under the ESA.  Rule at 44,475.  In May 2023, EPA informed the Services that it had "determined that [the proposed 2023-25 Rule] is not likely to adversely affect [endangered] species and critical habitat."  *Id.*  EPA then determined that, under section 7(d) of the ESA, it was appropriate to finalize the 2023-25 RFS requirements before the completion of the ESA consultation process.  *Id.*  Two weeks after the 2023-25 Rule was published, the National Marine Fisheries Service informed EPA that it "concurs" with EPA that the 2023-25 Rule is "not likely to adversely affect" endangered species or critical habitats.  Letter to Sarah Dunham, EPA, from Tanya Dobrzynski, NMFS, at 25 (July 27, 2023).  A few days later, the Fish and Wildlife Service informed EPA that it "concurs" because the 2023-25 Rule "will have no effect" on endangered species or critical

habitats." Letter to Sarah Dunham, EPA, from Craig Aubrey, FWS, at 9 (Aug. 3, 2023).

D.    Previously, the Center challenged EPA's rule setting the RFS standards for 2020-22, 87 Fed. Reg. 39,600 (July 1, 2022), on several grounds: (1) that EPA violated the ESA "by failing to complete consultation" with the Services "before promulgating its Final Rule issuing annual renewable fuel standards"; (2) that EPA violated the ESA and the Clean Air Act "by failing to fully and adequately assess environmental harms … resulting from its Final Rule"; and (3) that the final rule, "including [EPA's] 7(d) Determination, was arbitrary and capricious" for "ignoring" evidence of harm to species or habitat. Petitioner's Non-Binding Statement of Issues to Be Raised 1-2, *Center for Biological Diversity v. EPA*, No. 22-1164, ECF No. 1960249 (D.C. Cir. Aug. 22, 2022). The Center specifically argued that by "mandating … transportation sector use of roughly 15 billion gallons of corn ethanol," the 2020-22 rule "worsens water pollution and habitat loss, harming threatened and endangered species." Petitioner's Motion for Summary Vacatur ("2020-22 Vacatur Motion") 2, *Center for Biological Diversity v. EPA*, No. 22-1164, ECF No. 1966328 (D.C. Cir. Sept. 27, 2022).

The Center has not yet filed a statement of issues in this case, but its comment on the proposed 2023-25 Rule indicates that the Center will assert the same or similar challenges to the 2023-25 Rule as it raised against the 2020-22

rule.  *See* Comment of the Center for Biological Diversity ("Center 2023-25 Comment") (Feb. 15, 2023), Dkt. #EPA-HQ-OAR-2021-0427-0708.  If the Center's challenge here were to succeed, the result could be the vacatur or reduction of the 2023-25 standards.  *See* 2020-22 Vacatur Motion.

## ARGUMENT

### I.    GROWTH ENERGY MEETS THE STANDARD FOR INTERVENTION

Federal Rule of Appellate Procedure 15(d) and Circuit Rule 15(b) establish procedural requirements for intervention on appeal, but not substantive ones.[2] Regarding the substantive requirements, this Court has "held that intervention in the court of appeals is governed by the same standards as in the district court." *Massachusetts School of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997) (emphasis omitted).  Thus, a party has a right to intervene if it "claims an interest relating to the … transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Federal Rule of Civil Procedure 24(a)(2); *see*

---

[2] This motion satisfies those procedural requirements. The motion is timely because it was filed by the Court's deadline for procedural motions.  ECF No. 2008160.  This motion is being served on all parties to the case.  And the discussion in the text constitutes "a concise statement of [Growth Energy's] interest … and the grounds for intervention."  Federal Rule of Appellate Procedure 15(d).

*also Deutsche Bank National Trust Co. v. FDIC*, 717 F.3d 189, 192 (D.C. Cir. 2013).

Growth Energy satisfies this standard.[3]

## A.    This Court Has Routinely Allowed Growth Energy to Participate in Challenges to RFS Standards

Growth Energy successfully intervened in the Center's prior challenge to the 2020-22 rule on grounds that, as explained above, are likely to be similar to the grounds the Center will assert here.  *See* Order, *Center for Biological Diversity*, No. 22-1164, ECF No. 1975422 (Nov. 29, 2022); *supra* p.6.  Indeed, Growth Energy has successfully intervened in every lawsuit challenging EPA's annual RFS standards.  *See* Order, *Sinclair Wyoming Refining Co. v. EPA*, No. 22-1210, ECF No. 1975422 (2020-22 standards); Order, *RFS Power Coalition v. EPA*, No. 20-1046, ECF No. 1843937 (D.C. Cir. May 22, 2020) (2020 standards); Order, *Growth Energy v. EPA*, No. 19-1023, ECF No. 1784196 (D.C. Cir. Apr. 23, 2019) (2019 standards); Order, *American Fuel & Petrochemical Manufacturers v. EPA*, No. 17-1258, ECF No. 1725309 (D.C. Cir. Apr. 5, 2018) (2018 standards); Order, *Alon Refining Krotz Springs, Inc. v. EPA*, No. 16- 1052, ECF No. 1722824 (Mar.

