**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 23-1177 and Consolidated Cases**
___

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*.

ON PETITIONS FOR REVIEW OF FINAL AGENCY ACTION
OF THE ENVIRONMENTAL PROTECTION AGENCY

**OPENING BRIEF OF AMERICAN FUEL & PETROCHEMICAL**
**MANUFACTURERS; REH COMPANY; THE SMALL REFINERIES**
**COALITION; COUNTRYMARK REFINING AND LOGISTICS, LLC;**
**THE SAN ANTONIO REFINERY LLC;**
**AND WYNNEWOOD REFINING CO., LLC**

Robert J. Meyers
Elizabeth B. Dawson
Lynn Phan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2789
*Counsel for Petitioner American Fuel*
*& Petrochemical Manufacturers*

Jonathan G. Hardin
LeAnn Johnson
Alexandra Magill Bromer
PERKINS COIE LLP
700 Thirteenth Street, NW, Suite 800
Washington, D.C. 20005-3960
(202) 654-6200
*Counsel for Petitioners Small*
*Refineries Coalition; Countrymark*
*Refining and Logistics, LLC; The*
*San Antonio Refinery LLC; and*
*Wynnewood Refining Company, LLC*

Jeffrey R. Holmstead
Brittany M. Pemberton
BRACEWELL LLP
2001 M Street, NW
Suite 900
Washington, DC 20036-3389
(202) 828-5800
brittany.pemberton@bracewell.com
*Counsel for Petitioner REH Company*

Richard S. Moskowitz
Tyler J. Kubik
American Fuel & Petrochemical
Manufacturers
1800 M Street, NW, Suite 900N
Washington, DC 20036
*Counsel for Petitioner American Fuel*
*& Petrochemical Manufacturers*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties, intervenors, and amici

Petitioners:

| 23-1177 | Center for Biological Diversity |
|---------|--------------------------------|
| 23-1240 | Neste US, Inc. |
| 23-1243 | American Refining Group, Inc.; Calumet Montana Refining, LLC; Calumet Shreveport Refining, LLC; Ergon Refining, Inc.; Ergon-West Virginia, Inc.; Hunt Refining Co.; Par Hawaii Refining, LLC; Placid Refining Company LLC; San Joaquin Refining Co., Inc.; U.S. Oil & Refining Company; and Wyoming Refining Company ("Small Refineries Coalition"); Countrymark Refining and Logistics, LLC; The San Antonio Refinery LLC; Wynnewood Refining Company, LLC; and REH Company |
| 23-1244 | REH Company |
| 23-1246 | Sustainable Advanced Biofuel Refiners Coalition |
| 23-1247 | American Fuel & Petrochemical Manufacturers |
| 23-1249 | National Wildlife Federation |

Respondent:

Environmental Protection Agency.

Respondent-Intervenors:

American Fuel & Petrochemical Manufacturers, American Petroleum Institute, Clean Fuels Alliance America, Coalition for Renewable Natural Gas, Renewable Fuels Association.

Amici:

None

i

**B. Rulings under review**

The agency action under review is EPA's final rule, entitled "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44468 (July 12, 2023), which this Brief identifies throughout as the "Rule," "Set Rule," or "2023-2025 Rule."

**C. Related cases**

The consolidated cases have not been reviewed by this or any other Court. The following pending case may involve similar or substantially the same issues:

- *Sinclair Wyoming Refining Co. LLC v. EPA*, No. 22-1210 (argued Nov. 3, 2023)

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Circuit Rule

26.1, Petitioners provide the following disclosures:

- **American Fuel & Petrochemical Manufacturers** is a national trade association whose members comprise most U.S. refining and petrochemical manufacturing capacity. American Fuel & Petrochemical Manufacturers has no parent companies, and no publicly held company has a 10% or greater ownership interest in American Fuel & Petrochemical Manufacturers. American Fuel & Petrochemical Manufacturers is a "trade association" under Circuit Rule 26.1 and operates for the purpose of promoting the general commercial, professional, legislative, or other interests of its members.

- **American Refining Group, Inc.** is a Pennsylvania corporation. It is a refiner of petroleum products, has no parent company, and no publicly held company has a 10 % or greater ownership interest in it.

- **Calumet Montana Refining, LLC** is a Delaware corporation. It is owned 100% by Calumet Specialty Products Partners, L.P., which is a Delaware limited partnership. Calumet Specialty Products Partners, L.P. is a refiner of petroleum products and a publicly traded company. The Heritage Group owns 12.28% of the common stock of Calumet Specialty Products Partners, L.P., and there are no other known persons or entities that own more than 10% of it.

- **Calumet Shreveport Refining, LLC** is a Delaware corporation. It is owned 100% by Calumet Specialty Products Partners, L.P., which is a Delaware limited partnership. Calumet Specialty Products Partners, L.P. is a refiner of petroleum products and a publicly traded company. The Heritage Group owns 12.28% of the common stock of Calumet Specialty Products Partners, L.P., and there are no other known persons or entities that own more than 10% of it.

- **CountryMark Refining and Logistics, LLC** (CountryMark) is a cooperative business, owned and controlled by CountryMark member cooperatives, and each member cooperative, in turn, is owned and controlled by farmers, or local agricultural producers. CountryMark is a refiner of petroleum products. No publicly held company has a 10%

or greater ownership interest in it.

- **Ergon Refining, Inc.** is a Mississippi corporation. It is a refiner of petroleum products, is wholly owned by parent company Ergon, Inc., and no publicly held company has a 10% or greater ownership interest in it.

- **Ergon-West Virginia, Inc.** is a Mississippi corporation. It is a refiner of petroleum products, is wholly owned by parent company Ergon, Inc., and no publicly held company has a 10% or greater ownership interest in it.

- **Hunt Refining Company** is a Delaware corporation. It is a refiner of petroleum products, an indirect wholly owned subsidiary of Hunt Consolidated, Inc., and no publicly held company has a 10% or greater ownership interest in it.

- **Par Hawaii Refining, LLC** is a Delaware limited liability company. It is a refiner of petroleum products and is an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly traded corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it, or funds or accounts managed by it, owns more than 10% of Par Pacific Holding's stock; no other publicly held company has a 10% or greater ownership interest in it.

- **Placid Refining Company LLC** is a Delaware limited liability company. It is a refiner of petroleum products, is owned 100% by its parent companies Placid Holding Company and RR Refining, Inc., and no publicly held company has a 10% or greater ownership interest in it.

- **REH Company** is a privately held corporation with no parent corporation. On March 14, 2022, HollyFrontier Corporation acquired Sinclair Casper Refining Company and Sinclair Wyoming Refining Company and formed HF Sinclair Corporation as the new parent company of HollyFrontier Corporation. Currently, the refining companies are named HF Sinclair Parco Refining LLC and HF Sinclair Casper Refining LLC. These companies are wholly-owned subsidiaries of Sinclair Oil LLC, which is a wholly-owned subsidiary of HF Sinclair Corporation, a publicly held company. HF Sinclair Corporation is not a party to this case. Pursuant to the Business Combination Agreement between HF Sinclair and REH Company, REH Company retained an

iv

interest in Renewable Fuel Standard litigation relating to the refineries prior to March 14, 2022.

- **San Joaquin Refining Co., Inc.** is a privately held company located in California. It is a refiner of petroleum products and has no parent company, is not publicly traded, and no publicly held company has a 10 percent or greater ownership interest in it.

- **The San Antonio Refinery LLC** is a Delaware limited liability company. It is a refiner of petroleum products and is owned 100 percent by Allegiance Refining, LLC. Allegiance Refining, LLC, is a Texas limited liability company. It is a refining operations company and operates The San Antonio Refinery LLC. Allegiance Refining, LLC, is not publicly traded, and no publicly held company has a ten percent or greater ownership interest in it.

- **U.S. Oil & Refining Co.** is a Delaware corporation. It is a refiner of petroleum products and an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly held corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it, or funds or accounts managed by it, owns more than 10% of Par Pacific Holding's stock; no other publicly held company has a 10% or greater ownership interest in it.

- **Wynnewood Refining Company, LLC** is a wholly owned subsidiary of CVR Refining, LLC, a Delaware limited liability company. CVR Refining, LLC is a wholly owned subsidiary of CVR Refining, LP, which is an indirect wholly owned subsidiary of CVR Energy, Inc., a Delaware corporation that is publicly traded on the New York Stock Exchange under the symbol "CVI." Icahn Enterprises, L.P. and its affiliates ("IEP") hold a 10% or greater ownership interest in CVR Energy, Inc. IEP is a publicly traded partnership on the New York Stock Exchange under the symbol "IEP."

- **Wyoming Refining Company** is a trade name for Hermes Consolidated, LLC, a Delaware limited liability company. It is a refiner of petroleum products and an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly held corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it, or funds or accounts managed by it, owns more than 10% of Par Pacific Holding's stock; no

other publicly held company has a 10% or greater ownership interest in it.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................................................................. i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

GLOSSARY .................................................................................... xiii

INTRODUCTION ............................................................................... 1

STATEMENT REGARDING ORAL ARGUMENT ........................... 2

JURISDICTION ................................................................................. 2

STATUTES AND REGULATIONS .................................................. 2

STATEMENT OF ISSUES ................................................................ 3

STATEMENT OF THE CASE .......................................................... 3

I.      RFS Statutory Provisions ......................................................... 3

II.     EPA Promulgates the "Set" Rule for 2023-2025. ................... 5

III.    EPA Responds to the *ACE* Remand with a Second "Supplemental" Standard for 2023 .......................................... 7

SUMMARY OF ARGUMENT ......................................................... 9

STANDARDS OF REVIEW .......................................................... 11

STANDING .................................................................................... 12

ARGUMENT .................................................................................. 13

I.      EPA's 2023-2025 Standards Misinterpret and Misapply Congress' Instructions for the Set Rule and Violate the Regulatory Flexibility Act. ..................................................... 13

        A.      EPA's applicable volumes fail to reflect a lawful application of the statutory set criteria. ............................ 13

                1.      EPA's Set Rule violates the plain text of the statute by incorporating an extra-statutory factor: a policy of prioritizing increased renewable-fuel volumes. ............... 13

                2.      EPA's intentionally unachievable conventional-renewable-fuel requirement and artificially low advanced biofuel requirement fail to reflect a reasoned application of the set criteria. .................................. 16

3.  EPA arbitrarily and capriciously set unreachably high applicable volumes for cellulosic biofuel. ..................... 22

4.  EPA's arbitrary and capricious cost/benefit analysis undermines the Set Rule. ......................................... 24

B.  EPA's "review of the implementation of the [RFS] program" erroneously relies on the RIN-cost-passthrough theory. ............................................................................. 26

C.  EPA's misplaced reliance on the RIN-cost-passthrough theory violates the Regulatory Flexibility Act. ................................ 31

II.   EPA Violated the Statutory Requirement to Promulgate 2023 and 2024 RFS Standards 14 Months Before the Requirements Take Effect and Failed to Mitigate the Harm It Caused. ........................... 33

A.  EPA's continued failure to meet statutory deadlines effectively rewrites the statute. ........................................... 33

B.  EPA failed to mitigate hardship to obligated parties. ..................... 35

III.  EPA Unlawfully Imposed a Predetermined "Supplemental" Standard on Obligated Parties in Response to this Court's Remand in *ACE*. ............................................................. 39

A.  EPA failed to identify statutory authority for the supplemental mandate. ..................................................... 40

B.  The supplemental standard is arbitrary and capricious. ................... 40

1.  The 2023 supplemental standard was unlawfully predetermined. ......................................................... 41

2.  EPA failed to justify the supplemental standard approach. .................................................................. 42

3.  EPA ignored the mandatory statutory criteria in promulgating the supplemental standard. .............................. 43

4.  EPA failed adequately to consider other options on remand. ................................................................... 44

5.  EPA arbitrarily refused to allow use of 2015 or 2016 RINs for compliance with the supplemental standard. ................................................................. 46

CONCLUSION ............................................................... 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alon Refin. Krotz Springs, Inc. v. EPA,*
  936 F.3d 628 (D.C. Cir. 2019)......................................................11, 14, 26

*Am. Fuel & Petrochem. Mfrs. v. EPA,*
  937 F.3d 559 (D.C. Cir. 2019)................................................................5, 26

*Am. Petroleum Inst. v. EPA,*
  706 F.3d 474 (D.C. Cir. 2013)........................................................16, 22, 23

*Americans for Clean Energy v. EPA,*
  864 F.3d 691 (D.C. Cir. 2017)
  ................................................................. 3, 7, 8, 11, 14, 33, 34, 35, 36,
  ................................................................. 37, 38, 39, 41, 43, 44, 45, 50

*Calumet Shreveport Refin., L.L.C. v. EPA,*
  86 F.4th 1121 (5th Cir. 2023) ....................................................................30

*City of Arlington, Tex. v. FCC,*
  569 U.S. 290 (2013)....................................................................................15

*In re Ctr. for Auto Safety,*
  793 F.2d 1346 (D.C. Cir. 1986)..................................................................39

*EEOC v. Associated Dry Goods Corp.,*
  449 U.S. 590 (1981)....................................................................................49

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)....................................................................................40

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA,*
  71 F.4th 59 (D.C. Cir. 2023).......................................................................15

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977)....................................................................................12

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019)................................................................................11

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023).................................................................11

*Miss. Comm'n on Env't Quality v. EPA*,
790 F.3d 138 (D.C. Cir. 2015)................................................................25

*Monroe Energy, LLC v. EPA*,
750 F.3d 909 (D.C. Cir. 2014)..........................................................12, 34

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut.
Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................12, 13, 16, 25, 42

*Nat'l Petrochem. & Refiners Ass'n v. EPA*,
287 F.3d 1130 (D.C. Cir. 2002)..............................................................12

*National Petrochemical & Refiners Association v. EPA*,
630 F.3d 145 (D.C. Cir. 2010)..........................................................33, 34

*NetCoalition v. SEC*,
715 F.3d 342 (D.C. Cir. 2013).................................................................11

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)..................................................................................11

*University of Great Falls v. NLRB*,
278 F.3d 1335 (D.C. Cir. 2002)..............................................................46

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)................................................................................35

