**NO DATE FOR ORAL ARGUMENT HAS BEEN SET**

**No. 23-1177(L),**
*consolidated with* **Nos. 23-1240, 23-1243,**
**23-1244, 23-1246, 23-1247, 23-1249**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

CENTER FOR BIOLOGICAL DIVERSITY,
*Petitioner*,

v.

ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES FISH AND
WILDLIFE SERVICE; NATIONAL MARINE FISHERIES SERVICE,
*Respondents*.

--------------------------------------

AMERICAN PETROLEUM INSTITUTE; CLEAN FUELS ALLIANCE
AMERICA; COALITION FOR RENEWABLE NATURAL GAS;
GROWTH ENERGY; RENEWABLE FUELS ASSOCIATION,
*Intervenors for Respondent*.

————————

On Petition for Review of an Order of the United States
Environmental Protection Agency, No. EPA-88FR44468

————————

## BRIEF FOR PETITIONER NESTE US, INC.

————————

Amina Dammann
KING & SPALDING LLP
500 West 2nd Street
Suite 1800
Austin, TX 78701
(512) 457-2000

Ilana Saltzbart
Ashley C. Parrish
*Counsel of Record*
Jeremy M. Bylund
K. Paige Tenkhoff
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

*Counsel for Neste US, Inc.*

Initial Brief: March 22, 2024

**CERTIFICATE AS TO PARTIES,
RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), Petitioner Neste US, Inc. certifies that:

**A.     Parties, Intervenors, *Amici***

Petitioners in this action are the Center for Biological Diversity, Neste US, Inc., American Refining Group, Inc., Calumet Montana Refining, LLC, Calumet Shreveport Refining, LLC, Ergon Refining, Inc., Ergon-West Virginia, Inc., Hunt Refining Company, Par Hawaii Refining, LLC, Placid Refining Company LLC, REH Company, San Joaquin Refining Co., Inc., U.S. Oil & Refining Company, Wyoming Refining Company, Countrymark Refining and Logistics, LLC, the San Antonio Refinery LLC, Wynnewood Refining Company, LLC, Sustainable Advanced Biofuel Refiners Coalition, American Fuel & Petrochemical Manufacturers (No. 23-1247), and National Wildlife Federation.

Respondents are Environmental Protection Agency, United States Fish and Wildlife Service, National Marine Fisheries Service, and Michael S. Regan, Administrator, Environmental Protection Agency, in his official capacity.

Movant-Intervenors are Clean Fuels Alliance America, the Coalition for Renewable Natural Gas, Growth Energy, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and Renewable Fuels Association.

There are no *amici* at this time.

## B.    Rulings Under Review

The agency actions under review in Neste's challenge are EPA's rule entitled "Renewable Fuel Standard Program (RFS): Standards for 2023-2025 and Other Changes," JA__ (88 Fed. Reg. 44,468 (July 12, 2023) ("2023 Rule")) and the associated guidance in EPA's Response to Comments, JA ___.

## C.    Related Cases

The 2023 Rule has not been challenged in any proceedings other than these consolidated cases.  Related issues were raised in a number of cases including *RFS Power Coal. v. EPA*, No. 20-1046 (D.C. Cir. filed Feb. 21, 2020) (and consolidated cases), and *Sinclair Wyo. Refining Co., et al. v. EPA*, No. 22-1210 (D.C. Cir. filed Aug. 17, 2022) (addressing this Court's partial remand of *Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017)).

## NESTE CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Neste US, Inc. ("Neste US/Neste") certifies that it was incorporated in Delaware on March 9, 2004.  The parent company of Neste US is Neste Oyj.

Neste Oyj and its subsidiaries are world leading producers of renewable diesel and sustainable aviation fuel, some of which is imported to the United States for sale as transportation fuel.  Neste Singapore Pte Ltd ("Neste Singapore"), a subsidiary of Neste Oyj, is a RIN-generating foreign producer of renewable fuel.  Neste US imports renewable fuel produced at Neste refineries, including the Neste Singapore refinery, into the United States.  Both Neste US and Neste Singapore participate in EPA's Renewable Fuel Standard program (40 C.F.R. Part 80, subpart M).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ...................................................................i

NESTE CORPORATE DISCLOSURE STATEMENT ........................... iii

TABLE OF AUTHORITIES ........................................................vi

GLOSSARY ......................................................................x

JURISDICTION ..................................................................1

STATEMENT OF THE ISSUES ....................................................2

STATEMENT OF THE CASE ......................................................3

STANDARD OF REVIEW .........................................................8

SUMMARY OF ARGUMENT .......................................................8

STANDING ....................................................................10

ARGUMENT ....................................................................10

I.    EPA Has Not Justified Its Departure From Long-Held
      Understandings of the Recordkeeping Requirements ...................10

      A.    EPA's New Requirements Cannot Be Squared With
            the Regulatory Text ........................................10

      B.    EPA Failed to Provide Reasoned Explanations for
            the Changes to the Recordkeeping Requirements ..............15

            1.    EPA's Justifications Are Incoherent and
                  Historically Inaccurate ..............................16

            2.    EPA Failed to Explain Why it Rejected Less-
                  Burdensome Alternatives ..............................21

II.   EPA Has Failed to Justify Changing the RIN Generation
      Requirements ......................................................24

CONCLUSION ........................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

    Appendix A ...............................................................A-1

    Appendix B ...............................................................B-1

    Appendix C ...............................................................C-1

    Appendix D ...............................................................D-1

# TABLE OF AUTHORITIES*

**Cases**

*ABM Onsite Servs.-W., Inc. v. NLRB,*
    849 F.3d 1137 (D.C. Cir. 2017) .................................................. 16, 26

*Appalachian Power Co. v. EPA,*
    249 F.3d 1032 (D.C. Cir. 2001) ........................................................ 17

*Farmers Union Cent. Exch., Inc. v. FERC,*
    734 F.2d 1486 (D.C. Cir. 1984) .............................................. 21, 28, 29