---

[3] *A fortiori*, Growth Energy satisfies the standard for permissive intervention, which requires only a showing that the proposed intervenor has "a claim or defense that shares with the main action a common question of law or fact."  Federal Rule of Civil Procedure 24(b)(1)(B).

19, 2018) (2017 standards); Order, *Americans for Clean Energy v. EPA*, No. 16-1005, ECF No. 1611965 (D.C. Cir. May 5, 2016) (2014-16 standards); Order, *Monroe Energy, LLC v. EPA*, No. 13-1265, ECF No. 1468501 (D.C. Cir. Dec. 2, 2013) (2013 standards); Order, *American Petroleum Institute v. EPA*, No. 12-1139, ECF No. 1370535 (D.C. Cir. Apr. 24, 2012) (2012 standards); Order, *National Petrochemical & Refiners v. EPA*, No. 10-1070, ECF No. 1242852 (D.C. Cir. May 3, 2010) (2009-10 standards).

Growth Energy has also been a petitioner challenging annual RFS standards. *See, e.g.*, *Americans for Clean Energy*, 864 F.3d 691 (petitioner); *Growth Energy*, 5 F.4th 1 (petitioner).  And Growth Energy has successfully intervened in other lawsuits involving challenges to RFS obligations.  *See, e.g.*, Order, *Sinclair Wyoming Refining Co. v. EPA*, No. 22-1073, ECF No. 1987065 (D.C. Cir. Feb. 22, 2023); Order, *Coffeyville Resources Refining & Marketing v. EPA*, No. 17-1044, ECF No. 1706266 (D.C. Cir. Nov. 28, 2017).

There is no reason for the Court to depart from its longstanding practice and exclude Growth Energy from this case given its significant interest in the 2023-25 Rule.

**B.    The Disposition of This Case Could Impair Growth Energy's Strong Interest in the 2023-25 Standards**

EPA has already acknowledged that among the "[e]ntities potentially affected by this final rule are those involved with the production, distribution, and

sale of … renewable fuels such as ethanol." Rule at 44,468. That includes Growth Energy, both directly and through its members.

Growth Energy is a national trade association dedicated to promoting the commercial production and use of ethanol. Growth Energy's 93 members are ethanol producers and account for almost 60% of domestic corn ethanol production. *See* Growth Energy, "Our Members."[4] Growth Energy has a strong interest in RFS standards because, as explained above, they determine the minimum mandatory demand for renewable fuel, most of which is domestically produced corn ethanol. *Supra* p.5. That is why Growth Energy has consistently participated in rulemakings and litigation concerning the RFS. *See supra* pp.8-9.

Growth Energy's strong interest in the RFS is undiminished with respect to the 2023-25 Rule. Growth Energy submitted to EPA a lengthy comment on the proposed 2023-25 Rule. *See* Growth Energy, *Comments on EPA's Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes*, EPA-HQ-OAR-2021-0427-0796 (Feb. 10, 2023).[5] Its comment explained (among other things) that there is no credible evidence that the volume requirements for 2023-25 are likely to adversely affect endangered species or critical habitats. *Id.* at

---

[4] https://growthenergy.org/members.

[5] https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0427-0796.

29-37, 64-67.  Growth Energy also successfully sued to compel EPA to issue the 2023 standards after EPA missed the statutory deadline; EPA eventually issued the 2023-25 Rule under the consent decree entered in Growth Energy's suit.  *See* Consent Decree, *Growth Energy v. Regan*, No. 1:22-cv-01191, ECF No. 12 & 12-1 (July 26, 2022).