**Statutes**

5 U.S.C. §603-604....................................................................................31

5 U.S.C. §605(b)................................................................................31, 32

42 U.S.C. §7545(*o*)(1)(B)(i) ....................................................................17

42 U.S.C. §7545(*o*)(2)(B)(i) .............................................................18, 22

42 U.S.C. §7545(*o*)(2)(B)(i)(I) ................................................................22

42 U.S.C. §7545(*o*)(2)(B)(i)(I)-(II)..........................................................17

42 U.S.C. §7545(*o*)(2)(B)(i)(I)-(IV) ................................................3, 37

42 U.S.C. §7545(*o*)(2)(B)(ii) ................................ 3, 4, 13, 14, 23, 26, 31, 33, 37, 43

42 U.S.C. §7545(*o*)(2)(B)(ii)(II) ................................................25

42 U.S.C. §7545(*o*)(2)(B)(ii)(IV) ................................................25

42 U.S.C. §7545(*o*)(2)(B)(ii)(V) ................................................25

42 U.S.C. §7545(*o*)(2)(B)(ii)(VI) ................................................43

42 U.S.C. §7545(*o*)(2)(B)(iii) ................................................4, 14, 18

42 U.S.C. §7545(*o*)(2)(B)(iv) ................................................22

42 U.S.C. §7545(*o*)(2)(B)(v) ................................................37

42 U.S.C. §7545(*o*)(3)(A) ................................................37

42 U.S.C. §7545(*o*)(7) ................................................40

42 U.S.C. §7545(*o*)(7)(D) ................................................4, 23

42 U.S.C. §7607(b)(1) ................................................2

42 U.S.C. §7607(d)(9)(A) ................................................12

42 U.S.C. §7607(d)(9)(C) ................................................12, 43

**Regulations**

40 C.F.R. §80.1407 ................................................4

**Other Authorities**

77 Fed. Reg. 59458 (Sept. 27, 2012) ................................................5

80 Fed. Reg. 77420 (Dec. 14, 2015) ................................................8, 45, 46

86 Fed. Reg. 72436 (Dec. 21, 2021) ................................................47, 48

87 Fed. Reg. 39600 (July 1, 2022) ................................................7, 8, 42

# GLOSSARY

| | |
|---|---|
| AFPM | American Fuel & Petrochemical Manufacturers |
| EPA | Environmental Protection Agency |
| JA | Joint Appendix |
| RFS | Renewable Fuel Standard |
| RIA | Regulatory Impact Analysis |
| RTC | Response to Comments |
| RINs | Renewable Identification Numbers |
| 2020-2022 Rule | "Renewable Fuel Standard (RFS) Program: RFS Annual Rules," 87 Fed. Reg. 39600 (July 1, 2022) |
| 2023-2025 Proposed Rule or Proposed Rule | "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 87 Fed. Reg. 80582 (Dec. 30, 2022) |
| 2023-2025 Rule, Rule, or Set Rule | "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44468 (July 12, 2023) (excluding the Biogas Regulatory Reform rule) |

**INTRODUCTION**

Almost twenty years ago, the Renewable Fuel Standard (RFS) was added to the Clean Air Act. In 2007, Congress amended the RFS to mandate increasing amounts of renewable fuel for the nation's fuel supply each year—up until 2022, when the first phase of the program and Congress' aspirational volume targets ended. In the second phase of the RFS program (2023 forward), Congress directed EPA first to review the implementation of the RFS program during 2006 to 2022 (when statutory volume targets applied). Then Congress directed EPA to analyze several *non*-aspirational statutory criteria related to the impact of renewable fuels on specific factors and the expected commercial production of renewable fuel. And Congress directed EPA to determine applicable volumes of renewable fuel only after giving 14 months' prior notice.

The Rule is EPA's first attempt to apply this new statutory scheme in full.[1] EPA missed the mark. Despite knowing that this day would come, EPA promulgated the 2023 and 2024 standards unlawfully late and, for half of 2023, retroactively. For the 2023-2025 standards, EPA neither fully assessed the implementation of the program and all the required statutory criteria, nor meaningfully considered the costs

---

[1] While EPA has otherwise used statutory factors to determine the required level of biomass-based diesel and to *re*set volumes (in conjunction with statutory waiver authority), this rule is the first to assess all four renewable fuels together along with the required review of the implementation of the RFS program to "set" volumes.

1

and benefits of the rulemaking (despite costs appearing directly in the statute). Instead, EPA applied an aspirational, extra-textual policy goal of ever-increasing volumes to increase requirements for certain types of fuels to unachievable levels, while artificially lowering requirements for another. And EPA responded to a remand from this Court with a second unlawful "supplemental" standard that this Court did not compel. This Court should vacate the supplemental standard and remand the remainder of the 2023-2025 standards to EPA for new standards after comprehensively analyzing the RFS and its prior implementation, as Congress instructed.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners request oral argument. This case presents new issues about statutory limits governing the RFS program, impacting the Nation's transportation fuel supply.

## JURISDICTION

This Court has jurisdiction under 42 U.S.C. §7607(b)(1)[2] over the nationally applicable 2023-2025 Rule.

## STATUTES AND REGULATIONS

The Addendum provides pertinent statutes and regulations.

---

[2]    Unless otherwise noted, all statutory citations are to Title 42, U.S. Code.

2

## STATEMENT OF ISSUES

1.    Whether EPA acted arbitrarily, capriciously, or otherwise unlawfully when reviewing the implementation of the program and applying the criteria as required by §7545(*o*)(2)(B)(ii) to promulgate the applicable volumes and percentage standards for the 2023-2025 Rule.

2.    Whether the 2023-2025 Rule is lawful in light of EPA's conceded violation of the statutory 14-month leadtime requirement in §7545(*o*)(2)(B)(ii).

3.    Whether EPA acted arbitrarily, capriciously, or otherwise unlawfully in adding a 250-million-gallon "supplemental" renewable-fuel requirement for 2023 in response to *Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017) ("*ACE*"), and deciding that obligated parties could not use credits from 2015 or 2016 in demonstrating compliance.

## STATEMENT OF THE CASE

### I.    RFS Statutory Provisions

Under the RFS program, EPA must annually determine "applicable volumes," representing targets for renewable-fuel use across four "nested" categories: total renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel. Through 2022 (2012 for biomass-based diesel), EPA based the applicable volumes on annually increasing volumes prescribed by statute. §7545(*o*)(2)(B)(i)(I)-(IV). In 2023 and later years, EPA must set volumes "based on a review of the implementation of the program" and an analysis of six statutory criteria—referred

3

to as "set" criteria. §7545(*o*)(2)(B)(ii).

The set criteria include the environmental, energy security, infrastructure, and cost impacts of renewable fuels; expected future renewable-fuel production; and other factors such as impacts on job creation and agricultural commodities prices and supply. *Id.* The statute also imposes three category-specific constraints on volumes established under the set criteria: advanced biofuel must be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022; the cellulosic biofuel requirement must assume EPA will not need to issue a waiver under §7545(*o*)(7)(D); and biomass-based diesel volumes must be at least 1 billion gallons. §7545(*o*)(2)(B)(iii)-(v). EPA must promulgate set rules "no later than 14 months before the first year for which such applicable volume will apply." *Id.*

Once EPA establishes applicable volumes, EPA translates them into annual percentage standards for each category that obligated parties—defined by EPA as refiners and importers—must satisfy. JA__[88_Fed._Reg._44519]. EPA's percentage-standards formula divides the renewable-fuel volume targets into the volume of *non*renewable gasoline and diesel EPA projects will be produced in the year ahead. JA__[88_Fed._Reg._44519]. Obligated parties apply the resulting percentage to the gasoline and diesel they produce or import to determine their annual RFS obligations. 40 C.F.R. §80.1407. Obligated parties comply by retiring credits known as renewable identification numbers (RINs), obtained by blending

4

renewable fuels or purchasing from third parties (unobligated blenders or other RIN-market participants). *Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 571-72 (D.C. Cir. 2019) ("*AFPM*").

## II. EPA Promulgates the "Set" Rule for 2023-2025.

In the Set Rule, EPA for the first time promulgated applicable volumes for all renewable fuel categories under the set-criteria framework.[3] EPA acknowledged it violated the statutory requirement to provide 14 months' leadtime for *both* the 2023 *and* the 2024 standards. JA__[88_Fed._Reg._44510]. And because EPA did not issue the Rule until after the 2023 compliance year had begun, it acknowledged that the 2023 standard would be partially retroactive. JA__[88_Fed._Reg._44510]. EPA was therefore required to "consider and mitigate the burdens on obligated parties[.]" JA__[88_Fed._Reg._44510].

Tardiness aside, EPA set applicable volumes for 2023-2025 by first developing "candidate volumes" for cellulosic biofuel, biomass-based diesel, other advanced biofuel, and conventional renewable fuel, using a subset of "the statutory factors most closely related to renewable fuel supply and other relevant factors." JA__[88_Fed._Reg._44480]. EPA then used these volumes to evaluate the statutory

---

[3]    EPA first exercised its set authority to promulgate the volume requirements for biomass-based diesel in the 2013 RFS standard. 77 Fed. Reg. 59458 (Sept. 27, 2012).

factors and derive proposed volumes, which all exceeded the prior years'
requirements. JA__[87_Fed._Reg._80584].[4]

Numerous commenters expressed concern with the 2023-2025 proposal,
including EPA's analysis of the statutory criteria and resulting volumes and
percentage standards. Commenters highlighted the disconnect between projected
ethanol consumption and the proposed requirements, the artificially low advanced
biofuel requirement, and the problems that result from the two. *E.g.*, JA__-
__[AFPM_Comments_5-13_EPA-HQ-OAR-2021-0427-0812].            Commenters
supported EPA's use of historic performance from the previous 24 months to project
cellulosic biofuel production, but cautioned that the 13.1% growth rate proposed
might be an overestimation. JA__[AFPM_Comments_12]; *see also*
JA__[87_Fed._Reg._80593]. Commenters also noted that EPA's failure to comply
with the 14-month leadtime Congress required deprived obligated parties of notice
needed to plan for compliance, and thus asserted that EPA should set volumes for
2023 and 2024 at or below the applicable volumes for 2022.
JA__[AFPM_Comments_7].

Notwithstanding these concerns, EPA promulgated 2023-2025 volume

---

[4]    EPA also proposed to include "eRINs"—RINs from renewable electricity—
in the RFS, but did not finalize that proposal. JA__[88_Fed._Reg._44471].

requirements higher than the 2022 requirements—and almost all higher than EPA's proposal (except biomass-based diesel for 2023). *See* JA__[88_Fed._Reg._44518].[5] Notably, EPA departed from the 13.1% growth rate used to estimate cellulosic biofuel and instead used a *25%* growth rate. JA__-__[88_Fed._Reg._44481-82]. EPA also maintained a 15-billion-gallon "implied" (*i.e.*, not in the statutory text) requirement for conventional renewable fuel for 2023-2025, even though EPA calculated "candidate volumes" of conventional biofuel at only 13.8 to 14.0 billion gallons for 2023-2025. JA__[88_Fed._Reg._44517]. Meanwhile, EPA set overall advanced biofuel volumes *lower* than the candidate volumes calculated. JA__, __[88_Fed._Reg._44496,_44518]. And EPA denied the request to lower applicable volumes due to its unlawfully-late rule. JA__[88_Fed._Reg._44478].

### III. EPA Responds to the *ACE* Remand with a Second "Supplemental" Standard for 2023.

EPA promulgated a second "supplemental" volume requirement of 250 million gallons of renewable fuel for 2023 to "complet[e] the process of addressing" this Court's remand of the 2016 RFS rule in *ACE*. JA__[88_Fed._Reg._44509]. The Agency forecasted the 2023 supplemental standard in the 2020-2022 Rule when it promulgated the first 250-million-gallon renewable fuel requirement. 87 Fed. Reg.

---

[5]    The final volumes for cellulosic biofuel and total renewable fuel appear to be lower, but that is due to the absence of eRINs. JA__[88_Fed._Reg._44480]; *see supra* n.4.

39600, 39601, 39603 (July 1, 2022).[6]

In the 2016 Rule at issue in *ACE*, EPA concluded it needed to reduce statutory volumes by 4.14 billion gallons. *See* 80 Fed. Reg. 77420, 77439 (Dec. 14, 2015). EPA could have reduced all but 180 million gallons of that amount using the full extent of its cellulosic-waiver authority. *See* JA__[AFPM_Comments_13]. Instead, EPA interpreted and applied the inadequate-domestic-supply waiver authority to reduce the overall standard by 500 million gallons. *ACE*, 864 F.3d at 701-02. This Court ruled EPA's interpretation impermissible and vacated the use of the inadequate-domestic-supply waiver for 2016 and remanded for further proceedings, but did not foreclose EPA's use of other waiver authorities to reach the same conclusion. *Id.* at 713.

Despite previously acknowledging the burdens it would impose, 87 Fed. Reg. at 39630, EPA again promulgated the supplemental standard, JA__[88_Fed._Reg._44509]. EPA rejected suggestions that it use its cellulosic or general waiver authority to lower the 2016 volumes as originally intended. JA__[88_Fed._Reg._44511]. EPA also rejected a request that 2015 and 2016 RINs could be used for compliance. JA__[REH_Company_Comments_1-4_EPA-HQ-

---

[6]    The parties briefed and argued the legality of the 2022 supplemental standard before this Court in *Sinclair Wyoming Refining Co. v. EPA* (No. 22-1210 and consolidated cases), and that issue remains pending.

OAR-2021-0427-0421]; JA__[88_Fed._Reg._44509]. EPA imposed the supplemental requirement as "additive to the 2023 total renewable fuel percentage standard," JA__[88_Fed._Reg._44509], *i.e.*, beyond volumes subject to the statutory factors analysis.

## SUMMARY OF ARGUMENT

I.    The applicable volumes in the 2023-2025 Rule violate the Clean Air Act and Regulatory Flexibility Act. These statutes provide substantive requirements EPA must consider.

A.    Both the historical implementation of the RFS—where annual volumes have been waived every year since 2010—and an application of the statutory factors to the state of the renewable fuel industry *today* must be EPA's touchstone for the "set" rule. EPA's Rule disregards the past performance and failures of the RFS as well as the entirely new statutory criteria Congress provided to set applicable volumes for 2023-2025. EPA also misinterpreted its statutory duty for 2023 and beyond as continuing Congress's pattern of annually-increasing applicable volumes beyond their statutory life. The statute contains no such mandate. Nevertheless, EPA inserted this aspirational extra-statutory factor into its review and arbitrarily and capriciously downplayed concerns regarding future production and cost. As a result, EPA promulgated unreachably high conventional and cellulosic biofuel mandates and artificially low advanced biofuel requirements, increasing cost without

increasing renewable-fuel production, and violating the Clean Air Act.

B.    EPA unreasonably relied on its RIN-cost-passthrough theory in a woefully inadequate review of the implementation of the program. EPA disregarded the past performance of the RFS program, and the result was a one-sided review that led to a Rule reflecting only EPA's policy goals, not reality, contrary to Congress's statutory design.

C.    EPA's continued misplaced reliance on the RIN-cost-passthrough theory led the Agency to violate the Regulatory Flexibility Act. Because the RFS *does* negatively affect many small refineries, EPA was bound to complete a full RFA analysis, but did not.

II.    EPA unlawfully struck the statutory leadtime requirement for promulgating set rules out of the Clean Air Act, and replaced it with this Court's accommodation for rulemaking in violation of statutory deadlines—that EPA "mitigates" the harm to obligated parties. But adequate leadtime *is* the "mitigation" Congress afforded obligated parties to balance against the burdensome requirements it imposed; the balance is now upset. Because EPA lacks the authority to rewrite the statute, the Court should reject the increased 2023 and 2024 standards on that basis alone. Regardless, EPA failed to reasonably mitigate the hardship to obligated parties by *increasing* 2023 and 2024 applicable volumes over the 2022 requirements, and over the proposal.

10

III.    For a second time, EPA unlawfully imposed a "supplemental" standard on obligated parties in 2023 in purported response to this Court's remand in *ACE*. EPA identified no authority in the statute to respond to a remand in this way, failed to ground its decision in any reasoned explanation and, for 2023, unlawfully predetermined the outcome in the 2020-2022 Rule. EPA also arbitrarily denied obligated parties the ability to use 2015 or 2016 RINs for compliance.[7]

For all these reasons, the Court should vacate the supplemental standard and remand the remainder of the Rule.