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ........................................................................... 17

*Fund for Animals, Inc. v. Norton,*
    322 F.3d 728 (D.C. Cir. 2003) ......................................................... 10

*Grace v. Barr,*
    965 F.3d 883 (D.C. Cir. 2020) ......................................................... 16

*Int'l Org. of Masters, Mates
    & Pilots, ILA, AFL-CIO v. NLRB,*
    61 F.4th 169 (D.C. Cir. 2023) .................................................... 19, 26

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ......................................................................... 8

*Marx v. Gen. Revenue Corp.,*
    568 U.S. 371 (2013) ........................................................................... 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.
    v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................... 24, 26

*Newman v. FERC,*
    27 F.4th 690 (D.C. Cir. 2022) ..................................................... 8, 15

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ...............................................................20

*Sierra Club v. Whitman*,
285 F.3d 63 (D.C. Cir. 2002) ..................................................24

*Spirit Airlines, Inc. v. Dep't of Transp.*,
997 F.3d 1247 (D.C. Cir. 2021) .........................................21, 28

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) .............................................................18, 20

**Statutes**

42 U.S.C. § 7545................................................................3, 26

42 U.S.C. § 7607..................................................................1, 8

**Regulations**

40 C.F.R. § 69.51......................................................................25

40 C.F.R. § 80.1406....................................................................3

40 C.F.R. § 80.1407....................................................................3

40 C.F.R. § 80.1426....................................................5, 24, 25, 1

40 C.F.R. § 80.1431.............................................8, 24, 25, 27, 2

40 C.F.R. § 80.1450..............................................................5, 6, 2

40 C.F.R. § 80.1454....................5, 6, 11, 12, 13, 14, 18, 21, 1, 2, 1, 2

40 C.F.R. § 80.1466..................................................................27

40 C.F.R. § 80.1479..........................................................21, 22, 2, 1

*Renewable Fuel Standard (RFS) Program:
Standards for 2023–2025 and Other Changes*,
88 Fed. Reg. 44,468 (July 12, 2023) .....................1, 6, 7, 8, 10

Standards for 2020 and Biomass-Based
Diesel Volume for 2021 and Other Changes,
85 Fed. Reg. 7016 (Feb. 6, 2020) ........................................................... 6

**Agency Documents**

Am. Petroleum Inst. Comment
(Dkt. No. EPA-HQ-OAR-2021-0427-0627) ......................................... 12

*EPA Response to Comments
(Dkt. No. EPA-HQ-OAR-2021-0427-1114) ... 6, 7, 11, 13, 14, 16, 17, 18,
19, 23, 24, 26, 27, 28, 29

Neste Comment
(Dkt. No. EPA-HQ-OAR-2021-0427-0714) ...................... 4, 5, 12, 21, 26

Weaver & Tidwell LLP Comment
(Dkt. No. EPA-HQ-OAR-2021-0427-0741) ......................................... 22

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .................................................. 13

EPA,
*Guidance for Remedial Actions for the Renewable Fuel
Standard (RFS)* (last updated June 30, 2023),
https://www.epa.gov/fuels-registration-reporting-and-
compliance-help/guidance-remedial-actions-renewable-
fuel-standard ......................................................................................... 29

EPA,
*Renewable Identification Numbers (RINs) under the
Renewable Fuel Standard Program* (last updated Jan. 23,
2024), https://www.epa.gov/renewable-fuel-standard-
program/renewable-identification-numbers-rins-under-
renewable-fuel-standard ...................................................................... 3, 4

EPA,
RFS Registration for Renewable Fuel Producers:
Separated Food Waste Plan Guidance (July 2015),
*available at* https://www.epa.gov/sites/default/files/2015-
09/documents/rfs-sfwp-pres-2015-07.pdf ....................................11, 12

Mot.,
*Clean Fuels All. Am. v. EPA*,
No. 22-1201 (D.C. Cir. Dec. 15, 2022), Doc. 1977838 ...........................6

# GLOSSARY

| | |
|---|---|
| 2015 Guidance | EPA, RFS Registration for Renewable Fuel Producers: Separated Food Waste Plan Guidance (July 2015) |
| 2023 Rule | Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes, 88 Fed. Reg. 44,468 (July 12, 2023) |
| Neste Singapore | Neste Singapore Pte Ltd |
| Neste/Neste US | Neste US, Inc. |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Numbers |

## JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1) to review Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes, 88 Fed. Reg. 44,468 (July 12, 2023).  JA__.

EPA has imposed new, burdensome requirements on the production of renewable fuel made from separated food waste, including used cooking oil. These requirements cannot be squared with the text of the agency's regulations, and even if they could, EPA has not provided reasoned explanations for imposing new requirements that unsettle billions of dollars in private reliance interests. The agency has failed to consider less-burdensome alternatives, and it has not reasonably responded to objections. The 2023 Rule, and its associated binding guidance, should be vacated.

## STATEMENT OF THE ISSUES

1.    Whether EPA's new recordkeeping requirements should be struck down because they contradict the text of the regulations, EPA has arbitrarily undermined private reliance interests, EPA has failed to consider less costly alternatives and has not reasonably responded to objections, and EPA's articulated reasons for its regulatory changes are either demonstrably false or incoherent.

2.    Whether EPA has violated the requirements of reasoned decisionmaking by failing to provide a reasoned basis for requiring that

Renewable Identification Numbers ("RINs") be generated only for fuel actually used in the United States.

## STATEMENT OF THE CASE

Under the Energy Policy Act of 2005, Congress created the Renewable Fuel Standard ("RFS") program to "ensure that transportation fuel sold or introduced into commerce in the United States … contains" a minimum percentage of renewable fuels.  42 U.S.C. § 7545(o)(2)(A)(i).  Determining the amount of renewable fuel needed to reach the percentage requirements, EPA issues volume targets each year for how much renewable fuel should be produced by type.  *Id.*; *see also* 40 C.F.R. § 80.1407.  Obligated parties—refiners or importers of non-renewable gasoline or diesel fuel—prove that they are compliant with these requirements by using RINs.  40 C.F.R. §§ 80.1406(b), 80.1425.