This interest is jeopardized by the Center's suit.  The Center is expected to advocate for the reduction of the 2023-25 RFS standards, including in particular the implied non-advanced volumes, given the Center's (unfounded) claims regarding the environmental effects of producing corn ethanol.  Because the "demand for renewable fuel will be a function of the renewable fuel standards," *Americans for Clean Energy*, 864 F.3d at 710 (cleaned up), "the basic laws of economics" establish that reducing RFS standards will "cause the demand" for corn ethanol "to drop," *Growth Energy*, 5 F.4th at 33; *see also Monroe Energy, LLC v. EPA*, 750 F.3d 909, 917 (D.C. Cir. 2014).  Indeed, that proposition will presumably be the premise of the Center's case.  *See* Center 2023-25 Comment at 4 (2023-25 "Rule has a significant, if not overwhelming, influence on the behavior of the agricultural sector that produces the feedstocks for biofuels, including for corn ethanol").  Additionally, lowering RFS standards—which specify the portion of transportation fuel that must be renewable fuel—would lift a regulatory barrier

to competition from petroleum producers for the content of the nation's transportation fuel.

This is Growth Energy's only to parry the Center's claims and protect the 2023-25 standards.  *See* 42 U.S.C. § 7607(b)(1).  And no party will adequately represent Growth Energy's interests.  The requirement that there be no other adequate representative "present[s] proposed intervenors with only a minimal challenge," *Berger v. North Carolina State Conference of the NAACP*, 142 S. Ct. 2191, 2203 (2022); that requirement precludes intervention only if "it is clear that the party will provide adequate representation," *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015) (cleaned up).  Although Growth Energy seeks to intervene in support of respondents, they—as government agencies—cannot adequately represent the specific interests of the private commercial enterprises that comprise Growth Energy's membership.  *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736-37 (D.C. Cir. 2003); *Crossroads*, 788 F.3d at 321; *Natural Resources Defense Council v. Costle*, 561 F.2d 904, 912-13 (D.C. Cir. 1977).  In fact, respondents' arguments in defense of the 2023-25 Rule could be in tension with arguments that Growth Energy would advance in some respects, as happened in prior RFS cases.  *See Crossroads*, 788 F.3d at 321 (agency did not adequately represent private party even though there was "general alignment" between their positions).

## II.    GROWTH ENERGY NEED NOT ESTABLISH ARTICLE III STANDING, BUT ANYWAY IT SATISFIES THIS COURT'S REQUIREMENTS

### A.    Standing Is Not Required

This Court has said that a proposed intervenor supporting a respondent or defendant must also establish Article III standing. *See Deutsche Bank*, 717 F.3d at 193. Any such requirement is legally unsound and contrary to Supreme Court precedent because standing is necessary only for a party to invoke a court's jurisdiction, and a defensive intervenor, like the respondent or defendant it supports, does not invoke the court's jurisdiction. *See Virginia House of Delegates v. Bethune-Hill,* 139 S. Ct. 1945, 1951 (2019) (intervenor supporting defendants need not show standing because it is not invoking court's jurisdiction); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-11 (2013); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439-40 (2017).

Indeed, the notion of a defensive party's standing is incoherent because such a party necessarily does not claim to have been injured by the action being defended and does not seek relief from that action. Moreover, even if defensive standing were required, the respondent or defendant would certainly have it, obviating the need for a defensive intervenor to also establish standing because the defensive intervenor does not "pursue relief that is broader than or different from" that pursued by the respondent or defendant. *Little Sisters of the Poor Saints Peter*

13

& *Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) (citing *Town of Chester*, 137 S. Ct. at 1650-51); *see Maine Lobstermen's Ass'n v. National Marine Fisheries Service*, 70 F.4th 582, 593 (D.C. Cir. 2023) ("Because the Association has standing to sue …, we do not need to consider the standing of the intervenors.").  That is certainly true here, where Growth Energy seeks affirmance of the 2023-25 Rule just as respondents do.

Accordingly, other circuits have correctly held that defensive intervenors need not establish standing.  *See, e.g.*, *King v. Governor of New Jersey*, 767 F.3d 216, 245-46 (3d Cir. 2014), *abrogated in part on other grounds by National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018).[6]

### B.    Growth Energy Has Standing

In any event, the Court's standing requirement as it has applied it to defensive intervenors is satisfied here for the same reasons that the Center's challenge threatens to impair Growth Energy's interests.  An association has Article III standing to sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim

---

[6] If the Court considers standing dispositive of Growth Energy's motion, Growth Energy respectfully requests that the Court overturn *Deutsche Bank* and similar precedents through the *Irons* procedure.  *See Irons v. Diamond*, 670 F.2d 265, 267-68 & n.11 (D.C. Cir. 1981).

asserted nor the relief requested requires the participation of individual members in the lawsuit." *Military Toxics Project v. EPA*, 146 F.3d 948, 953–54 (D.C. Cir. 1998).  And to have standing in its own right, an association member must show "injury-in-fact, causation, and redressability." *Deutsche Bank*, 717 F.3d at 193.[7]

For the same reasons that Growth Energy has a substantial interest that could be impaired by this litigation, its members will suffer a cognizable injury-in-fact if the 2023-25 Rule is set aside on any ground that would result in reduced volume requirements, such as those expected to be asserted by the Center.  *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("any person who satisfies Rule 24(a) will also meet Article III's standing requirement").