## STANDARDS OF REVIEW

"[A]gency action 'may not stand if the agency has misconceived the law.'" *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). To determine whether the agency got it right, courts begin with the text of the statute, *NetCoalition v. SEC*, 715 F.3d 342, 348 (D.C. Cir. 2013), exhausting all tools of statutory construction. Only "'when that legal toolkit is empty' may [the court] 'wave the ambiguity flag.'" *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 675 (D.C. Cir. 2019) (Williams, J. concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

---

[7]    American Fuel & Petrochemical Manufacturers does not join Argument §III.B.5.

11

Courts must also set aside EPA action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." §7607(d)(9)(A), (C). Arbitrary action includes "fail[ing] to consider an important aspect of the problem" and failing to articulate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (internal quotation marks and citation omitted).

## STANDING

As established in the administrative record, *e.g.*, JA__[Small_Refineries_Coalition_Comments_EPA-HQ-OAR-2021-0427-0811]; JA__[AFPM_Comments]; JA__[REH_Comments], Petitioners and their members[8] are "direct objects" of the challenged governmental action and therefore have Article III standing. *Monroe Energy*, *LLC v. EPA*, 750 F.3d 909, 915 (D.C. Cir. 2014). Petitioners likewise fall within the statute's zone of interests. *Nat'l Petrochem. & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147-48 (D.C. Cir. 2002).

---

[8] American Fuel & Petrochemical Manufacturers has associational standing to challenge the Rule, which imposes compliance obligations on their members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *e.g.*, JA__[Phillips_66_Comments_EPA-HQ-OAR-2021-0427-0684] (referencing AFPM comments), JA__[PBF_Energy_Comments_EPA-HQ-OAR-2021-0427-0606] (same).

## ARGUMENT

**I.    EPA's 2023-2025 Standards Misinterpret and Misapply Congress' Instructions for the Set Rule and Violate the Regulatory Flexibility Act.**

**A.    EPA's applicable volumes fail to reflect a lawful application of the statutory set criteria.**

EPA's general approach to the Set Rule was to continue where Congress left off, *i.e.*, to set applicable volumes as though the statutory volumes continued—and continued trending upward—forever. EPA claims that because Congress did not "rigidly mandat[e] the specific steps of analysis that EPA should take or how EPA should weigh the various factors" EPA enjoys "considerable discretion[.]" JA__[88_Fed._Reg._44476]. But Congress carefully circumscribed the analysis EPA was bound to conduct. And the Set Rule must still demonstrate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks and citation omitted). Here, such connection is sorely lacking, because the applicable volumes in the Set Rule are divorced from the set criteria, especially the factors regarding production rates and economic impacts. Because EPA prioritized its own policy over Congress' text, the Court should reject the Set Rule.

> *1.    EPA's Set Rule violates the plain text of the statute by incorporating an extra-statutory factor: a policy of prioritizing increased renewable-fuel volumes.*

In the set provision, §7545(*o*)(2)(B)(ii), "Congress directed EPA to consider the lessons learned from its retrospective 'review' of the program, [and] apply them

in its prospective 'analysis of' the six statutory factors[.]" *Alon*, 936 F.3d at 666 (citation omitted). This duty was carefully delineated: (1) "review … the implementation of the [RFS] program during [the] calendar years [2006-2022]"; and (2) analyze the "impact of renewable fuels" on a variety of statutory factors (*e.g.*, environment, energy security, infrastructure, cost to consumers, and "other factors, including job creation"), along with "the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category[.]" §7545(*o*)(2)(B)(ii). Five of the six statutory criteria require EPA to analyze "the impact of" renewable fuels, and include factors that could realistically weigh *against* forcing unrealistic renewable-fuel consumption (*e.g.*, the impact on infrastructure, cost to consumers, cost to transport goods, food prices), reinforcing that "Congress … did not pursue its purposes of increased renewable fuel generation at all costs." *ACE*, 864 F.3d at 714 (internal quotation marks and citation omitted).

Additionally, Congress included three fuel-specific instructions for set rules: (1) biomass-based diesel "shall not be less than" 1 billion gallons; (2) the percentage of advanced biofuel as a portion of total renewable fuel must be at least as high as it was in 2022; and (3) the volume of cellulosic ethanol must be set at a level that would not require EPA to later invoke its cellulosic waiver authority. §7545(*o*)(2)(B)(iii)-(v). In other words, Congress: (1) did not provide any direction that biomass-based diesel should increase aspirationally year-over-year; (2) capped

14

requirements for total renewable fuel based on the applicable volume of advanced biofuel appropriate using the statutory criteria, *see* JA__[88_Fed._Reg._44476] (conceding this effectively limits conventional renewable fuel); and (3) limited the applicable volume of cellulosic biofuel to that which may reasonably be projected to be produced. These fuel-specific requirements combined with the explicit six set criteria comprise "exhaustive instructions … [that] make it less plausible that Congress meant" for EPA to consider *other* factors when promulgating a set rule. *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023).

But instead of hewing to these "exhaustive instructions," *id.*, EPA unabashedly saw the Set Rule as a "policy tool" "to support ongoing growth in renewable fuels," and wielded that extra-statutory tool *in addition to* "consideration of the multiple factors" in the statute to require arbitrarily high volumes of conventional renewable fuel and cellulosic biofuel. JA__[88_Fed._Reg._44473]; *see also* JA__-__[88_Fed._Reg._44517-18].[9] Had Congress intended EPA to continue to mandate growth in the way attempted through 2022, it would have done so expressly. *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013). That

---

[9]    Yet EPA elsewhere concedes "the CAA does not require any increased volumes of renewable fuel after 2022[.]" *Coal. for Renewable Nat. Gas v. EPA*, No. 23-1248, Doc. 2004041 at 40-41 (EPA response brief).

Congress did *not* do that, but rather specified that EPA review the "implementation of the program" and criteria focusing on the "impact" of renewable fuels on a host of factors, indicates a focus on reality, not aspirational growth. JA__[AFPM_Comments_4-5]; *Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 479 (D.C. Cir. 2013) ("*API*") ("not … every constitutive element of the RFS program should be understood to individually advance a technology-forcing agenda"). Even if EPA could locate such a policy in the RFS generally, "a broad programmatic objective cannot trump specific instructions." *API*, 706 F.3d at 479. Moreover, the statute itself does not contain *any* statement of purposes; EPA's implication that they exist and that they overwhelm explicit statutory criteria is thus unlawful.

Ultimately, EPA relied on a factor—a policy of ever-increasing volumes of renewable fuel—that Congress did not intend the Agency to consider, *State Farm*, 463 U.S. at 43, and worse still, let that factor drive the outcome, as discussed further below.

> 2. *EPA's intentionally unachievable conventional-renewable-fuel requirement and artificially low advanced biofuel requirement fail to reflect a reasoned application of the set criteria.*

To set applicable volumes for 2023-2025, EPA established "candidate volumes" of individual renewable fuels to evaluate against the statutory factors. JA__[88_Fed._Reg._44480]. But the final applicable volumes used to derive the percentage standards for the Set Rule do not reflect this review. Instead, EPA applied

16

its extra-statutory factor of artificially forcing additional ethanol production to set applicable volumes divorced from reality.

a.    EPA used "candidate volumes for conventional renewable fuel … equal to [EPA's] projections of conventional ethanol consumption for 2023-2025," because the former comprises almost exclusively the latter. JA__[88_Fed._Reg._44493]. EPA set those volumes between 13.78 and 13.96 billion in 2023-2025, JA__[88_Fed._Reg._44493]. So far, so good. But from there, EPA set an "implied conventional renewable fuel volume requirement" of 15 billion gallons.[10] JA__-__[88_Fed._Reg._44516-17]. With a gap of over one billion gallons, this begs the question—*why* does EPA promulgate an "implied conventional renewable fuel volume requirement" of 15 billion gallons? EPA has no answer grounded in the statute or the statutory factors.

First, EPA lacks statutory authority to impose *any* "implied" conventional-renewable-fuel volume. EPA imported this concept from the no-longer-operative statutory volumes, where the 15-billion-gallon figure represented a *cap* on conventional renewable fuel (largely cornstarch ethanol) from 2015 to 2022, not a requirement.[11] Congress notably kept that volume flat while increasing the mandate

---

[10]    15.25 billion gallons for 2023, including the unlawful supplemental mandate.

[11]    *See* §7545(*o*)(1)(B)(i) (excluding "ethanol derived from corn starch" from "advanced biofuel"); §7545(*o*)(2)(B)(i)(I)-(II) (difference between total renewable

17

for advanced biofuels. §7545(*o*)(2)(B)(i) (flatlining both implied conventional-renewable-fuel volume from 2015 through 2022 and one-billion-gallon minimum of biomass-based diesel from 2012 onward, while increasing other fuel types); §7545(*o*)(2)(B)(iii) (requiring ratio of advanced biofuel to total renewable fuel is to be *at least* the same ratio as was present in 2022, which Congress expected to be 58%). EPA misinterprets the statute by assuming that Congress intended to keep that implicit 15-billion-gallon volume as part of the post-2022 rulemaking process, let alone make that "implicit" volume a "requirement."

Second, EPA explains that, consistent with its "policy" of ever-increasing volumes, EPA intends the conventional requirement to "provide ongoing incentive for the use of higher-level ethanol blends," JA__[88_Fed._Reg._44517], because EPA "continue[s] to believe that support for E15 and E85 is an important element of the RFS program." JA__[Response_to_Comments_(RTC)_95_EPA-HQ-OAR-2021-0427-1114]. But direction to provide incentives for the use of higher-level ethanol appears nowhere in the statute. Again, Congress made clear that *other* fuels were to increase proportionally as part of the renewable-fuel mix. §7545(*o*)(2)(B)(i), (iii).

---

fuel and advanced biofuel is 15 billion gallons). EPA will respond that the implied conventional requirement is not an implied *ethanol* requirement, which is technically true, but does not deny that ethanol comprises the overwhelming majority of the conventional requirement.

Third, EPA readily acknowledges that the 15-billion-gallon requirement for conventional renewable fuel cannot actually be met by conventional renewable fuel (including higher-level ethanol blends). JA__[88_Fed._Reg._44493]. Rather, EPA concedes that "*non*-ethanol renewable fuels" are what will "enable the total renewable fuel volume requirements to be met." JA__[88_Fed._Reg._44517] (emphasis added); *see also* JA__[RTC_95] ("most of the implied volume requirement for conventional renewable fuel that is above the E10 blendwall will be met with non-cellulosic advanced biofuel"). This disconnect belies the achievability of EPA's policy goal, even if it were lawful. AFPM and other commenters explained that it is unrealistic to continue to believe that the RFS can incentivize higher-ethanol blends, due to such factors as the low adoption of E85 and the flex-fuel vehicles that use it, and the lack of E15 infrastructure and consumer demand for the fuel. *E.g.*, JA__-__[AFPM_Comments_8-9]. EPA recognizes this in evaluating the implementation of the program, conceding that "[t]he E10 blendwall [the amount of ethanol typically present in gasoline] appears to have been a decisive factor in limiting growth in domestic consumption of ethanol." JA__[Regulatory_Impact_Analysis_(RIA)_29_EPA-HQ-OAR-2021-0427-1113]. Further, "higher-level ethanol blends (e.g., E15 and E85) have generally not been cost effective, even with the incentives provided by the RFS program." JA__[RIA_39]. EPA does not explain how 2023-2025 will somehow be different

given this past history where higher conventional mandates have, to date, been unable to spur the market for such fuel.

b.    Erring in the other direction with regard to advanced biofuel, EPA identified candidate volumes that ranged from 7.343 billion gallons to 8.547 billion gallons, but set applicable volumes between 5.94 billion gallons and 7.33 billion gallons. JA__[88_Fed._Reg._44496] (adding together cellulosic biofuel, biomass-based diesel, and other advanced biofuel); JA__[88_Fed._Reg._44518]. That is, EPA estimated candidate volumes for advanced biofuel that exceeded the final applicable volumes by more than *one billion gallons*. Befuddling on its own given EPA's preference for increased volume mandates (not to mention the statute's direction that advanced biofuel comprise *at least* a certain percentage of the total mandate), the reason behind this gap is revealed when considered in tandem with EPA's unlawful implied conventional requirement—EPA needs those surplus gallons to overcome the conventional-renewable-fuel shortfall of its own making. JA__[88_Fed._Reg._44516].

This decision compounded the harm from the conventional requirement, because by forcing advanced biofuel to backfill the conventional-renewable-fuel mandate the RIN prices converge, with ethanol RINs rising to meet the price of advanced biofuel RINs. JA__, __[AFPM_Comments_5-6, 9]; JA__, __[PBF_Comments_3,_9]; JA__[API_Comments_10 n.11_EPA-HQ-OAR-2021-

20

0427-0627] (citing economist study). The linking of advanced biofuel and ethanol RINs drives up the overall cost of compliance without material differences in the actual volumes of renewable fuel consumed. JA__[AFPM_Comments_9]. In other words, were EPA to retain the conventional-renewable-fuel candidate volume, while keeping the total renewable obligation the same, obligated parties would comply with the same volumes with less programmatic cost. EPA should be sensitive to the cost of compliance, since "cost to consumers" is one of the statutory factors, and obligated parties' costs ultimately impact the consumer. In fact, consumers could be forced to shoulder billions in additional costs to account for EPA's policy choice. *See* JA__[Monroe_Comments_8_EPA-HQ-OAR-2021-0427-0710].

Paradoxically, not only does EPA apparently not care about cost to consumers, EPA also responded that keeping "D6 [ethanol] RIN prices high" is a *feature*, not a bug, of the Set Rule, because EPA believes it "provid[es] a significant financial incentive for the growth of E15 and E85." JA__[RTC_66]. EPA has no reasoned basis for this belief, as it concedes that the ability of "the implied volume requirement for conventional renewable fuel to increase sales of E15 and/or E85 is … limited." JA__[RTC_66]. This concession is crucial, for it also reflects EPA's understanding that the intentionally too-high conventional-renewable-fuel requirement has had *no impact* on overall renewable fuel consumption. JA__[AFPM_Comments_9]. In sum, requiring advanced biofuel to make up for the

21

shortfall in ethanol increases costs to obligated parties (and according to EPA, consumers) without *any* corresponding benefit. EPA's failure to justify these applicable volumes is arbitrary and capricious.

> 3.    *EPA arbitrarily and capriciously set unreachably high applicable volumes for cellulosic biofuel.*

Congress intended cellulosic biofuel—a fuel that promised much lower greenhouse gas emissions than other renewable fuels—to increase from 100 million gallons in 2010 to 16 *billion* gallons by 2022. *See* §7545(*o*)(2)(B)(i). To put it mildly, things did not go as planned. EPA was forced to waive nearly all cellulosic biofuel volumes for the first ten years of the requirement and by 2022, cellulosic biofuel production had still not come close to reaching even one billion gallons. JA__[88_Fed._Reg._44481]. And EPA set applicable volumes for total U.S. renewable fuel consumption in 2022 at just 57% of the statutory target Congress set in 2007. *Compare* JA__[88_Fed._Reg_44498] *with* §7545(*o*)(2)(B)(i)(I) (36-billion-gallon target).