A RIN is a tradeable credit—the "currency" of the RFS program—connected to a specific volume of renewable fuel.  *See* EPA, *Renewable Identification Numbers (RINs) under the Renewable Fuel Standard Program* (last updated Jan. 23, 2024).  Producers registered with EPA can "generate" a RIN for each gallon of renewable fuel they produce, and the RIN then travels with the fuel from party to party.  *Id.*  Once the

renewable fuel is blended with the fuel supply, the RIN is "separated" from the original gallon of fuel and can be "retired" to show compliance with an obligated party's renewable fuel obligations.  *Id.*

Neste is a foreign producer of renewable fuel that generates RINs under the RFS program.  Neste is the world's largest producer of renewable diesel and sustainable aviation fuel, with an annual production of more than one billion gallons of renewable products.  JA__ (Neste Comment at 2 (EPA-HQ-OAR-2021-0427-0714)).  Neste is also a significant supplier to the United States.  *Id.*  Roughly one-third of Neste's products are sold and consumed in North America, reducing greenhouse gas emissions by around 3.3 million tons annually.  *Id.*

Producers like Neste create their renewable fuel from a variety of renewable materials (called feedstocks), including separated food waste such as used cooking oil.  Each type of renewable fuel has unique recordkeeping requirements.  Neste collects and purchases its feedstock from aggregators (often small businesses) that obtain used cooking oil from restaurants and other establishments.  *Id.*  The aggregators consider the sources of their used cooking oil confidential business information, which they shield from competitors and do not disclose.  *Id.*

4

at 13-15. Under past regulations, source confidentiality was not a problem because Neste was required to tell EPA which aggregators it used, 40 C.F.R. § 80.1450(b)(1)(vii)(B); to keep records of how much feedstock it collected from those aggregators, *id.* § 80.1454(j)(1)(i); and to obtain certifications (also called declarations) from the aggregators that the feedstock qualified as renewable biomass, *id.* § 80.1454(d).[1] Neste was also allowed to generate RINs for any fuel "produced …for use" in the United States, *id.* § 80.1426(b), without perfectly predicting or proving that the fuel that was intended for the United States was ultimately used here. Neste invested billions in reliance on these requirements. *See* JA__ (Neste Comment at 1).

Through its 2023 Rule, EPA upended the RFS regulatory regime, imposing substantial changes to the regulatory requirements. While EPA made minor edits to the regulatory text, it imposed substantial new requirements through guidance that EPA views in as binding, as set forth

---

[1] The requirements of § 80.1454(d), which apply to domestic producers and parallel those in § 80.1454(c) which apply to foreign producers. *See* Appendix C. Neste is bound by subsection (c) as a foreign producer. Though Neste's arguments apply to both subsections, Neste addresses § 80.1454(d) because EPA refers to subsection (d) in the administrative record.

5

in the Rule's Preamble, JA___, and in EPA's Response to Comments, JA___.

Understanding EPA's changes requires going back to the 2020 rulemaking because the 2023 Rule repromulgates at least one requirement introduced in that failed rulemaking. In 2020, EPA moved the location requirement—requiring that producers document the location of where they collect separated food waste—from the registration regulation (40 C.F.R. § 80.1450) to the recordkeeping regulation (*id.* § 80.1454). *See* Standards for 2020 and Biomass-Based Diesel Volume for 2021 and Other Changes, 85 Fed. Reg. 7016, 7080 (Feb. 6, 2020). For the first time in the preamble to the final 2020 RFS Rule, EPA asserted that "the location" from which food waste was collected referred not to where the producer collects the food waste (the aggregator's address) but to the address of the original sources that generate the food waste (meaning each individual restaurant). 85 Fed. Reg. at 7062. Various groups challenged the 2020 Rule, and the litigation was stayed in anticipation of the 2023 Rule. Mot. 1-2, *Clean Fuels All. Am. v. EPA*, No. 22-1201 (D.C. Cir. Dec. 15, 2022), Doc. 1977838 (noting in a joint motion for abeyance that the 2023 rulemaking includes the "changes to the

separated food waste recordkeeping regulations that are the subject of"
the stayed case).

In the 2023 Rule, and in binding guidance, EPA has imposed four
new regulatory requirements that Neste challenges here.

*First*, the agency requires producers to maintain documents
showing not the location from where they collect food waste (i.e., the
aggregators) but the many original sources (i.e., the individual
restaurants) that generate the food waste that is commingled before it is
provided to them.  *See* JA__ (Preamble, 88 Fed. Reg. at 44,548); JA__
(EPA Resp. at 364-65 (EPA-HQ-OAR-2021-0427-1114)).

*Second*, EPA requires each producer to document the exact amount
of feedstock generated by each original source.  *See* JA__ (Preamble, 88
Fed. Reg. at 44,548); JA__ (EPA Resp. at 364-65).

*Third,* EPA disallows the use of self-declarations under
subsection 80.1454(d) to show that the feedstock qualifies as renewable
biomass.  *See* JA__ (EPA Resp. at 367).

*Fourth*, the 2023 Rule changes the regulation allowing RINs to be
generated for fuel that a producer must show is not only intended for use

in the United States but is also ultimately used here.   40 C.F.R. § 80.1431(a)(1)(viii); *see also* JA__ (88 Fed. Reg. at 44,547).

A comparison of the changes to the regulations are provided in Appendix A.  The current regulations are reproduced in Appendices B-D.