As explained above, reducing the volume requirements would reduce the mandated demand for renewable fuel, especially the corn ethanol that constitutes the vast majority of renewable fuel used to meet the RFS requirements and that Growth Energy's members sell.  "[T]he constriction of [the members'] buyers' market" is "a direct economic injury" cognizable under Article III.  *Craig v. Boren*, 429 U.S. 190, 194 (1976).  Additionally, as explained above, reducing the volume requirements would "lift regulatory restrictions on [ethanol producers'] competitors," i.e., petroleum producers, for the content of transportation fuel—

---

[7] It suffices for a single member of Growth Energy to have standing. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002); *Military Toxics Project*, 146 F.3d at 954.

itself a "constitutional injury in fact." *American Fuel & Petrochemical Manufacturers v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021) (cleaned up). *See generally Crossroads*, 788 F.3d at 317 ("Our cases have generally found a sufficient injury in fact where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit."); *Fund for Animals*, 322 F.3d at 733-34 (D.C. Cir. 2003); *Military Toxics*, 146 F.3d at 954.

The causal relationship between the Rule, this litigation, and Growth Energy's members' potential injuries is straightforward. The 2023-25 RFS standards set the level of renewable-fuel demand and the restriction on competition; the Center's challenge presumably will argue that the standards are too high; the success of that challenge could therefore reduce the standards, resulting in the financial and competitive injuries just described; and rejecting the Center's challenge would preserve the standards and thus avoid those injuries. That satisfies the traceability and redressability elements of standing. *See American Fuel*, 3 F.4th at 379 ("the increased competition is … redressed by restoring the regulatory *status quo ante*").

Moreover, the interests that Growth Energy seeks to protect in this litigation are germane—indeed, integral—to its purpose of protecting and promoting the demand for renewable fuel, especially ethanol, and "mere pertinence between

16

litigation subject and organizational purpose is sufficient." *National Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000) (cleaned up).  Finally, the validity of the relevant determinations reflected in the 2023-25 Rule can be adjudicated without the participation of any of Growth Energy's individual members.

## CONCLUSION

For the foregoing reasons, the Court should grant Growth Energy's motion to intervene.

Respectfully submitted,

/s/ David M. Lehn

ETHAN G. SHENKMAN
ARNOLD & PORTER KAYE SCHOLLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
ethan.shenkman@arnoldporter.com

DAVID M. LEHN
BOIES SCHILLER FLEXNER LLP
1401 NEW YORK Avenue NW
Washington, DC 20035
(202) 237-2727
dlehn@bsfllp.com

August 15, 2023

17

## CORPORATE DISCLOSURE STATEMENT

Growth Energy is a non-profit trade association within the meaning of

Circuit Rule 26.1(b).  Its members are ethanol producers and supporters of the

ethanol industry.  It operates to promote the general commercial, legislative, and

other common interests of its members.  It does not have a parent company, and

no publicly held company has a 10% or greater ownership interest in it.

Respectfully submitted,

/s/ David M. Lehn
DAVID M. LEHN
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC  20035
(202) 237-2727

August 15, 2023

## CERTIFICATE OF PARTIES AND AMICI CURIAE

Pursuant to Circuit Rule 27(a)(4), Growth Energy certifies that the parties in these consolidated cases are:

*Petitioner*:  Center for Biological Diversity.

*Respondents*:  U.S. Environmental Protection Agency; U.S. Fish and Wildlife Service; National Marine Fisheries Service.

*Movant-Intervenors*:  None.

*Amici curiae*:  None.

Respectfully submitted,

/s/ David M. Lehn

DAVID M. LEHN
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC  20035
(202) 237-2727

August 15, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned hereby certifies:

1.      This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 3,550 words, excluding the exempted portions, as provided in Federal Rule of Appellate Procedure 32(f).  As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

2.      This motion complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(a)(5)-(6) because it was prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ David M. Lehn
DAVID M. LEHN

August 15, 2023

## CERTIFICATE OF SERVICE

I certify that on August 15, 2023, I filed a copy of this brief using the

Court's case management electronic case filing system, which will automatically

serve notice of the filing on registered users of that system.


/s/ David M. Lehn
DAVID M. LEHN


August 15, 2023