The Set Rule differs from prior years' rules for instead of waiving applicable volumes, EPA is setting those applicable volumes in the first instance. For cellulosic biofuel, Congress instructed EPA to presume it would *not* need to subsequently waive those volumes. §7545(*o*)(2)(B)(iv). This also means that EPA did not issue cellulosic waiver credits, rendering obligated parties—"captive consumers," in this Court's words, *API*, 706 F.3d at 480—without the compliance flexibility afforded in

22

prior years when both a cellulosic biofuel waiver and waiver credits were operative. §7545(*o*)(7)(D). In this way, this Court's instruction that EPA is to look at "what will *actually* happen" in the context of the statutory phrase "projected volume of cellulosic biofuel" at issue in *API*, 706 F.3d at 479, is just as applicable to the set rule framework, where EPA is to look at the "impact" of renewable fuels and their "expected annual rate of future commercial production", §7545(*o*)(2)(B)(ii). The main difference is that with the set rule framework EPA is *also* supposed to review what *has actually happened*. This makes it even more important than before that EPA take "neutral aim at accuracy" in setting the applicable volume for cellulosic biofuel. *API*, 706 F.3d at 476. EPA did not do so.

EPA proposed a candidate volume for cellulosic biofuel that reflected historical production rates, using a 13.1% growth rate for the majority of cellulosic biofuel, which represented year-over-year growth for the most recent 24-month period for which EPA had data. JA__-__[87_Fed._Reg._80592-93]. AFPM cautiously agreed with this approach for 2025 (not 2023-2024 for the reasons explained in Argument §II, *infra*). JA__[AFPM_Comments_12]. However, in the final Rule EPA took a dramatic turn—upward—applying instead a growth rate of 25%, encompassing a longer time period, 2015-2022. JA__[88_Fed._Reg._44483]. EPA claims that this growth rate balances out potential negative effects on growth from COVID. JA__[88_Fed._Reg._44483]. But EPA does not account for the

precipitous decline in growth rate that occurred *before* the pandemic. JA__[RTC_30]. Thus, the more likely rationale for the change is, once again, EPA's position to favor ever-increasing volumes. As explained above, because that position has no basis in the statute, the result is arbitrary and capricious.[12]

        4.     *EPA's arbitrary and capricious cost/benefit analysis undermines the Set Rule.*

EPA brushed off the exorbitant costs of the Set Rule, even though its costs "dwarf" the benefits EPA monetized. JA__[RIA_275]. EPA claims that it did not have enough time to quantify or monetize all costs/benefits. JA__[RTC_5]. But even for the analysis it completed, EPA admitted that "our assessment of costs did not yield a specific threshold value below which the incremental costs of biofuels are reasonable and above which they are not." JA__[88_Fed._Reg._44505].

EPA has known for well over a decade that it had a duty to promulgate its own applicable volumes before November 2021. Thus, the requirement for EPA to

---

[12]     This position has real-world effects. As it turned out, transportation fuel consumption in 2023 was higher than EPA estimated and cellulosic biofuel production could not keep up to achieve the amount required by the percentage standard—resulting in a 122.9-million-gallon shortfall. AFPM's Petition for Partial Waiver of the 2023 Cellulosic Biofuel Volumetric Requirements – Update (Mar. 4, 2024), https://www.epa.gov/system/files/documents/2024-03/afpm-2023-volume-waiver-2024-03-04.pdf. EPA did not "ensure" that the requirements it set could be met, because it set unreasonably high standards without a path to compliance. Obligated parties requested that EPA exercise its cellulosic waiver authority to reduce the applicable volume to the volume actually available in 2023, and concurrently make cellulosic waiver credits available for sale. *Id.*

assess costs can hardly be viewed as a surprise, particularly because the statutory factors are replete with references to impacts that directly or indirectly implicate a cost/benefit analysis. Most explicitly, EPA is to consider the impact on cost to consumers and cost to transport goods, and on the price of agricultural commodities and food. §7545(*o*)(2)(B)(ii)(V)-(VI). Cost considerations are also implicit in the energy security factor insofar as prices influences import/export considerations; and in the infrastructure factor, since prices also influence investment decisionmaking. §7545(*o*)(2)(B)(ii)(II), (IV). As such, EPA has no excuse for failing to develop a way not only to fully quantify impacts, but also to have those quantifications reflected in the applicable volumes. And yet, "societal costs" were anticipated to be $23.8 billion just from fuel in the 2023-2025 timeframe, compared with $513 million in energy security benefits and "illustrative" greenhouse gas emission reductions. JA__[RIA_v]. EPA's summary response that it "consider[ed] all statutory factors in this rulemaking, and … find[s] that the final volumes are appropriate under the set authority when [it] balance[d] all the relevant factors," JA__[88_Fed._Reg._44472], does not meaningfully engage with its own analysis. EPA has therefore failed to consider an important aspect of the problem, *State Farm*, 463 U.S. at 43, violating the "basic obligation … to conduct reasoned decisionmaking." *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (internal quotation marks and citation omitted).

**B.    EPA's "review of the implementation of the [RFS] program" erroneously relies on the RIN-cost-passthrough theory.**

The Clean Air Act requires that EPA "determine[]" the applicable volumes "based on", among other factors, "a review of the implementation of the [RFS] program[.]" §7545(*o*)(2)(B)(ii). Recognizing this obligation, EPA dedicated the first chapter of its regulatory impact analysis to such a review. JA__-__[RIA_1-61]. As part of that chapter, EPA included a section cataloging the transformation of the RIN system since its inception in 2010. JA__-__[RIA_37-44]. Most alarming is the change in the market cost of RINs to obligated parties, skyrocketing from "less than $0.05 per RIN" to "nearly $2 per RIN"—an increase of up to 3,900%. JA__-__[RIA_39-40]; *see also infra* at 42-43 (discussing EPA's indifference to increased RIN prices).

But notably absent from EPA's review is any discussion of the liquidity issues with and inefficiencies of the RIN market that have contributed to that price hike. Under EPA's watch, rules "setting annual volume obligations" have been chronically late, JA__[Coalition_Comments_2], like this Rule, *see infra* at 32-35, and the parties needing RINs can purchase them "only at very high cost[.]" JA__[Coalition_Comments_3].

EPA's obligation to "base[]" the volumes on a "review of the implementation of the program" is more than a mere "retrospective assessment." *See Alon*, 936 F.3d at 666; *AFPM*, 937 F.3d at 585. Setting volumes "based on" the implementation of

26

the RFS requires accounting for the problems that arose in past implementation and addressing them in volumes set today as EPA transitions the RFS from statutory volumes and waivers to the set criteria.[13]

EPA's volumes do not account for the past (and ongoing) problems in implementing the RFS program. EPA claims it does not have to, insisting that harms from its past implementation of the RFS program disappear because according to EPA's RIN-cost-passthrough theory, "all obligated parties, including small refineries, are able to pass through the costs of their RFS compliance" to their customers and therefore cannot "suffer disproportionate economic hardship caused by [RFS] compliance[.]" JA__[88_Fed._Reg._44520].

Throughout the Set Rule and the agency's response to comments, EPA uses RIN-cost passthrough like a magic wand, waving it around to dismiss any argument that the Rule will cause harm. EPA explicitly justifies the Rule by pointing to its passthrough theory more than 10 times. JA__[88_Fed._Reg._44505] ("[W]e have assumed that obligated parties pass through their RIN costs to consumers[.]"), JA__-__[88_Fed._Reg._44505],                          JA__-__[88_Fed._Reg._44520-21],

---

[13]    *See    Base    On*,    Oxford    Learner's    Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/base-on?q=base+on (accessed Mar. 20, 2024) ("to use an idea, a fact, a situation, etc. as the point from which something can be developed"); *Base*, Merriam-Webster Dictionary,   https://www.merriam-webster.com/dictionary/base#dictionary-entry-2 (accessed Mar. 20, 2024) ("to find a foundation or basis for").

JA__[88_Fed._Reg._44552], JA__[RTC_93] ("obligated parties recover the cost of the RINs they acquire in the sales price for the petroleum-based fuels they produce"), JA__[RTC_121], JA__[RTC_135], JA__[RTC_164], JA__[RTC_179], JA__-__[RTC_183-84], JA__[RTC_384]. For example, EPA refused to decrease its "implied volume requirement" for conventional renewable fuel, despite acknowledging that doing so would decrease the cost of RFS compliance and encourage investment "in low carbon fuels", because EPA "believe[d]" the net cost of compliance would be the same. JA__[RTC_121]. That could only be true if, as EPA assumes, all "obligated parties recover the cost of RINs through their [fuel] sales[.]" JA__[RTC_121]. But EPA's theory is not a magic wand; its application has been found to be "flawed" and arbitrary and capricious, and is therefore not a valid basis to determine volume obligations.

GAO found that EPA's passthrough theory relied on a "flawed assumption and an incomplete assessment." JA__[GAO_Report_9]. As to flawed assumptions, EPA's theory unreasonably assumed that all parties pay and receive the same price for RINs, but EPA did not analyze the RIN market transaction data in its exclusive possession to test that hypothesis. JA__[GAO_Report_67]. When GAO examined the data, it determined that EPA's assumption is empirically false. JA__[GAO_Report_10]. The data show that some "smaller buyers pay more, and smaller sellers receive less, when buying or selling RINs compared to larger buyers

28

and sellers." JA__[GAO_Report_67].

As to the incomplete assessment, GAO faulted EPA for relying on studies regarding RIN-cost passthrough in only a few markets "to draw conclusions about additional markets that were not examined in those studies." JA__[GAO_Report_10]. Given the "important limitations" of these studies and EPA's failure to "systematically analyze th[e] small markets" at issue, "EPA does not have assurance" that its passthrough theory is "based on quality information" and "risks inappropriately denying valid exemption petitions." JA__-__[GAO_Report_11-13]. Obligated parties raised GAO's findings in their comments to the Rule and included GAO's report in the record. *E.g.*, JA__-__[Coalition_Comments_5-6].

EPA responds to criticisms of its passthrough theory by asserting that they are "beyond the scope of this rule" but that, even if they were not, "EPA has addressed the findings of the GAO report" in a report of its own, and that settles the matter. JA__-__[RTC_135-36]. Taking those responses in turn, neither is persuasive.

It is difficult to see how EPA's RIN-cost-passthrough theory can be beyond the scope of this Rule. EPA explicitly based the Rule on the assumption that all "obligated parties recover the cost of RINs through their [fuel] sales[.]" JA__[RTC_121]. And EPA defended the Rule by repeatedly relying on its passthrough theory. JA__[RTC_93], JA__[RTC_135], JA__[RTC_164],

29

JA__[RTC_179], JA__-__[RTC_183-84], JA__[RTC_384]. EPA cannot justify this Rule without proving the validity of its RIN-cost-passthrough theory.

And EPA's attempt to address the GAO report's findings failed to actually support its theory. EPA's subsequent RIN price analysis—which used cherry-picked data from an unidentified subset of small refineries and then excluded actual market transactions it labeled as "outliers"—shows that many small refineries pay 7.5% more for RINs compared with the daily average price. JA__-__, __[EPA_RIN_Price_Analysis_1-3,_9_EPA-HQ-OAR-2021-0427-1020].    That percentage could be higher for any particular refinery. And on top of paying more for RINs, EPA found that the small refineries studied must sell their RINs for less. JA__[EPA_RIN_Price_Analysis_10]. EPA's self-serving analysis does not even support its passthrough theory for the subset of small refineries it studied.

Since EPA issued this Rule, the Fifth Circuit reviewed EPA's denials of certain small refinery exemptions based on its RIN-cost-passthrough theory. *Calumet Shreveport Refin., L.L.C. v. EPA*, 86 F.4th 1121 (5th Cir. 2023). The court held that EPA's finding "that all refineries can completely pass on their RIN costs" was not only wrong but "so implausible" that "it cannot be ascribed to a difference in view or agency expertise." *Id.* at 1140. The Court reached that conclusion without even needing to consider the GAO's findings and EPA's response, which are in the record here. *Id.* at 1141 n.44. Thus, EPA cannot reasonably rely on its passthrough

theory as a basis or justification for this Rule.

In sum, EPA did not set these volumes "based on" the implementation of the RFS program, as the statute requires, because EPA failed to account for how the program has actually been implemented. And EPA's volumes "determin[ation]" is not saved by its repeated reliance on the "implausible" RIN-cost-passthrough theory. The volumes must therefore be set aside. *See* §7545(*o*)(2)(B)(ii).

### C.    EPA's misplaced reliance on the RIN-cost-passthrough theory violates the Regulatory Flexibility Act.

The Regulatory Flexibility Act requires agencies "to carefully consider the economic impacts that [their] rules may have on small entities." JA__[RIA_462]. Specifically, an agency must "prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements … unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities[.]" JA__[RIA_462]; 5 U.S.C. §§603–604, 605(b). This requirement "ensure[s] that concerns regarding small entities are adequately considered during the development of new regulations that affect those entities[.]" JA__[RIA_462].

Here, EPA performed a "screening analysis" to determine whether any small entities would be negatively affected by the Rule, which would require EPA to perform a full regulatory flexibility analysis. JA__-__[RIA_462-65]. EPA concluded that the rule would have *no effect* on small entities and that no regulatory

31

flexibility analysis was necessary. JA__-__[RIA_465]. That conclusion is wrong.

EPA reached its conclusion by "compar[ing] [obligated parties'] cost of compliance with the ability for the obligated parties to recover these compliance costs through the higher prices for the gasoline and diesel they sell" to their customers. JA__[RIA_464]. In other words, EPA's *sole* basis for determining that the Rule does not negatively affect small refineries and other small obligated parties is the agency's "implausible" RIN-cost-passthrough theory. Accordingly, EPA's screening analysis is valid only if "obligated parties have been shown to recover their RFS compliance costs through the resulting higher market prices for their petroleum products" and "there are *no net costs* of the rule on small businesses"— "a cost-to-sales ratio of *0.00%*." JA__[RIA_465] (emphasis added). For the reasons already discussed—including EPA's own finding of a 7.5% average net cost to many small refineries, JA__, __[EPA_RIN_Price_Analysis_1,_9]—the passthrough theory does not support EPA's conclusion.

Because the Rule will "have a significant economic impact on a substantial number of small entities," 5 U.S.C. §605(b), EPA was required to perform a full regulatory flexibility analysis. The Rule must be remanded for that analysis.

II.    **EPA Violated the Statutory Requirement to Promulgate 2023 and 2024 RFS Standards 14 Months Before the Requirements Take Effect and Failed to Mitigate the Harm It Caused.**

A.    **EPA's continued failure to meet statutory deadlines effectively rewrites the statute.**

EPA violated the statutory deadline to establish volume requirements twice over. The statute requires volumes for years after 2022 to be determined "no later than 14 months before the first year" for which the volume requirement will apply. §7545(*o*)(2)(B)(ii). Although EPA was required to promulgate volume requirements by October 2021 for the 2023 RFS compliance year and October 2022 for the 2024 RFS compliance year, EPA flouted these deadlines by 21 months and 9 months, respectively. In fact, EPA did not issue *any* standards for 2023 until July 2023, over halfway through the 2023 compliance year and less than 6 months before the start of the 2024 compliance year, completely undermining its claim that "[p]romulgating standards for three years in a single action … increases the likelihood that we can meet the statutory deadline to promulgate applicable volumes by 14 months prior to the beginning of the calendar year." JA__[88_Fed._Reg._44477].