## STANDARD OF REVIEW

This Court must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   42 U.S.C. § 7607(d)(9)(A).   Agencies receive deference when interpreting their own regulations, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2411 (2019), but only if the regulations remain "genuinely ambiguous" after "exhaust[ing] all the traditional tools of construction."   *Newman v. FERC*, 27 F.4th 690, 696 (D.C. Cir. 2022).  If the "text, structure, history, and purpose of [the] regulation" show that the agency's reading is "plainly … inconsistent with the regulation," no deference is permitted.  *Id*.

## SUMMARY OF ARGUMENT

Neste challenges EPA's 2023 Rule and its associated binding guidance, as set forth in the Rule's Preamble and EPA's Response to Comments.   EPA's new regulatory requirements (imposed through binding guidance) cannot be squared with the regulations' plain text, and EPA has not reasonably responded to objections or justified its new

requirements, especially considering the enormous reliance interests at stake.

From 2010, EPA's RFS regulations allowed foreign renewable fuel producers to provide or maintain records that (1) reflected the aggregate amount of qualifying food waste by weight *purchased*, (2) reflected the location *of the aggregator* from which the food waste was *collected*, and (3) included self-declarations from the aggregator that it was providing qualifying food waste. These requirements balanced the need to verify qualifying inputs against the burdens imposed on producers.

EPA has arbitrarily and capriciously departed from these long-standing requirements. Without any reasoned explanation, EPA has changed the recordkeeping requirements by mandating that records be kept about the location of each original source and how much volume is generated by each original source, and by disallowing self-declarations from aggregators. Without justification, EPA has also changed when RINs can be generated. For 10 years, the regulation has allowed RINs to be generated for fuel "produced for use" in the United States. EPA now says that only fuel that is prophetically predicted to be—and proven to have been—used in the United States qualifies for RIN generation. EPA

has failed to consider less costly alternatives and has not responded to objections or given cogent reasons for these changes.

## STANDING

Neste's standing is "self-evident" because it produces renewable fuel and is a direct object of EPA's regulations. *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733-34 (D.C. Cir. 2003); JA__ (88 Fed. Reg. at 44,468) (noting "[e]ntities potentially affected by this final rule").

## ARGUMENT

## I.  EPA Has Not Justified Its Departure From Long-Held Understandings of the Recordkeeping Requirements.

Neste has invested billions of dollars in its infrastructure to produce renewable fuel, including fuel produced from used cooking oil.  Those reliance interests are substantially undermined by EPA's new requirements.

### A.  EPA's New Requirements Cannot Be Squared With the Regulatory Text.

EPA's binding guidance—set forth in the 2023 Rule's Preamble and Response to Comments—cannot be squared with the regulatory text. The regulations impose obligations on producers to document the location and amount of feedstock that they collect and purchase, and to provide appropriate "certifications."  They do not require producers to obtain

10

confidential information about the conduct of other parties or to provide proof beyond appropriate certifications.

***The Location Requirement.*** Subsection 80.1454(j)(1)(ii) requires producers, like Neste, to maintain "[d]ocuments demonstrating *the location of any establishment(s)* from which the … separated food waste … *is collected*." 40 C.F.R. § 80.1454(j)(1)(ii) (emphasis added). When this provision was housed in the registration regulation, it was interpreted to require a producer to provide *either* the location of the aggregator from which it "collects" separated food waste feedstock *or* the location of the original source (when the producer collects food waste directly from that source). EPA, RFS Registration for Renewable Fuel Producers: Separated Food Waste Plan Guidance at 3-4 (July 2015) ("2015 Guidance"). EPA now contends that the location is the address of each individual restaurant that generates feedstock even if the feedstock is collected by the producer at the aggregator's address. *See* JA__ (EPA Resp. at 364-65). But subsection (j)(1)(ii) expressly imposes an obligation on each producer to provide the location of the "establishment" from which it "collects" food waste—information that is available to the producer. It does not require the producer to hunt down information

concerning the original source of the feedstock supplies that aggregators treat as confidential and are unwilling to disclose.

*The Amount Requirement.* Subsection 80.1454(j)(1)(i) imposes an obligation on producers to maintain "[d]ocuments demonstrating the amounts, by weight, *purchased* of … separated food waste." 40 C.F.R. § 80.1454(j)(1)(i) (emphasis added). The text thus directs that when a producer purchases food waste from an aggregator, it must keep records of the amount purchased from each aggregator. EPA's 2015 Guidance thus recognized that producers are permitted under the regulations to provide the address of aggregators and to identify the region where feedstocks are obtained. 2015 Guidance at 3-4. That understanding accords with reality because aggregators are unwilling to provide the location of their sources to producers and producers have access only to the information of the amounts they purchased (not the amounts generated by others). *See* JA__ (Neste Comment at 14); JA__ (Am. Petroleum Inst. Comment at 14-15 (EPA-HQ-OAR-2021-0427-0627)). In contrast, EPA's new approach violates the regulations by imposing a new obligation on producers to track down information concerning not the amount of food waste they have purchased but the separate amounts of

12

food waste aggregated by a third party—information that producers do not control.

*The Certification Requirement.* The text of the certification requirement in subsection 80.1454(d) also does not support EPA's new position that self-declarations cannot be used to show that feedstock is qualifying biomass. *See* JA__ (EPA Resp. at 367). Subsection 80.1454(d)(1) requires domestic producers to keep "documents associated with feedstock purchases and transfers that identify where the feedstocks were produced and are sufficient to verify that feedstocks used are renewable biomass." *See also id.* § 80.1454(c)(1) (requiring foreign producers to "keep records of feedstock purchases … sufficient to verify that feedstocks used are renewable biomass"). For separated food waste, that regulation historically contained two requirements to achieve that goal: First, producers were required to obtain documents "certifying" that the feedstock qualifies as renewable biomass from their feedstock supplier. 40 C.F.R. § 80.1454(c)(2)(vii) & (d)(4) (effective 2010–2023). The word "certifying" is a legal term of art and is an attestation or declaration from the feedstock supplier that the feedstock qualifies. *Certify*, Black's Law Dictionary (11th ed. 2019) ("2. To attest as being true

or as meeting certain criteria."). Second, producers must abide by the recordkeeping requirements under subsection (j). *See id*. § 80.1454(c)(3) & (d)(4) (effective 2010–2023).