EPA relies on judicial precedent to justify its non-compliance with statutory mandates, citing *ACE* as permitting retroactive and late RFS standards "so long as EPA" acts "reasonably." JA__[88_Fed._Reg._44478]. *ACE*, in turn, referenced two decisions of this Court concerning *other* late RFS rulemakings: *National Petrochemical & Refiners Association v. EPA*, 630 F.3d 145 (D.C. Cir. 2010) and

33

*Monroe Energy*, 750 F.3d 909. But unlike the rule at issue in *NPRA*, the Rule does not involve an instance where "the deadlines … were likely unrealistic." 630 F.3d at 156. And unlike *Monroe*, where this court indicated that obligated parties "had long been aware of the applicable volumes prescribed in the statute" and "could readily have estimated their respective obligations using [Energy Information Administration ("EIA") projections]," 750 F.3d at 920, neither factor applies to this rulemaking, given the absence of both statutory volumes and relevant EIA projections.[14] Finally, while the *ACE* Court allowed EPA some leeway in issuing a late and retroactive rules, it "is not unlimited." 864 F.3d at 718. And *ACE* considered a rule promulgated at a time when statutory volumes were operative for three of the four renewable fuels. Now, by contrast, statutory volumes no longer exist for *any* fuel, making the statutory deadlines crucial for the RFS program to operate effectively.

Evidently, EPA's extra-statutory behavior was norm during the first phase of the RFS program. But by applying this dilatory and destructive practice in the second phase of the RFS program, EPA has effectively, and unlawfully, treated this Court's prior decisions as a get-out-of-jail-free card, rendering statutory deadlines a dead-letter even where the Agency had more than sufficient time to comply. EPA had *14*

---

[14]     Because EIA estimates are only required through 2021, EPA states that "[o]n its face, this language does not apply to rulemakings establishing obligations for years subsequent to 2022." JA__[88 Fed. Reg. 44478].

*years* prior notice (dating from the amendment of the RFS in 2007) to prepare for the time that it would need to set standards for all four renewable fuels beginning in 2023. In the Rule, EPA offers no explanation as to *why* it was late, only stating that it is "exercising *our authority* to set the applicable renewable fuel volume requirements … after the statutory deadline[.]" JA__[88_Fed._Reg._44478] (emphasis added). But as EPA well knows, "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). The requirement for 14 months' notice could hardly be a "clear[er] statutory term[]." *Id.*

While this Court has previously extended EPA considerable latitude regarding RFS deadlines, that precedent cannot be a blank check. The Court should now make clear that such latitude—or, in EPA's words, its "authority" to violate the statute— is not unbounded. At some point, EPA—and this Court—must give the statutory deadlines meaning.

**B.     EPA failed to mitigate hardship to obligated parties.**

EPA further failed even to meet this Court's minimal requirement of "mitigat[ing] any hardship" to obligated parties with the late 2023 and 2024 volume requirements. *ACE*, 864 F.3d at 718. Obligated parties could not have anticipated how EPA might apply the set criteria, for how many years EPA would set RFS standards, nor how EPA would change its methodology to promulgate standards

35

from the methods used for 2010-2022. JA__[AFPM_Comments_7]. Accordingly, AFPM advocated that EPA should set the 2023 and 2024 volume requirements no higher than the volumes finalized for the 2022 standard, the last year that EPA promulgated an RFS implementation rule. JA__[AFPM_Comments_7]. This remedy would provide both a "floor" level of demand for renewable fuel producers and at the same time represent the most recent volume requirements for which obligated parties had notice and could plan compliance.

EPA dismissed AFPM's concerns and set the 2023 and 2024 standards at over 300 million and 900 million gallons higher than the 2022 standard, respectively. JA__[88_Fed._Reg._44470]. EPA claimed it "considered similar factors" to those relied on by this Court in *ACE* to uphold the 2014-2017 biomass-based diesel volumes, including the amount of leadtime provided to obligated parties and the availability of RINs for compliance. JA__[RTC_3]; JA__[88_Fed._Reg._44478]. EPA failed to acknowledge, however, the significant differences between the Rule and the 2014-2017 biomass-based diesel volume requirements at issue in *ACE* that make compliance for obligated parties significantly more burdensome, chief among them a greatly reduced volume of carryover RINs. *See, e.g.*, JA__[88_Fed._Reg._44471] (acknowledging "effectively no available carryover RINs for several renewable fuel categories going into the 2022 compliance year"). Given these differences, EPA was required to do more than it did in *ACE* to minimize

the burden of compliance, rendering the Rule arbitrary and capricious.

First, whereas EPA failed to meet the 14-month leadtime requirement for only biomass-based diesel in *ACE* (the only category of renewable fuel subject to the requirement at the time)*,* in promulgating the Rule it missed the deadline for *all four* renewable-fuel categories, compounding hardship for obligated parties. This is particularly so for cellulosic biofuel, since unlike other categories only cellulosic biofuel can satisfy that standard and, for the first time, no cellulosic waiver credits were available.

Second, the obligated parties in *ACE* had at least some statutory notice of the final volume requirements for biomass-based diesel given its statutory minimum annual volume of 1 billion gallons. §7545(*o*)(2)(B)(v). The statute does not, however, prescribe a floor or provide any other information concerning volumes for cellulosic biofuel, non-cellulosic advanced biofuel, or conventional renewable fuel after 2022. §7545(*o*)(2)(B)(i)(I)-(IV). Obligated parties were essentially left in the dark concerning required volumes until the Agency proposed and finalized the 2023 and 2024 standards. The 14-month leadtime requirement is thus all the more notable and central to the statutory scheme for "set" standards in the second phase of the RFS, whereas pre-2023 standards were subject only to a two-month leadtime requirement. *Compare* §7545(*o*)(2)(B)(ii) *with* §7545(*o*)(3)(A).

Third, EPA's delay in promulgating the Rule was more egregious than in

*ACE*, as was the substantive outcome. In *ACE*, this Court found that although the final biomass-based diesel volume requirements for 2016 and 2017 were each 100 million gallons more than the proposed requirements, such increase and the Agency's delay did not meaningfully affect obligated parties' ability to comply because the Rule was promulgated 15 months before the compliance deadline for 2016, and 13 months before the 2017 compliance year began. *ACE*, 864 F.3d at 722. Here, volumetric increases were proportionally much greater than the biomass-based diesel increases at issue in *ACE*: for example, EPA finalized an increase for cellulosic biofuel in 2023 that was 210 million ethanol-equivalent gallons over 2022's requirement of 630 million ethanol-equivalent gallons, and for 2024, *460 million* more. JA__[88_Fed._Reg._44518].

EPA also promulgated the Rule with much less leadtime (none, in the case of 2023), finalizing it less than nine months from the compliance *deadline* for 2023 and just six months before the start of the 2024 compliance year. EPA cites this nine-month timeframe for 2023—and even the time since the proposal's issuance—as though that were "mitigation." JA__[88_Fed._Reg._44479]. Setting aside the sufficiency of a proposal as "notice," as AFPM explained, when EPA misses a statutory deadline, "the opportunity to react to increases in obligations is extremely limited." JA__[AFPM_Comments_7]. The deadline to demonstrate compliance matters little if the market lacked sufficient notice to produce the required renewable

fuel quantities *during the compliance year*—as it did here for 2023, where the rule was not only late, but partially retroactive. *See In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353-54 (D.C. Cir. 1986) (when "Congress create[s] a specific deadline … to provide the industry with … leadtime", missing it can be "detrimental" because industry "cannot plan ahead and ensure compliance"). The 2023 and 2024 Standards violate a clear statutory command and are arbitrary and capricious.

## III.    EPA Unlawfully Imposed a Predetermined "Supplemental" Standard on Obligated Parties in Response to this Court's Remand in *ACE*.

For the second time, EPA mandated a "supplemental" addition of 250 million gallons of renewable fuel to the total renewable fuel requirement. EPA claims to do this because this Court ruled that EPA "inappropriately waived" 500 million gallons from the 2016 standard. JA__[88_Fed._Reg._44510]. But the Court never addressed EPA's *substantive* conclusion that prompted the waiver. Rather, the Court "vacate[d] EPA's decision to reduce the total renewable fuel volume requirements for 2016 through use of the 'inadequate domestic supply' waiver" because EPA misinterpreted that provision. *ACE*, 864 F.3d at 713. And, the Court suggested that EPA could consider applying other statutory authorities, including the severe economic harm waiver. *Id.* at 712. The Court should reject EPA's misguided response to the remand.

A.    **EPA failed to identify statutory authority for the supplemental mandate.**

EPA purports to locate authority for the 2023 supplemental mandate in its original authority to establish the 2016 standard and to "'ensure' that the volume requirements 'are met.'" JA__[88_Fed._Reg._44510]; *see also* JA__[RTC_138]. But EPA's arguments lack statutory foundation. The RFS has safety valves to grant relief from its requirements, *e.g.*, §7545(*o*)(7), but no mechanisms to ratchet *up* volumes in a subsequent year for "missed" volumes. And EPA has continuously relied on this absence of an upward ratchet to (rightly) decline to make after-the-fact adjustments. *E.g.*, JA__[2020-2022_RTC_139]. At a minimum, EPA's decision to require a supplemental standard in 2023 for 2016 volume requirements is thus an inadequately explained departure from prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

B.    **The supplemental standard is arbitrary and capricious.**

Far from providing a "meaningful remedy" for the Court's remand, JA__[88_Fed._Reg._44509], EPA arbitrarily and capriciously addressed only the superficial *result* of its error, not the cause. Moreover, EPA failed to adequately consider whether it made sense to issue this *second* supplemental standard in light of the distinct context of the Set Rule—instead, EPA let its reasoning for the 2022 Standard control the outcome here.

40

*1.    The 2023 supplemental standard was unlawfully predetermined.*

Strikingly, EPA did not even pretend to independently review the propriety of

a 250-million-gallon supplemental standard for 2023:

> We maintain the same views on the alternatives, including the alternatives identified by commenters, discussed in [the 2022 RFS] rulemaking[.] … In particular, because we have already begun our response by imposing a 250-million-gallon supplemental standard in 2022, consideration of any other alternatives is evaluated in light of that partial response.

JA__[88_Fed._Reg._44509]. In other words, because EPA had issued a 250-million-

gallon supplemental standard in 2022, any other future action would need to

overcome the inertia of EPA's prior decision. Confirming the 2023 supplemental

standard as a *fait accompli*, EPA stated that "[r]eversing course mid-way through

EPA's response to the *ACE* remand … would require consideration of the impacts

on the market and market participants." JA__[RTC_144]. But EPA's stated intent to

impose a supplemental standard in 2023 is not a regulation. And EPA often changes

applicable volumes between proposed and final rules without concern for "impacts

on the market and market participants"—EPA has not explained why the 250-

million-gallon supplemental requirement must be different. EPA must justify the

"impacts on the market and market participants" of *this year's* supplemental

standard, but failed to do so. Because EPA had already decided to issue the 2023

supplemental standard, it did not sufficiently consider this year's record, including

the dearth of available RINs for compliance. *See supra* p.36. Once again, EPA

reached a conclusion that lacks a connection between the facts found and the choice made. *State Farm*, 463 U.S. at 43.

> 2.    *EPA failed to justify the supplemental standard approach.*

When EPA considered how to respond to this Court's remand in 2019, it recognized that a supplemental standard would "impose a significant burden on obligated parties", without "any corresponding benefit" and that it would "be unduly burdensome and inappropriate" to impose a higher standard. 87 Fed. Reg. at 39630. EPA had it right in 2019.

Most obviously, adding volumes to one year to make up for another cannot prompt more biofuel blending *in 2016*, as EPA acknowledges. JA__[RTC_140]. EPA claims incentivizing renewable fuel use in the abstract is sufficient. JA__[RTC_144]. But that approach contravenes Congress' framework of annual percentage standards and waivers based on careful consideration of existing market and other factors at the time of rulemaking. EPA thus ignored central aspects of the problem in analyzing how to respond to the remand. *State Farm*, 463 U.S. at 43. This is especially arbitrary since EPA locates its authority to promulgate the supplemental standard in its original authority to promulgate a standard *for 2016*, JA__[88_Fed._Reg._44510], while claiming that it is treating the supplemental standard "like all other 2023 standards in all respects," JA__[88_Fed._Reg._44509]. EPA's justification is thus far from reasonably explained.

42

3.    *EPA ignored the mandatory statutory criteria in promulgating the supplemental standard.*

EPA claims to have considered the "obligation to respond to the *ACE* remand" as part of its evaluation of "other factors" for the Set Rule as instructed by section 7545(*o*)(2)(B)(ii)(VI). But this claim strains credulity (and undermines the credibility of EPA's explanations throughout), since for 2023, EPA expressly acknowledged that it did *not* include the supplemental mandate in its analysis of the statutory factors. JA__[RIA_109]. In fact, EPA asserts—without any justification or legal foundation—that those factors "do not apply to the 250-million-gallon supplemental volume requirement for 2023[.]" JA__[RIA_109]. EPA cannot so easily avoid the statutory mandate. As EPA takes pains to reiterate, the supplemental mandate is fully part of the 2023 Standard "in all respects." JA__[88_Fed._Reg._44509]. As such, EPA was bound to promulgate any "supplemental" standard within the statutory confines Congress prescribed in §7545(*o*)(2)(B)(ii). Commenters explained why an evaluation against the statutory factors was important—if nothing else, excluding the supplemental volume, and thus its impact, from the "candidate volumes" when analyzing the anticipated rate of future production is nonsensical. JA__[AFPM_Comments_14]. EPA's failure to evaluate the statutory factors is not only arbitrary and capricious, it is "in excess of statutory … authority [and] limitations[.]" §7607(d)(9)(C).

43

### 4.    *EPA failed adequately to consider other options on remand.*

Obligated parties explained to EPA that it had other options besides the blunt instrument it chose. *E.g.*, JA__[AFPM_Comments_15]. EPA claims to have "carefully considered" these alternatives, JA__[88_Fed._Reg._44511], but EPA's response to comments for 2023-2025 is largely a cut-and-paste of how EPA inadequately responded in 2020-2022. *Compare* JA__-__[RTC_137-144] *with* JA__-__[2020-2022_RTC_147-154_EPA-HQ-OAR-2021-0427-0045].

*First*, EPA could have acknowledged that there is no action that it could take to encourage more production in 2016 since the year is over, and clarified that it would not incorporate demand-side considerations into a future finding of inadequate domestic supply. This would have reflected its reasoning in the 2020 proposed rule, and reality.

*Second*, on remand EPA could have invoked the full extent of its cellulosic-waiver authority to lower the total renewable fuel standard for 2016 by 380 million of the total 500 million gallons at issue in the 2016 remand. JA__[AFPM_Comments_15]. This approach would have addressed the very real constraints EPA identified in 2016, and would have been consistent with EPA's ability to maximize the cellulosic-waiver authority. *ACE*, 864 F.3d at 733 (explaining that EPA's cellulosic-waiver authority encompasses a broad range of considerations). EPA's choice to instead impose a supplemental standard of

hundreds of millions of gallons 2023 ignores the Agency's prior reasoning and belies a meaningful response to this Court's remand. The entire purpose of this "supplemental" standard is purportedly to "ensure" volumes allegedly "inappropriately" waived in 2016 are met. Ignoring the reason for the waiver in the first place is not a "meaningful" response to this Court's decision.