EPA added language in the 2023 Rule stating that the producer "must have documents from their feedstock suppliers *and feedstock aggregators, as applicable*, certifying that the feedstock qualified as renewable biomass, describing the feedstock." 40 C.F.R. § 80.1454(d)(5) (emphasis added); *see also id*. § 80.1454(c)(2)(vii) (making similar change for foreign producers). EPA announced that it will not "allow[] self-declarations to meet the recordkeeping requirements in 40 CFR 80.1454(d) and (j)." JA__ (EPA Resp. at 367). EPA went on to state that "commenter[s] fail[] to describe how self-declarations are sufficient to show the renewable fuel producer, auditors, and EPA that the feedstock qualifies under the program." *Id.* But EPA ignores the text of its own regulation. Subsections (c) and (d) require *certifications*, not additional supporting documentation. Yet EPA now contends that a certification is of no worth. And EPA's logic applies with even less force to subsection 80.1454(c) for foreign producers because that provision lacks subsection (d)'s language requiring producers to identify "where the

14

feedstocks were produced." *See* Appendix C. EPA cannot casually rewrite the plain text of its regulation in its Response to Comments.

In short, considering the "text, structure, history, and purpose of" the recordkeeping requirements, EPA's regulatory changes are "plainly … inconsistent" with the text of its own regulations. *Newman*, 27 F.4th at 696. EPA cannot promulgate regulations that on their face require producers only to maintain information that is readily within their possession and then later, after substantial investments have been made in reliance on what the regulations require, reinterpret the regulatory requirements to impose new and much more burdensome obligations, including forcing producers to obtain information not in their possession that other parties treat as confidential. If EPA wants to change its regulations, it must comply with proper notice-and-comment rulemaking procedures. It cannot impose massive substantive changes by reinterpreting its regulations in a way that is at war with their plain text.

## B. EPA Failed to Provide Reasoned Explanations for Its Changes to the Recordkeeping Requirements.

EPA has failed to provide reasoned explanations for regulatory changes that will disturb billions in private reliance interests. The

combined effect of these changes is to undermine the purpose of the RFS program—to increase the use of renewable fuel—by forcing producers and used cooking oil aggregators out of the market through exorbitant compliance costs. *See Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (striking down agency action that "could undermine th[e] purpose" of the relevant statute).

### 1. EPA's Justifications Are Incoherent and Historically Inaccurate.

EPA cannot provide a consistent answer to justify its changes to the RFS program. In one breath, EPA asserts that its location and volume requirements have always been compelled under subsection 80.1454(d). JA__ (EPA Resp. at 374). That claim is demonstrably false and therefore represents an "unexplained departure from [agency] precedent." *ABM Onsite Servs.-W., Inc. v. NLRB*, 849 F.3d 1137, 1142 (D.C. Cir. 2017). In another, EPA contends that moving the "location requirement" from the registration regulation to the recordkeeping regulation was meaningful. JA__ (EPA Resp. at 377). But EPA's contention makes no sense and has never been explained. Reasoned decision making requires more, especially because EPA's actions upset more than a decade of private reliance interests. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

515 (2009) (it is arbitrary and capricious to "ignore" that a "prior policy has engendered serious reliance interests"); *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1054 (D.C. Cir. 2001) (per curiam).

*Unexplained justification 1*: EPA is incorrect in suggesting that the "location requirement" in subsection 80.1454(j)(1)(ii) has always required identifying location of individual restaurants. *Contra* JA__ (EPA Resp. at 374). In 2015, EPA took the contrary position, requiring only the location of the aggregator—that is, the location where the producer collected the feedstock—and the region where the aggregator would obtain its feedstock. EPA did not materially change the regulatory language when it moved the provision in 2020. *See* Appendix A. And as discussed above, subsection (j)(1)(ii)'s text does not compel providing the location of each restaurant that generates food waste instead of identifying the location where the producer collects the food waste.

EPA's failure to acknowledge that it is changing regulatory requirements is clear grounds for vacating its actions. *See Fox*, 556 U.S. at 515 (noting that an agency must "display awareness that it *is* changing position" and cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"). EPA tries to brush aside the

earlier 2015 Guidance, stating that it was issued when the location requirement remained part of the registration regulation. JA__ (EPA Resp. at 374-75). But EPA never explains why that move supports a drastically different reading of materially similar text. *See* Appendix A (textual comparison).

EPA also states that providing the aggregator location and regional information (as allowed by the 2015 guidance) may not be sufficient to ensure that the feedstock would qualify as renewable biomass under the regulation. JA__ (EPA Resp. at 375). But that ignores the separate requirement that aggregators provide certifications that they are providing qualifying feedstocks. 40 C.F.R. § 80.1454(d). Requiring redundant source information would make the certification requirement superfluous, violating a basic canon of textual interpretation. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

***Unexplained justification 2***: EPA is wrong that the "amount requirement" in subsection 80.1454(j)(1)(i) has always required the amount collected at each original source. *Contra* JA__ (EPA Resp. at 374). Because the location documentation was part of registration until 2020, producers submitted their documentation of the locations of food

waste collection facilities upfront—before fuel production. Accordingly, this documentation could not possibly include amounts generated by each facility—the fuel had not been generated and the producer has not yet collected the fuel from the aggregator. EPA's failure to recognize a change in course is fatal. *See Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (vacating agency action where agency "did not acknowledge—much less justify—its adoption of a new rule").