Further, EPA cannot contend it is "responding to the Court's decision in *ACE* regarding the proper interpretation of 'inadequate domestic supply[.]'" JA__[RTC_138]. This Court did not interpret "inadequate domestic supply;" it rejected EPA's interpretation. *ACE*, 864 F.3d at 713. Ordinarily, when a court remands an agency action, the agency fixes the error in that action. Rather than reassess the meaning of "inadequate domestic supply" or evaluating whether the rule could be supported in a different way, EPA behaves as though the Court reached a conclusion about the amount of fuel waived. But the Court did not determine *whether* EPA's decision to waive volumes was correct—it only adjudicated *how* EPA justified it. EPA sidestepped that entire aspect of the problem. JA__-__[RTC_138-42].

*Third*, EPA could have re-interpreted "inadequate domestic supply" to justify its original 2016 conclusion. EPA declined to invoke the cellulosic waiver to its full extent because that "level of reduction [was] insufficient to address all of the supply limitations associated with total renewable fuel." 80 Fed. Reg. at 77434. While this

45

Court ruled that EPA erred in considering certain demand-side factors as part of those stated "supply limitations," EPA did not attribute particular fuel volumes to specific limitations, but identified a range of factors affecting supply. *See id.* at 77451-52. EPA has yet to articulate how it might have evaluated those factors differently given that ruling.

At bottom, an increase in the 2023 standard because of EPA's mistakes in 2016 is not a "narrow[]" response to this Court's remand as EPA contends, JA__[RTC_144], and deserves no deference in any event, *University of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002).

### 5. *EPA arbitrarily refused to allow use of 2015 or 2016 RINs for compliance with the supplemental standard.*[15]

The express purpose of the 2023 supplemental standard (together with the 2022 supplement) is to "meaningful[ly] remedy" EPA's unlawful use of the "inadequate domestic supply general waiver" to reduce biofuel requirements for 2016 by 500 million gallons. JA__[88_Fed._Reg._44509]. The premise of the supplemental standard is that the 2016 waiver resulted in a 500-million-gallon reduction in demand for biofuels—essentially, "undercompliance" in that year that must now be remedied. JA__[RTC_146]. However, EPA admits that "the market overcomplied with the 2016 standards," JA__[RTC_147], a fact supported by EPA

---

[15]     American Fuel & Petrochemical Manufacturers does not join this argument.

data showing there are 39 million unused 2015 and 2016 RINs that represent biofuel produced and consumed but never redeemed for compliance in those years. JA__[REH_Comments_2n.2].

Comments proposed that EPA allow obligated parties to choose to comply with a supplemental standard for either 2016 or 2023. JA__[REH_Comments_1-4]. Although EPA suggests this alternative is a "complicated solution" that would benefit only REH, JA__[RTC_148], REH holds only a modest number of the available RINs: 2015 RINs (i) that REH retired before EPA granted its 2016 small-refinery exemptions and (ii) that EPA returned after it was too late to sell them to anyone who could use them. JA__[REH_Comments_2-3]. While small refineries exempted from 2016 compliance would not be obligated on any supplemental gallons added to the 2023 volumes, allowing non-exempt parties to use valid 2015 or 2016 RINs would reduce the burdens of the supplemental standard, rather than requiring parties who *already spent resources* on these RINs to pay for duplicate RINs to comply with a 2023 standard. JA__[REH_Comments_2-3]. And it would reduce reliance on additional imports of foreign biofuels, thereby furthering the statutory goals related to American energy independence and security. JA__[REH_Comments_3] (citing 86 Fed. Reg. 72436, 72461 (Dec. 21, 2021)). None of the reasons EPA gave for rejecting REH's request are persuasive.

     a.    EPA argues that 2015-2016 RINs are expired or may be otherwise

invalid, JA__[RTC_146-48], but as EPA already recognized, the Agency's regulations allow 2015-2016 RINs to be used for *2016 compliance*. 86 Fed. Reg. at 72459. REH does not ask EPA to "expand the lifespan" of these RINs so they can be used for *2023* compliance, JA__[RTC_149], but rather to give obligated parties the option of complying with a 2016 standard using these RINs. JA__[REH_Comments_3].

It is untrue that EPA has "little or no ability to verify" the validity of 2015 and 2016 RINs. Each unique "Renewable Identification Number" is traceable in EPA's electronic reporting system. In REH's case, that system shows that EPA accepted its RINs for compliance in 2016 before refunding them, making it obvious that these particular RINs were not "improperly generated[.]" JA__[RTC_147]. In any case, EPA's expressed concerns are unfounded. Just as it would be illegal to submit invalid 2023 RINs for the 2023 supplemental standard, it would be illegal to submit invalid 2015 or 2016 RINs to comply under this alternative. If companies chose not to use invalid 2015 or 2016 RINs in 2016, there's no reason to believe they would do so now.

b. In rejecting the proposed option, EPA makes much of the supposed "resource burdens" associated with REH's approach, but it makes no effort to weigh these burdens against the tens of millions of dollars at stake for obligated parties. JA__[RTC_147]. EPA asserts that this alternative would necessitate "reopening"

48

2016 compliance with "cascading impacts." JA__[RTC_147]. But EPA can't say for certain that it would need to reopen compliance for later years—only that this may be "likely." JA__[RTC_149]. EPA also says REH's proposal would require updates to its electronic system and changes to recordkeeping, attest requirements, and forms, but there is nothing in the record to suggest that the cost of doing so would be significant enough to outweigh the benefits to obligated parties. JA__[RTC_147-49]. And in any case, the fact that systems, regulations, and forms *EPA* controls "[are] not set up to handle" this alternative is hardly dispositive. JA__[RTC_147]. "[M]ere[] administrative convenience" does not justify ignoring otherwise valid unretired 2015 and 2016 representing the very volumes it claims must be replaced. *Cf. EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 604 (1981). Moreover, EPA admits that allowing obligated parties to choose to comply with either a 2016 or a 2023 supplemental standard (rather than mandating one industry-wide approach) would avoid its administrative concerns. JA__[RTC_147].

     c.     EPA attempts to blame REH for making the "business decision" to retire these RINs instead of carrying forward a deficit while it waited for EPA to decide its small-refinery exemption petition. JA__[RTC_148]. True, the deficit carryforward is *an option*, but it also represents a gamble that poses great risks to any refinery waiting for EPA to act on an exemption petition. If a company chooses this option and EPA ultimately denies the petition, the company's deferred

compliance costs could be even higher, exacerbated by perhaps dramatically inflated future RIN prices. In any case, a refinery's choice to decline a regulatory option does not relieve EPA of its obligation to engage in reasoned decisionmaking.

d.     EPA also insists its approach "provides certainty to obligated parties and the market, and encourages the use of any carryover RINs at the time of compliance, such that RINs are not left stranded and unused." JA__[RTC_146]. But the uncertainty regarding the status of REH's 2015 RINs is entirely of EPA's own making. This court faulted *EPA* for improperly using its general waiver authority and it was *EPA* that returned REH's valid 2015 RINs to the company only after they were "stranded and unused." *See* JA__[REH_Comments_2-3]. EPA claims parties like REH had notice as far back as 2019 that they should not retain these RINs, JA__[RTC_146], but by 2019, REH's 2015 RINs had long-since been stranded by EPA. That fact makes it equally unreasonable for EPA to assert that the "overcompliance" that unused 2015 or 2016 RINs represent has already been "addressed through the availability of carryover RINs[.]" JA__[RTC_147]. Through no fault of its own, REH has no "opportunity to sell or retire" these excess RINs "ahead of their expiration[.]" JA__[RTC_147].

"To survive arbitrary and capricious review, … an agency decision must be 'reasonable and reasonably explained.'" *ACE*, 864 F.3d at 735 (citation omitted). The supplemental standard's compliance mechanism is neither.

50

## CONCLUSION

The Rule is unlawful. This Court should (1) remand the 2023-2025 standards for revision in accordance with this Court's opinion, including an instruction to set standards for 2023 and 2024 no higher than the 2022 standard; and (2) vacate the supplemental standard.

March 22, 2024

Respectfully submitted,

*/s/ Brittany M. Pemberton*
Jeffrey R. Holmstead
Brittany M. Pemberton
BRACEWELL LLP
2001 M Street N.W.
Suite 900
Washington, D.C. 20036
(202) 828-5800 (telephone)
(202) 857-4812 (facsimile)

*Counsel for Petitioners Sinclair
Wyoming Refining Co. LLC and
Sinclair Casper Refining Co. LLC*

*/s/ Jonathan G. Hardin*
Jonathan G. Hardin
LeAnn Johnson
Alexandra Magill Bromer
PERKINS COIE LLP
700 Thirteenth Street, N.W.,
Suite 800
Washington, D.C. 20005
(202) 654-6200

*Counsel for Petitioners Small
Refineries Coalition; Countrymark
Refining and Logistics, LLC; The*

*/s/ Robert J. Meyers*
Robert J. Meyers
Elizabeth B. Dawson
Lynn Phan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2789
rmeyers@crowell.com

Richard S. Moskowitz
Tyler Kubik
American Fuel &
Petrochemical Manufacturers
1800 M Street, NW
Suite 900 North
Washington, DC 20036
(202) 844-5474

*Counsel for Petitioner American Fuel &
Petrochemical Manufacturers*

*San Antonio Refinery LLC; and*
*Wynnewood Refining Company, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's briefing order because this brief contains 10,968 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

 Dated: March 22, 2024                            */s/ Robert J. Meyers*
                                                  Robert J. Meyers

53

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2024, I have caused the foregoing to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Robert J. Meyers*
Robert J. Meyers

# **ADDENDUM**

# TABLE OF CONTENTS

**Addendum Page**

**Statutes**

42 U.S.C. §7545(*o*) ...............................................................................................1

42 U.S.C. §7607 ...................................................................................................10

**Regulations**

40 C.F.R. §80.1407 ..............................................................................................15

shall take effect no later than November 1, 1992 (or at such other date during 1992 as the Administrator establishes under the preceding provisions of this paragraph). For other areas, the revision shall provide that such requirement shall take effect no later than November 1 of the third year after the last year of the applicable 2-year period referred to in paragraph (1) (or at such other date during such third year as the Administrator establishes under the preceding provisions of this paragraph) and shall include a program for implementation and enforcement of the requirement consistent with guidance to be issued by the Administrator.

**(3) Waivers**

(A) The Administrator shall waive, in whole or in part, the requirements of paragraph (2) upon a demonstration by the State to the satisfaction of the Administrator that the use of oxygenated gasoline would prevent or interfere with the attainment by the area of a national primary ambient air quality standard (or a State or local ambient air quality standard) for any air pollutant other than carbon monoxide.

(B) The Administrator shall, upon demonstration by the State satisfactory to the Administrator, waive the requirement of paragraph (2) where the Administrator determines that mobile sources of carbon monoxide do not contribute significantly to carbon monoxide levels in an area.

(C)(i) Any person may petition the Administrator to make a finding that there is, or is likely to be, for any area, an inadequate domestic supply of, or distribution capacity for, oxygenated gasoline meeting the requirements of paragraph (2) or fuel additives (oxygenates) necessary to meet such requirements. The Administrator shall act on such petition within 6 months after receipt of the petition.

(ii) If the Administrator determines, in response to a petition under clause (i), that there is an inadequate supply or capacity described in clause (i), the Administrator shall delay the effective date of paragraph (2) for 1 year. Upon petition, the Administrator may extend such effective date for one additional year. No partial delay or lesser waiver may be granted under this clause.

(iii) In granting waivers under this subparagraph the Administrator shall consider distribution capacity separately from the adequacy of domestic supply and shall grant such waivers in such manner as will assure that, if supplies of oxygenated gasoline are limited, areas having the highest design value for carbon monoxide will have a priority in obtaining oxygenated gasoline which meets the requirements of paragraph (2).

(iv) As used in this subparagraph, the term distribution capacity includes capacity for transportation, storage, and blending.

**(4) Fuel dispensing systems**

Any person selling oxygenated gasoline at retail pursuant to this subsection shall be required under regulations promulgated by the Administrator to label the fuel dispensing system with a notice that the gasoline is oxygenated and will reduce the carbon monoxide emissions from the motor vehicle.

**(5) Guidelines for credit**

The Administrator shall promulgate guidelines, within 9 months after November 15, 1990, allowing the use of marketable oxygen credits from gasolines during that portion of the year specified in paragraph (2) with higher oxygen content than required to offset the sale or use of gasoline with a lower oxygen content than required. No credits may be transferred between nonattainment areas.

**(6) Attainment areas**

Nothing in this subsection shall be interpreted as requiring an oxygenated gasoline program in an area which is in attainment for carbon monoxide, except that in a carbon monoxide nonattainment area which is redesignated as attainment for carbon monoxide, the requirements of this subsection shall remain in effect to the extent such program is necessary to maintain such standard thereafter in the area.

**(7) Failure to attain CO standard**

If the Administrator determines under section 7512(b)(2) of this title that the national primary ambient air quality standard for carbon monoxide has not been attained in a Serious Area by the applicable attainment date, the State shall submit a plan revision for the area within 9 months after the date of such determination. The plan revision shall provide that the minimum oxygen content of gasoline referred to in paragraph (2) shall be 3.1 percent by weight unless such requirement is waived in accordance with the provisions of this subsection.

**(n) Prohibition on leaded gasoline for highway use**

After December 31, 1995, it shall be unlawful for any person to sell, offer for sale, supply, offer for supply, dispense, transport, or introduce into commerce, for use as fuel in any motor vehicle (as defined in section 7554(2)[8] of this title) any gasoline which contains lead or lead additives.

**(o) Renewable fuel program**

**(1) Definitions**

In this section:

**(A) Additional renewable fuel**

The term ''additional renewable fuel'' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

**(B) Advanced biofuel**

**(i) In general**

The term ''advanced biofuel'' means renewable fuel, other than ethanol derived from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

---

[8] So in original. Probably should be section ''7550(2)''.

A-1

**(ii) Inclusions**

The types of fuels eligible for consideration as "advanced biofuel" may include any of the following:

(I) Ethanol derived from cellulose, hemicellulose, or lignin.

(II) Ethanol derived from sugar or starch (other than corn starch).

(III) Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

(IV) Biomass-based diesel.

(V) Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

(VI) Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

(VII) Other fuel derived from cellulosic biomass.

**(C) Baseline lifecycle greenhouse gas emissions**

The term "baseline lifecycle greenhouse gas emissions" means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

**(D) Biomass-based diesel**

The term "biomass-based diesel" means renewable fuel that is biodiesel as defined in section 13220(f) of this title and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

**(E) Cellulosic biofuel**

The term "cellulosic biofuel" means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

**(F) Conventional biofuel**

The term "conventional biofuel" means renewable fuel that is ethanol derived from corn starch.

**(G) Greenhouse gas**

The term "greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons,[9] sulfur hexafluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

**(H) Lifecycle greenhouse gas emissions**

The term "lifecycle greenhouse gas emissions" means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

**(I) Renewable biomass**

The term "renewable biomass" means each of the following:

(i) Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested.

(ii) Planted trees and tree residue from actively managed tree plantations on non-federal[10] land cleared at any time prior to December 19, 2007, including land belonging to an Indian tribe or an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

(iii) Animal waste material and animal byproducts.