***Unexplained justification 3***: EPA is wrong that subsection 80.1454(d)(1)—requiring producers to keep documents that "are sufficient to verify that feedstocks used are renewable biomass"—has always *independently required* producers to document the location of, and the amount of the used cooking oil generated by, each individual restaurant. *Contra* JA__ (EPA Resp. at 374). Subsection (d)(1) sets the general requirement for documentation, and the subsequent subsections explain how the requirement is met for each type of renewable fuel. For separated food waste, the specific requirements are found in subsections (d)(5) (certifications) and (d)(6) (cross-referencing subsection 80.1454(j)'s amount and location requirements).

19

The specific requirements would be superfluous if the general requirement independently had the same effect. *TRW*, 534 U.S. at 31 ("[A] statute ought … to be so construed that … no clause, sentence, or word shall be superfluous, void, or insignificant." (quotation marks omitted)). "[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). The specific requirements must be given independent meaning. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) (explaining that "[g]eneral language of a statutory provision … will not be held to apply to a matter specifically dealt with in another part of the same enactment"). That independent meaning is evidenced by EPA's decision to move the "location requirement" to the recordkeeping provision in 2020, which would have been unnecessary if location recordkeeping was already independently required by subsection (d)(1).

EPA's reading of subsection 80.1454(d) would also make the alternative recordkeeping pathway promulgated in 2023 meaningless. As part of the 2023 Rule, EPA added an exception to the recordkeeping requirements in subsection (j) for "parties complying with the alternative

20

recordkeeping requirements in § 80.1479." 40 C.F.R. § 80.1454(j). That pathway requires aggregators to register with EPA, submit to EPA jurisdiction, and to maintain records instead of producers retaining the records. *Id.* § 80.1479. But that exception applies only to subsection (j), so if subsection (d) independently requires all the same information the alternative recordkeeping pathway is meaningless. *Id.* § 80.1454(j).

### 2. EPA Failed to Explain Why it Rejected Less-Burdensome Alternatives.

EPA has failed to explain why it rejected less burdensome alternatives. *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984), *as amended* (June 26, 1984) ("[A]n agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives."); *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (vacating agency action where agency failed to "consider[] another reasonable path forward").

Neste commented that used cooking oil aggregators are unwilling to share their sources because they consider that information to be confidential. JA__ (Neste Comment at 12). To comply with the 2023 Rule, producers will either need to obtain the locations of an aggregator's

sources or prevail upon the aggregator to submit to the EPA's jurisdiction. Either option will greatly reduce the amount of used cooking oil available to Neste and other producers.

Aggregating used cooking oil is an "extremely competitive" market, with confidential sources of used cooking oil being a key competitive advantage. JA__ (Weaver & Tidwell LLP Comment at 7 (EPA-HQ-OAR-2021-0427-0741)). Aggregators cannot and do not know "which of the restaurants' [used cooking oil] is in a given shipment," *id.*, because the oil is commingled, and it is not practical to track any amount of oil through that commingling. Renewable fuel producers also sometimes collect used cooking oil directly from their own restaurant suppliers to increase feedstock supply—making them direct competitors to aggregators. *Id.* To avoid sharing this information, aggregators will stop selling to participating producers, decreasing the available used cooking oil for producing renewable fuel. *See id.*

EPA's response was to promulgate an "alternative recordkeeping pathway." But that pathway requires aggregators to register and submit to EPA's jurisdiction and to assume burdensome recordkeeping requirements. 40 C.F.R. § 80.1479. Foreign aggregators have neither

the motivation nor resources to comply and will sell their feedstock for use in other countries. As a result, the new regulations will drastically reduce food waste available to foreign producers like Neste.

EPA invokes fraud prevention as a basis for its new requirements. JA__ (EPA Resp. at 365). According to EPA, there is a "long history of fraud involving these types of feedstocks described in Preamble Section X.H." *Id.* But Preamble Section X.H contains no discussion of fraud involving foreign food waste (or other types of feedstocks). Instead of responding to concerns about these unsubstantiated fraud claims, EPA asserted that the "lack of fraud being reported at present under the previous biogas provisions is not necessarily indicative of the lack of fraud occurring. It simply means that it has not been reported." JA__ (EPA Resp. at 212). But the lack of reported fraud cannot be a basis to conclude that there is widespread fraud sufficient to impose new recordkeeping requirements that disincentivize participation in the RFS program. EPA could otherwise always claim there is an exigency without record support to justify its actions.

23

## II.    EPA Has Failed to Justify Changing the RIN Generation Requirements.

EPA has not given any reasoned justification for its new requirement that RINs can be generated only for fuel used in the United States, 40 C.F.R. § 80.1431(a)(1)(viii), instead of for any fuel *produced for use in the United States*, 40 C.F.R. § 80.1426(b).  This change is arbitrary and capricious.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).  Moreover, to the extent EPA may try to claim that this change applies to pre-2023 enforcement actions, that argument is foreclosed because the Clean Air Act does not provide express authority for EPA to make retroactive regulations. *Sierra Club v. Whitman,* 285 F.3d 63, 68 (D.C. Cir. 2002) ("The relevant provisions of the Clean Air Act contain no language suggesting that Congress intended to give EPA the unusual ability to implement rules retroactively.").

***EPA Has Not Acknowledged Its Change in Course.***  EPA couches subsection 80.1431(a)(1)(viii) as a clarification, not a substantive change to the RIN generation requirements.  JA__ (EPA Resp. at 358). That is wrong.  Requiring that producers perfectly predict in advance and later prove that fuel is actually used in the United States is different from

24

requiring confirmation that fuel was produced for use in the United States. The latter leaves open the possibility that although fuel is intended for the United States, it may actually be sold elsewhere because of a dynamic fuel market.