(iv) Slash and pre-commercial thinnings that are from non-federal[10] forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

(v) Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

(vi) Algae.

(vii) Separated yard waste or food waste, including recycled cooking and trap grease.

**(J) Renewable fuel**

The term "renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

**(K) Small refinery**

The term "small refinery" means a refinery for which the average aggregate daily

---

[9] So in original. The word "and" probably should appear.

[10] So in original. Probably should be "non-Federal".

crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

**(L) Transportation fuel**

The term ''transportation fuel'' means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

**(2) Renewable fuel program**

**(A) Regulations**

**(i) In general**

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

**(ii) Noncontiguous State opt-in**

**(I) In general**

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

**(II) Other actions**

In carrying out this clause, the Administrator may—

(aa) issue or revise regulations under this paragraph;

(bb) establish applicable percentages under paragraph (3);

(cc) provide for the generation of credits under paragraph (5); and

(dd) take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

**(iii) Provisions of regulations**

Regardless of the date of promulgation, the regulations promulgated under clause (i)—

(I) shall contain compliance provisions applicable to refineries, blenders, dis-

tributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

(II) shall not—

(aa) restrict geographic areas in which renewable fuel may be used; or

(bb) impose any per-gallon obligation for the use of renewable fuel.

**(iv) Requirement in case of failure to promulgate regulations**

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

**(B) Applicable volumes**

**(i) Calendar years after 2005**

**(I) Renewable fuel**

For the purpose of subparagraph (A), the applicable volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
| --- | --- |
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 26.0 |
| 2019 | 28.0 |
| 2020 | 30.0 |
| 2021 | 33.0 |
| 2022 | 36.0 |

**(II) Advanced biofuel**

For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
| --- | --- |
| 2009 | 0.6 |
| 2010 | 0.95 |
| 2011 | 1.35 |
| 2012 | 2.0 |
| 2013 | 2.75 |
| 2014 | 3.75 |
| 2015 | 5.5 |
| 2016 | 7.25 |
| 2017 | 9.0 |

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
|---|---|
| 2018 | 11.0 |
| 2019 | 13.0 |
| 2020 | 15.0 |
| 2021 | 18.0 |
| 2022 | 21.0 |

**(III) Cellulosic biofuel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of cellulosic biofuel (in billions of gallons): |
|---|---|
| 2010 | 0.1 |
| 2011 | 0.25 |
| 2012 | 0.5 |
| 2013 | 1.0 |
| 2014 | 1.75 |
| 2015 | 3.0 |
| 2016 | 4.25 |
| 2017 | 5.5 |
| 2018 | 7.0 |
| 2019 | 8.5 |
| 2020 | 10.5 |
| 2021 | 13.5 |
| 2022 | 16.0 |

**(IV) Biomass-based diesel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of biomass-based diesel (in billions of gallons): |
|---|---|
| 2009 | 0.5 |
| 2010 | 0.65 |
| 2011 | 0.80 |
| 2012 | 1.0 |

**(ii) Other calendar years**

For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of—

(I) the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

(II) the impact of renewable fuels on the energy security of the United States;

(III) the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel);

(IV) the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other than renewable fuel, and the sufficiency of infrastructure to deliver and use renewable fuel;

(V) the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

(VI) the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

**(iii) Applicable volume of advanced biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022.

**(iv) Applicable volume of cellulosic biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

**(v) Minimum applicable volume of biomass-based diesel**

For the purpose of making the determinations in clause (ii), the applicable volume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

**(3) Applicable percentages**

**(A) Provision of estimate of volumes of gasoline sales**

Not later than October 31 of each of calendar years 2005 through 2021, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an estimate, with respect to the following calendar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

**(B) Determination of applicable percentages**

**(i) In general**

Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

**(ii) Required elements**

The renewable fuel obligation determined for a calendar year under clause (i) shall—

(I) be applicable to refineries, blenders, and importers, as appropriate;

(II) be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

(III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

**(C) Adjustments**

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments—

(i) to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

(ii) to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

**(4) Modification of greenhouse gas reduction percentages**

**(A) In general**

The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

**(B) Amount of adjustment**

In promulgating regulations under this paragraph, the specified 50 percent reduction in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20 percent reduction in greenhouse gas emissions from renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

**(C) Adjusted reduction levels**

An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

**(D) 5-year review**

Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

**(E) Subsequent adjustments**

After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

**(F) Limit on upward adjustments**

If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

**(G) Applicability of adjustments**

If the Administrator adjusts, or revises, a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

**(5) Credit program**

**(A) In general**

The regulations promulgated under paragraph (2)(A) shall provide—

(i) for the generation of an appropriate amount of credits by any person that re-

fines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

(ii) for the generation of an appropriate amount of credits for biodiesel; and

(iii) for the generation of credits by small refineries in accordance with paragraph (9)(C).

**(B) Use of credits**

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(C) Duration of credits**

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

**(D) Inability to generate or purchase sufficient credits**

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created—

(i) achieves compliance with the renewable fuel requirement under paragraph (2); and

(ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

**(E) Credits for additional renewable fuel**

The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(6) Seasonal variations in renewable fuel use**

**(A) Study**

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

**(B) Regulation of excessive seasonal variations**

If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

**(C) Determinations**

The determinations referred to in subparagraph (B) are that—

(i) less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

(ii) a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

(iii) promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

**(D) Periods**

The 2 periods referred to in this paragraph are—

(i) April through September; and

(ii) January through March and October through December.

**(E) Exclusion**

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

**(F) State exemption from seasonality requirements**

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

**(7) Waivers**

**(A) In general**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)—

(i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

(ii) based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

**(B) Petitions for waivers**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days

after the date on which the petition is received by the Administrator.

**(C) Termination of waivers**

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

**(D) Cellulosic biofuel**

(i) For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

(ii) Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

(iii) Eighteen months after December 19, 2007, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum applicable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

**(E) Biomass-based diesel**

**(i) Market evaluation**

The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under this paragraph on the price of diesel fuel.

**(ii) Waiver**

If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(iii) Extensions**

If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed an additional 15 percent of the applicable annual requirement for biomass-based diesel.

**(F) Modification of applicable volumes**

For any of the tables in paragraph (2)(B), if the Administrator waives—

(i) at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

(ii) at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

**(8) Study and waiver for initial year of program**

**(A) In general**

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

**(B) Required evaluations**

The study shall evaluate renewable fuel—

(i) supplies and prices;

(ii) blendstock supplies; and

(iii) supply and distribution system capabilities.

**(C) Recommendations by the Secretary**

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

**(D) Waiver**

**(i) In general**

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

**(ii) No effect on waiver authority**

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

**(9) Small refineries**

**(A) Temporary exemption**

**(i) In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii) Extension of exemption**

**(I) Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II) Extension of exemption**

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B) Petitions based on disproportionate economic hardship**

**(i) Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii) Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii) Deadline for action on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

**(C) Credit program**

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

**(D) Opt-in for small refineries**

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

**(10) Ethanol market concentration analysis**

**(A) Analysis**

**(i) In general**

Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

**(ii) Scoring**

For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

**(B) Report**

Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

**(11) Periodic reviews**

To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of—

(A) existing technologies;

(B) the feasibility of achieving compliance with the requirements; and

(C) the impacts of the requirements described in subsection (a)(2)[11] on each individual and entity described in paragraph (2).

**(12) Effect on other provisions**

Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas,

---

[11] So in original. Subsection (a) does not contain a par. (2).

or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475) of this chapter. The previous sentence shall not affect implementation and enforcement of this subsection.

**(q) [12] Analyses of motor vehicle fuel changes and emissions model**

**(1) Anti-backsliding analysis**

**(A) Draft analysis**

Not later than 4 years after August 8, 2005, the Administrator shall publish for public comment a draft analysis of the changes in emissions of air pollutants and air quality due to the use of motor vehicle fuel and fuel additives resulting from implementation of the amendments made by the Energy Policy Act of 2005.

**(B) Final analysis**

After providing a reasonable opportunity for comment but not later than 5 years after August 8, 2005, the Administrator shall publish the analysis in final form.

**(2) Emissions model**

For the purposes of this section, not later than 4 years after August 8, 2005, the Administrator shall develop and finalize an emissions model that reflects, to the maximum extent practicable, the effects of gasoline characteristics or components on emissions from vehicles in the motor vehicle fleet during calendar year 2007.

**(3) Permeation effects study**

**(A) In general**

Not later than 1 year after August 8, 2005, the Administrator shall conduct a study, and report to Congress the results of the study, on the effects of ethanol content in gasoline on permeation, the process by which fuel molecules migrate through the elastomeric materials (rubber and plastic parts) that make up the fuel and fuel vapor systems of a motor vehicle.

**(B) Evaporative emissions**

The study shall include estimates of the increase in total evaporative emissions likely to result from the use of gasoline with ethanol content in a motor vehicle, and the fleet of motor vehicles, due to permeation.

**(r) Fuel and fuel additive importers and importation**

For the purposes of this section, the term "manufacturer" includes an importer and the term "manufacture" includes importation.

**(s) Conversion assistance for cellulosic biomass, waste-derived ethanol, approved renewable fuels**

**(1) In general**

The Secretary of Energy may provide grants to merchant producers of cellulosic biomass ethanol, waste-derived ethanol, and approved renewable fuels in the United States to assist the producers in building eligible production facilities described in paragraph (2) for the production of ethanol or approved renewable fuels.

**(2) Eligible production facilities**

A production facility shall be eligible to receive a grant under this subsection if the production facility—

(A) is located in the United States; and

(B) uses cellulosic or renewable biomass or waste-derived feedstocks derived from agricultural residues, wood residues, municipal solid waste, or agricultural byproducts.

**(3) Authorization of appropriations**

There are authorized to be appropriated the following amounts to carry out this subsection:

(A) $100,000,000 for fiscal year 2006.

(B) $250,000,000 for fiscal year 2007.

(C) $400,000,000 for fiscal year 2008.

**(4) Definitions**

For the purposes of this subsection:

(A) The term "approved renewable fuels" are fuels and components of fuels that have been approved by the Department of Energy, as defined in section 13211 of this title, which have been made from renewable biomass.

(B) The term "renewable biomass" is, as defined in Presidential Executive Order 13134, published in the Federal Register on August 16, 1999, any organic matter that is available on a renewable or recurring basis (excluding old-growth timber), including dedicated energy crops and trees, agricultural food and feed crop residues, aquatic plants, animal wastes, wood and wood residues, paper and paper residues, and other vegetative waste materials. Old-growth timber means timber of a forest from the late successional stage of forest development.

**(t) Blending of compliant reformulated gasolines**

**(1) In general**

Notwithstanding subsections (h) and (k) and subject to the limitations in paragraph (2) of this subsection, it shall not be a violation of this part [13] for a gasoline retailer, during any month of the year, to blend at a retail location batches of ethanol-blended and non-ethanol-blended reformulated gasoline, provided that—

(A) each batch of gasoline to be blended has been individually certified as in compliance with subsections (h) and (k) prior to being blended;

(B) the retailer notifies the Administrator prior to such blending, and identifies the exact location of the retail station and the specific tank in which such blending will take place;

(C) the retailer retains and, as requested by the Administrator or the Administrator's designee, makes available for inspection such certifications accounting for all gasoline at the retail outlet; and

(D) the retailer does not, between June 1 and September 15 of each year, blend a batch of VOC-controlled, or "summer", gasoline

---

[12] So in original. No subsec. (p) has been enacted.

[13] See References in Text note below.

SEC. 11. *Uniformity*. Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded*. Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

### (b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

### (c) Additional evidence

In any judicial proceeding in which review is sought of a determination under this chapter re-

---

[1] See References in Text note below.
[2] So in original. Probably should be ''this''.
[3] So in original.
[4] So in original. Probably should be ''subsection,''.

quired to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to[5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F)[6] of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth and provide a reference to any pertinent find-

---

[5] So in original. The word "to" probably should not appear.

[6] So in original. There are no subpars. (D) and (F) of section 7412(g)(1) of this title.

ings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b)) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section[7] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, §307, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, §302(a), Nov. 18, 1971, 85 Stat. 464; Pub. L. 93–319, §6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§303(d), 305(a), (c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, §14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§108(p), 110(5), title III, §302(g), (h), title VII, §§702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

**Editorial Notes**

REFERENCES IN TEXT

Section 7521(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, §230(2), Nov. 15, 1990, 104 Stat. 2529.

Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, §230(3), Nov. 15, 1990, 104 Stat. 2529.

Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977), referred to in subsec. (b)(1), was in the original "section 119(c)(2)(A), (B), or

---

(C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Part C of subchapter I, referred to in subsec. (d)(1)(J), was in the original "subtitle C of title I", and was translated as reading "part C of title I" to reflect the probable intent of Congress, because title I does not contain subtitles.

CODIFICATION

In subsec. (h), "subchapter II of chapter 5 of title 5" was substituted for "the Administrative Procedures Act" on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

Section was formerly classified to section 1857h–5 of this title.

PRIOR PROVISIONS

A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly §14, as added Dec. 17, 1963, Pub. L. 88–206, §1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, §703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out "or section 7521(b)(5)" after "section 7410(f)".

Subsec. (b)(1). Pub. L. 101–549, §706(2), which directed amendment of second sentence by striking "under section 7413(d) of this title" immediately before "under section 7419 of this title", was executed by striking "under section 7413(d) of this title," before "under section 7419 of this title", to reflect the probable intent of Congress.

Pub. L. 101–549, §706(1), inserted at end: "The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action."

Pub. L. 101–549, §702(c), inserted "or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title," before "or any other final action of the Administrator".

Pub. L. 101–549, §302(g), substituted "section 7412" for "section 7412(c)".

Subsec. (b)(2). Pub. L. 101–549, §707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

---

[7] So in original. Probably should be "sections".

Subsec. (d)(1)(C). Pub. L. 101–549, §110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: "the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title,".

Subsec. (d)(1)(D), (E). Pub. L. 101–549, §302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101–549, §302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101–549, §110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: "promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),".

Subsec. (d)(1)(G), (H). Pub. L. 101–549, §302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101–549, §710(b), which directed that subpar. (H) be amended by substituting "subchapter VI" for "part B of subchapter I", was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101–549, §302(h), see below.

Pub. L. 101–549, §302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101–549, §302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101–549, §302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101–549, §110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (O).

Subsec. (d)(1)(O) to (T). Pub. L. 101–549, §302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101–549, §110(5)(C), added subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101–549, §302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101–549, §110(5)(C), redesignated former subpar. (N) as (U).

Subsec. (d)(1)(V). Pub. L. 101–549, §302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101–549, §108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95–190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review under section 1857c–10(c)(2)(A), (B), or (C) to the period prior to Aug. 7, 1977, and provisions authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95–95, §305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate

circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95–95, §305(a), added subsec. (d).

Subsec. (e). Pub. L. 95–95, §303(d), added subsec. (e).

Subsec. (f). Pub. L. 95–95, §305(b), added subsec. (f).