In the past, the text of the regulation allowed RIN generation if "the fuel was produced for use" in the 48 contiguous states or Hawaii. 40 C.F.R. § 80.1426(b) (effective starting July 1, 2010). Nothing in that language required that Neste predict or prove that the fuel was used in the United States as long as it was produced for that purpose. EPA would now *ex ante* change "produced for use" and read it to mean "used in." But those phrases have different meanings. In another regulatory section, EPA clearly distinguished between fuels "for use" versus fuel that "is used" in a particular region: "Diesel fuel that is *designated for use only* in Alaska *and is used only in Alaska*, is exempt from the sulfur standard …." 40 C.F.R. § 69.51(b) (emphasis added). The textual distinction is exactly why EPA had to add a provision in 2023 Rule explicitly stating that a RIN is invalid if it "was generated for fuel that was not used in the covered location." 40 C.F.R. § 80.1431(a)(1)(viii). Such an addition would be unnecessary if RIN generation had always

25

been limited to fuel used in the United States. EPA's claim that it is not

changing course requires vacatur. *See Int'l Org. of Masters*, 61 F.4th at

180 (vacating agency action where agency "did not acknowledge—much

less justify—its adoption of a new rule").

*EPA Has No Reasoned Explanation.* EPA's about-face on RIN

generation is not adequately explained and undermines the purpose of

the RFS program and industry practice. *See State Farm*, 463 U.S. at 42;

*ABM Onsite Servs.*, 849 F.3d at 1142. Fuel markets are inherently

dynamic, making it difficult or impossible to control or predict where

demand is high and product will ultimately be sold. JA__ (Neste

Comment at 18). Limiting RIN generation to product that is only

ultimately proven to be sold in the United States, coupled with draconian

penalties, will stifle RIN generation by foreign producers. EPA

acknowledges that "[o]ne of [the] goals of the RFS program is to increase

domestic consumption of renewable fuels." JA__ (EPA Resp. at 358).

Neste agrees—Congress created the RFS program to reduce greenhouse

gas emissions and expand the use of renewable fuels while reducing

reliance on imported oil. *See* 42 U.S.C. § 7545(o)(2)(A)(i) (the RFS

ensures fuel *sold or introduced into commerce in the United States*

26

contains renewable fuel). EPA's new requirement undermines that goal by making it harder for foreign producers to sell renewable fuel to American businesses. Foreign producers must generate a RIN when the renewable fuel is first produced, designating the batch of fuel as "RFS-FRRF" (denoting that it was produced abroad). 40 C.F.R. § 80.1466(c)(1). Requiring foreign producers to generate RINs *only* for fuel that is ultimately used in the United States would unduly burden this process because a fuel producer is unable to predict or control at production exactly which fuel is going to be sold in the United States in a dynamic fuel market. That is because fuel is often sold on spot contracts for locations that cannot be predicted in advance. Foreign producers will necessarily generate fewer RINs under EPA's new rule because the rule mandates draconian consequences for violations, including invalidating *all* the RINs attached to the single invalid batch. 40 C.F.R. § 80.1431(a)(3). This potential consequence will reduce participation in the renewable fuel program. EPA never responded to the objection that this new requirement will actually decrease the amount of available renewable fuel. *See* JA__ (EPA Resp. at 358).

***EPA Failed to Consider Less Costly Alternatives.*** EPA failed to adequately consider a less costly alternative that better addresses the dynamic fuel market: allowing fuel producers to generate RINs for all fuel "produced for use" in the United States and to subsequently retire any RINs associated with fuel ultimately used elsewhere. *Farmers Union Cent. Exch.*, 734 F.2d at 1511; *Spirit Airlines*, 997 F.3d at 1255. The less burdensome alternative of retiring RINs would ensure that renewable fuel used outside of the United States is not counted against renewable obligations but would be less costly because it would allow fuel producers flexibility to address dynamic market conditions. EPA does not explain why this less costly alternative is insufficient.

EPA instead says "[t]here are several existing mechanisms available to address the commenter's concern that a foreign renewable fuel producer may not know the ultimate destination of its product at the time of production." JA__ (EPA Resp. at 358). EPA suggests that "renewable fuel producer[s] could dedicate storage tanks for volumes that are produced for use in the covered location and divert new volumes to other storage tanks when market demands shift." *Id.* EPA's suggestion ignores the realities of the industry—market demands are always

28

"shift[ing]" so dedicating specific fuel tanks by location is not workable. *See id.*

EPA also contends that "if RINs are generated on a batch of renewable fuel that is ultimately sent to a non-covered location, the foreign renewable fuel producer can seek to address this through the remedial action process." *Id.* But EPA's guidance on remedial actions does not even contemplate this situation. EPA, *Guidance for Remedial Actions for the Renewable Fuel Standard (RFS)* (last updated June 30, 2023). The rule should be vacated because EPA failed to justify its costly change in light of less-burdensome alternatives that provide the same benefit. *Farmers Union Cent. Exch.*, 734 F.2d at 1511.

## CONCLUSION

The Court should set aside the 2023 RFS Set Rule and the binding

guidance in its Preamble and Response to Comments.

Respectfully submitted,

*/s/ Ashley C. Parrish*

| | |
|---|---|
| Amina Dammann | Ilana Saltzbart |
| KING & SPALDING LLP | Ashley C. Parrish |
| 500 West 2nd Street | *Counsel of Record* |
| Suite 1800 | Jeremy M. Bylund |
| Austin, TX 78701 | K. Paige Tenkhoff |
| (512) 457-2000 | KING & SPALDING LLP |
| | 1700 Pennsylvania Avenue NW |
| | Washington, DC 20006 |
| | (202) 737-0500 |
| | aparrish@kslaw.com |

*Counsel for Neste US, Inc.*

March 22, 2024

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of this Court's February 14, 2024 Order, Doc. 2040364, because it contains 5,332 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(a)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in the proportionally spaced typeface Century Schoolbook 14-point font using Microsoft Word 365 ProPlus.