Subsec. (g). Pub. L. 95–95, §305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93–319 inserted reference to the Administrator's action under section 1857c–10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1971—Subsec. (a)(1). Pub. L. 92–157 substituted reference to section "7545(c)(3)" for "7545(c)(4)" of this title.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

#### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

#### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

#### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### § 7608. Mandatory licensing

Whenever the Attorney General determines, upon application of the Administrator—

(1) that—

(A) in the implementation of the requirements of section 7411, 7412, or 7521 of this

(d) The price for cellulosic biofuel waiver credits will be calculated in accordance with § 80.1456(d) and published on EPA's Web site.

[77 FR 1354, Jan. 9, 2012, as amended at 78 FR 49830, Aug. 15, 2013; 79 FR 25031, May 2, 2014; 80 FR 18140, Apr. 3, 2015; 80 FR 77517, Dec. 14, 2015; 81 FR 89804, Dec. 12, 2016; 82 FR 58527, Dec. 12, 2017; 83 FR 63744, Dec. 11, 2018; 85 FR 7074, Feb. 6, 2020]

### § 80.1406 Who is an obligated party under the RFS program?

(a)(1) An *obligated party* is any refiner that produces gasoline or diesel fuel within the 48 contiguous states or Hawaii, or any importer that imports gasoline or diesel fuel into the 48 contiguous states or Hawaii during a compliance period. A party that simply blends renewable fuel into gasoline or diesel fuel, as defined in § 80.1407(c) or (e), is not an obligated party.

(2) If the Administrator approves a petition of Alaska or a United States territory to opt-in to the renewable fuel program under the provisions in § 80.1443, then "obligated party" shall also include any refiner that produces gasoline or diesel fuel within that state or territory, or any importer that imports gasoline or diesel fuel into that state or territory.

(b) For each compliance period starting with 2010, an obligated party is required to demonstrate, pursuant to § 80.1427, that it has satisfied the Renewable Volume Obligations for that compliance period, as specified in § 80.1407(a).

(c) *Aggregation of facilities*—(1) Except as provided in paragraphs (c)(2), (d) and (e) of this section, an obligated party may comply with the requirements of paragraph (b) of this section in the aggregate for all of the refineries that it operates, or for each refinery individually.

(2) An obligated party that carries a deficit into year i + 1 must use the same approach to aggregation of facilities in year i + 1 as it did in year i.

(d) An obligated party must comply with the requirements of paragraph (b) of this section for all of its imported gasoline or diesel fuel in the aggregate.

(e) An obligated party that is both a refiner and importer must comply with the requirements of paragraph (b) of this section for its imported gasoline or diesel fuel separately from gasoline or diesel fuel produced by its domestic refinery or refineries.

(f) Where a refinery or import facility is jointly owned by two or more parties, the requirements of paragraph (b) of this section may be met by one of the joint owners for all of the gasoline or diesel fuel produced/imported at the facility, or each party may meet the requirements of paragraph (b) of this section for the portion of the gasoline or diesel fuel that it produces or imports, as long as all of the gasoline or diesel fuel produced/imported at the facility is accounted for in determining the Renewable Volume Obligations under § 80.1407. In either case, all joint owners are subject to the liability provisions of § 80.1461(d).

(g) The requirements in paragraph (b) of this section apply to the following compliance periods: Beginning in 2010, and every year thereafter, the compliance period is January 1 through December 31.

[75 FR 14863, Mar. 26, 2010, as amended at 75 FR 26037, May 10, 2010]

### § 80.1407 How are the Renewable Volume Obligations calculated?

(a) The Renewable Volume Obligations for an obligated party are determined according to the following formulas:

(1) *Cellulosic biofuel.*

$$RVO_{CB,i} = (RFStd_{CB,i} * (GV_i + DV_i)) + D_{CB,i-1}$$

Where:

$RVO_{CB,i}$ = The Renewable Volume Obligation for cellulosic biofuel for an obligated party for calendar year i, in gallons.

$RFStd_{CB,i}$ = The standard for cellulosic biofuel for calendar year i, determined by EPA pursuant to § 80.1405, in percent.

$GV_i$ = The non-renewable gasoline volume, determined in accordance with paragraphs (b), (c), and (f) of this section, which is produced in or imported into the 48 contiguous states or Hawaii by an obligated party in calendar year i, in gallons.

$DV_i$ = The non-renewable diesel volume, determined in accordance with paragraphs (d), (e), and (f) of this section, produced in or imported into the 48 contiguous states or Hawaii by an obligated party in calendar year i, in gallons.

**Environmental Protection Agency**                                          **§ 80.1407**

$D_{CB,i-1}$ = Deficit carryover from the previous year for cellulosic biofuel, in gallons.

(2) *Biomass-based diesel.*

$RVO_{BBD,i} = (RFStd_{BBD,i} * (GV_i + DV_i)) + D_{BBD,i-1}$

Where:

$RVO_{BBD,i}$ = The Renewable Volume Obligation for biomass-based diesel for an obligated party for calendar year i, in gallons.

$RFStd_{BBD,i}$ = The standard for biomass-based diesel for calendar year i, determined by EPA pursuant to §80.1405, in percent.

$GV_i$ = The non-renewable gasoline volume, determined in accordance with paragraphs (b), (c), and (f) of this section, which is produced in or imported into the 48 contiguous states or Hawaii by an obligated party in calendar year i, in gallons.

$DV_i$ = The non-renewable diesel volume, determined in accordance with paragraphs (d), (e), and (f) of this section, produced in or imported into the 48 contiguous states or Hawaii by an obligated party in calendar year i, in gallons.

$D_{BBD,i-1}$ = Deficit carryover from the previous year for biomass-based diesel, in gallons.

(3) *Advanced biofuel.*

$RVO_{AB,i} = (RFStd_{AB,i} * (GV_i + DV_i)) + D_{AB,i-1}$

Where:

$RVO_{AB,i}$ = The Renewable Volume Obligation for advanced biofuel for an obligated party for calendar year i, in gallons.

$RFStd_{AB,i}$ = The standard for advanced biofuel for calendar year i, determined by EPA pursuant to §80.1405, in percent.

$GV_i$ = The non-renewable gasoline volume, determined in accordance with paragraphs (b), (c), and (f) of this section,

which is produced in or imported into the 48 contiguous states or Hawaii by an obligated party in calendar year i, in gallons.

$DV_i$ = The non-renewable diesel volume, determined in accordance with paragraphs (d), (e), and (f) of this section, produced in or imported into the 48 contiguous states or Hawaii by an obligated party in calendar year i, in gallons.

$D_{AB,i-1}$ = Deficit carryover from the previous year for advanced biofuel, in gallons.

(4) *Renewable fuel.*

$RVO_{RF,i} = (RFStd_{RF,i} * (GV_i + DV_i)) + D_{RF,i-1}$

Where:

$RVO_{RF,i}$ = The Renewable Volume Obligation for renewable fuel for an obligated party for calendar year i, in gallons.

$RFStd_{RF,i}$ = The standard for renewable fuel for calendar year i, determined by EPA pursuant to §80.1405, in percent.

$GV_i$ = The non-renewable gasoline volume, determined in accordance with paragraphs (b), (c), and (f) of this section, which is produced in or imported into the 48 contiguous states or Hawaii by an obligated party in calendar year i, in gallons.

$DV_i$ = The non-renewable diesel volume, determined in accordance with paragraphs (d), (e), and (f) of this section, produced in or imported into the 48 contiguous states or Hawaii by an obligated party in calendar year i, in gallons.

$D_{RF,i-1}$ = Deficit carryover from the previous year for renewable fuel, in gallons.

(b) The non-renewable gasoline volume, $GV_i$, for an obligated party for a given year as specified in paragraph (a) of this section is calculated as follows:

$$GV_i = \sum_{x=1}^{n} G_x - \sum_{y=1}^{m} RBG_y$$

Where:

x = Individual batch of gasoline produced or imported in calendar year i.

n = Total number of batches of gasoline produced or imported in calendar year i.

$G_x$ = Volume of batch x of gasoline produced or imported, as defined in paragraph (c) of this section, in gallons.

y = Individual batch of renewable fuel blended into gasoline in calendar year i.

m = Total number of batches of renewable fuel blended into gasoline in calendar year i.

$RBG_y$ = Volume of batch y of renewable fuel blended into gasoline, in gallons.

(c) Except as specified in paragraph (f) of this section, all of the following products that are produced or imported during a compliance period, collectively called "gasoline" for the purposes of this section (unless otherwise

513

§ 80.1407                                        40 CFR Ch. I (7–1–21 Edition)

specified), are to be included (but not double-counted) in the volume used to calculate a party's Renewable Volume Obligations under paragraph (a) of this section, except as provided in paragraph (f) of this section:

(1) Reformulated gasoline, whether or not renewable fuel is later added to it.

(2) Conventional gasoline, whether or not renewable fuel is later added to it.

(3) Reformulated gasoline blendstock that becomes finished reformulated gasoline upon the addition of oxygenate (RBOB).

(4) Conventional gasoline blendstock that becomes finished conventional gasoline upon the addition of oxygenate (CBOB).

(5) Blendstock (including butane, pentane, and gasoline treated as blendstock (GTAB)) that has been combined with other blendstock and/or finished gasoline to produce gasoline.

(6) Any gasoline, or any unfinished gasoline that becomes finished gasoline upon the addition of oxygenate, that is produced or imported to comply with a state or local fuels program.

(d) The diesel non-renewable volume, $DV_i$, for an obligated party for a given year as specified in paragraph (a) of this section is calculated as follows:

$$DV_i = \sum_{x=1}^{n} D_x - \sum_{y=1}^{m} RBD_y$$

Where:

x = Individual batch of diesel produced or imported in calendar year i.
n = Total number of batches of diesel produced or imported in calendar year i.
$D_x$ = Volume of batch x of diesel produced or imported, as defined in paragraph (e) of this section, in gallons.
y = Individual batch of renewable fuel blended into diesel in calendar year i.
m = Total number of batches of renewable fuel blended into diesel in calendar year i.
$RBD_y$ = Volume of batch y of renewable fuel blended into diesel, in gallons.

(e) Except as specified in paragraph (f) of this section, all products meeting the definition of *MVNRLM diesel fuel* at § 80.2 that are produced or imported during a compliance period, collectively called "diesel fuel" for the purposes of this section (unless otherwise specified), are to be included (but not double-counted) in the volume used to calculate a party's Renewable Volume Obligations under paragraph (a) of this section.

(f) The following products are not included in the volume of gasoline or diesel fuel produced or imported used to calculate a party's Renewable Volume Obligations according to paragraph (a) of this section:

(1) Any renewable fuel as defined in § 80.1401.

(2) Blendstock that has not been combined with other blendstock, finished gasoline, or diesel to produce gasoline or diesel.

(3) Gasoline or diesel fuel produced or imported for use in Alaska, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Marianas, unless the area has opted into the RFS program under § 80.1443.

(4) Gasoline or diesel fuel produced by a small refinery that has an exemption under § 80.1441 or an approved small refiner that has an exemption under § 80.1442.

(5) Gasoline or diesel fuel exported for use outside the 48 United States and Hawaii, and gasoline or diesel fuel exported for use outside Alaska, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Marianas, if the area has opted into the RFS program under § 80.1443.

(6) For blenders, the volume of finished gasoline, finished diesel fuel, RBOB, or CBOB to which a blender adds blendstocks.

(7) Transmix gasoline product (as defined in 40 CFR 1090.80) and transmix distillate product (as defined in 40 CFR 1090.80) produced by a transmix processor, and transmix blended into gasoline or diesel fuel by a transmix blender under 40 CFR 1090.500.

(8) Any gasoline or diesel fuel that is not transportation fuel.

(9) Distillate fuel with a sulfur content greater than 15 ppm that is clearly designated for a use other than transportation fuel, such as heating oil or ECA marine fuel.

(10) Distillate fuel that meets a 15 ppm sulfur standard, is designated for

514

**Environmental Protection Agency**                                      **§ 80.1408**

non-transportation use, and that remains completely segregated from MVNRLM diesel fuel from the point of production through to the point of use for a non-transportation purpose, such as heating oil or ECA marine fuel.

(11) Certified NTDF, if the refiner or importer has a reasonable expectation that the fuel will be used for non-transportation purposes. To establish a reasonable expectation that the fuel will be used for non-transportation purposes, a refiner or importer must, at a minimum, be able to demonstrate that they supply areas that use heating oil, ECA marine fuel, or 15 ppm distillate fuel for non-transportation purposes in quantities that are consistent with past practices or changed circumstances. EPA may consider any other relevant information, including the price of the fuel, in assessing whether a refiner or importer has a reasonable expectation that the fuel will be used for non-transportation purposes.

[75 FR 14863, Mar. 26, 2010, as amended at 79 FR 23655, Apr. 28, 2014; 85 FR 7074, Feb. 6, 2020; 85 FR 78467, Dec. 4, 2020]

### § 80.1408 What are the requirements for parties that own and redesignate certified NTDF as MVNRLM diesel fuel?

(a) Beginning January 1, 2021, a party that owns certified NTDF, and only a party that owns certified NTDF, may redesignate NTDF as MVNRLM diesel fuel if they meet all of the following requirements:

(1) Register as a refiner and register each facility where redesignation occurs as a refinery under § 80.76. NTDF may only be redesignated as MVNRLM diesel fuel at a facility registered as a refinery.

(2) At each facility, calculate a balance of MVNRLM diesel fuel during each annual compliance period according to the following equation:

$$\text{MVNRLM}_{BAL} = \text{MVNRLM}_O + \text{MVNRLM}_{INVCHG} - \text{MVNRLM}_I$$

Where:

$\text{MVNRLM}_{BAL}$ = the balance for MVNRLM diesel fuel for the compliance period.

$\text{MVNRLM}_I$ = the total volume of all batches of fuel designated as MVNRLM diesel fuel owned when the fuel was received at the facility and acquired at the facility during the compliance period. Any MVNRLM diesel fuel produced (apart from redesignation of NTDF to MVNRLM diesel fuel) or imported into the facility must also be included in this volume.

$\text{MVNRLM}_O$ = the total volume of all batches of fuel designated as MVNRLM diesel fuel owned and sold or transferred to other parties at the facility during the compliance period.

$\text{MVNRLM}_{INVCHG}$ = the volume of MVNRLM diesel fuel owned at the end of the compliance period minus the volume of MVNRLM diesel fuel owned at the beginning of the compliance period, including accounting for any corrections in inventory due to volume swell or shrinkage, difference in measurement calibration between receiving and delivering meters, and similar matters, where corrections that increase inventory are defined as positive.

(i) If $\text{MVNRLM}_{BAL}$ is greater than 0, an RVO is incurred by the redesignating party for the volume of diesel fuel equal to MVNRLM. The redesignating party must also comply with all of the following:

(A) The reporting requirements of § 80.1451(a)(1)(xix).

(B) The recordkeeping requirements of § 80.1454(t).

(C) The attest engagement requirements of §§ 80.1464 and 80.1475, as applicable.

(ii) If $\text{MVNRLM}_{BAL}$ is less than or equal to 0, no RVO is incurred by the redesignating party for any redesignated certified NTDF. These parties must comply with all of the following:

(A) The reporting requirements of § 80.1451(i).

(B) The recordkeeping requirements of § 80.1454(t).

(b) Parties that incur an RVO under paragraph (a)(2)(i) of this section must comply with all applicable requirements for obligated parties under this subpart.

(c) The provisions of this section do not apply to gasoline or diesel fuel that is designated for export.

[85 FR 7074, Feb. 6, 2020]