Dated: March 22, 2024

*/s/ Ashley C. Parrish*
Ashley C. Parrish

*Counsel for Neste US, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Ashley C. Parrish
Ashley C. Parrish

*Counsel for Neste US, Inc.*

**ADDENDUM**

# APPENDIX A

## *Comparison of Current and Historical Regulations*

**2010 to 2023 Comparison of "Amount Requirement"** (deletions and additions to original 2010 regulation in bold redline):

> (1)(i) Documents demonstrating the amounts, by weight, purchased of separated yard **and waste, separated** food waste**, or biogenic waste oils/fats/greases** for use as a feedstock in producing renewable fuel.

Comparing 40 C.F.R. § 80.1454(j)(1)(i) (effective starting July 1, 2010) to current version of 40 C.F.R. § 80.1454(j)(1)(i).

**2010 to 2023 Comparison of "Location Requirement"** moved from the registration regulation (40 C.F.R. § 80.1450) to the record keeping regulation (40 C.F.R. § 80.1454) (deletions and additions in original 2010 regulation in bold redline):

> **(1)(ii) Documents demonstrating t**he location of any **municipal waste facility or other facility establishment(s)** from which the waste stream consisting solely of **separated yard waste,** separated food waste**, or biogenic waste oils/fats/greases** is collected.

Comparing 40 C.F.R. 80.1450(b)(1)(vii)(B)(1) (effective starting July 1, 2010) to current version of 40 C.F.R § 80.1454(j)(1)(ii).

**2010 to 2023 Comparison of Certification Requirement** (deletions and additions to original 2010 regulation in bold redline):

> **(d) Additional requirements for domestic producers of renewable fuel.**
>
> **(d1) Additional requirements for domestic producers of renewable fuel.** Except as provided in paragraphs (g) and (h) of this section, **beginning July 1, 2010,** any domestic producer of renewable fuel **as defined in § 80.1401** that generates RINs for such fuel must keep documents associated with feedstock purchases and transfers that identify where the feedstocks were

produced and are sufficient to verify that feedstocks used are renewable biomass ~~(as defined in § 80.1401)~~ if RINs are generated.

….

**(4~~5~~)** Domestic producers of renewable fuel **~~made or~~ ~~biointermediates produced~~** from **~~any other~~ a** type of renewable biomass **not specified in paragraphs (d)(2) through (4) of this section** must have documents from their feedstock suppliers **and feedstock aggregators, as applicable,** certifying that the feedstock qualifies as renewable biomass **~~as defined in § 80.1401~~**, describing the feedstock. **~~Separated yard and food waste and separated municipal solid waste are subject to the requirements in paragraph (j) of this section.~~**

**(6) Producers of renewable fuel or biointermediate produced from separated yard and food waste, biogenic oils/fats/greases, or separated MSW must comply with either the recordkeeping requirements in paragraph (j) of this section or the alternative recordkeeping requirements in § 80.1479.**

Comparing 40 C.F.R. § 80.1450(d) (effective starting July 1, 2010) to current version of 40 C.F.R § 80.1454(d).

# APPENDIX B

## *Current Location and Amount Requirements*

**40 C.F.R. § 80.1454(j)**

***Additional requirements for producers that use separated yard waste, separate food waste, separated MSW, or biogenic waste oils/fats/greases.*** Except for parties complying with the alternative recordkeeping requirements in § 80.1479, a renewable fuel or biointermediate producer that produces fuel or biointermediate from separated yard waste, separated food waste, separated MSW, or biogenic waste oils/fats/greases must keep all the following additional records:

> (1) For separated yard waste, separated food waste, and biogenic waste oils/fats/greases:

> > (i) Documents demonstrating the amounts, by weight, purchased of separated yard waste, separated food waste, or biogenic waste oils/fats/greases for use as a feedstock in producing renewable fuel.

> > (ii) Documents demonstrating the location of any establishment(s) from which the waste stream consisting solely of separated yard waste, separated food waste, or biogenic waste oils/fats/greases is collected.

> > (iii) Such other records as may be requested by EPA.

> …

# APPENDIX C

## *Current Certifications Requirements*

### 40 C.F.R. § 80.1454(d)

(1) Except as provided in paragraphs (g) and (h) of this section, any domestic producer of renewable fuel that generates RINs for such fuel must keep documents associated with feedstock purchases and transfers that identify where the feedstocks were produced and are sufficient to verify that feedstocks used are renewable biomass if RINs are generated.

…

(5) Domestic producers of renewable fuel or biointermediates produced from a type of renewable biomass not specified in paragraphs (d)(2) through (4) of this section must have documents from their feedstock suppliers and feedstock aggregators, as applicable, certifying that the feedstock qualifies as renewable biomass, describing the feedstock.

(6) Producers of renewable fuel or biointermediate produced from separated yard and food waste, biogenic oils/fats/greases, or separated MSW must comply with either the recordkeeping requirements in paragraph (j) of this section or the alternative recordkeeping requirements in § 80.1479.

**40 C.F.R. § 80.1454(c)**

(1)    Beginning July 1, 2010, any RIN-generating foreign producer of a renewable fuel or RIN-generating importer must keep records of feedstock purchases and transfers associated with renewable fuel for which RINs are generated, sufficient to verify that feedstocks used are renewable biomass.

…

(iii) RIN-generating foreign producers and importers of renewable fuel made from any other type of renewable biomass must have documents from their feedstock supplier certifying that the feedstock qualifies as renewable biomass, describing the feedstock and identifying the process that was used to generate the feedstock.

…

## APPENDIX D

### *Current RIN Generation Regulation*

**40 C.F.R. § 80.1426(b)**

(b) Regional applicability.—

(1) Except as provided in paragraph (c) of this section, a RIN may only be generated by a renewable fuel producer or importer for a batch of renewable fuel that satisfies the requirements of paragraph (a)(1) of this section if it is produced or imported for use as transportation fuel, heating oil, or jet fuel in the covered location.

**40 C.F.R. § 80.1431(a)**

(a) *Invalid RINs.*

>   (1) An invalid RIN is a RIN that is any of the following:

>   …

>>   (viii) Was generated for fuel that was not used in the covered location.

>   …