**ORAL ARGUMENT NOT YET SCHEDULED**

No. 23-1177 and consolidated cases

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

CENTER FOR BIOLOGICAL DIVERSITY,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY, ET AL.,
Respondents.

—————————————

ON PETITION FOR REVIEW OF AN ACTION OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

—————————————

INITIAL BRIEF FOR RESPONDENTS

—————————————

TODD KIM
  *Assistant Attorney General*

KIMERE J. KIMBALL
ALEXANDER PURPURO
JOHN H. MARTIN
JOSEPH CRUSHAM
  *U.S. DOJ/ENRD*
  *P.O. Box 7611*
  *Washington, D.C. 20044*
  *(202) 514-2285/9771*
  kimere.kimball@usdoj.gov
  alexander.purpuro@usdoj.gov
  john.h.martin@usdoj.gov
  joseph.crusham@usdoj.gov

*Of Counsel:*
LUCAS MAY, NORA
GREENGLASS, MONICA DERBES
GIBSON & MEREDITH MILLER
  *U.S. EPA*
REBECCA FINLEY
  *U.S. DOI*
JENNIFER DOUGLAS
  *NOAA*

**RESPONDENTS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), counsel for Respondents United States Environmental Protection Agency ("EPA"), U.S. Fish and Wildlife Service ("FWS"), and U.S. National Marine Fisheries Service ("NMFS") submit this certificate as to parties, rulings, and related cases.

**A.      Parties and Amici**

The list of petitioners, respondents, intervenors, and amici in Center for Biological Diversity and National Wildlife Federation's opening brief (the "Environmental Petitioners' Brief") mistakenly omits Growth Energy, LLC as a respondent-intervenor. The list is otherwise accurate.

The list of petitioners, respondents, intervenors, and amici in Refiners' opening brief mistakenly omits FWS and NMFS as respondents in Case No. 23-1177, and mistakenly omits Growth Energy, LLC as a respondent-intervenor. The list is otherwise accurate.

The list of petitioners, respondents, intervenors, and amici in Neste US Inc.'s ("Neste") opening brief is accurate.

The list of petitioners, respondents, intervenors, and amici in Sustainable Advanced Biofuel Refiners Coalition's ("SABR") opening brief is accurate.

i

**B.     Rulings Under Review**

The agency actions under review are EPA's rule entitled "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44468 (July 12, 2023), referred to as the "Set Rule" throughout this brief, as well as FWS's August 3, 2023 Concurrence with EPA's "May Affect, Not Likely to Adversely Affect" Determination and NMFS's July 27, 2023 Concurrence with EPA's "May Affect, Not Likely to Adversely Affect" Determination for the Set Rule.

**C.     Related Cases**

The Set Rule was also challenged by the Coalition for Renewable Natural Gas ("CRNG") in a case that was previously consolidated with these actions but later severed. *CRNG v. EPA*, No. 23-1248 (D.C. Cir. argued April 25, 2024). That case is fully briefed and argued and is currently awaiting final disposition.

The Set Rule has not otherwise been challenged in any proceedings other than these consolidated cases and the *CRNG* matter. However, related issues were raised in *Sinclair Wyoming Refining Co. v. EPA*, 101 F.4th 871 (D.C. Cir. 2024) (and consolidated cases), which involved a number of challenges to the applicable volumes and percentage standards under the RFS program that EPA established for 2020-2022 by application of the same statutory criteria at issue in this litigation. Additionally, both Refiners here and petitioners in *Sinclair Wyoming* challenged

EPA's response to the court's partial remand of an earlier RFS annual rule challenged in *Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017). In response to that remand, EPA promulgated a Supplemental Standard for 2022 (challenged in *Sinclair Wyoming*) and 2023 (challenged here). The *Sinclair Wyoming* court issued its decision on May 14, 2024, between Refiners' opening brief and this response brief.

/s/ *Alexander Purpuro*
ALEXANDER PURPURO

Counsel for Respondent

# TABLE OF CONTENTS

Respondents' Certificate as to Parties, Rulings, and Related Cases ........................ i

Table of Contents ............................................................................................. iv

Table of Authorities ........................................................................................ viii

Glossary........................................................................................................ xxviii

Introduction ........................................................................................................1

Jurisdiction ..........................................................................................................3

Pertinent Statutes and Regulations....................................................................4

Statement of Issues.............................................................................................4

Statement of the Case.........................................................................................6

    I.      Statutory and Regulatory Background ...................................6

        A.    Set Authority .................................................................7

        B.    Annual Percentage Standards ......................................8

        C.    Compliance ...................................................................8

    II.     The Set Rule .........................................................................10

        A.    2023-2025 Volumes....................................................11

        B.    2023 Supplemental Standard ....................................12

        C.    RIN Generation Regulations......................................13

        D.    The Conversion Factor for the Biomass-Based Diesel Percentage Standard Equation .................................14

        E.    Separated Food Waste Recordkeeping Requirements.............14

        F.    Biomass-Based Diesel Category.............................16

III.   ESA Consultation on the Set Rule ......................................................18

Summary of Argument ...........................................................................21

Standard of Review ...............................................................................27

Argument ..............................................................................................28

I.   EPA Reasonably Set and Fully Explained the 2023-2025
     Volumes Using the Set Authority. ....................................................28

     A.   EPA Appropriately Analyzed the Set Factors. ........................28

          1.   EPA Fully Considered All Statutory Factors in
               Light of the Statute's Purposes. ......................................29

          2.   Environmental Petitioners Misunderstand EPA's
               Greenhouse Gas Emissions Analysis. ............................37

          3.   EPA Appropriately Considered Environmental
               Justice and Non-Greenhouse Gas Environmental
               Effects in Assessing Volumes. ......................................42

          4.   EPA Properly Set Cellulosic Biofuel Volumes. .............45

          5.   EPA Properly Set Advanced Biofuel and Total
               Renewable Volumes. .....................................................47

     B.   EPA Properly Considered the RIN Cost Pass-Through
          Principle. ...............................................................................52

     C.   The Set Rule Does Not Violate the Regulatory Flexibility
          Act. .......................................................................................57

     D.   EPA Properly Considered the Timing of the Rulemaking. ......60

II.  The 2023 Supplemental Standard Is Lawful and Reasonable. ...........63

     A.   EPA Has Statutory Authority to Address the *ACE*
          Remand through a Supplemental Standard. ..............................64

B.    EPA's Imposition of the 2023 Supplemental Standard
      Was Reasonable. ........................................................................65

III.    EPA Properly Declined SABR's Requested Changes to
        Biomass-Based Diesel Requirements. .................................................71

A.    SABR's Challenges to the Implementation of the
      Biomass-Based Diesel Requirement Are Untimely. ...............71

B.    SABR's Challenges to the Implementation of the
      Biomass-Based Diesel Requirements Are Beyond the
      Scope of the Set Rule. ................................................................73

C.    The Statutory Definition of Biomass-Based Diesel
      Encompasses Renewable Diesel and Renewable Jet Fuel........76

D.    EPA's Denial of SABR's Request for a Mono-Alkyl
      Ester Biodiesel Carveout Is Reasonable. ..................................80

E.    SABR's Challenge to the Biomass-Based Diesel
      Conversion Factor and the Renewable Diesel
      Equivalence Value Must Be Rejected. ......................................86

      1.    SABR Lacks Standing to Challenge the Biomass-
            Based Diesel Conversion Factor. ...................................86

      2.    The Biomass-Based Diesel Equivalence Value Is
            Reasonable. ......................................................................88

      3.    The Renewable Diesel Equivalence Value Is
            Reasonable. ......................................................................88

      4.    The Court Should Not Vacate the Biomass-Based
            Diesel Conversion Factor or the Renewable Diesel
            Equivalence Value. ..........................................................91

IV.    EPA's Recordkeeping and RIN Generation Requirements Are
       Reasonable...............................................................................................92

A.    EPA's Interpretation of the Recordkeeping Provisions Is
      Consistent with the Regulatory Text. .......................................93

B.    EPA's Recordkeeping Provisions Are Reasonable,
       Supported by the Record, and Do Not Reflect a Change
       in EPA's Policy. ........................................................................ 97

C.    EPA's RIN Generation Provisions Merely Clarify
       Existing Regulatory and Statutory Requirements and Are
       Reasonable. ............................................................................. 107

D.    Any Remand Should Be Without Vacatur. ............................. 111

V.    The Set Rule and EPA's Informal Consultations with NMFS
       and FWS Comply with the Endangered Species Act. ....................... 111

A.    EPA's Biological Evaluation Complies with the ESA. .......... 111

       1.    The Biological Evaluation Reasonably Identifies
              the Potential Effects of the Set Rule. ........................... 112

       2.    EPA Reasonably Evaluated Possible Effects from
              Potential Water Pollution. ............................................ 118

B.    NMFS Reasonably Concurred with EPA's
       Determinations. ....................................................................... 121

C.    FWS Reasonably Concurred with EPA's Determinations. .... 131

Conclusion ..................................................................................................... 137

## TABLE OF AUTHORITIES

# CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993)................................................................92

*Alon Refining Krotz Springs, Inc. v. EPA,*
   936 F.3d 628 (D.C. Cir. 2019).................................... 29, 52, 55, 59, 82

*Am. Fuel & Petrochemical Mfrs. v. EPA ("AFPM"),*
   937 F.3d 559 (D.C. Cir. 2019)............................... 6, 27, 73, 74, 76, 137

*Am. Wildlands v. Kempthorne,*
   530 F.3d 991 (D.C. Cir. 2008)..............................................................119

*Ams. for Clean Energy v. EPA ("ACE"),*
   864 F.3d 691 (D.C. Cir. 2017).............................. 4, 11, 12, 30, 61, 62, 63, 64, 66

*Bennett v. Spear,*
   520 U.S. 154 (1997) ..........................................................................125

*Bldg. Indus. Ass'n of Superior Cal. v. Norton,*
   247 F.3d 1241 (D.C. Cir. 2001)..........................................................128

*Bluewater Network v. EPA,*
   370 F.3d 1 (D.C. Cir. 2004)..................................................................27

*Cabinet Mountains Wilderness v. Peterson,*
   685 F.2d 678 (D.C. Cir. 1982)............................................................133

*Calumet Shreveport Refin., LLC v. EPA,*
   86 F.4th 1121 (5th Cir. 2023) ....................................................... 56, 57

*Charter Commc'ns, Inc. v. FCC,*
   460 F.3d 31 (D.C. Cir. 2006)................................................................91

*City of Tacoma v. FERC,*
   460 F.3d 53 (D.C. Cir. 2006)...................................................... 27, 135

*CSX Transp., Inc. v. STB,*
   584 F.3d 1076 (D.C. Cir. 2009)...........................................................76

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ........................................................................58

*Eagle Pharms., Inc. v. Azar*,
    952 F.3d 323 (D.C. Cir. 2020)........................................................80

*El Puente v. U.S. Army Corps of Eng'rs*,
    100 F.4th 236 (D.C. Cir. 2024) ......................................................99

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) ........................................................................55

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ................................................................ 68, 109

*Fla. Bankers Ass'n v. U.S. Dep't of Treasury*,
    799 F.3d 1065 (D.C. Cir. 2015)......................................................58

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ........................................................................28

*Free Access & Broad. Telemedia, LLC v. FCC*,
    865 F.3d 615 (D.C. Cir. 2017)........................................................74

*Grocery Mfrs. Ass'n v. EPA*,
    693 F.3d 169 (D.C. Cir. 2012)........................................................58

*Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021) .................................................. 28, 59, 127

*Jama v. Immigr. & Customs Enf't*,
    543 U.S. 335 (2005) ........................................................................79

*Jimenez v. Quarterman*,
    555 U.S. 113 (2009) ........................................................................76

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) ................................................................. 97, 98

*Lead Indus. Ass'n Inc. v. EPA*,
    647 F.2d 1130 (D.C. Cir. 1980)......................................................27

ix

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
    70 F.4th 582 (D.C. Cir. 2023) ............................................................125

*Med. Waste Inst. & Energy Recovery Council v. EPA*,
    645 F.3d 420 (D.C. Cir. 2011)..............................................................73

*Mingo Logan Coal Co. v. EPA*,
    829 F.3d 710 (D.C. Cir. 2016)............................................................103

*Mobil Oil Expl. & Producing Se., Inc. v. United Distrib. Cos.*,
    498 U.S. 211 (1991) .............................................................................91

*Monroe Energy, LLC v. EPA*,
    750 F.3d 909 (D.C. Cir. 2014).................................................... 61, 63

*Mossville Env't Action Now v. EPA*,
    370 F.3d 1232 (D.C. Cir. 2004)............................................................96

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................... 27, 136

*Nasdaq Stock Mkt., LLC v. SEC*,
    38 F.4th 1126 (D.C. Cir. 2022) ...........................................................31

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) ....................................................59

*Nat'l Fam. Farm Coal. v. EPA*,
    966 F.3d 893 (9th Cir. 2020) .............................................................119

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
    630 F.3d 145 (D.C. Cir. 2010).................................................... 61, 64

*Nat. Res. Def. Council v. EPA*,
    571 F.3d 1245 (D.C. Cir. 2009)............................................................55

*Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*,
    No. C11-2044-RSM, 2014 WL 5449859 (W.D. Wash. Oct. 24, 2014) ...........133

*Pub. Emps. for Env't Resp. v. EPA*,
    77 F.4th 899 (D.C. Cir. 2023) .............................................................76

*Pub. Emps. for Env't Resp. v. U.S. Dep't of the Interior*,
    832 F. Supp. 2d 5 (D.D.C. 2011) ........................................................126

*Rural Cellular Ass'n v. FCC*,
    588 F.3d 1095 (D.C. Cir. 2009)................................................... 28, 47

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ..........................................................126

*Save Our Springs All., Inc. v. Tex. Dep't of Transp.*,
    No. 1:19-CV-762-RP, 2022 WL 1004776 (W.D. Tex. Mar. 31, 2022) ..................

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
    992 F.3d 1071 (D.C. Cir. 2021)..........................................................28

*Sierra Club v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008)..........................................................75

*Sierra Club v. Van Antwerp*,
    661 F.3d 1147 (D.C. Cir. 2011)................................................... 75, 129

*Sinclair Wyoming Refining Co. v. EPA*,
    101 F.4th 871 (D.C. Cir. 2024) . ..2, 28, 30, 36, 37, 42, 48, 61, 62, 63, 64, 65, 67,
    68, 69, 70, 71, 126

*Solar Energy Indus. Ass'n v. Fed. Energy Regul. Comm'n*,
    59 F.4th 1287 (D.C. Cir. 2023) ..........................................................31

*Stilwell v. Off. of Thrift Supervision*,
    569 F.3d 514 (D.C. Cir. 2009)................................................... 105, 106

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..........................................................................87

*Taylor v. FAA*,
    895 F.3d 56 (D.C. Cir. 2018)..............................................................91

*United States v. McGill*,
    815 F.3d 846 (D.C. Cir. 2016)............................................................75

*Village of Bensenville v. FAA*,
    457 F.3d 52 (D.C. Cir. 2006)............................................................131

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ................................................................91

*Wildearth Guardians v. EPA,*
    759 F.3d 1196 (10th Cir. 2014) ..........................................114

*Wynnewood Refin. Co., LLC v. EPA,*
    77 F.4th 767 (D.C. Cir. 2023) ...............................................63

## STATUTES

5 U.S.C. § 601(3)-(6) ...................................................................58

5 U.S.C. § 603 ..............................................................................57

5 U.S.C. § 604 ..............................................................................57

5 U.S.C. § 605(b) ..........................................................................57

5 U.S.C. § 611 .................................................................. 57, 58, 59

15 U.S.C. § 632(a) ........................................................................58

16 U.S.C. § 1532(16) ....................................................................18

16 U.S.C. § 1532(19) ..................................................................128

16 U.S.C. § 1536(a)(2) ................................................................127

16 U.S.C. § 1539(j) .......................................................................18

26 U.S.C. § 40A(f)(1) ...................................................................79

42 U.S.C. § 7545(*o*) .................................................................. 6, 76

42 U.S.C. § 7545(o)(1)(B) ..........................................................6, 9

42 U.S.C. § 7545(o)(1)(B)(i) .................................................. 39, 41

42 U.S.C. § 7545(*o*)(1)(D) ........................................ 6, 9, 16, 17, 77, 81

42 U.S.C. § 7545(*o*)(1)(E) ................................................. 6, 9, 39, 41

42 U.S.C. § 7545(*o*)(1)(F) .............................................................7

42 U.S.C. § 7545(*o*)(1)(I) ...................................................................6

42 U.S.C. § 7545(*o*)(1)(I)(vii)...........................................................14

42 U.S.C. § 7545(*o*)(1)(J) ...................................................................6

42 U.S.C. § 7545(*o*)(2)..........................................................................6

42 U.S.C. § 7545(*o*)(2)(A)(i) ...................................... 10, 13, 39, 41, 107

42 U.S.C. § 7545(*o*)(2)(A)(iii) ..........................................................13

42 U.S.C. § 7545(*o*)(2)(A)(iii)(II)(aa) ...............................................82

42 U.S.C. § 7545(*o*)(2)(B)(i) ...................................... 7, 9, 48, 85

42 U.S.C. § 7545(*o*)(2)(B)(i)(IV) .......................................................7

42 U.S.C. § 7545(*o*)(2)(B)(ii) ...................... 4, 8, 11, 28, 31, 38, 42, 114

42 U.S.C. § 7545(*o*)(2)(B)(ii)(I) ............................................... 42, 50

42 U.S.C. § 7545(*o*)(2)(B)(ii)(II)......................................................50

42 U.S.C. § 7545(*o*)(2)(B)(ii)(III).....................................................49

42 U.S.C. § 7545(*o*)(2)(B)(ii)(IV) ....................................................50

42 U.S.C. § 7545(*o*)(2)(B)(ii)(V)............................................... 42, 83

42 U.S.C. § 7545(*o*)(2)(B)(ii)(VI) ............................................. 42, 69

42 U.S.C. § 7545(*o*)(3)(B)(i) ..................................................... 8, 13, 64

42 U.S.C. § 7545(*o*)(3)(B)(ii) .............................................................8

42 U.S.C. § 7545(o)(5).......................................................... 9, 10

42 U.S.C. § 7545(*o*)(5)(D)..................................................................10

42 U.S.C. § 7545(*o*)(7)(A)...................................................................70

42 U.S.C. § 7545(*u*) ...........................................................................79

42 U.S.C. § 7607(b)(1)............................................................... 3, 72, 73

42 U.S.C. § 7607(d)(1)(E) ...................................................................27

42 U.S.C. § 7607(d)(7)(A) ...................................................................28

42 U.S.C. § 7607(d)(7)(B) ............................ 55, 59, 96, 101, 110

42 U.S.C. § 7607(d)(9)(A) ...................................................................27

42 U.S.C. § 13220(a)(1) .......................................................................79

42 U.S.C. § 13220(f) ................................... 17, 72, 77, 80, 81

42 U.S.C. § 17021(c)(2) .......................................................................78

Pub. L. No. 109-58, 119 Stat. 594 (2005) ................................................6

Pub. L. No. 109-58, 119 Stat. 1055 (2005) .........................................79

Pub. L. No. 110-140, 121 Stat. 1492 (2007) ............................... 6, 30

## CODE OF FEDERAL REGULATIONS

13 C.F.R. § 121.201 (324110) ...........................................................58

40 C.F.R. Part 79 ...................................................................................80

40 C.F.R. § 80.1401 (2010) ............................................ 72, 77, 84

40 C.F.R. § 80.1405(a) .........................................................................88

40 C.F.R. § 80.1405(c) .................................................................. 8, 88

40 C.F.R. § 80.1406 ..............................................................................8

40 C.F.R. § 80.1407(a) .........................................................................9

40 C.F.R. § 80.1415(a)(2) ...................................................................14

40 C.F.R. § 80.1415(b) .........................................................................14

40 C.F.R. § 80.1426 ..............................................................................9

40 C.F.R. § 80.1426(a) .................................................................. 9, 110

40 C.F.R. § 80.1426(b)(1) ...................................................................10

40 C.F.R. § 80.1426(b)(1) (July 2010) ........................................ 13, 108

40 C.F.R. § 80.1426(c)(2) ........................................ 14, 107

40 C.F.R. § 80.1427(a) ........................................9

40 C.F.R. § 80.1427(a)(1) ........................................10

40 C.F.R. § 80.1427(a)(3)(i) ........................................9

40 C.F.R. § 80.1427(a)(5) ........................................10

40 C.F.R. § 80.1427(b) ........................................10

40 C.F.R. § 80.1428(b) ........................................9

40 C.F.R. § 80.1428(c) ........................................10

40 C.F.R. § 80.1431(a)(1)(viii) ........................................ 14, 107

40 C.F.R. § 80.1450(b) ........................................ 95, 101

40 C.F.R. § 80.1450(b)(1)(vii)(B)(1) (Sept. 2014) ........................................99

40 C.F.R. § 80.1450(d) ........................................95

40 C.F.R. § 80.1454(c) ........................................ 94, 97

40 C.F.R. § 80.1454(c)(1) (July 2010) ........................................98

40 C.F.R. § 80.1454(c)(1)(iii) ........................................ 94, 97

40 C.F.R. § 80.1454(d) ........................................ 95, 97, 101

40 C.F.R. § 80.1454(d) (July 2010) ........................................ 15, 94, 96, 98

40 C.F.R. § 80.1454(d)(1) (July 2010) ........................................94

40 C.F.R. § 80.1454(d)(4) ........................................15

40 C.F.R. § 80.1454(d)(5) ........................................ 15, 97

40 C.F.R. § 80.1454(j) ........................................ 15, 95

40 C.F.R. § 80.1454(j)(1) ........................................ 16, 93, 101

40 C.F.R. § 80.1454(j)(1) (July 2010) ....................................................15

40 C.F.R. § 80.1454(j)(1)(i) ........................................................... 94, 96

40 C.F.R. § 80.1454(j)(1)(ii) ........................................................ 16, 94

40 C.F.R. § 80.1466(c)(1) .....................................................................109

40 C.F.R. § 80.1479 ..................................................................... 16, 106

40 C.F.R. § 80.1479(a) ..........................................................................16

40 C.F.R. § 80.2 ........................................................................ 9, 13, 78

40 C.F.R. § 1090.80 ...............................................................................49

50 C.F.R. § 402.02 (2019) ................................................. 114, 118, 131, 132

50 C.F.R. § 402.13(b) ............................................................................20

50 C.F.R. § 402.14(a) ............................................................................20

50 C.F.R. § 402.14(b)(1) .......................................................................127

50 C.F.R. § 402.14(e) ...........................................................................125

50 C.F.R. § 402.14(g)(2) .......................................................................114

## FEDERAL REGISTER

59 Fed. Reg. 65781 (Dec. 21, 1994) ....................................................124

72 Fed. Reg. 23900 (May 1, 2007) .........................................................72

75 Fed. Reg. 14670 (Mar. 26, 2010)........................... 17, 72, 84, 85, 90, 93

77 Fed. Reg. 59458 (Sept. 27, 2012) ......................................................74

78 Fed. Reg. 14190 (Mar. 5, 2013) ........................................................73

80 Fed. Reg. 77420 (Dec. 14, 2015) .................................................. 12, 63

81 Fed. Reg. 80828 (Nov. 16, 2016) ................................................. 99, 100

84 Fed. Reg. 44976 (Aug. 27, 2019) ................................................ 133, 134

85 Fed. Reg. 7016 (Apr. 6, 2020) .......................................... 15, 94, 95, 98, 99, 100

86 Fed. Reg. 72436 (Dec. 21, 2021) ..........................................................66

87 Fed. Reg. 39600 (July 1, 2022).................................................. 12, 13, 48, 64, 66

88 Fed. Reg. 44468 (July 12, 2023) ...........................................................1

# GLOSSARY

| | |
|---|---|
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| FWS Concurrence | FWS's August 3, 2023, Concurrence with EPA's "May Affect, Not Likely to Adversely Affect" Determination for the Set Rule |
| NMFS | National Marine Fisheries Service |
| NMFS Concurrence | NMFS's July 27, 2023, Concurrence with EPA's "May Affect, Not Likely to Adversely Affect" Determination for the Set Rule |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |
| Set Rule | "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44468 (July 12, 2023) |

**INTRODUCTION**

This litigation is the latest of the near-annual disputes over the annual required volumes of renewable fuels the Environmental Protection Agency ("EPA") sets to be used in transportation fuel, as required by the Clean Air Act's ("CAA") Renewable Fuel Standard ("RFS") program. At issue is EPA's "Set Rule," which establishes the renewable fuel volumes for 2023-2025. *See* "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44468 (July 12, 2023). Petitioners assert five challenges, none of which is availing.

First, Refiners[1] and Environmental Petitioners[2] challenge the 2023-2025 volumes. But EPA lawfully and reasonably set the 2023-2025 volumes by conducting the same type of analyses of the same series of statutory factors that this Court recently upheld for the 2020-2022 volumes in *Sinclair Wyoming*

---

[1] "Refiners" refers to the Petitioners who joined in filing the Initial Brief of American Fuel & Petrochemical Manufacturers, REH Company, The Small Refineries Coalition, Countrymark Refining and Logistics, LLC, the San Antonio Refinery LLC, and Wynnewood Refining Co., LLC (Mar. 22, 2024), Doc. No. 2046440 (hereinafter "Refiners' Br.").

[2] "Environmental Petitioners" refers to Petitioners who joined in filing the Initial Brief for the Environmental Petitioners Center for Biological Diversity & National Wildlife Federation (Mar. 22, 2024), Doc. No. 2046438 (hereinafter "Env. Br.").

*Refining Co. v. EPA*, 101 F.4th 871 (D.C. Cir. 2024) (hereinafter "*Sinclair Wyoming*").

Second, Refiners challenge EPA's implementation of the "2023 supplemental standard"—a 250-million-gallon additional renewable fuel volume obligation that comprises the second half of EPA's manner of addressing this Court's remand of a 2016 annual volume. Notably, this Court already upheld the identical *first* half (i.e., the 2022 supplemental standard) in *Sinclair Wyoming*, and it should uphold the 2023 supplemental standard for the same reasons.

Third, SABR[3] challenges EPA's declination to craft new regulations to protect biodiesel from competition with other biomass-based diesel fuels. But consistent with the CAA, EPA reasonably declined to redefine the statutory biomass-based diesel category to preclude qualifying renewable fuels that meet the definition for biomass-based diesel from being used to satisfy that volume requirement. Further, SABR fails to establish it has standing to establish the biomass-based diesel conversion factor and EPA's continued use of the renewable diesel equivalence value is reasonable.

---

[3] SABR refers to the Petitioner that filed the Initial Brief for the Sustainable Advanced Biofuel Refiners Coalition (Mar. 22, 2024), Doc. No. 2046447 (hereinafter "SABR Br.").

Fourth, Neste[4] challenges EPA's revised regulations pertaining to recordkeeping provisions for separated food waste used as a feedstock for renewable fuels. But EPA has always required renewable fuel producers to keep records demonstrating that their feedstocks qualify under the RFS program. And EPA's revisions to separate regulations describing how renewable fuel is credited under the RFS program simply ensure—as the statute requires—that only fuel sold in the United States is used to satisfy parties' RFS obligations.

Finally, Environmental Petitioners challenge Endangered Species Act ("ESA") analyses of the Set Rule by three federal agencies: EPA, National Marine Fisheries Service ("NMFS"), and Fish and Wildlife Service ("FWS"). But as required by the ESA, all three agencies fully considered the potential effects of the Set Rule, completed informal consultation, and reasonably determined the Set Rule is not likely to adversely affect any ESA-listed species or their critical habitats.

Accordingly, the Court should deny the petitions.

## JURISDICTION

Petitioners timely filed petitions for review challenging the Set Rule, and the Court has jurisdiction to consider the petitions under the CAA. 42 U.S.C. § 7607(b)(1). As more fully explained in Pt.I.C, *infra*, Refiners have failed to

---

[4] Neste refers to the Petitioner that filed the Initial Brief for Neste US, Inc. (Mar. 22, 2024), Doc. No. 2046444 (hereinafter "Neste Br.").

3

establish statutory standing to assert a claim under the Regulatory Flexibility Act.

Additionally, as more fully explained in Pt. III.A, *infra*, the Court lacks jurisdiction

over SABR's challenge to the biomass-based diesel category because it is

untimely. And as more fully explained in Pt. III.E.1, *infra*, the Court lacks

jurisdiction over SABR's challenge to the biomass-based diesel conversion factor

in the percentage standard equation because SABR fails to establish standing to

challenge that provision.

## PERTINENT STATUTES AND REGULATIONS

EPA has provided materials in the attached addendum to supplement

materials contained in Petitioners' addendums.

## STATEMENT OF ISSUES

1.      Whether the volumes and percentage standards of renewable fuel for

years 2023-2025 that EPA set under the RFS program based on its extensive

analysis of statutory factors under 42 U.S.C. § 7545(*o*)(2)(B)(ii) were lawful and

reasonable.

2.      Whether EPA lawfully and reasonably applied a supplemental

standard to address the remaining half of the outstanding 2016 total renewable fuel

RFS volume resulting from this Court's remand of the 2016 RFS volumes in

*Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017) (hereinafter

"*ACE*").

4

3.      Whether EPA reasonably declined to narrow the scope of the biomass-based diesel category by limiting that category to only mono-alkyl ester biodiesel for the first time in the program's history.

4.      Whether EPA reasonably adjusted the conversion factor for the biomass-based diesel percentage standard equation and whether EPA reasonably declined to revise the renewable diesel equivalence value.

5.      Whether EPA's clarifying revisions to its longstanding recordkeeping requirements for separated food waste used as a feedstock for renewable fuel in the RFS program are reasonable.

6.      Whether EPA's revisions to its RIN generation provisions, reiterating that RINs may only be generated for renewable fuel produced for use in the United States, are reasonable.

7.      Whether EPA complied with the ESA by completing its Biological Evaluation (hereinafter the "Evaluation") and determining the Set Rule is "not likely to adversely affect" ESA-listed species or critical habitats and by relying on NMFS' and FWS' concurrences with the effects determinations in the Evaluation.

8.      Whether NMFS and FWS each complied with the ESA in their separate concurrences to EPA's effects determinations in its Evaluation that the Set Rule is not likely to adversely affect ESA-listed species or critical habitats.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background

In 2005 and again in 2007, Congress amended the Clean Air Act ("CAA") to establish and revise the RFS program, codified at 42 U.S.C. § 7545(*o*). *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (Aug. 8, 2005); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (Dec. 19, 2007).

The statute identified increasing target volumes of renewable fuel to be introduced into the United States' transportation fuel supply each year through 2022 and required EPA to set volumes after 2022 based on EPA's analysis of specific statutory factors. *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 568-69 (D.C. Cir. 2019) (hereinafter "*AFPM*"); 42 U.S.C. § 7545(*o*)(2). Renewable fuel is defined as only fuel made from enumerated types of "renewable biomass" that is "used to replace or reduce the quantity of fossil fuel present in a transportation fuel." 42 U.S.C. § 7545(*o*)(1)(I), (J).

The statute addresses four nested categories of renewable fuel: biomass-based diesel, cellulosic biofuel, advanced biofuel, and total renewable fuel. Biomass-based diesel and cellulosic biofuel are both subsets of advanced biofuel, which also includes any other renewable fuels that meet certain statutory requirements. *Id.* § 7545(*o*)(1)(B), (D), (E). Total renewable fuel is the broadest

6

category. It includes all three other categories as well as "conventional" renewable fuels, which includes "ethanol derived from cornstarch." *Id*. § 7545(*o*)(1)(F).

## A.    Set Authority

For cellulosic biofuel, advanced biofuel, and total renewable fuel, the statute establishes increasing annual volumes through 2022. *Id*. § 7545(*o*)(2)(B)(i). For biomass-based diesel, the statute establishes volumes through 2012. *Id*. § 7545(*o*)(2)(B)(i)(IV). The statute further directs EPA to set all fuel volumes for subsequent years "based on a review of the implementation of the program…and an analysis of" a series of factors:

- the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

- the impact of renewable fuels on the energy security of the United States;

- the expected annual rate of future commercial production of [each statutory category of] renewable fuels…;

- the impact of renewable fuels on the infrastructure of the United States, including deliverability of material goods, and products other than renewable fuel, and the sufficiency of infrastructure to deliver and use renewable fuel;

- the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

- the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

7

*Id.* § 7545(*o*)(2)(B)(ii). The statute affords EPA flexibility regarding how to weigh these factors, without mandating any specific criteria or type of analysis.

### B.    Annual Percentage Standards

Prior to 2023, EPA was required to "ensure[]" that the applicable volumes of renewable fuel were met by determining and publishing the "renewable fuel obligation" for each compliance year. 42 U.S.C. § 7545(*o*)(3)(B)(i). While the applicable volumes reflected the nationwide use of renewable fuel, the renewable fuel obligation, expressed as a percentage standard, imposed requirements on specific obligated parties (refiners and importers of gasoline and diesel) to meet their share of those volumes. EPA calculated percentage standards by dividing the applicable volume for each renewable fuel type by the projected total volume of petroleum gasoline and diesel expected to be used in the United States that year, with certain adjustments. 42 U.S.C. § 7545(*o*)(3)(B)(ii); 40 C.F.R. § 80.1405(c). EPA has continued this same methodology of establishing annual percentage standards for the 2023-2025 volumes set pursuant to 42 U.S.C. § 7545(*o*)(2)(B)(ii).

### C.    Compliance

Refiners and importers of gasoline and diesel are required to comply with their RFS obligations unless granted an exemption. 40 C.F.R. § 80.1406. Each obligated party uses the percentage standard for each renewable fuel category to calculate its renewable volume obligation by multiplying the relevant percentage

8

standard by the volume of its own production or importation of gasoline and diesel in that year. *Id.* § 80.1407(a). This renewable volume obligation represents the share of the nationally applicable renewable fuel volume that the obligated party is responsible for meeting.

Each obligated party demonstrates compliance with its individual obligation by obtaining and "retir[ing]" a sufficient number of compliance credits in an annual compliance demonstration. 40 C.F.R. § 80.1427(a). Those credits, known as renewable identification numbers ("RINs"), represent volumes of renewable fuels used in the United States. 42 U.S.C. § 7545(*o*)(5); 40 C.F.R. §§ 80.2, 80.1426. An obligated party can obtain RINs by blending renewable fuels into transportation fuel or by purchasing RINs from others. 40 C.F.R. §§ 80.1426(a), (e), 80.1428(b).

Because the volume requirements are nested, cellulosic biofuel and biomass-based diesel RINs may be used not only to satisfy obligations for those categories, but also to satisfy the advanced biofuel obligation, and they and other advanced biofuels RINs may also be used to satisfy the total renewable fuel obligation. *See* 42 U.S.C. § 7545(*o*)(1)(B), (D), (E), (*o*)(2)(B)(i); 40 C.F.R. § 80.1427(a)(3)(i). Thus, for example, a cellulosic biofuel RIN may simultaneously satisfy cellulosic biofuel, advanced biofuel, and total renewable fuel obligations.

Parties that acquire excess RINs in one year may either sell them or carry them over to meet up to 20% of their compliance obligations the following year.[5] 42 U.S.C. § 7545(*o*)(5); 40 C.F.R. §§ 80.1427(a)(1), (5), 80.1428(c). Additionally, obligated parties may carry a compliance deficit forward to the next year, which must then be satisfied together with the next year's compliance obligations. 42 U.S.C. § 7545(*o*)(5)(D); 40 C.F.R. § 80.1427(b).

The CAA mandates that EPA "shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States...contains the applicable volumes of renewable fuel" established by EPA. 42 U.S.C. § 7545(*o*)(2)(A)(i). Accordingly, RINs may only be generated based on renewable fuel that is used in the contiguous United States or Hawaii. *See* 40 C.F.R. § 80.1426(b)(1).

## II.    The Set Rule

EPA published the Set Rule in the Federal Register on July 12, 2023. JA-[FR_44468]. In relevant part, the Set Rule (1) established the 2023, 2024, and 2025 applicable volumes and percentage standards for cellulosic biofuel, biomass-based diesel, advanced biofuel, and total renewable fuel; (2) addressed outstanding volume remaining from this Court's remand of the 2016 annual total renewable

---

[5] These excess RINs are colloquially known as "carryover RINs."

fuel volume in *ACE*, 864 F.3d 691; (3) set forth numerous amendments to EPA's RFS regulatory provisions, including adjusting the conversion factor in the percentage standard equation for biomass-based diesel; and (4) establishing an alternative recordkeeping provision for renewable fuel producers.

### A.      2023-2025 Volumes

EPA established the volume requirements at issue in this litigation pursuant to its authority to set volumes after the statutorily identified years (hereinafter "set authority"). 42 U.S.C. § 7545(*o*)(2)(B)(ii); JA-[FR_44475-521]. Pursuant to the statutory requirements, EPA "review[ed]…the implementation of the program" and conducted an extensive analysis of the enumerated statutory factors. JA-[FR_44480-508]; JA-[RIA_1-465]; 42 U.S.C. § 7545(*o*)(2)(B)(ii).

The following table shows the resulting established volumes:

**2023-2025 Rule Volume Requirements** (billion gallons)

| Fuel | 2023 | 2024 | 2025 |
|------|------|------|------|
| Cellulosic biofuel | 0.84 | 1.09 | 1.38 |
| Biomass-based diesel | 2.82 | 3.04 | 3.35 |
| Advanced biofuel | 5.94 | 6.54 | 7.33 |
| Total renewable fuel | 20.94 | 21.54 | 22.33 |

JA-[FR_44470].[6]

---

[6] Volumes are expressed as ethanol-equivalent volumes on an energy-content basis, except for biomass-based diesel, which is expressed in physical gallons of biomass-based biodiesel. JA-[FR_44470 tbl. I.A.1-1 n.a.].

**B.    2023 Supplemental Standard**

The Set Rule also completed addressing this Court's remand of the 2016 total renewable fuel volume in *ACE* following EPA's imposition of a 250-million-gallon supplemental standard in 2022. JA-[FR_44508-11]. As part of the 2014-2016 annual rule, EPA relied on its general waiver authority under a finding of inadequate domestic supply, Section 7545(*o*)(7)(A)(ii), to reduce the 2016 statutory total renewable fuel volume by 500 million gallons. 80 Fed. Reg. 77420, 77444 (Dec. 14, 2015). The *ACE* Court found that EPA exceeded its authority in using the general waiver authority and vacated and remanded that portion of the rule. 864 F.3d at 703. In EPA's 2020-2022 Rule,[7] EPA stated its intent to restore the full 500 million gallons of total renewable fuel that it had improperly waived over two years: 2022 and 2023. 87 Fed. Reg. 39603. To do so, EPA established the first of two supplemental volume obligations of 250 million gallons in the 2020-2022 Rule, implemented as the 2022 supplemental standard. *Id.* In the Set Rule, EPA completed its response to the remand by establishing the second supplemental volume requirement of 250 million gallons, implemented as a 2023 supplemental standard. JA-[FR_44470]. EPA established this supplemental standard pursuant to its authority to "ensure" that the 2016 total renewable fuel volume requirements

---

[7] "Renewable Fuel Standard (RFS) Program: RFS Annual Rules," 87 Fed. Reg. 39600 (July 1, 2022).

"are met." 87 Fed. Reg. 39629-30 & n.171; JA-[FR_44510] (citing 42 U.S.C.

§ 7545(*o*)(2)(A)(i), (iii), (*o*)(3)(B)(i)). Moreover, in light of practical challenges in

implementing a modified 2016 standard, EPA explained that this supplemental

standard would be treated as a 2023 standard in all respects, including which

parties would be obligated to comply with the supplemental standard and which

RINs would be valid for compliance, among other things. JA-[FR_44509]. Thus,

the original 2016 standard for total renewable fuel remains unchanged and the

compliance demonstrations that obligated parties made for it likewise remain in

place. JA-[FR_44509-11].

### C.    RIN Generation Regulations

The CAA specifies that EPA's regulations must "ensure that transportation

fuel sold or introduced into commerce in the United States" contains at least the

applicable volumes of renewable fuel. 42 U.S.C. § 7545(*o*)(2)(A)(i). EPA's

regulations previously specified that only fuel that is "produced or imported for use

as transportation fuel" in the 48 contiguous states, or Hawaii may generate RINs.

*See* 40 C.F.R. § 80.1426(b)(1). In the Set Rule, EPA revised its regulations to

reiterate that parties "cannot generate RINs for renewable fuel unless it was

produced for use in the covered location."[8] JA-[FR_44547]; *see* 40 C.F.R. §§

---

[8] A "covered location" is "the contiguous 48 states [and] Hawaii…." 40 C.F.R. §
80.2. This brief refers to a "covered location" as "United States."

80.1426(c)(2), 80.1431(a)(1)(viii) (a RIN is invalid if it "[w]as generated for fuel that was not used in the covered location.").

###  D.    The Conversion Factor for the Biomass-Based Diesel Percentage Standard Equation

An "equivalence value is a number that is used to determine how many gallon-RINs can be generated for a gallon of renewable fuel...." 40 C.F.R. § 80.1415(a)(2). The equivalence value for mono-alkyl ester biodiesel is 1.5 and renewable diesel is 1.7, meaning each physical gallon of biodiesel and renewable diesel generate 1.5 and 1.7 RINs respectively. 40 C.F.R. § 80.1415(b). Based on these equivalence values and the actual volumes of biodiesel and renewable diesel produced in 2022, EPA adjusted the biomass-based diesel percentage standard equation by revising the conversion factor, which is used to convert from gallons of biomass-based diesel to number of biomass-based diesel RINs in determining the percentage standard, from 1.5 to 1.6. *See* JA-[FR_44547].

###  E.    Separated Food Waste Recordkeeping Requirements

To qualify under the RFS program, renewable fuel must be produced from one of the seven statutory categories of renewable biomass, which include separated food waste. 42 U.S.C. § 7545(*o*)(1)(I)(vii). To ensure this requirement is met, EPA requires that renewable fuel producers maintain records documenting where the feedstocks were produced and demonstrating that they qualify as renewable biomass. *See* 40 C.F.R. § 80.1454(d). For certain waste feedstocks,

including separated food waste, information necessary to determine that a feedstock is truly a waste, as opposed to a non-waste, virgin oil, includes the location at which the food waste was collected, which might be a restaurant or a food processing facility. *See* JA-[RTC_365, 370]. EPA also requires renewable fuel producers that use separated food waste as a feedstock to document the amounts of qualifying feedstock purchased from each location, *see* 40 C.F.R. § 80.1454(j)(1), and to keep documents from feedstock suppliers "certifying that the feedstock qualifies as renewable biomass, describing the feedstock." *Id.* § 80.1454(d)(5). These provisions enable EPA to verify that renewable fuel produced from separated food waste meets the statutory requirements and qualifies to generate RINs.

EPA's regulations have required renewable fuel producers to maintain these records since 2010. *See id.* § 80.1454(d), (j)(1) (July 2010). In 2020, EPA eliminated a separate registration provision requiring renewable fuel producers to submit food waste location information when facilities first register with EPA. However, producers would "still be required to maintain records that demonstrate that they used a qualifying feedstock to produce renewable fuels for the generation of RINs pursuant to the recordkeeping requirements at 40 C.F.R. § 80.1454(d)(4) and (j)." 85 Fed. Reg. 7016, 7062 (Apr. 6, 2020). To reinforce this point, EPA amended 40 C.F.R. § 80.1454(j)(1) to clarify that renewable fuel producers were

still required to keep records demonstrating the location of the establishment that produces the feedstock. *Id.* EPA further clarified that in cases where a renewable fuel producer obtains feedstock from a food waste aggregator—an entity that collects food waste from originating sources, such as restaurants, to resell to a renewable fuel producer—the "location" means "the physical address that the aggregator obtained the wastes used as feedstocks from, not the physical or company address of the aggregator." *Id.*

In response to concerns raised regarding notice of the changes made in 2020 to 40 C.F.R. § 80.1454(j)(1)(ii), EPA reopened that provision for public comment in the proposal for the Set Rule. *See* JA-[NPRM_80701]. To provide additional recordkeeping flexibility, EPA also proposed and subsequently finalized an alternative recordkeeping provision at 40 C.F.R. § 80.1479. *See* JA-[FR_44548]. Under that provision, an aggregator may voluntarily register with EPA and maintain records of the locations where the separated food waste was collected. An independent auditor can then verify those records, ensuring that the feedstocks are renewable biomass. *See* 40 C.F.R. § 80.1479(a).

### F.    Biomass-Based Diesel Category

One nested category of advanced biofuel is biomass-based diesel. 42 U.S.C. § 7545(*o*)(1)(D). The CAA states that biomass-based diesel is "biodiesel" as defined by 42 U.S.C. § 13220(f); it must have lifecycle greenhouse gas emissions

"that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions" and must not be "co-processed" with a petroleum feedstock. *See* 42 U.S.C. § 7545(*o*)(1)(D). Section 13220(f) defines "biodiesel" as "a diesel fuel substitute produced from nonpetroleum renewable resources that meets the registration requirements for fuels and fuel additives" as established by EPA. 42 U.S.C. § 13220(f)(1)(A).

Since its inception, the biomass-based diesel category has included both mono-alkyl ester biodiesel and non-ester renewable diesel. *See* 75 Fed. Reg. 14670, 14686 (Mar. 26, 2010). Biodiesel and renewable diesel are both produced from animal fat and vegetable oils, and both serve as replacements for petroleum diesel. *See* JA-[FR_44484]. The main difference between the two is that biodiesel is an oxygenated mono-alkyl ester that is produced using a transesterification process, while renewable diesel is a hydrocarbon fuel similar to petroleum diesel, that is produced by a hydrotreating process. JA-[FR_44484]. Both fuels may be used to satisfy the annual volume requirements for biomass-based diesel, and together they constitute the majority of available fuel that qualifies as biomass-based diesel. JA-[FR_44484]. Since 2010, EPA has also allowed renewable jet fuel generated through the renewable diesel production process to satisfy the biomass-based diesel volume requirements. 75 Fed. Reg. at 14864.

17

EPA did not propose or finalize any changes to what fuels can be used to satisfy the biomass-based diesel volume requirements. In response to the Set Rule proposal, EPA received a comment requesting that it change the statutory and longstanding regulatory definition of biomass-based diesel to create a "carveout" that would exclude all fuels that are not mono-alkyl ester biodiesel from being used to satisfy the biomass-based diesel requirements or, in the alternative, that EPA specifically set a volume for mono-alkyl ester biodiesel. EPA declined to make such changes, reasoning that they would be inconsistent with the statutory definition and beyond the scope of EPA's proposed rulemaking. JA-[RTC_58-59].

## III.    ESA Consultation on the Set Rule

EPA engaged in over two years of informal consultation and technical assistance with FWS and NMFS (collectively, the "Services") to assess the potential impacts of the Set Rule on critical habitats and entities listed in the ESA.[9]

In March 2021, the Services began providing technical assistance to EPA in preparation for potential ESA consultation(s) on the RFS program, including

---

[9] ESA-listed species can include subspecies, distinct population segments, evolutionarily significant units, and other protected population groups. *E.g.,* 16 U.S.C. §§ 1532(16), 1539(j). Going forward, reference to "listed entities" includes all 810 ESA-listed species and their designated critical habitats covered in the Evaluation, including 712 unique species (672 FWS species, 32 NMFS species, and 8 assigned to both Services). JA-[BE_6, 40-74]. Environmental Petitioners do not separately challenge Respondents' findings regarding potential effects on designated critical habitat for any listed entity (Env. Br. 3). Reference herein to "listed entities" also includes designated critical habitat for such entities.

18

reviewing draft chapters of EPA's Evaluation. JA-[EPA-HQ-OAR-2021-0427-1112(7(d) memo)]; JA-[BE_14-15]; JA-[NMFS-LOC_2]. On January 30, 2023, EPA submitted a draft of the entire Evaluation of the Set Rule to the Services for review. *Id*. After further informal consultation and revision, EPA submitted its final Evaluation, dated May 19, 2023, to the Services and requested each Service's concurrence on EPA's determinations that the Set Rule was not likely to adversely affect any of the listed entities associated with the Set Rule. On May 31, 2023, EPA submitted an addendum to its Evaluation following discussion with NMFS. JA-[EPA-HQ-OAR-2021-0427-1110]; JA-[EPA-HQ-OAR-2021-0427-1109]; JA-[NMFS-0028-0032]; JA-[EPA-HQ-OAR-2021-0427-1112(7(d)-memo)].

Both Services acknowledged receipt of EPA's request for concurrences and documented their willingness to proceed with informal consultation. JA-[EPA-HQ-OAR-2021-0427-1107]; JA-[EPA-HQ-OAR-2021-0427-1109]. EPA thereafter signed the Set Rule on June 21, 2023, in satisfaction of a consent decree. As informal consultation was ongoing, EPA also documented its compliance with ESA Section 7(d). JA-[EPA-HQ-OAR-2021-0427-1112(7(d)-memo)]; *see also* JA-[FR_44475].

In its Evaluation, EPA made effects determinations pursuant to 50 C.F.R. §§ 402.14(a) and 402.13(b) for the listed entities that may be found in the terrestrial and aquatic areas wherever cultivation of corn, soy, and canola crops could expose

listed entities to effects potentially caused by the Set Rule. JA-[BE_6-13, 26-74].

EPA based its determinations on analysis of the several steps in the complex causal

chain and the confounding factors between the Set Rule's requirements that

refiners use specific volumes of renewable fuels in 2023-2025 to replace fossil

fuel-based transportation fuels and the potential for physical, chemical, and biotic

changes that could occur. JA-[BE_231-242]. This stepwise analysis was necessary

because the Set Rule does not directly affect land use or listed entities. Instead,

there is a multi-step causal chain between the standards and potential land-use

changes resulting from production of crops that involves several layers of third

parties not subject to the RFS standards. JA-[BE_236-242]. Refiner and farmer

decisions, imports and exports of renewable fuel, various tax incentives and grants,

consumer preferences, and relative costs between different renewable fuels are all

examples of factors in the causal chain that affects the production of, and land used

to grow, feedstock crops. JA-[BE_236-242]. Thus, EPA began its evaluation of the

potential effects on listed entities with analysis of the impact of the Set Rule on

biofuel consumption and production for each of the three main biofuel feedstock

crops (corn, soy, and canola). JA-[BE_7-10, 75-132]. It then evaluated the

potential locations of acreage impacted due to increases in biofuel production

attributable to the Set Rule. JA-[BE_9-12, 133-171]. Finally, EPA evaluated the

potential effects to listed entities from both land-use changes and changes in water quality. JA-[BE_6-13, 75-184, 231-235].

EPA ultimately concluded that the Set Rule and the volumes of biofuel use mandated therein are "not likely to adversely affect" listed entities because of the uncertainty that such effects would occur, even at the potential maximum magnitudes or locations EPA projected *(i.e.,* possible cropland increases ranging from zero to 2.65 million acres by 2025), given the complex and uncertain causal chain between the Set Rule volumes and potential localized land-use changes. JA-[BE_6, 9, 11, 13, 99-101, 108-112, 185-242]. EPA thus found all potential effects to be either discountable, insignificant, or both. JA-[BE_13, 231-235].

The Services each reviewed the final Evaluation for the listed species under their specific jurisdictions. JA-[BE_6]. Each Service responded with its own letter explaining its rationale for concurring in the effects determinations for the listed entities under its jurisdiction. JA-[NMFS0002-027(NMFS-LOC)]; JA-[RFS003-RFS012(FWS-LOC)].

## SUMMARY OF ARGUMENT

I.    EPA lawfully and reasonably set the 2023-2025 volumes of cellulosic biofuel, biomass-based diesel, advanced biofuel, and total renewable fuel required to be used in transportation fuel under the RFS program. Congress required EPA to consider its experience in implementing the RFS program and to set volumes based

21

on six statutory factors relating to environmental considerations, including climate change; energy security; future production of renewable fuel; the impacts of renewable fuel on infrastructure, including the infrastructure available to distribute renewable fuels; transportation costs and costs to transport goods; and other factors, including rural economic development and job growth. Consistent with the analysis this Court recently upheld for the 2020-2022 volumes in *Sinclair Wyoming*, 101 F.4th at 886-90, EPA extensively analyzed all of the statutory factors and appropriately set the 2023-2025 volumes based on that analysis.

Although Environmental Petitioners assert EPA failed to adequately consider greenhouse gas emissions and environmental justice, the record demonstrates the contrary. EPA analyzed the best available science and determined that renewable fuels provide significant greenhouse gas emission reductions. EPA then extensively analyzed illustrative quantifiable impacts of renewable fuels on greenhouse gas emissions. Similarly, EPA, in its discretion, fully considered the impacts of the 2023-2025 volumes on environmental justice concerns and determined that although a potential for some benefits and limited negative impacts on communities of concern exist, they could not be adequately assessed because the RFS program does not dictate where or how feedstocks are grown or produced, or where biofuel facilities may be located.

Based on analysis of all statutory factors, EPA appropriately set the specific volumes of cellulosic biofuel, biomass-based diesel, advanced biofuel, and total renewable fuel. Although Refiners complain that EPA considered an overly aggressive growth rate for the production of renewable natural gas when setting the cellulosic biofuel volume, EPA's analysis is well supported by the data that was available when the volumes were set. Similarly, Refiners erroneously assert EPA arbitrarily set the volume of advanced biofuel below the full amount of advanced biofuel expected to be produced and set the total renewable fuel higher than the expected use of conventional renewable fuel (which comprises only *one* component of total renewable fuel). But EPA fully considered and explained that it set these volumes to incentivize growth in higher-level ethanol blends of gasoline due to their potential to effectuate long-term reductions in greenhouse gas emissions.

Moreover, Refiners incorrectly assert EPA acted arbitrarily by considering the RIN cost pass-through principle both when assessing appropriate 2023-2025 volumes and when certifying the volumes would not have a substantial impact on a significant number of small entities under the Regulatory Flexibility Act. This Court already has upheld the validity of EPA's RIN cost pass-through analyses. Refiners also assert that EPA's reliance on RIN cost pass-through violates the Regulatory Flexibility Act, but that argument lacks merit and is unavailable to

Refiners anyway because they failed to establish they fall within the Act's zone of interest and failed to exhaust the issue before EPA.

Finally, EPA fully considered the late timing of the 2023 and 2024 volumes and mitigated the burden caused by EPA's delay. EPA first gave notice of the proposed volumes 15 months before—and finalized volumes eight months before—the 2023 deadline. Similarly, it gave notice 27 months before, and finalized volumes 20 months before, the 2024 compliance deadline. Moreover, EPA set all volumes within the projected availability of renewable fuels in each category.

II.    EPA properly imposed the 2023 supplemental standard pursuant to this Court's remand of the 2016 volumes. In *ACE*, this Court determined that EPA had improperly reduced the 2016 statutory volumes by 500 million gallons. EPA addressed that remand by dividing compliance with the 2016 volumes over two years, imposing a 250-million-gallon standard in each of 2022 and 2023. This Court already considered and upheld EPA's imposition of the 2022 supplemental standard in EPA's 2020-2022 Rule, finding that EPA had statutory authority to impose the supplemental standard, and that EPA reasonably considered and applied the standard. EPA used the same statutory authority and considered the same suite of factors in imposing an identical standard in 2023. Accordingly, the Court should uphold the 2023 supplemental standard.

III.    EPA properly declined SABR's suggested revisions to the biomass-based diesel category in the Set Rule. SABR's challenge is untimely, beyond the scope of EPA's rulemaking, and conflicts with the statutory text. In 2010, EPA established a regulatory definition of biomass-based diesel consistent with the statute that includes renewable diesel and renewable jet fuel, and promulgated regulations allowing parties to generate biomass-based diesel RINs for these fuels. SABR challenges this longstanding definition well beyond the statutory deadline. Moreover, SABR's request that EPA exclude qualifying fuels from the biomass-based diesel category and its request for a new RFS category specifically for mono-alkyl ester biodiesel both conflict with the statutory text and are outside the scope of this rulemaking. SABR has also failed to establish an injury deriving from EPA's adjustment to the conversion factor in the biomass-based diesel percentage standard equation and therefore lacks standing. Further, EPA's adjustment to the conversion factor was reasonable. And EPA's continued use of the renewable diesel equivalence value is reasonable in light of its decision to further consider its proposal to establish a regulatory definition for "produced from renewable biomass."

IV.    EPA properly revised the recordkeeping requirements for separated food waste used as a feedstock for renewable fuels under the RFS program. Since 2010, EPA has required renewable fuel producers to keep records demonstrating

that their feedstocks meet the statutory definition of renewable biomass, which includes keeping records of the source from which those feedstocks are obtained. These records enable EPA to combat fraud and ensure that renewable fuel used to satisfy RFS obligations qualifies under the program.

Additionally, Neste's challenge to the RIN generation provisions is based on a mischaracterization of those regulatory requirements. Consistent with the statutory requirements, only fuel that is produced or imported for use in the United States qualifies under the RFS program. EPA's RIN generation provisions, as they apply to foreign renewable fuel producers, reasonably implement this requirement and ensure that RINs are generated only on the renewable fuel that is produced for use in the United States.

V. EPA fully complied with its ESA obligations and reasonably determined the Set Rule is not likely to adversely affect any ESA-listed entities.

Notably, Environmental Petitioners do not challenge EPA's data regarding the potential effects of the Set Rule on ESA-listed entities, nor do they meaningfully engage with EPA's technical analyses. Their scattered legal challenges lack any basis in the administrative record and are premised on alleged legal requirements for ESA consultation that do not exist.

The Services each separately assessed EPA's analysis and concurred in EPA's effects determinations for all species and critical habitats under their

26

respective jurisdictions. Environmental Petitioners' challenges to the concurrences misstate applicable law and identify no relevant information the Services did not consider. Respondents' analyses thus were reasonable and should be affirmed.

## STANDARD OF REVIEW

The Court may reverse an agency's action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(1)(E), (d)(9)(A); *AFPM*, 937 F.3d at 574 (applying standard to CAA challenges); *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006) (applying same standard to ESA challenges).

This standard is narrow, and the Court cannot substitute its policy judgment for the agency's. *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004). Where an agency has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decisions must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Lead Indus. Ass'n Inc. v. EPA*, 647 F.2d 1130, 1160 (D.C. Cir. 1980). This Court gives an "extreme degree of deference" to agencies' "evaluation of scientific data within its technical expertise," and especially to "EPA's administration of the complicated provisions of the Clean Air Act." *Sinclair Wyoming*, 101 F.4th at 883; *see also Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1089-90 (D.C. Cir. 2021) (affording Services'

technical expertise and analysis under ESA deference). Judicial review is "particularly deferential in matters implicating predictive judgments," requiring only that "the agency acknowledge factual uncertainties and identify the considerations it found persuasive." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009); *see also Growth Energy v. EPA*, 5 F.4th 1, 15 (D.C. Cir. 2021); *Sinclair Wyoming*, 101 F.4th at 883. The Court's review is limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); 42 U.S.C. § 7607(d)(7)(A).

## ARGUMENT

## I.    EPA Reasonably Set and Fully Explained the 2023-2025 Volumes Using the Set Authority.

### A.    EPA Appropriately Analyzed the Set Factors.

EPA thoroughly supported the 2023-2025 volumes it set for cellulosic biofuel, biomass-based diesel, advanced biofuel, and total renewable fuel using its set authority under 42 U.S.C. § 7545(*o*)(2)(B)(ii). JA-[FR_44480-508]; *contra* Env. Br. 33-38; Refiners' Br. 13-32.

When applying the set authority, the statute requires that EPA "determine[]" the new volumes for each fuel "based on a review of the implementation of the program...and an analysis of" six statutory factors regarding impacts on (1) the environment, including climate change; (2) energy security; (3) future commercial production of renewable fuels; (4) infrastructure; (5) costs of transportation fuel

28

and to transport goods; and (6) other factors, including job creation, agricultural commodities, rural economic development, and food prices. 42 U.S.C. § 7545(*o*)(2)(B)(ii). EPA "considered in detail how setting [the different fuel volumes] at a level higher or lower [than the volumes determined] would affect the six statutory factors." *Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 667 (D.C. Cir. 2019); JA-[RIA_449-61].

Indeed, EPA provided more than 28 pages of analysis covering all the statutory factors in the preamble to the rule, as well as over 450 pages of analysis in its Regulatory Impact Analysis. JA-[FR_44480-508]; JA-[RIA_1-465]. Although Petitioners challenge the volumes set through this analysis, none of their arguments is availing.

### 1.    EPA Fully Considered All Statutory Factors in Light of the Statute's Purposes.

As this Court has explained, the RFS program is "a market forcing policy intended to overcome the constraints in the market by creating demand pressure to increase consumption of renewable fuels." *ACE*, 864 F.3d at 710 (internal quotations omitted). The statute itself explicitly identifies purposes of "increas[ing] the production of clean renewable fuels" and improving "energy independence and security." Pub. L. No. 110-140, 121 Stat. 1492; *contra* Refiners' Br. 16. Accordingly, this Court recognized that "Congress made a policy choice to accept higher fuel prices in order to reap the benefits of 'greater energy independence

and...reduce[d] greenhouse gas emissions.'" *Sinclair Wyoming*, 101 F.4th at 889 (quoting *ACE*, 864 F.3d at 696). In keeping with this policy, EPA analyzed each of the statutory factors and set the 2023-2025 volumes to reap meaningful benefits— particularly in greenhouse gas emissions reductions and energy security—with *no* net increase in fuel prices over 2022 prices, and only a very modest increase— approximately 2 to 4 cents-per-gallon—compared to a scenario in which the RFS program entirely ceased to exist. JA-[RIA_444, tbl. 10.5.2-10, 10.5.2-11].

At the outset, Refiners argue that EPA erred by considering Congress's purpose in enacting the RFS program of "increas[ing] the production of clean renewable fuels," Pub. L. No. 110-140, 121 Stat. 1492, when setting the 2023-2025 volumes under the set authority. Refiners' Br. 13-16. But the set factors can only be properly understood in the context of the overall dual statutory purposes of increasing production of renewable fuels with lower greenhouse gas emissions and improving energy security. These purposes animate and inform the extensive set of factors Congress requires EPA to consider when setting volumes. *See* 42 U.S.C. § 7545(*o*)(2)(B)(ii). Indeed, this Court has repeatedly explained that "the reasonableness of an agency's construction [of a statute] depends on the construction's fit with the statutory language as well as its conformity to statutory purposes." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1136 (D.C. Cir. 2022) (internal quotations omitted); *see also Solar Energy Indus. Ass'n v. Fed. Energy*

30

*Regul. Comm'n*, 59 F.4th 1287, 1292 (D.C. Cir. 2023) (courts consider whether an agency's construction is "a permissible construction of the statute in light of its language, structure, and purpose." (cleaned up)). EPA's consideration of Congress's purpose in enacting the RFS statute as the backdrop on which it analyzes the statutory factors thus is permissible and appropriate. And against this backdrop, EPA fully considered each of the statutory factors and selected volumes appropriately. JA-[FR_44480-508]; JA-[RIA_1-465].

Contrary to Environmental Petitioners' assertions, Env. Br. 37-38, EPA fully explained its analysis. In considering the first statutory factor, EPA evaluated the potential greenhouse gas emissions benefits based on the best available science and reasonably considered these potential benefits and risks—and uncertainties of those benefits and risks—when setting the volumes. EPA found, through an extensive review, that the body of current scientific literature, as a whole, evidences that renewable fuels provide net greenhouse gas emissions benefits. JA-[FR_44501]; JA-[RIA_128, 168, 170]. EPA then estimated the annual greenhouse gas emissions impacts for an illustrative scenario of the 2023-2025 volumes over a 30-year period. JA-[RIA_164-210]. Summing EPA's annual estimates over the 30-year period, EPA calculated the 2023-2025 volumes reduce between 1.5 to 50.5 million metric tons of carbon dioxide-equivalent greenhouse gas emissions per year (equivalent to taking between approximately 0.3 to 12 million gasoline-

31

powered cars off the road each year). JA-[RIA_174, 178];

https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

EPA further determined that the identified volumes would result in an

additional $505 to $540 million in monetized energy security benefits, JA-

[FR_44506], and would create over 200,000 jobs from 2023 through 2025—

between 31,700 and 33,900 jobs in renewable fuel production and over 175,000

jobs in construction, JA-[RIA_353-56]. EPA further assessed the benefits of the

selected volumes on rural economic development, explaining that the expected

increase in renewable natural gas production alone would result in "$357 million

[in 2023], $522 million [in 2024], and $707 million [in 2025] in economic activity

relative to the No RFS baseline" that would likely predominantly occur in rural

areas. JA-[RIA_356-57].

EPA further considered the *possibility*—including the uncertainty of that

possibility—that increased production of crop-based renewable fuels (like ethanol

from corn or biodiesel from soybeans) could result in loss of wildlife habitat. JA-

[RIA_210-11]. Although Environmental Petitioners assert that "prior

implementation of the RFS program resulted in unlawful environmental harm," the

record shows no such thing. Env. Br. 34 (citing JA-[RIA_218-22]). The cited

pages discuss changes in agricultural uses of certain lands as a result of incentive

programs under Farm Bills—*not* the RFS program. JA-[RIA_218]. The cited pages

further explain that "[r]eductions in forested areas to grow corn or soybeans does not appear to be occurring in large amounts." JA-[RIA_218]. EPA explains only 60,000 acres of forest (0.008% of U.S. forests) have been converted within 50 miles of all biorefineries and that that amount appears to be offset by reforestation of pasturelands. JA-[RIA_218]; https://www.fs.usda.gov/research/treesearch/64468. EPA then discusses that conversion of grasslands to cropland has "the potential" to occur and "may be associated with increased pressure" resulting from the 2023-2025 volumes, but "[t]here exists substantial uncertainty in projecting changes in land use and management associated with corn, soybeans, and other crops." JA-[RIA_222]. Moreover, although Environmental Petitioners reference EPA's explanation in the Triennial Reports to Congress that the historical *overall* use of crop-based fuels— not just crop-based fuel production resulting from the RFS production—has resulted in conversion of grasslands, Env. Br. 34 (citing JA_[3rd_TR_ES-2-3, IS-22]; JA-[EPA-HQ-OAR-2021-0427-0279_ix, 87], those reports also explain that the impact of biofuels *in the RFS program* has been substantially more limited. JA-[3rd_TR_ES-2-3, ES-2-4, IS-22]; JA-[EPA-HQ-OAR-2021-0427-0279_ix].

Although Environmental Petitioners assert conversion of grasslands to cropland would "devastate[] air, water, and soil quality," Env. Br. 34, the record does not support this conclusion. As noted *supra*, the expected effects caused by

33

the RFS program are limited, JA-[3rd_TR_ES-2-3, IS-22], and the potential effects of the Set Rule specifically are even more limited due to the small increase in renewable fuel attributable to the 2023-2025 volume requirements. JA-[RIA_237-38]. Moreover, the specific RFS impacts are highly uncertain due to how the RFS program operates. For example, soil and water quality effects "depend[] on the feedstocks planted, the types of land used, and the management practices, all of which are not directly determined by the RFS standards." JA-[RIA_238]. Similarly, any increased irrigation pressure on water resources caused by the 2023-2025 volumes could not be quantified due to lack of information regarding which feedstocks may be planted. JA-[RIA_253].

EPA further considered that certain biofuels may increase some types of air emissions while others would decrease other types of emissions. JA-[RIA_v, 111-20]; JA-[RTC_203-05]. EPA explained that "overall, the impacts on air quality resulting from the biofuel volume changes due to this rule are expected to be relatively minor and thus provide little basis to favor higher or lower volumes." JA-[RIA_111]. EPA further considered that the selected volumes were unlikely to have any impact on the infrastructure necessary to deliver biogas or biodiesel, and only a modest impact on the infrastructure for renewable diesel and ethanol. JA-[RIA_334-48]. Moreover, EPA determined it was unlikely the selected volumes

would impact the sufficiency of current infrastructure to deliver goods other than renewable fuel. JA-[RIA_349].

Finally, EPA considered potential consumer costs—including increased costs of transportation fuel, both when purchased by consumers and as incorporated into the costs of goods with higher transportation costs—of $22.3 billion to $23.9 billion over the *abolishment* of the RFS program in 2023. JA-[FR_44506]. Critically, this increase in costs is only 2- to 4-cents-per-gallon more than if there were *no RFS program at all* as of 2023. JA-[RIA_444, tbl. 10.5.2-10]. Compared to 2022 fuel prices (*i.e.*, the status quo of the RFS program prior to the Set Rule), EPA determined there would be *no* increase in the cost per gallon of fuel. JA-[RIA_444, tbl. 10.5.2-11]. EPA thus fully explained its analysis of the set factors.

Refiners assert EPA's analysis of the statutory factors is necessarily arbitrary and capricious because it considers not only monetized costs and benefits, but also qualitative impacts. Refiners' Br. 24-25. But this Court rejected this exact argument as applied specifically to the analysis of the Section 7545(*o*)(2)(B)(ii) statutory factors. *Sinclair Wyoming*, 101 F.4th at 890. This Court explained that the fact that the statutory factors Congress identified "are not easily monetizable does not mean they are less valuable." *Id.* at 889. Instead, the qualitative nature of the assessment of the majority of factors "mean[s] that weighing the monetizable costs

35

against the monetizable benefits—and thereby excluding the primary benefits for which Congress created the program—will yield a misleading result." *Id*. As this Court recognized, many of the statutory factors are not easily or meaningfully monetizable because of the factors themselves and the currently available science. *Id*. at 889-90. This Court thus recognized that EPA's combined qualitative and quantitative (where possible) assessments of the set factors is a reasonable methodology and meets EPA's statutory and regulatory burdens. *Sinclair Wyoming*, 101 F.4th at 889-90 (upholding EPA's "qualitative analysis' [of the set factors] where 'no quantified information on benefits, costs, and effectiveness can be produced." (quotations omitted).

In short, EPA did not allow "a policy of ever-increasing volumes of renewable fuel" to "drive the outcome" of its analysis. Refiners' Br. 16. EPA conducted an exceedingly thorough analysis of all factors and set the 2023-2025 volumes at levels that "reap[ed] the benefits of greater energy independence and...reduce[d] greenhouse gas emissions" in line with Congress's stated purposes. *Sinclair Wyoming*, 101 F.4th 889 (internal quotations omitted). Accordingly, the Court should defer to EPA's "considerable discretion to weigh and balance the various factors required by statute, especially where, as here, the statute does not state what weight should be accorded to the relevant factors." *Sinclair Wyoming*, 101 F.4th at 887 (internal quotations omitted).

## 2. Environmental Petitioners Misunderstand EPA's Greenhouse Gas Emissions Analysis.

Contrary to Environmental Petitioners' assertions, EPA fully considered and reasonably assessed greenhouse gas emissions in its set-factor analysis of the 2023-2025 volumes. Environmental Petitioners misconceive two primary tenets: the purpose of the set-factor analysis and the method by which EPA assessed greenhouse gas emissions. Env. Br. 29-33.

First, Environmental Petitioners fail to understand the purpose of the set-factor analysis. EPA analyzed the set factors by assessing the impacts of the potential volumes compared to the scenario in which the RFS program ceases to exist beginning in 2023. JA-[FR_44496-99]. Environmental Petitioners argue EPA instead should have considered the impact of the 2023-2025 volumes as compared to a scenario in which land is assumed to be used for the most environmentally beneficial purpose (as framed by Environmental Petitioners). Env. Br. 10. They fault EPA for not considering the "carbon opportunity cost" of renewable fuels generally, *i.e.*, whether it would be better for the environment if farmers "regenerat[ed] forest[s]" instead of planting crops, or replaced their farms with "solar panels," despite the fact that the RFS program could not implement these types of land changes. Env. Br. 10, 31-33. EPA's selected baseline isolates the impacts of the 2023-2025 volumes, whereas Environmental Petitioners' alternate

37

paradigm would merely demonstrate the impact of any number of land uses unrelated to the 2023-2025 volumes (including growing crops for food).

Comparing the greenhouse gas emissions of renewable fuel production against purportedly environmentally ideal scenarios would elevate the environmental statutory factors over all statutory factors. 42 U.S.C. § 7545(*o*)(2)(B)(ii). The statute, however, affords EPA discretion regarding the way it considers the enumerated factors, and certainly does not mandate that EPA consider volumes against any purportedly environmentally idealized scenario. 42 U.S.C. § 7545(*o*)(2)(B)(ii). EPA reasonably considered the benefits of the selected volumes against a baseline in which the RFS program ceased to exist in 2023 to isolate the impact of the 2023-2025 volumes. JA-[FR_44496-99]; JA-[RIA_62-100].

Second, Environmental Petitioners misunderstand EPA's climate change analysis. EPA thoroughly analyzed literature available regarding lifecycle greenhouse gas emissions methodologies to gauge the overall greenhouse gas emissions associated with renewable fuels in the RFS program. JA-[FR_44500-02]; JA-[RIA_120-210]. Simultaneously and separately, EPA conducted a model comparison exercise in which it extensively compared various greenhouse gas emissions models to better understand *why* the models produced varying results for EPA's *future* refinement of its greenhouse gas emissions modeling used to

38

determine whether fuels qualify as renewable fuels under 42 U.S.C.

§ 7545(*o*)(1)(B)(i), (1)(E), and (2)(A)(i). JA-[FR_44500-02]; JA-[EPA-HQ-OAR-

2021-0427-1115_MCE].

Environmental Petitioners note that EPA's literature search demonstrated

that greenhouse gas emissions analyses for corn- and soy-based fuels produced "a

wide range" of greenhouse gas emissions estimates, "some of which would be

greater than emissions from petroleum fuels and some that would be less." Env.

Br. 29.[10] But this framing is misleading. EPA considered 32 estimates of corn-

based ethanol emissions using various models, of which 24 (*i.e.*, 75%)

demonstrated lower greenhouse gas emissions than any petroleum-based gasoline

estimates. JA-[RIA_128, 135, 138-47]. And EPA studied 46 models of soy-based

diesel of which all but *one* (*i.e.*, 98%) demonstrated lower greenhouse gas

emissions than the lowest petroleum-based diesel estimates. JA-[RIA_128, 135,

138-47]. Thus, the *vast majority* of available studies estimated greenhouse gas

emissions reductions from renewable fuels. Although Environmental Petitioners

emphasize the minority of studies suggesting potentially higher greenhouse gas

---

[10] Although Environmental Petitioners argue EPA's model comparison exercise "revealed that GHG [greenhouse gas] emissions are actually greater than the reference case of assuming constant biofuel volumes in two of three models for soy biodiesel," Env. Br. 9, 30, this is incorrect. The model comparison exercise was based on a pure hypothetical for the sole purpose of better understanding how the models worked; it did not compare the volumes set in this rule against any scenario. JA-[EPA-HQ-OAR-2021-0427-1115_MCE_43-45, 125-171].

emissions from certain renewable fuels, they offer no reasoned basis why those outliers should be accepted over the majority of studies that demonstrate the opposite. Thus, EPA reasonably considered the full range of available scientific literature and assessed that the predominant current view of the science finds these fuels emit fewer greenhouse gases than petroleum-based fuels. JA-[RIA_124-30].

Environmental Petitioners incorrectly argue that the range in greenhouse gas emissions values in the scientific literature makes reliance on the literature too uncertain for regulatory analysis and suggest that EPA should have used the model comparison exercise instead. Env. Br. 29-31. But this fundamentally misunderstands both the literature review and the model comparison exercise. First, EPA reasonably conducted the literature review and relied on the full scope of available scientific literature so that it could consider the best available science, including competing viewpoints, in a fair and rigorous manner. JA-[RTC_186-200]. Second, the model comparison exercise did not determine a "best" model; it analyzed *differences* among five specific models to understand why the models produced different results. JA-[EPA-HQ-OAR-2021-0427-1115_MCE]; JA-[RTC_193-94]. Indeed, the scientific literature EPA assessed in its literature review used some of the models considered in the model comparison exercise, as well as several additional models. *Compare* JA-[EPA-HQ-OAR-2021-0427-1115_MCE] *with* JA-[RIA_135 fig. 4.2.2.3-1]. Accordingly, EPA reasonably

relied on the literature review to assess the impact of the 2023-2025 volumes on greenhouse gas emissions.

EPA then developed illustrative monetized effects of greenhouse gas emissions based on its review of the scientific literature and EPA's own modeling used to assess whether fuels qualify as renewable fuels under 42 U.S.C. § 7545(*o*)(1)(B)(i), (1)(E), and (2)(A)(i). JA-[RIA_161-79]. EPA explained that its modeling was the only methodology assessed in EPA's literature review that would allow monetization of corn- and soy-based fuels because it was the only methodology that included an annual stream of net greenhouse gas emissions. JA-[RIA_161-62]. EPA further explained that its modeling fell within the range of the analyses presented in the literature review. JA-[RIA_121, 135 (fig. 4.2.2.3-1), 139 (fig. 4.2.2.4-1). Recognizing the substantial variations in greenhouse gas emissions estimates depending on the mix of renewable fuels, the discount rate used, and the inherent uncertainty in constructing a 30-year scenario, EPA maintained its analysis as purely illustrative, a methodology this Court explicitly upheld in *Sinclair Wyoming*. 101 F.4th at 890 (explaining that the "illustrative benefits" as demonstrated by a wide range in potential monetary benefits "help demonstrate the magnitude of the potential climate-change related benefits EPA associated with the

41

Final Rule."); JA-[RIA_164-210]. Accordingly, EPA fully explained its

greenhouse gas analysis, and that analysis was reasonable.[11]

### 3. EPA Appropriately Considered Environmental Justice and Non-Greenhouse Gas Environmental Effects in Assessing Volumes.

Environmental Petitioners are incorrect that the CAA "requires EPA to

address...environmental justice." Env. Br. 33. Environmental justice does not

appear in the mandatory statutory factors that EPA must consider under its set

authority. 42 U.S.C. § 7545(*o*)(2)(B)(ii). Nevertheless, EPA *discretionarily*

considered environmental justice as part of its analysis of the statutory factors,

including as an "other" factor under the statute, and fully assessed environmental

justice impacts within the bounds of the available data. *Id*. § 7545(*o*)(2)(B)(ii)(I),

(V), (VI); JA-[FR_44506-08]; JA-[RIA_371-90]. EPA ultimately determined that

the impacts of the 2023-2025 volumes on communities of concern were uncertain,

with some potential positive benefits and limited potential negative benefits. JA-

[FR_44506-08].

EPA explained at length that greater use of renewable fuels would decrease

certain air emissions caused by production and use of fossil fuels, and would

increase other air emissions caused by the production and use of biofuels, resulting

---

[11] Environmental Petitioners seek vacatur of "the volumes for corn and soy biofuel." Env. Br. 38. But this request is nonsensical; the Set Rule contains no volumes specific to "corn [or] soy biofuel." JA-[FR_44470].

in a "relatively minor" overall impact. JA-[RIA_111-20]. EPA further explained that small increases in non-greenhouse gas pollutants from biofuel facilities and small decreases in pollutants from petroleum facilities could change people's exposure, but that no data exists regarding which facilities will be impacted or how they may be impacted. JA-[FR_44507]. EPA reviewed demographics near both registered biofuel facilities and petroleum refineries to identify disproportionate impacts of the volume changes. JA-[FR_44507]. This analysis demonstrated that people of color and other minority groups are, on average, more likely to be impacted by emissions from petroleum refineries, particularly in certain regions of the country. JA-[FR_44508]. Reducing emissions from those facilities thus likely would benefit those communities.

EPA further considered that there may be localized impacts on water and soil quality caused by biofuels that could potentially impact communities of concern, both positively and negatively. JA-[FR_44508]. For example, EPA considered that biogas used to produce renewable natural gas could improve soil and water quality because qualifying biogas is produced from wastes from wastewater treatment plants, agricultural digesters, and landfills, thus diverting wastes that could otherwise cause adverse effects. JA-[RIA_382-83]. In contrast, EPA considered that communities near cropland could be negatively impacted by agricultural runoff and nutrient leaching, which could impact groundwater, as well

43

as fish and other aquatic life on which the communities depend. JA-[RIA_383-84].
Again, because the RFS program does not dictate *where* biogas facilities are built,
*where* crops for renewable fuels are grown, or *how* those crops are grown, EPA
cannot assess the relative magnitudes of these impacts on any particular
community. JA-[FR_44507].

Contrary to Environmental Petitioners' assertions, EPA also fully considered
the economic impact of the 2023-2025 volumes on communities of concern,
including the effect on food prices. JA-[FR_44508]; JA-[RIA_367-70, 384-86,
391-461]. EPA specifically considered that the selected volumes would result in
less than 1% higher food prices than if the RFS program ceased to exist. JA-
[FR_44508]. EPA considered that the 2023-2025 volumes primarily increased corn
and soy prices, and that "corn and soy are a relatively small proportion of most
foods purchased and consumed in the U.S., and the overall food price impacts are
relatively small as a percentage of total food expenditures." JA-[RIA_384]. EPA
considered that these effects were "generally small," but "borne more heavily by
low-income populations, as they spend a disproportionate amount of their income
on goods in these categories." JA-[FR_44508]. Specifically, EPA assessed that the
selected volumes could cause the poorest consumers to spend 0.2% more of their
income on food by 2025. JA-[RIA_385].

EPA also considered that climate change disproportionately impacts communities of concern, as those communities are more dependent on climate-sensitive resources like local water and food. JA-[RIA_387]. Additionally, certain communities are more sensitive to immediate and future health impacts of climate change, including heat waves, droughts, food- and waterborne infection diseases, changes in quality of air, food, and water. JA-[RIA_387-90]. Because the 2023-2025 volumes are expected to reduce greenhouse gas emissions, the volumes may benefit communities of concern. EPA thus fully considered the impact of the 2023-2025 volumes on environmental justice within its analysis of the set factors.

### 4.    EPA Properly Set Cellulosic Biofuel Volumes.

EPA set the 2023-2025 cellulosic biofuel volumes in accordance with data available at the time regarding the expected growth in the industry. *Contra* Refiners' Br. 22-24. In the notice of proposed rulemaking, EPA used a 13.1% expected growth rate of renewable natural gas—the predominant form of cellulosic biofuel—based on data limited to the 24 months before the proposed rulemaking (*i.e.*, 2021-2022), while simultaneously requesting comment on alternative growth rates of 26.3% and 30.4%, based on 2015-2019 data and 2019-2021 data, respectively. JA-[NRPM_80623]; JA-[FR_44481]. EPA received numerous comments asserting that only considering 2021 and 2022 data overemphasized the impacts of the COVID-19 pandemic and underestimated the growth in the

industry. JA-[RTC_29-30]. Many commenters asserted that EPA should consider the growth rate over 2015-2022 and that a growth rate of 20-30% would be appropriate, while some suggested 50-65% as the appropriate rate. JA-[FR_44481-83]; JA-[RTC_29-30]. Upon consideration of the comments, EPA determined the longer time period was appropriate and determined that the appropriate expected growth rate of renewable natural gas was 25%. JA-[FR_44481-83].

Although Refiners argue that the growth in renewable natural gas production was declining in the years leading up to the pandemic, their assessment is incomplete. Refiners' Br. 23-24. While there had been somewhat of a decline in the year-over-year growth rate from a high of over 40% growth, the cellulosic biofuel market still grew by approximately 33% in December 2019. JA-[RTC_30]. Moreover, the growth rate had generally fluctuated between 20% and 35% prior to the pandemic, with the pre-pandemic decrease consistent with the general market fluctuations over the prior five years. JA-[RTC_30]. Additionally, the most recent data prior to the rulemaking—January 2022 through March 2023—demonstrated an upward trajectory in the growth rate, reaching 18.6% by March 2023 and, at the time, was anticipated to reach 25% by December 2023. JA-[RTC_30].

In addition to historic growth rate data, EPA considered updated information regarding the projected expansion of the renewable natural gas market, including the projected number of new renewable natural gas facilities under construction.

46

JA-[FR_44482]. EPA also considered advancements in ethanol produced from corn kernel fiber (which qualifies as a cellulosic biofuel). JA-[FR_44483]. EPA explained that between the proposed and final rulemakings, several corn kernel fiber ethanol facilities had approached the agency with registration requests, and EPA projected the total production of ethanol from corn kernel fiber would increase from 7 million gallons in 2023 to 77 million gallons in 2025. JA-[FR_44483]; JA-[RTC_26, 28]. Refiners do not dispute these data or challenge the appropriateness of their consideration. Moreover, EPA is entitled to "particular[] deferen[ce] in matters implicating predictive judgments...." *Rural Cellular Ass'n*, 588 F.3d at 1105. EPA thus fully explained and supported its cellulosic biofuel volumes.

> **5.    EPA Properly Set Advanced Biofuel and Total Renewable Volumes.**

EPA reasonably set the advanced biofuel and total renewable fuel volumes based on the statutory criteria. At the outset, Refiners incorrectly assert that EPA set volumes for conventional renewable fuel. Refiners' Br. 16-18. Pursuant to its statutory mandate, EPA set volumes for total renewable fuel and advanced biofuel, recognizing that conventional ethanol composes the majority—but not the entirety—of total renewable fuel beyond the advanced biofuel volumes. JA-[FR_44517]; JA-[RTC_106-108].

47

EPA set the 2023-2025 volumes such that total renewable fuel was 15 billion gallons higher than advanced biofuel, resulting in a 15-billion-gallon volume that can be met with *any* type of renewable fuel in the program, including conventional renewable fuels. JA-[FR_44517-18, tbl. VI.E-1, VI.E-2]. This 15-billion-gallon difference in the total renewable fuel and advanced biofuel volumes maintains the same difference EPA set for 2022, and the same difference in volume that Congress set for every year from 2015 through 2022. 87 Fed. Reg. 39601; 42 U.S.C. § 7545(*o*)(2)(B)(i). Although Refiners argue EPA erred by "assuming that Congress intended to keep that implicit 15-billion-gallon volume" when EPA used its set authority, Refiners' Br. 18, this Court rejected this exact same argument when EPA applied the same statutory criteria to set the 2022 volumes. *Sinclair Wyoming*, 101 F.4th at 888 ("Nothing in...[§ 7545(*o*)(2)(B)(i)] limits EPA's discretion to retain the implied volumes [set by Congress] for conventional renewable fuel and non-cellulosic advanced biofuel.").

Moreover, EPA fully explained its analysis of the statutory factors in determining to maintain a 15-billion-gallon difference between the two levels. EPA assessed "the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category" to set the total renewable fuel volume. 42 U.S.C. § 7545(*o*)(2)(B)(ii)(III). EPA considered the expected growth in

48

higher-level ethanol blends of gasoline, specifically E15.[12] JA-[RTC_107]. EPA
noted that its projections of the available fuel were based, *inter alia*, on
information regarding grant programs and industry efforts to expand distribution of
E15 and E85 at gas stations. JA-[RTC_107]. EPA further considered that non-
ethanol conventional renewable fuels could also be used to meet the total
renewable fuel requirement, including conventional biodiesel and renewable
diesel. JA-[RTC_108]. Finally, EPA specifically noted that total renewable fuel is
not required to be met *only* with conventional renewable fuel, and can be met with
*any* qualifying renewable fuel, including advanced biofuels. JA-[RTC_106-08].
EPA explained that "advanced biofuel volumes, together with corn ethanol, will
enable the market to satisfy the total renewable fuel standard...." JA-[RTC_108];
JA-[RIA_296-319]. EPA thus did not set the volume of advanced biofuel at the
exact "sum of the candidate volumes for cellulosic biofuel and non-cellulosic
advanced biofuel" because excess volumes of advanced biofuel would be available
to meet the total renewable fuel volume. JA-[FR_44516].

 EPA maintained the 15-billion-gallon difference, in part, because "[h]igher-
level ethanol blends such as E15 and E85 are one avenue through which higher
volumes of renewable fuels can be used in the transportation sector to reduce

---

[12] E10 is the most common ethanol-gasoline blend and contains 9-10% ethanol; E0
contains 0% ethanol; E15 contains 11-15% ethanol; and E85 contains 51-83%
ethanol. 40 C.F.R. § 1090.80.

[greenhouse gas] emissions and improve energy security over time." JA-[FR_44517]; 42 U.S.C. § 7545(*o*)(2)(B)(ii)(I), (II). Departing from EPA's longstanding 15-billion-gallon volume could eliminate incentives from the RFS program for E15 and E85 that "contribute to the[ir] economic attractiveness." JA-[FR_44517, RTC_111 ].

Additionally, "the impact of renewable fuels on...the sufficiency of infrastructure to deliver and use renewable fuel" support maintaining a 15-billion-gallon difference between total renewable fuel and advanced biofuel. 42 U.S.C. § 7545(*o*)(2)(B)(ii)(IV); JA-[FR_44517-18]. "[S]ustained and predictable support of higher-level ethanol blends through the level of the implied conventional renewable fuel volume requirement" fosters incentives for investment in E15 and E85 infrastructure. JA-[FR_44517]. Although Refiners argue that higher-level ethanol blends are not *yet* produced in significant amounts, Refiners' Br. 19-20, EPA specifically considered "projections of expanded offerings of E15 and E85 at retail service stations" based on "information about USDA's grant programs and estimates of the ongoing efforts of industry and private parties." JA-[RTC_107-08]; JA-[RIA_341-48].

Finally, Refiners argue the 2023-2025 volumes of advanced biofuel and total renewable fuel would increase the cost of conventional renewable fuel RINs ("D6 RINs"), which they claim increase the cost of fuel to consumers over a

scenario with a higher advanced biofuel volume and the same total renewable fuel

volume. Refiners' Br. 20-22. But this is incorrect. As more fully explained in

Pt.I.B, *infra*, RINs effect a cross-subsidy that increase the cost of petroleum fuel,

but reduce the cost of renewable fuel. JA-[RTC_127, 167]; JA-[EPA-HQ-OAR-

2021-0427-0008_Burkholder]. Thus, when RIN prices are higher, they discount

the renewable portion of the blended renewable-petroleum fuel consumers

purchase, which offsets the increase in cost of the petroleum portion of the fuel.

JA-[RTC_167]. The extent to which the discount of the cost of the renewable

portion and the increase in the cost of the petroleum portion offset each other is a

function of their relative makeup in the specific blended fuel the consumer

purchases. For example, a lower RIN price would make petroleum-only gasoline

("E0") cheaper than a higher RIN price because the E0 fuel only carries the cost of

the RIN on the petroleum fuel with no offsetting subsidy for a renewable portion of

the fuel. JA-[EPA-HQ-OAR-2021-0427-0008_Burkholder]. But the same pricing

dynamic would result in an increasing offset of cost with an increasing proportion

of renewable fuel. So, for example, E85 would be cheaper with a higher RIN price

than with a lower RIN price because the discount on the renewable portion of the

fuel would more than offset the increase in cost of the petroleum portion. JA-

[EPA-HQ-OAR-2021-0427-0008_Burkholder]; JA-[RIA_40]. Although the D6

RIN price may affect the price of a particular blend, they do not change the overall

consumer cost across the market of all transportation fuel blends (E10, E15, E85, etc.). JA-[RTC_168-69].

**B.    EPA Properly Considered the RIN Cost Pass-Through Principle.**

EPA has repeatedly and consistently explained—and this Court has agreed—that, because the fuel market is highly competitive, Refiners pass through the cost of RINs through higher sale prices of the petroleum portion of obligated fuels. *Alon Refining*, 936 F.3d at 652-53; JA-[EPA-HQ-OAR-2021-0427-0008_Burkholder]. At a very high level, under the RFS program, renewable fuel producers generate RINs per volume of renewable fuel produced. Blenders purchase renewable fuel (with the RINs attached) from renewable fuel producers and petroleum fuel from refiners and importers ("obligated parties"). The blender then combines the renewable fuel with the petroleum fuel, separates the RINs from the renewable fuel, sells the separated RINs to obligated parties, and sells the blended fuel for retail consumption. JA-[EPA-HQ-OAR-2021-0427-0008_Burkholder_6].

52



JA-[EPA-HQ-OAR-2021-0427-0008_Burkholder_6 fig. 2].

Refiners sell their petroleum fuel to the blender at a price that fully recoups the cost of the RIN. For example, if, as in the example depicted below, the RIN for 1 gallon of ethanol (*i.e.*, a D6 RIN) costs the refiner $0.60 and the percentage standard for the year is 10% (i.e., 10% of fuel blended into transportation fuel must be renewable fuel), the RFS compliance cost is 10% of $0.60 or $0.06 per gallon of gasoline, and the refiner will increase the price of their gasoline by $0.06 per gallon to recoup the cost of the RIN. JA-[EPA-HQ-OAR-2021-0427-0008_Burkholder_6].

JA-[EPA-HQ-OAR-2021-0427-0008_Burkholder_18 fig. 10].

The blender then sells the blended fuel for retail consumption at a price that reflects both the higher cost of the gasoline due to the RFS obligations and the lower net cost of the ethanol, after accounting for the blender's sale of the RIN to the refiner. Thus, for one gallon of E10 fuel (10% ethanol and 90% gasoline) where the ethanol and RIN together cost $2.25 and gasoline costs $2.75, the blender sells the fuel at (0.1*($2.25-$0.60)) + (0.9*($2.75+$0.06)) = $2.69. If more ethanol is blended into the gasoline, as in the case of E85 (approximately 74% ethanol and 26% gasoline), the value of the RIN discounts the blended fuel even more because the gallon is comprised of more discounted renewable fuel and less non-discounted gasoline: (0.74*($2.25-$0.60)) + (0.26*($2.75+$0.06)) = $1.95. Resultantly, consumers pay less for transportation fuels blended with high concentrations of renewable fuel and more for transportation fuels with no or low

concentrations of renewable fuels. JA-[RTC_167]; JA-[EPA-HQ-OAR-2021-0427-0008_Burkholder]. Across the market, on average, the costs and discounts balance out. JA-[RTC_167]. EPA regularly reviews "the available fuels market and RIN price data" to ensure this principle continues to hold true in the empirical data. JA_[RTC_164, 167].

Refiners assert three arguments regarding EPA's longstanding RIN cost pass-through principle, none of which is availing. First, Refiners argue that EPA failed to consider "the liquidity issues with and inefficiencies of the RIN market" that they believe (with no cited evidence) have "contributed" to high RIN prices. Refiners' Br. 26. As an initial matter, this issue was not raised in comments and thus has been waived. 42 U.S.C. § 7607(d)(7)(B) (requiring argument to be raised with "reasonable specificity" in public comment); *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 511-12 (2014); *Nat. Res. Def. Council v. EPA*, 571 F.3d 1245, 1259 (D.C. Cir. 2009). Moreover, as this Court has explained, "the increases in RIN prices are a completely understandable effect of the program's ever-increasing pressure to expand renewable volumes[;]" it is "not indicative of a dysfunctional RIN market." *Alon Refining*, 936 F.3d at 652 (internal citations omitted); *see also* JA-[RTC_161] (discussing market reasons for RIN price fluctuations).

Second, Refiners mischaracterize a report issued by the Government Accountability Office regarding EPA's assessment of small refinery exemption petitions. Refiners' Br. 28-31. Contrary to Refiners' assertions, the Government Accountability Office did not assess whether RIN cost pass-through occurred for the market as a whole, nor did it offer any opinion as to whether the principle is a valid consideration in setting *volumes*. JA-[EPA-HQ-OAR-2021-0427-0811_Tab_A_GAO_Report]. The report assessed "information, policies and procedures that EPA [used] to make decisions about small refinery exemptions," "the extent to which decisions about the exemptions [were] timely," and narrowly considered the prices paid for RINs by small entities relative to larger entities.[13] JA-[EPA-HQ-OAR-2021-0427-0811_Tab_A_GAO_Report_1-2, 10, 13]. Because of the different questions considered in the report, it simply is not relevant to the EPA's analysis of the volumes under its set authority.

Third, Refiners' reference to the Fifth Circuit's recent decision remanding the denials of certain small refinery exemption petitions is also misplaced. Refiners' Br. 30-31 (citing *Calumet Shreveport Refin., LLC v. EPA*, 86 F.4th 1121 (5th Cir. 2023)). The *Calumet* court held that EPA had failed to adequately consider the local-market- and refinery-specific information that a few small

---

[13] Notably, EPA strongly disagrees with this report and issued its own report detailing the multiple substantial analytical flaws and faulty data in the report. JA-[EPA-HQ-OAR-2021-1427-1044_GAO_Response].

refineries had submitted when they sought exemptions from prior years' volume requirements applicable to all other refiners. *Calumet*, 86 F.4th at 1140-42 (explaining that EPA failed to consider small refinery petitioners' evidence that "the local markets in which they operate are inefficient," including, for example, "market price data from the local 'micro-market'" in which one small refinery operated). But the *Calumet* court explicitly did not consider EPA's "macro-level analysis about fuel markets" that "supports a conclusion that passthrough can occur in fuel markets generally...." *Id*. at 1141. Accordingly, Refiners have failed to demonstrate any defect in any consideration EPA may have made of the RIN cost pass-through principle in setting volumes for the market as a whole.

### C.    The Set Rule Does Not Violate the Regulatory Flexibility Act.

Pursuant to 5 U.S.C. § 605(b), the EPA Administrator certified that the Set Rule would not have a significant economic impact on a substantial number of small entities. JA-[FR_44552]. Accordingly, EPA was not obligated to complete a full regulatory flexibility analysis. 5 U.S.C. §§ 603-604. Although Refiners assert that EPA's reliance on the RIN cost pass-through principle violates the Regulatory Flexibility Act, this claim fails for a multitude of reasons.

1.    At the outset, Refiners have failed to demonstrate statutory standing to assert this claim. 5 U.S.C. § 611(a)(1); *Fla. Bankers Ass'n v. U.S. Dep't of Treasury*, 799 F.3d 1065, 1074 n.1 (D.C. Cir. 2015) (Henderson, J., dissenting)

(explaining entities that are not "'small' businesses" under 5 U.S.C. § 611 lack

statutory standing under the Regulatory Flexibility Act). A petitioner must show

"by affidavit or other evidence...in [its] opening brief" that it has standing for each

claim it seeks to press. *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir.

2012) (quotations omitted); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335

(2006).

Only a "small entity that is adversely affected or aggrieved by final agency

action is entitled to judicial review" under the Regulatory Flexibility Act. 5 U.S.C.

§ 611(a)(1). The Act defines a "small entity" as (1) a "small governmental

jurisdiction," (2) a "not-for-profit enterprise which is independently owned and

operated and is not dominant in its field....;" or (3) a "small business concern" as

defined by the Small Business Act, 15 U.S.C. § 632(a). 5 U.S.C. § 601(3)-(6).

Under the Small Business Act, petroleum refiners only constitute a "small business

concern" if "the petroleum refiner, including its affiliates...either [has] no more

than 1,500 employees or no more than 200,000 barrels per calendar day total

Operable Atmospheric Crude Oil distillation capacity." 13 C.F.R. §

121.201(324110) n.4. Because Refiners do not even attempt to demonstrate that

any of their members qualify as a "small entity" under 5 U.S.C. § 601(6) that is

authorized to bring suit under the Regulatory Flexibility Act, this claim must be

dismissed. *NAACP v. Trump*, 298 F. Supp. 3d 209, 235-36 (D.D.C. 2018); 5 U.S.C. § 611.

2.    Refiners' argument is further barred because they failed to raise it in comments before the agency. *Growth Energy*, 5 F.4th at 24 (rejecting refiners' Regulatory Flexibility Act claim for failure to raise the issue in comments); 42 U.S.C. § 7607(d)(7)(B) (requiring argument to be raised with "reasonable specificity" in public comment). Indeed, *no* commenters commented on EPA's certification that the 2023-2025 volumes would not have a significant economic impact on a substantial number of small entities. On this basis too, this Court should not consider Refiners' arguments here.

3.    Even if Refiners' Regulatory Flexibility Act argument were properly before the Court (and it is not), as fully explained in Pt.I.C.1-2, *supra*, EPA reasonably relied on the RIN cost pass-through principle to certify that the rule would not result in a significant economic impact on a substantial number of small entities. *Alon Refining*, 936 F.3d at 652-53. JA-[EPA-HQ-OAR-2021-0427-0008_Burkholder]; JA-[EPA-HQ-2021-0427-1020_Smith]; JA-[RTC_164]. Although Refiners assert *EPA* found "a 7.5% average net cost to many small refineries," this misrepresents the cited report. Refiners' Br. 32 (citing JA-[EPA-HQ-2021-0427-1020_Smith _1, 9]). The 7.5% difference in the cost of RINs on the cited page very clearly refers to a re-creation of the Government Accountability

Office model, which EPA explains is premised on a set of demonstrably flawed assumptions. JA-[EPA-HQ-2021-0427-1020_Smith _9-10]; JA-[EPA-HQ-OAR-2021-1427-1044_GAO_Response]. EPA's analysis demonstrates that small refineries only "paid 1.1% (1.2¢) more per RIN when buying separated RINs when compared to the average daily price and 0.5% (6¢) more per RIN than the largest 20 refiners;" EPA affirmed this "small variation" in RIN price data "may simply reflect noise in the data" rather than "any real difference in the prices parties pay." JA-[EPA-HQ-2021-0427-1020_Smith _1, 9]; JA-[EPA-HQ-OAR-2021-1427-1044_GAO_Response_1, 4-5].

Moreover, regardless of any potential cost difference of RINs purchased by small versus large refineries, Refiners have failed to demonstrate any impropriety in EPA's certification that the Set Rule would not result in a *significant* economic impact on a *substantial* number of small entities. Refiners did not even comment on the Regulatory Flexibility Act certification, much less submit any evidence in the record to demonstrate any economic impact, nor do they cite to any evidence at this late stage. Refiners' Br. 31-32. Accordingly, Refiners have failed to demonstrate any violation of the Regulatory Flexibility Act.

### D.    EPA Properly Considered the Timing of the Rulemaking.

Pursuant to this Court's longstanding caselaw, EPA retained not just statutory authority but a statutory mandate to issue the Set Rule. *Contra* Refiners'

60

Br. 33-35. EPA recognized that it missed the statutory deadline for 2023 and 2024 and has been actively working to get the RFS program back on track. Indeed, a main reason that EPA set volumes for three years in the Set Rule was to provide adequate notice for 2025, and to give EPA time and resources to begin a timely assessment for future years. JA-[FR_44477]. EPA thus, in accordance with this Court's precedent, fully considered the timing of the rule, including the partially retroactive nature of the rule for 2023 volumes, and the somewhat-shortened notice for the 2024 volumes, and set volumes accordingly.

This Court repeatedly has held that a delay in issuing RFS volume-setting rules does not render the rulemaking procedurally or substantively infirm, so long as EPA acts reasonably to mitigate the effect of the late notice. *See, e.g.*, *Sinclair Wyoming Refining LLC v. EPA*, 101 F.4th at 886-87; *ACE*, 864 F.3d at 720-21; *Monroe Energy LLC v. EPA*, 750 F.3d 909, 919-21 (D.C. Cir. 2014); *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 147-66 (D.C. Cir. 2010). Although Refiners attempt to distinguish this case law by asserting the obligated parties in those cases had notice of the *statutory* volumes, the Court directly rejected that exact argument in *ACE* with respect to the biomass-based diesel volumes, which were set pursuant to EPA's set authority in that rulemaking. *ACE*, 864 F.3d at 720-21.

The *ACE* court explained that EPA's ability to promulgate late RFS rules was not based on any particular notice to obligated parties, but was instead based on the Court's longstanding, repeatedly reiterated "reading of the statute and on congressional intent." *Id*. at 721. Thus, the Court concluded that it was "bound by *stare decisis* to reach the same result—EPA may issue delayed volume requirements so long as it acts reasonably in doing so." *Id*. at 720 (internal quotations omitted). Refiners attempt to distinguish *ACE* by arguing that the obligated parties in that rule had notice of the non-biomass-based diesel volume requirements, but that was not a factor in the Court's analysis in *ACE*. *Id*. at 720-21; Refiners' Br. 37.

Here, EPA fully considered the timing of the rule and mitigated any harm to Refiners by setting the 2023 standards at projected actual production for the cellulosic biofuel component and within projected production for the biomass-based diesel, advanced biofuel, and total renewable fuel components. As in the 2020-2022 Rule affirmed in *Sinclair Wyoming*, because the "volumes were partially prospective, EPA expected they would induce the market to produce, import, and consume additional biofuels" in 2023. 101 F.4th at 880 (quotations omitted). Although Refiners note that EPA expected carryover RINs for certain fuel categories to be largely unavailable, Refiners' Br. 36, EPA anticipated all

volumes could be met with actual renewable fuel production in 2023 and carryover RINs would not be needed. JA-[RIA_291-95, tbl. 6.1.3-1].

Moreover, EPA provided all parties advanced notice of the volumes—the proposal was available fifteen months before the compliance deadline for 2023 and 25 months before the compliance deadline for 2024, longer than the timeframes the D.C. Circuit has held reasonable in prior years. JA-[FR_44479]; *see Wynnewood Refin. Co., LLC v. EPA*, 77 F.4th 767, 783 (D.C. Cir. 2023) (upholding 10-month lead time until compliance); *Sinclair*, 101 F.4th at 886-87 (upholding 11-month lead time); *Monroe Energy*, 750 F.3d at 911, 920 (upholding 10-month lead time). EPA thus fully considered and appropriately mitigated the timing of the rulemaking.

## II.     The 2023 Supplemental Standard Is Lawful and Reasonable.

This Court upheld the lawfulness and reasonableness of imposing a supplemental standard to address the *ACE* remand in *Sinclair Wyoming*, 101 F.4th at 893-96. Because the 2023 supplemental standard is the second half of the supplemental standard upheld in *Sinclair*, this Court should also uphold it here.

In *ACE*, EPA initially reduced the statutory volume of total renewable fuel for 2016 under the cellulosic waiver authority, and then further reduced by 500 million gallons via application of its general waiver authority. 80 Fed. Reg. at 77439. This Court vacated EPA's application of the general waiver authority,

resulting in 500 million gallons of the 2016 total renewable fuel volume that were not lawfully waived. *ACE*, 864 F.3d at 696, 706-07. In the 2020-2022 Rule, EPA restored 250 million gallons of that total renewable fuel as the 2022 supplemental standard. 87 Fed. Reg. 39627-28. In the Set Rule, EPA is restoring the remaining 250 million gallons as the 2023 supplemental standard. JA-[FR_44509-11]. Refiners challenged the imposition of the 2022 supplemental standard based on virtually identical arguments to those presented here, and this Court rejected each argument. *Sinclair Wyoming*, 101 F.4th at 893-96. Just as in *Sinclair*, EPA lawfully and reasonably imposed the 2023 supplemental standard.

### A.    EPA Has Statutory Authority to Address the *ACE* Remand through a Supplemental Standard.

This Court explicitly held EPA has statutory authority to impose a supplemental standard to address the *ACE* remand. *Sinclair Wyoming*, 101 F.4th at 893-94 (citing 42 U.S.C. § 7545(*o*)(3)(B)(i); *Nat'l Petrochemical Refins*, 630 F.3d at 148-67); *contra* Refiners' Br. 40. The Court explained that EPA's statutory mandate to "'ensure' that applicable volumes 'are met'" for each compliance year unless EPA reduces those volumes through lawful application of its waiver authorities authorizes EPA to impose a supplemental standard to address remands of previously unlawfully waived volumes. *Sinclair Wyoming*, 101 F.4th at 893-94 (quoting 42 U.S.C. § 7545(*o*)(3)(B)(i)).

64

Refiners argue EPA unreasonably asserts statutory authority to address a

court-ordered remand of unlawfully waived volumes because EPA has long

asserted it lacks statutory authority to address shortfalls in volumes when it

inaccurately projects the amount of fuel that will be consumed when setting annual

volumes. Refiners' Br. 40. But this Court already rejected that argument,

explaining "[t]he two situations are materially different…making it reasonable for

EPA to treat them differently." *Sinclair Wyoming*, 101 F.4th at 895. Inaccurately

projecting volumes of gasoline and diesel is "a technical error inherent in the

nature of projecting events that have yet to occur," whereas the remand of

unlawfully waived volumes is "a legal mistake" that "subjects the resulting

percentage standard to vacatur." *Id*. Thus, this Court concluded, "[i]t is not

arbitrary or capricious to treat a legal mistake differently from a prognostication

error." *Id*.

Accordingly, Refiners' statutory authority arguments are foreclosed by this

Court's decision in *Sinclair Wyoming*.

## B.    EPA's Imposition of the 2023 Supplemental Standard Was Reasonable.

1.    Refiners argue that EPA failed to specifically consider the 2023

supplemental standard in light of the 2023 market conditions and volume

requirements, Refiners' Br. 41-42, but the record belies this assertion. JA-

[FR_44494-95, 44509-11]; JA[RIA_47-48, 109-10]; JA-[RTC_135-50]. EPA

65

explained that there was sufficient market capacity in 2023 such that the supplemental standard would be "feasible and achievable, and that "the use of carryover RINs w[ould] not be necessary." JA-[FR_44510-11]. Specifically, EPA projected that sufficient excess capacity of biodiesel and renewable diesel would exist in the market to comply with the supplemental standard in addition to the 2023 annual volumes. JA-[RIA_109-10]. EPA then further considered that use of carryover RINs "nevertheless remains available as an option for obligated parties for compliance" based on EPA's detailed analysis of the availability of RINs in the market. JA-[FR_44494-95, 44511]; JA-[RIA_44-48]; JA-[RTC_139-40]. EPA further considered that other options remained available, including obligated parties' ability to carry forward a deficit. JA-[FR_44511].

The Set Rule also considers and mitigates burdens on obligated parties. *ACE*, 864 F.3d at 718. Although partially retroactive, EPA gave obligated parties substantial lead-time and repeated notice before the imposition of the 2023 supplemental standard. EPA first announced its intent to apply a 250-million-gallon 2023 supplemental standard in the proposal for the 2020-2022 Rule 27 months before the 2023 compliance deadline. 86 Fed. Reg. 72437. EPA reiterated this intent when it finalized the 2020-2022 Rule 20 months before the 2023 compliance deadline. 87 Fed. Reg. 39601. EPA proposed the same 250-million-gallon 2023 supplemental standard in the notice of proposed rulemaking for the Set

66

Rule 15 months before the 2023 compliance deadline. JA-[NPRM_80584]. And

EPA ultimately finalized the 250-million-gallon 2023 supplemental standard nine

months before the 2023 compliance deadline, JA-[FR_44511]. Refiners thus had

over two years to plan for the 2023 supplemental standard.

EPA further mitigates the burden of the supplemental standard by allowing

obligated parties to meet the supplemental standard with RINs currently available

at market (as opposed to 2015 and 2016 vintage RINs), sparing them from revising

their 2016 compliance demonstrations (and all subsequent years) and permitting

them to demonstrate compliance in the same documents they use for the other 2023

standards. JA-[FR_44511].

2.    Refiners also are incorrect that EPA failed to explain its departure

from its pre-2022 proposal that no supplemental standard should be imposed.

Refiners' Br. 42. At the outset, this Court already rejected this argument when

EPA imposed the supplemental standard in 2022 (i.e., the year EPA departed from

the prior viewpoint). *Sinclair Wyoming*, 101 F.4th at 895. The Court explained that

"EPA...explained that it no longer believed the supplemental volume would result

in a drawdown of carryover RINs" because "EPA determined that the market is

capable of achieving the supplemental volumes with increased biofuel use." *Id*.

(internal quotations omitted). "Thus, EPA 'display[ed] awareness that it [was]

67

changing its position' and offered a reasonable basis for doing so.'" *Id.* (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)).

In the Set Rule, too, EPA explicitly acknowledges its continued departure from its prior proposal and explained its reasoning. JA-[RTC_140-41] ("We have considered the approach proposed in the 2020 annual rule NPRM and have concluded that such an approach would not be appropriate for the reasons discussed in this final rule."). EPA explains that it "still has a statutory duty to 'ensure' that the volumes are met." JA-[RTC_140]. The agency further explains that "[w]hile it is true that we cannot induce additional demand in 2016, imposing a supplemental standard in 2023 is expected to induce additional renewable fuel demand in 2023." *Id.* EPA further considers "obligated parties' ability to obtain RINs to meet that additional demand, and find[s] that an additional 250 million gallons can be used by the market." *Id.* And, EPA considers that it did "not anticipate that a drawdown of the number of available carryover RINs will be required by this action, however, it is an available compliance option for obligated parties." *Id.*

3.    Refiners incorrectly assert that EPA was required to consider the supplemental standard under the statutory factors of the Set Rule. Refiners' Br. 43. Indeed, this Court has already rejected this argument. *Sinclair Wyoming*, 101 F.4th at 895-96. The Court explained, "EPA correctly recognized [the supplemental

68

standard was] an obligation to impose a requirement to 'ensure' that the prescribed volume [from the *ACE* remand] was met" and imposed "no obligation to consider the statutory factors as if it were devising a volume requirement anew." *Id*. at 896.

The fact that EPA considers the supplemental standard as an "other" factor when setting the 2023 annual volumes under its set authority does not change this analysis. JA-[FR_44476]; *contra* Refiners' Br. 43. The supplemental standard is a market condition that should be considered in assessing the statutory factors to set the annual volumes under the set authority. 42 U.S.C. § 7545(*o*)(2)(B)(ii)(VI). Refiners' assertion that the statutory factors then must *also* be assessed to set the supplemental standard is a circular analysis divorced from any statutory text.

4.    Contrary to Refiners' assertions, EPA fully considered alternatives to the supplemental standard. Refiners' Br. 44-46. As discussed in Pt.II.B.2, *supra*, the Set Rule considers "retaining the 2016 total renewable fuel volume as described in the 2020 proposal," and determines it was not appropriate. JA-[FR_44511]; JA-[RTC_140-41]. The Set Rule also considers "using [its] cellulosic or general waiver authority to retroactively lower 2016 volumes such that 2022 and 2023 supplemental standards would be smaller," and explains the inappropriateness of that option as well. JA-[FR_44511]; JA-[RTC_141-44]. Specifically, market conditions in 2016 do not support imposition of the general waiver authority because EPA could not make a finding of "inadequate domestic

supply" in 2016 or that imposition of the 2016 standard would "severely harm the economy" based on the actual data available from that year. 42 U.S.C. § 7545(*o*)(7)(A); JA-[RTC_141-43].

Similarly, EPA explains that it declined to use its discretionary authority to waive total renewable fuel using the cellulosic waiver authority because of the same 2016 market conditions. JA-[RTC_144]. Moreover, EPA explains that the cellulosic waiver authority would not have waived the entire volume necessitated by the remand, and parties would have had to adjust compliance obligations in past years for which no valid 2015 or 2016 RINs exist. JA-[RTC_144].

As this Court explained when upholding EPA's determination not to use either waiver authority when implementing the first half of the supplemental standard in 2022, "[i]nvocation of those provisions is discretionary, and EPA's choice not to invoke them retroactively was not arbitrary and capricious." *Sinclair Wyoming*, 101 F.4th at 895.

5.    Finally, Refiners[14] argue that EPA should have allowed parties to use excess 2015 and 2016 RINs to comply with the supplemental standard. Refiners' Br. 46-50. Here, too, this Court has already rejected this argument. *Sinclair Wyoming*, 101 F.4th at 896. The Court explained, "EPA considered that option and

---

[14] Counsel for Refiners informed undersigned counsel that, if the Court grants Petitioner REH's pending unopposed motion to voluntarily dismiss its petition for review, ECF 2061730, the remaining petitioners will not advance this argument.

concluded that doing so would be administratively impractical and highly burdensome…." *Id*. (quotations omitted); JA-[FR_44510-11]; JA-[RTC_146-50]. Accordingly, Refiners have failed to demonstrate any defect in the 2023 supplemental standard.

## III. EPA Properly Declined SABR's Requested Changes to Biomass-Based Diesel Requirements.

The Set Rule reasonably implements the CAA's requirements for biomass-based diesel. SABR's challenges to the biomass-based diesel volume requirements are untimely and beyond the scope of the Set Rule. Further, EPA's implementation of those requirements is consistent with the statutory text, reasonable, and supported by the record. The Court should also reject SABR's challenge to the conversion factor in the biomass-based diesel percentage standard equation for lack of standing and the equivalence value for renewable diesel because EPA reasonably declined to change to that value in light of its further consideration of a regulatory definition of "produced from renewable biomass."

### A. SABR's Challenges to the Implementation of the Biomass-Based Diesel Requirement Are Untimely.

The Court should reject SABR's challenges to the inclusion of renewable diesel and renewable jet fuel in the biomass-based diesel category because they are untimely. EPA implemented its interpretation of the biomass-based diesel category in 2010, when it set its first volume standards for biomass-based diesel, *see* 75 Fed.

Reg. at 14686, 40 C.F.R. § 80.1401 (2010), and EPA has applied this approach

consistently since then. Billions of RINs representing biomass-based diesel that has

been produced and sold have been sold for compliance with the standards in the

years since EPA first implemented this approach. SABR's attempt to upend EPA's

well-established implementation of the biomass-based diesel category must fail.

A petition for review under the CAA must "be filed within sixty days from

the date notice of such promulgation, approval, or action appears in the Federal

Register...."[15] 42 U.S.C. § 7607(b)(1). SABR argues that renewable diesel and

renewable jet fuel should not be included in the definition of "biomass-based

diesel." But in a 2007 rulemaking, EPA explicitly interpreted "biodiesel" under 42

U.S.C. § 13220(f) to include both mono-alkyl ester biodiesel and non-ester

renewable diesel. 72 Fed. Reg. 23900, 23917 (May 1, 2007). EPA's 2010

regulations explained that "'[b]iomass-based diesel' includes both biodiesel

(mono-alkyl esters) and non-ester renewable diesel (including cellulosic diesel),"

and defined "biomass-based diesel" to include renewable diesel and renewable jet

fuel. 75 Fed. Reg. at 14686, 14864; 40 C.F.R. § 80.1401 (2010). And in 2013, EPA

clarified that biomass-based diesel RINs may be generated for renewable jet fuel.

---

[15] SABR does not raise any arguments suggesting that the grounds for its challenge
arose more than sixty days after the statutory deadline. *See* 42 U.S.C. § 7607(b)(1).

*See* 78 Fed. Reg. 14190, 14201 (Mar. 5, 2013). The Set Rule did not reopen either the 2010 or the 2013 rulemakings.

Because SABR filed its petition challenging EPA's inclusion of renewable diesel and renewable jet fuel under the biomass-based diesel category *years* beyond the sixty-day limit for challenging the above cited rulemakings, the Court lacks jurisdiction to consider SABR's claims. 42 U.S.C. § 7607(b)(1); *Med. Waste Inst. & Energy Recovery Council v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011).

### B.     SABR's Challenges to the Implementation of the Biomass-Based Diesel Requirements Are Beyond the Scope of the Set Rule.

EPA also properly declined SABR's request that EPA revisit its longstanding implementation of the biomass-based diesel volume requirements as beyond the scope of the rulemaking. *See AFPM*, 937 F.3d at 585 ("The EPA correctly dismissed comments...as outside the scope of the 2018 Rule."). EPA plainly stated that the rulemaking proposed "the applicable volumes and percentage standards for 2023 through 2025 for cellulosic biofuel, biomass-based diesel, advanced biofuel, and total renewable fuel." JA-[NPRM_80582]. EPA solicited comment on the factors pertaining to the category-wide volumes and percentage standards and other discrete changes. *See, e.g.*, JA-[NPRM_80585-87, 80595, 80611, 80615, 80617, 80623, 80626-30].

SABR's comments raised issues that are beyond the scope of the Set Rule. Nowhere in the proposal did EPA suggest that it was reconsidering the biomass-

based diesel definition or considering excluding renewable diesel or renewable jet fuel from the biomass-based diesel category. And there is no indication in the proposal that EPA was considering creating a separate subcategory solely for mono-alkyl ester biodiesel. SABR incorrectly asserts that EPA invited comments on the scope of the biomass-based diesel category in the proposed rule by stating that it "requested comment on 'the proposed increase to the [biomass-based diesel] standard and whether other options should be considered.'" SABR Br. 19-20 (quoting JA-[NPRM_80626]). But EPA's request for comment actually pertained to the increase to the volume requirements, *not* the qualification of fuels within the statutory categories and thus does not encompass SABR's requests. *See AFPM*, 937 F.3d at 585-86. SABR's isolated and unsolicited comments cannot reopen EPA's interpretation of the biomass-based diesel category. *See Free Access & Broad. Telemedia, LLC v. FCC*, 865 F.3d 615, 617-18 (D.C. Cir. 2017).

Additionally, SABR incorrectly contends—without elaboration—that EPA reopened "[a]ny prior determinations regarding the scope of the biomass-based diesel program[.]" SABR Br. 23 n.10. But in the Set Rule, EPA set annual volume requirements for biomass-based diesel, just as it has done every year since 2012. *See* 77 Fed. Reg. 59458 (Sept. 27, 2012). EPA neither expressly, nor "constructively" reopened the scope of biomass-based diesel. As this Court stated in *Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008), a constructive

reopening occurs where an agency's regulatory revision "significantly alters the stakes of judicial review... as a result of a change that could not have been reasonably anticipated[.]" (quotations omitted). SABR fails to identify *any* regulatory revision in the Set Rule that would trigger a reopening of the definition of biomass-based diesel. No change in the regulatory circumstances require reconsideration of the definition of biomass-based diesel.[16]

Further, EPA appropriately declined to consider SABR's alternative request that EPA change the *statutory* structure of the RFS program to create a brand new nested renewable fuel category *just* for mono-alkyl ester biodiesel. SABR Br. 19-21. The public has no duty to "anticipate... [] proposed alternatives" as SABR suggests. *Id.* at 19. SABR mischaracterizes statements in two other public comments to assert that "[t]he public was on fair notice" of SABR's comments. *Id.* at 20. Those comments responded to *SABR's* remarks at a public hearing, not to any solicitation of comment by *EPA. See* JA-[EPA-HQ-OAR-2021-0427-0627_at_9] ("Some commenters at the public hearing suggested...."); JA-[EPA-HQ-OAR-2021-0427-0812_at_10] ("several individuals testified recommending EPA provide a specific carve-out..., *but EPA had not yet proposed to do so*") (emphasis added). SABR's lone, unsolicited request cannot reopen EPA's

---

[16] Additionally, SABR's failure to elaborate on this point constitutes waiver. *See United States v. McGill*, 815 F.3d 846, 909 (D.C. Cir. 2016).

implementation of the biomass-based diesel category simply because SABR

disguises it as an "alternative." *See Pub. Emps. for Env't Resp. v. EPA*, 77 F.4th

899, 913 (D.C. Cir. 2023). Moreover, implementation of SABR's request, which

falls outside the scope of the proposal, would arguably not be a logical outgrowth

of EPA's proposal and would not provide the public with fair notice of that change.

*See CSX Transp., Inc. v. STB*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009).

Accordingly, the Court should not find error where EPA appropriately conformed

to the scope of its proposed rule. *See AFPM*, 937 F.3d at 587.

      **C.**    **The Statutory Definition of Biomass-Based Diesel Encompasses Renewable Diesel and Renewable Jet Fuel.**

Even if this Court determines that SABR's statutory arguments are not time-

barred or beyond the scope of the rulemaking, it should reject them because

SABR's construction of the term "biomass-based diesel" is inconsistent with the

statutory text. The Court's "analysis begins with the plain language of the statute."

*Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).

Congress defined the renewable fuel categories in 42 U.S.C. § 7545(*o*),

including defining biomass-based diesel as "renewable fuel that is *biodiesel as*

*defined in section 13220(f) of this title* and that has lifecycle greenhouse gas

emissions...that are at least 50 percent less than the baseline lifecycle greenhouse

gas emissions." 42 U.S.C. § 7545(*o*)(1)(D) (emphasis added). Section 13220(f)

defines "biodiesel" as "a diesel fuel substitute produced from nonpetroleum

renewable resources that meets the registration requirements for fuels and fuel additives established by the [EPA] under section 7545 of this title[.]" *Id.* § 13220(f)(1)(A). Accordingly, biomass-based diesel encompasses any "diesel fuel substitute" that is also produced from qualifying renewable feedstocks and satisfies the applicable requirements of the RFS program. *See id.* §§ 7545(*o*)(1)(D); 13220(f)(1). EPA thus appropriately interpreted "biodiesel" under section 13220(f)(1) as including mono-alkyl ester biodiesel, renewable diesel, and renewable jet fuel as those products are substitutes for petroleum diesel fuel and can be produced from renewable feedstocks. *See* 40 C.F.R. § 80.1401 (2010).

SABR's contention that renewable diesel and renewable jet fuel should be excluded from the biomass-based diesel category is contrary to the statute. The statutory definition broadly refers to any "diesel fuel substitute," not a specific product. *See* 42 U.S.C. § 13220(f)(1). Like biodiesel, both renewable diesel and renewable jet fuel are produced from renewable biomass and are "diesel fuel substitute[s]" within the meaning of the text. Renewable diesel is used in diesel engines and substitutes for the use of petroleum diesel fuel. JA-[FR_44485-86]. And renewable jet fuel is produced through the same process as renewable diesel.[17] *See id.*

---

[17] EPA notes that the record on this point is limited because no party timely challenged EPA's inclusion of renewable jet fuel in the biomass-based diesel

*Footnote continued on next page…*

SABR repeatedly conflates the term "biodiesel," as it is defined in the statute, with one specific biodiesel product that is produced from mono-alkyl esters—claiming that the statutory category is somehow limited to the latter. *See* SABR Br. 11. But as discussed, the biodiesel product to which SABR refers has a specific technical definition, which Congress chose not to use when drafting § 7545(*o*) to incorporate the § 13220(f) definition rather than limiting the definition to mono-alkyl ester biodiesel. Indeed, Congress expressly treats "biomass-based diesel" and mono-alkyl ester biodiesel distinctly, contrary to SABR's assertions otherwise. *See* 42 U.S.C. § 17021(c)(2) ("The term 'biomass-based diesel' means biodiesel as defined in section 13220(f) of this title."), (3) ("The term 'biodiesel' means the monoalkyl esters of long chain fatty acids derived from plant or animal matter...."). Separating these definitions would make no sense if Congress meant for "biomass-based diesel" to only include mono-alkyl ester biodiesel as SABR asserts.

SABR cites to other, contemporaneously drafted statutory provisions for the contention that the definition of "biodiesel" under § 7545(*o*) does not include renewable diesel. SABR Br. 11. But none of those provisions support SABR's argument. One provision states that "[f]or purposes of this title... [e]xcept as

---

category. Renewable jet fuel is chemically analogous to No. 1 diesel, a "diesel fuel" as defined by EPA, *see* 40 C.F.R. § 80.2, and can be used as such.

provided in paragraph (2) [of this section], renewable diesel shall be treated in the same manner as biodiesel." Pub. L. No. 109-58, §1346, 119 Stat. 1055 (26 U.S.C. § 40A(f)(1)). Similarly, nothing in the text of sections 13320(a)(1) or 7545(u) limits "biodiesel" to mono-alkyl ester biodiesel as SABR suggests. *See* 42 U.S.C. §§ 13220(a)(1); 7545(u).

SABR's citation to the biodiesel engine testing program under § 757, 119 Stat. 833 (42 U.S.C. § 16105(e)), also undermines its position. Although that provision defines "biodiesel" in the manner that SABR prefers, encompassing "a diesel fuel substitute" that meets the industry standards for mono-alkyl ester biodiesel, it explicitly applies only "[f]or purposes of this section[.]" § 757(e), 119 Stat. 833. Congress thus plainly knew how to limit the definition of biodiesel to mono-alkyl ester biodiesel when it deemed appropriate and just as plainly did not include that limitation under section 13220(f). *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341-42 (2005).

In connection with its statutory argument, SABR asserts that even if the plain text of the RFS statute includes renewable diesel, EPA should rely on legislative history and statutory purpose to reinterpret the plain statutory language and exclude renewable diesel and renewable jet fuel from the biomass-based diesel category. SABR Br. 12-13. But as this Court has held, "the plain meaning of legislation should be conclusive, except in the rare cases in which the literal

application of the statute will produce a result demonstrably at odds with the intentions of its drafters." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 332 (D.C. Cir. 2020) (citation omitted, cleaned up). As discussed, the plain statutory text contradicts SABR's position. Further, nothing in the statute or legislative history supports a finding that Congress intended to promote mono-alkyl ester biodiesel over other products meeting the definition of biomass-based diesel.

Finally, SABR's contention that renewable jet fuel fails to meet the fuel and fuel additives registration requirements set forth under section 7545(b) is incorrect. *See* SABR Br. 22. The statute does not mandate that EPA register all diesel fuel substitutes that are used to satisfy the biomass-based diesel or other volume requirements; it simply states that renewable fuel must comply with those requirements to meet the definition of "biodiesel." *See* 42 U.S.C. § 13220(f). To the extent that renewable jet fuel is subject to the registration requirements—*i.e.*, if it is used as No. 1 diesel—it must comply with those requirements. *See* 40 C.F.R. Part 79.

D.     **EPA's Denial of SABR's Request for a Mono-Alkyl Ester Biodiesel Carveout Is Reasonable.**

EPA reasonably declined to create a new "carveout" nested category for mono-alkyl ester biodiesel, instead setting 2023-2025 volumes using the statutory categories, as EPA has done since the inception of the RFS program. In doing so, EPA appropriately allows obligated parties to meet their biomass-based diesel

volume requirements with any fuels meeting the biomass-based diesel definition. *See* 42 U.S.C. § 7545(*o*)(1)(D).

EPA's continued adherence to the statutory definition is reasonable and supported by the record. SABR first contends that EPA must create a carveout for its preferred type of biomass-based diesel—mono-alkyl ester biodiesel—because in its view Congress did not contemplate "forcing biodiesel to compete with other fuels." SABR Br. 14. But as already discussed, Congress did not limit biomass-based diesel to mono-alkyl ester biodiesel. *See* 42 U.S.C. §§ 7545(*o*)(1)(D); 13220(f). Because the statute itself defines biomass-based diesel broadly, SABR has no basis for contending that Congress did not "contemplate" that any products meeting the biomass-based diesel definition would compete within the biomass-based diesel category. Further, this Court has previously upheld EPA's conclusion "that increasing fuel diversity serves one of Congress's primary goals in establishing the Renewable Fuel Standards program: improving the nation's 'energy independence and security.'" *See Alon Refining*, 936 F.3d at 666 (citation omitted). SABR's request that EPA eliminate competition for biodiesel runs counter to this purpose.

EPA's adherence to the statutory structure of volume categories does not decrease biodiesel volumes, as SABR contends. *See* SABR Br. 14-15. EPA has steadily increased the biomass-based diesel volume requirements since 2012,

which, along with the advanced biofuel and total renewable fuel requirements, provides substantial support for the biodiesel industry. *Compare* JA-[RIA_98] *with* JA-[RIA_100]; *see also* JA-[RTC_60] ("[W]ithout the RFS program the volumes of [biomass-based diesel] used in the U.S. would be significantly lower…than the volumes of [biomass-based diesel] we project will be used to meet the [2023-2025] RFS volume requirements.").

SABR also cites several limited bases for asserting that EPA must create a biodiesel carveout, none of which are availing. First, SABR's contention that 42 U.S.C. § 7545(*o*)(2)(A)(iii)(II)(aa) compels EPA to ensure that *every* particular type of fuel within each statutory nested category is nationally available is incorrect. SABR Br. 15. That provision prohibits EPA from "restrict[ing] geographic areas in which renewable fuel may be used." *See* 42 U.S.C. § 7545(*o*)(2)(A)(iii)(II)(aa). But nothing compels EPA to distinguish between qualifying fuels based on their geographic production and use. The statute provides no support for the assertion that EPA must protect biodiesel from competition based on the geographic reach of other products.

SABR also contends that a carveout is required because (according to SABR) "renewable diesel costs more than biodiesel," biodiesel has greater environmental benefits, and, SABR alleges, renewable diesel producers are more likely to engage in manipulative practices than biodiesel producers. SABR Br. 16-

18. First, EPA did appropriately consider "the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods."[18] *See* 42 U.S.C. § 7545(*o*)(2)(B)(ii)(V); JA-[RIA_428-30, 444-48]. Second, SABR's assertion that the environmental benefits of biodiesel outweigh those of renewable diesel is also unsupported in the record, which instead demonstrates environmental benefits of both products. *See* JA-[RIA_116-17]. Third, SABR cites no evidence to support its speculation that renewable diesel producers are more likely than biodiesel producers to manipulate the RIN market. SABR asserts that increases in the availability of renewable diesel will result in the elimination of biodiesel as a product. *See* JA-[EPA-HQ-OAR-2021-0427-0813_at_3-4]. But that premise is unsupported; EPA has projected that biodiesel will continue to constitute a substantial portion of the biomass-based diesel volume requirements. *See* JA-[RIA_103]. And finally, even if SABR's assertions *were* correct, they would not justify the creation of a mono-alkyl ester biodiesel carveout not set forth by the statutory text.

SABR next asserts that EPA should create a biodiesel carveout because renewable diesel is "co-process[ed] with petroleum feedstocks" due to the fact that renewable diesel is produced through hydrotreating. SABR Br. 15-16. This is

---

[18] Further, if SABR is correct that biodiesel is more affordable, then it makes no sense that biodiesel needs a carveout to protect it from competition.

incorrect and SABR's assertion ignores EPA's regulatory definition of "co-processed" and its interpretation of that term. *See* 75 Fed. Reg. at 14863; *see also* 40 C.F.R. § 80.1401 (2010). EPA explained that co-processing occurs "only if both *petroleum* and biomass feedstock are processed in the same unit simultaneously...." 75 Fed. Reg. at 14684 (emphasis added). EPA further explained that a producer who simply uses a chemical that is derived from fossil fuels to produce a renewable fuel does not co-process the fuel because the statute was intended to address the use of *petroleum* in the production process. *See id.* at 14684 n.3. Accordingly, SABR is incorrect that renewable diesel is "co-processed" simply because it may use hydrogen derived from a fossil fuel source and its assertion on that point is inconsistent with EPA's regulations and the statute.[19] Notably, under SABR's interpretation, volumes of mono-alkyl ester biodiesel would also be excluded from the biomass-based diesel category because it is produced using methanol that is usually derived from fossil natural gas. *See* 75 Fed. Reg. at 14686 n.3.

SABR's assertion that the implied volume requirement for conventional renewable fuel somehow also justifies a mono-alkyl ester biodiesel carveout is misguided. The implied volume requirement for conventional renewable fuel is

---

[19] SABR does not challenge EPA's definition of co-processed or even acknowledge it. Indeed, such a challenge would be untimely as EPA did not revisit its definition of "co-processed" in the Set Rule. *See supra* III.A.

merely calculated by subtracting the advanced biofuel volume from the total renewable fuel volumes. *See* 42 U.S.C. § 7545(*o*)(2)(B)(i). Based on this structure, obligated parties can meet that implied volume using conventional renewable fuel, as well as any other type of qualifying renewable fuel. *See* JA-[RTC_108]. EPA did *not* determine, as SABR suggests, that there is an implied *restriction* in the statute that compels the exclusion of qualifying fuels from any category. Indeed, contrary to SABR's assertion, the implied conventional volume is *inclusive*, not *exclusive*, meaning that any qualifying renewable fuel under any of the categories can be used to satisfy the implied conventional renewable fuel volume. *See id.* Accordingly, the implied volume does not support the creation of a mono-alkyl ester biodiesel carveout.

Finally, insofar as SABR contends that EPA ignored relevant alternatives in setting the volume requirements, that assertion is incorrect. As explained earlier, SABR's requested biodiesel carveout was beyond the scope of this rulemaking; further, implementing such a change would not be a logical outgrowth of EPA's proposal or supported by the statute. *See supra* III.B. Further, SABR's contention that EPA ignored its comments is incorrect. EPA responded to SABR's comment, explaining that its request "would be inconsistent with the plain language of the [Energy Independence and Security Act]." *See* JA-[RTC_58]. EPA has thus satisfied its rulemaking obligations by considering comments relevant to its

proposal and providing a reasoned basis for setting the volumes set forth in the final rule. The Court should reject SABR's arguments.[20]

### E. SABR's Challenge to the Biomass-Based Diesel Conversion Factor and the Renewable Diesel Equivalence Value Must Be Rejected.

SABR failed to establish an injury deriving from EPA's adjustment to the conversion factor in the biomass-based diesel percentage standard equation and therefore lacks standing. Further, EPA's adjustment to the conversion factor was reasonable. SABR's challenge to the biomass-based diesel conversion factor is simply an attempt to collaterally attack the renewable diesel equivalence value, which must fail.

### 1. SABR Lacks Standing to Challenge the Biomass-Based Diesel Conversion Factor.

To establish standing, SABR must demonstrate an injury caused by EPA's adjustment to the biomass-based diesel conversion factor that will be redressed by its requested judicial relief. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). SABR fails to explain how its members are injured by EPA's upward

---

[20] SABR asks the Court to vacate "[t]he allowance that renewable diesel and renewable jet fuel be used to meet biomass-based diesel volume obligations" while leaving the volume requirements in place. The Court should reject SABR's request. The volume requirements account for *all* qualifying biomass-based diesel, not biodiesel alone. Should the Court find any merit to SABR's arguments, it should remand the challenged provisions to EPA without vacatur so that EPA may take appropriate action.

adjustment of the biomass-based diesel conversion factor. This conversion factor is part of the biomass-based diesel percentage standard equation and is used to convert the biomass-based diesel volume to an ethanol equivalent volume. JA-[FR_44545]. In the Set Rule, EPA adjusted the conversion factor from 1.5 to 1.6 to account for the increase in the amount of renewable diesel relative to biodiesel in the biomass-based diesel category. JA-[FR_44546-47]. The effect of this change is a higher annual volume obligation for biomass-based diesel.

The only injury SABR alleges is that the *renewable diesel* equivalence value allows renewable diesel producers to generate more RINs, which disadvantages its members. SABR Br. 25-27. But SABR does not allege an injury from the *biomass-based diesel conversion factor*. The biomass-based diesel conversion factor is not used to generate RINs; rather, it is used by EPA to calculate the biomass-based diesel percentage standard that applies to obligated parties. The biomass-based diesel volume obligations can be satisfied with *both* biodiesel *and* renewable diesel. *See* 40 C.F.R § 80.1405(c). Were the Court to vacate EPA's change to the biomass-based diesel conversion factor and were EPA to adjust the value downward from 1.6 to 1.5 as SABR demands, EPA would need to lower the biomass-based diesel percentage standards.[21] *See id.* Obligated parties would then

---

[21] If EPA had not raised the conversion factor from 1.5 to 1.6, the biomass-based diesel percentage standard in 2025 would have been 2.96% rather than the 3.15% finalized in the Set Rule. *See* 40 C.F.R. § 80.1405(a).

need to purchase and use *less* biodiesel *and* renewable diesel to satisfy the biomass-based diesel volume obligations, thus harming the interests of SABR's members. Accordingly, SABR fails to establish an injury from the adjustment to the biomass-based diesel conversion factor.

## 2.    The Biomass-Based Diesel Equivalence Value Is Reasonable.

Even if SABR has standing, EPA's adjustment to the biomass-based diesel conversion factor is reasonable. Early in the RFS program, virtually all biomass-based diesel was mono-alkyl ester biodiesel, so EPA set the conversion factor based on the value for mono-alkyl ester biodiesel, 1.5. JA-[FR_44545]. In the Set Rule, EPA explained that due to the growth of renewable diesel, the percentage standard equation for biomass-based diesel should be adjusted to account for that growth. *See* JA-[FR_44546-47]. Accordingly, EPA increased the biomass-based diesel conversion factor from 1.5 to 1.6. *See id.* SABR does not argue that EPA's methodology for increasing the conversion factor was flawed. Rather, SABR argues that the renewable diesel equivalence value should be changed, SABR Br. 25-26, but EPA's handling of that value is reasonable.

## 3.    The Renewable Diesel Equivalence Value Is Reasonable.

In challenging the equivalence value for renewable diesel, SABR misleadingly cites EPA's discussion of a separate, unfinalized change, to suggest that EPA's use of the equivalence value is unreasonable. SABR Br. 25, 27 (citing

88

JA-[NPRM_80705-07]). But SABR fails to provide the context for EPA's discussion of that value or acknowledge EPA's reasoning for not finalizing changes to that value. EPA solicited comments on a proposed regulatory definition for "produced from renewable biomass." *See* JA-[NPRM_80704-07]. The CAA does not define that phrase and EPA discussed two potential proposed definitions: one based on the energy content of fuel that derives from renewable biomass and the other based on the mass of the fuel that derives from renewable biomass. JA-[NPRM_80705-06]. Ultimately, EPA did not finalize either approach.

While EPA proposed an energy-content-based definition, it recognized "that this is not the only potentially reasonable definition of produced from renewable biomass...." JA-[NPRM_80706]. EPA explained that one potential consequence of an energy-content-based approach is that "renewable diesel produced via hydrotreating would be affected" because "some of the energy in the fuel" may come from a non-renewable source. JA-[NPRM_80707]. Under the proposed definition, renewable diesel producers "would [only] generate RINs based on the portion of the energy in the renewable diesel that is from renewable biomass." *Id.* EPA explained that establishing an energy-content-based definition would likely require it to change the regulations for how RINs are generated on renewable diesel. *Id.* The present renewable diesel equivalence value is based on a formula that EPA promulgated in 2010, and reasonably accounts for the higher energy

content in renewable diesel. *See* 75 Fed. Reg. at 14709-10. EPA decided not to finalize the proposed definition in the Set Rule, explaining that "[i]n order to allow us more time to fully consider the comments received, as well as to determine what would be needed to implement such a broad approach, we are not finalizing a definition of 'produced from renewable biomass' in this action." JA-[FR_44551]. Consequently, EPA did not address any impacts that the non-final definition may have had on the renewable diesel equivalence value.

The Court should reject SABR's argument that EPA must adjust the renewable diesel equivalence value. "'An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of ... priorities' and 'need not solve every problem before it in the same proceeding.'" *Taylor v. FAA*, 895 F.3d 56, 68 (D.C. Cir. 2018) (quoting *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230-31 (1991)). SABR does not challenge or acknowledge EPA's decision not to finalize the definition of "produced from renewable biomass." Instead, SABR cherry picks from the discussion surrounding that proposal to assert that EPA was required to change the renewable diesel equivalence value and that EPA "doubled down" on its position. SABR Br. 27. But EPA's decision to take more time to consider comments received and determine how to implement a definition of "produced from renewable biomass" across the RFS program was reasonable. *See* JA-[FR_44551].

90

The law grants EPA discretion to control the timing of its rulemaking. *See Charter Commc'ns v. FCC*, 460 F.3d 31, 43 (D.C. Cir. 2006) (quotation omitted) (an agency has discretion "to defer consideration" of issues "when it thinks that doing so would be conducive to the effective dispatch of business and the ends of justice"). EPA need not halt its orderly implementation of other aspects of the RFS program while it works through this complex issue. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543-44 (1978). It is perfectly reasonable for EPA to take additional time to consider comments on the proposed definition, while maintaining the existing regulatory structure surrounding equivalence values. The law does not require EPA to implement an unfinalized definition in a piecemeal manner.

### 4.    The Court Should Not Vacate the Biomass-Based Diesel Conversion Factor or the Renewable Diesel Equivalence Value.

Any remand should be without vacatur. In deciding a remedy, "[t]he decision whether to vacate depends on the seriousness of the order's deficiencies ... and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (quotation omitted). SABR challenges the reasonableness of EPA's regulations, and the validity of SABR's contentions depend on how EPA implements a definition of "produced from renewable biomass." SABR does not

91

challenge EPA's decision not to finalize that definition and any record deficiencies the Court finds can be easily addressed. Further, vacatur of these provisions would be highly disruptive to the RFS program. If the Court vacates the biomass-based diesel conversion factor, EPA will need to re-calculate the biomass-based diesel percentage standards, which would be disruptive to parties who have been complying with the 2023 standards. And the renewable diesel equivalence value is required for renewable fuel producers to generate RINs for the renewable diesel they produce. Vacatur of that value would effectively remove renewable diesel from the pool of available fuel that can be used for compliance and undermine obligated parties' ability to comply with the standards.

## IV.  **EPA's Recordkeeping and RIN Generation Requirements Are Reasonable.**

Since 2010, EPA's regulations have required renewable fuel producers to maintain records documenting the locations where renewable feedstocks are generated. Neste's attack on EPA's reiteration of this longstanding recordkeeping requirement mischaracterizes the regulatory provisions and ignores EPA's reasoning for these provisions. Further, Neste's challenge to the RIN generation requirements conflicts with the statutory requirements for the RFS program. The Court should therefore deny Neste's petition.

### A.    EPA's Interpretation of the Recordkeeping Provisions Is Consistent with the Regulatory Text.

EPA's regulations have always required renewable fuel producers to maintain documents demonstrating that their fuel is produced from qualifying renewable biomass to enable EPA and third-party auditors to confirm that renewable fuel used to satisfy RFS obligations qualifies as such. *See* JA-[FR_44547-48]; *see also* 75 Fed. Reg. at 14888-89. In the Set Rule, EPA reopened for comment revisions made in 2020 to section 80.1454(j)(1),[22] which sets forth recordkeeping requirements that specifically apply to renewable fuel producers who use separated food waste as a feedstock. *See* 40 C.F.R. § 80.1454(j)(1). As revised in 2020, this provision contains two requirements. First, renewable fuel producers must maintain records that demonstrate "the amounts, by weight, purchased of...separated food waste...for use as a feedstock in producing renewable fuel." *Id.* § 80.1454(j)(1)(i). And second, renewable fuel producers must maintain records that demonstrate "the location of any establishment(s) from which the waste stream consisting solely of...separated food waste...is collected." *Id.* § 80.1454(j)(1)(ii). EPA has explained that "location" means "the location of any establishment from which separated food waste is collected," *i.e.*, not the address

---

[22] As explained in the following section, those revisions clarified existing recordkeeping requirements.

of an aggregating company that collects food waste from the establishments that actually generate the waste. *See* JA-[FR_44548]; JA-[RTC_365].

Neste argues that EPA's interpretation of its recordkeeping requirements should be overturned because it purportedly conflicts with the text of those regulations. There is no conflict. Since 2010, the regulatory text has required renewable fuel producers to maintain records of where the feedstocks are produced. *See* 40 C.F.R. § 80.1454(d)(1) (July 2010). And EPA has consistently interpreted its recordkeeping regulations, beginning with the generally applicable requirement in 40 C.F.R. § 80.1454(c) and (d), and then the reopened location requirement under § 80.1454(j)(1)(ii), as requiring that producers using separated food waste as a feedstock maintain records identifying the physical address of the originating source of the feedstock, not a feedstock aggregator. *See, e.g.*, 85 Fed. Reg. at 7062; JA-[FR_44548-49]; JA-[RTC_365]. EPA's interpretation is consistent with the clear regulatory text.

Neste contends that EPA's construction "cannot be squared with the regulatory text" based on EPA guidance relating to now repealed *registration*—not ongoing recordkeeping—requirements. Neste Br. 10-11. In the 2015 presentation to which Neste refers (hereinafter, the "2015 Guidance"), EPA stated that, at registration, parties were only required to identify a food waste aggregator in their separated food waste plans, as opposed to the individual establishments from

which an aggregator may collect wastes. *See* JA-

[RFS_Registration_for_Renewable_Fuel_Producers_Separated_Food_Waste_Plan

_Guidance_July_2015]. Registration normally occurs before a facility begins

producing renewable fuel, when that facility may not know every physical location

from which their feedstocks will be sourced. Requiring this detailed information at

registration meant that a facility would have to submit repeated registration updates

as they changed the establishments from which they obtained feedstocks. *See* 85

Fed. Reg. at 7062. In contrast, the recordkeeping requirements do not impose this

administrative burden because facilities can maintain records of feedstock

locations at the time they purchase those feedstocks. *Compare* 40 C.F.R. §

80.1450(b), (d), *with* § 80.1454(d), (j).

Neste similarly argues that EPA interprets section 80.1454(j)(1)(i) to newly

require renewable fuel producers to "track down information concerning...the

separate amounts of food waste aggregated by a third party." Neste Br. 12-13. But

EPA did not render any "new" interpretation of the amount requirement. EPA has

always required renewable fuel producers to keep records demonstrating their

sources of separated food waste and the amount of waste purchased from feedstock

producers. *See* 40 C.F.R. § 80.1454(d), (j)(1)(i) (July 2010). Moreover, EPA did

not make *any* changes to section 80.1454(j)(1)(i) in the Set Rule, nor did EPA

reopen that provision for public comment. No commenters raised the concern

identified by Neste during the public comment period, and Neste does not cite to any portion of the record where EPA issued the challenged "interpretation."[23] *See* Neste Br. 12-13. Because Neste's arguments regarding the amount requirement were not raised during the public comment period, those arguments are waived. 42 U.S.C. § 7607(d)(7)(B); *Mossville Env't Action Now v. EPA*, 370 F.3d 1232, 1238-39 (D.C. Cir. 2004).

Neste next contends that EPA's regulations do not, and have never, required producers to keep documentation showing their feedstocks are renewable biomass beyond declarations from food waste suppliers. *See* Neste Br. 13-15. But this is again incorrect. EPA's regulations require renewable fuel producers to keep documents sufficient to verify that their renewable fuel is produced from qualifying renewable feedstocks. *See* 40 C.F.R. § 80.1454(c), (d). Those provisions contain an *added* requirement that producers using separated food waste as a feedstock provide certifications. *See id.* § 80.1454(c)(1)(iii), (d)(5). Self-certifications by feedstock suppliers are not independently sufficient to verify that feedstocks are renewable biomass, *see* JA_RTC_367, and the certification requirement does not eliminate the general recordkeeping requirement for

---

[23] Although commenters referred to the "amount" requirement, they merely did so in association with substantive comments addressing the location requirement and did not challenge the requirement that renewable fuel producers keep records documenting the amount of feedstock purchased.

renewable fuel producers or limit the means of compliance with those provisions to certifications. *See* § 80.1454(c)(1)(iii), (d)(5). Neither the text of the regulations, nor any other authority or guidance suggests that parties may comply in the manner Neste outlines.

Finally, if the Court determines any of the challenged provisions are ambiguous, it should defer to EPA's reasonable and contemporaneous interpretation. *See Kisor v. Wilkie*, 588 U.S. 558, 575-76 (2019). The recordkeeping regulations exist to ensure that renewable fuel is produced from qualifying renewable feedstocks and EPA's interpretation advances that purpose. *See id.* at 576. Moreover, the character and context of EPA's interpretation entitles it to deference. *Id.* EPA provided its interpretation on the record in a publicly noticed rulemaking and explained why it is imperative that regulated entities abide by that interpretation. *See* JA-[FR_44548]; 85 Fed. Reg. at 7062. Thus, there can be no dispute that EPA's interpretation represents its "authoritative" and "official position," that EPA's interpretation "implicate[s] its substantive expertise," or that its interpretation reflects its "fair and considered judgment." *See Kisor*, 588 U.S. at 577-79. Accordingly, the Court should reject Neste's arguments.

### B.   EPA's Recordkeeping Provisions Are Reasonable, Supported by the Record, and Do Not Reflect a Change in EPA's Policy.

EPA's recordkeeping regulations are reasonable and have always required renewable fuel producers to keep records demonstrating that the feedstocks they

97

use qualify under the RFS program. *Contra* Neste Br. 16. Neste incorrectly asserts that EPA's recordkeeping requirements reflect a change in agency policy. Neste Br. 16-17 (citing *Fox Television Stations*, 556 U.S. at 515). But EPA has required renewable fuel producers to maintain records of the locations from which food waste is collected since 2010. EPA's general recordkeeping requirements mandate that renewable fuel producers "keep documents associated with feedstock purchases and transfers that identify where the feedstocks were produced and *are sufficient to verify that feedstocks used are renewable biomass*... if RINs are generated." 40 C.F.R. § 80.1454(d) (July 2010) (emphasis added); *see also id.* § 80.1454(c)(1) (July 2010) (requiring foreign renewable fuel producers to "keep records of feedstock purchases and transfers associated with renewable fuel for which RINs are generated, sufficient to verify that feedstocks used are renewable biomass...."). Satisfying these criteria necessitates that renewable fuel producers keep records showing the locations where food waste was generated. *See* JA-[FR_44548]; 85 Fed. Reg. at 7062; 81 Fed Reg. at 80902-03.

Neste's failure to identify *any* EPA guidance, statement, or other communication or interpretation contrary to EPA's longstanding interpretation of the recordkeeping requirements is fatal to Neste's position. *See El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 256 (D.C. Cir. 2024). Neste's sole support for its position, aside from its own misreading of EPA's regulations, is EPA's

interpretative guidance pertaining to the registration provision, discussed earlier. *See* Neste Br. 17-18. But as Neste recognizes, *see id.*, that guidance pertained to the requirement that producers making renewable fuel from separated food waste include location information with their registration submissions. *See* 40 C.F.R. § 80.1450(b)(1)(vii)(B)(1) (Sept. 2014); JA-[RFS_Registration_for_Renewable_Fuel_Producers_Separated_Food_Waste_Plan_Guidance_July_2015]. As already explained, the 2015 Guidance was specifically issued to address registration requirements and related burdens. *See supra* IV.A. This burden is decidedly not present in the recordkeeping provisions and EPA has emphasized, both when it first proposed modifying the registration provision in 2016, and when it finalized that amendment in 2020, that the existing recordkeeping requirements remained. 85 Fed. Reg. at 7062; 81 Fed. Reg. 80828, 80902-03 (Nov. 16, 2016). Neste is therefore incorrect that EPA has changed its position with respect to the recordkeeping requirement and the 2015 Guidance.

Neste is also incorrect that EPA has not explained the distinction between the location requirement as it was interpreted under the registration provision, and how it is interpreted in the recordkeeping context. In its Response to Comments, EPA explains that the separated food waste plan submitted at registration "must only be specific enough for EPA to determine that it is *possible* for the producer to obtain and use feedstocks that qualify as renewable biomass...." JA_RTC_374. As

EPA further explains, the recordkeeping requirements mandate greater specificity because they "are intended to ensure that actual quantities of feedstock used to produce renewable fuel were in fact renewable biomass." *Id.* EPA also repeatedly explained in its rulemakings that the prior recordkeeping requirements imposed independent obligations on renewable fuel producers, stating that "renewable fuel producers will still be required to maintain records that demonstrate that they used a qualifying feedstock to produce renewable fuels." 85 Fed. Reg. at 7062; 81 Fed. Reg. at 80903.

With respect to Neste's challenge relating to the requirements under 40 C.F.R. § 80.1454(j)(1)(i), those arguments are waived as they were not raised during the public comment period. *See* 42 U.S.C. § 7607(d)(7)(B). But even absent waiver, Neste's assertions are incorrect. Neste contends that the recordkeeping provisions cannot require the amounts collected at each establishment because, prior to 2020, location information was required as part of registration and renewable fuel producers would not know *a priori* how much they would eventually purchase. Neste Br. 18-19. But Neste's argument highlights EPA's point; the location requirement for registration was distinct from the requirement for recordkeeping and involved different considerations. *See supra* IV.A. Just as EPA did not require information regarding the location of each food waste generator at registration, EPA did not require food waste amount information at

100

registration. *See* 40 C.F.R. § 80.1450(b). This is because renewable fuel producers will not know at the time of registration the future amounts of food waste they will purchase from each establishment. And just as EPA has always required renewable fuel producers to keep documents associated with fuel that *has been* produced demonstrating where a feedstock was produced, EPA has also required them to document the amount of feedstock generated by those sources. *See id.* § 80.1454(d), (j)(1).

Neste last contends that the recordkeeping requirements constitute a "change in course" because section 80.1454(d)(1) cannot be read to require renewable fuel producers to retain location information. Neste asserts that EPA's decision to promulgate the location requirement in 40 C.F.R. § 80.1454(j)(1)(ii) in 2020 would render the interpretation of section 80.1454(d)(1) "superfluous." Neste Br. 20. But as EPA explained, it added the location provision "[t]o emphasize that this requirement remains in the regulations in light of removing the corresponding registration requirement...." JA-[NPRM_80701]. Neste faults EPA for adding this provision to provide greater clarity, but Neste's own position demonstrates the reasonableness of providing this clarity. As EPA explains, these requirements are necessary to ensure compliance with the statute. *See* JA-[RTC_365, 370]. And absent EPA's clarification, parties like Neste may continue to selectively read

EPA's regulatory provisions in an effort to avoid or limit their compliance obligations.

In support of the above assertion, Neste also incorrectly asserts that 40 C.F.R. § 80.1454(d)(1) could not have been read to require location information because the alternative recordkeeping provision under section 80.1479 only applies to section 80.1454(j). Section 80.1454(d)(1) contains a general requirement that applies to all renewable fuel producers.[24] EPA promulgated the separated-food-waste-specific iteration of the location requirement in 2020 and subsequently provided an exception to this food waste-specific provision in the Set Rule. The later-in-time exception specific to separated food waste does not retroactively abrogate the original, generally applicable requirement.

Accordingly, for the reasons set forth above, the Court should reject Neste's contention that the location requirement constitutes a change in agency policy. Neste clearly has a contrary understanding of the recordkeeping requirements; however, it cannot simply assert that its historical misinterpretation of those requirements nullifies EPA's consistent, reasoned, and contemporaneous explanation of its own policy.

---

[24] As Neste acknowledges, Neste Br. 5 n.1, while 40 C.F.R. § 80.1454(d) applies to domestic producers, 40 C.F.R. § 80.1454(c) contains similar general requirements which apply to foreign producers like Neste.

Even if EPA's treatment of these issues could be considered a change in policy, however, the Court should still uphold the recordkeeping requirements because EPA, in reopening the recordkeeping requirements for public comment and consideration, has provided a reasoned explanation, considered alternatives, and accounted for the interests of the regulated community. *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 726-27 (D.C. Cir. 2016) (where there was a disagreement as to whether a policy change occurred, this Court found "the EPA's explanation adequate even assuming *arguendo* that it was required to supply 'a more detailed justification'" pursuant to *Fox Television Stations*, 556 U.S. at 515).

As EPA explained, these recordkeeping requirements are necessary because they allow EPA to verify that the feedstock used to generate renewable fuel under the program is qualifying renewable biomass as required by the statute. *See* JA-[RTC_365, 374]. This requirement is necessary because the RFS program is susceptible to fraud and there is a "long history of fraud" involving separated food waste as a feedstock due to "the relative ease in which non-qualifying oils can be substituted for or blended with [used cooking oil]." *See* JA-[RTC _365, 370]. EPA further explained that simply relying on information identifying a food waste aggregator is insufficient because it alone does not allow EPA to verify that the feedstock used was actually a qualifying waste. *See* JA-[RTC_372] (noting, with respect to food waste aggregators, that "[g]eneralized information...is not sufficient

103

to verify that any particular quantity of feedstock that is used to produce RIN-generating renewable fuel is actually renewable biomass."). And contrary to Neste's assertion otherwise, Neste Br. 18, self-certifications are not an adequate means of ensuring compliance "[s]ince it is not possible to verify self-declarations without additional documentation...." JA-[RTC_367]. As EPA explained, "[a]uditing and enforcing based on self-declarations is difficult, especially when the underlying records originate from parties that EPA does not directly regulate or originate outside of the U.S." *Id.*

Neste also incorrectly contends that EPA can cite to no instances of fraud. In both the proposed and final rule preambles, EPA cites to its civil enforcement page outlining multiple instances of fraud. *See* JA-[FR_44525 n.264]; JA-[NPRM_80643 n.225]. For example, Scott Carl Johnson engaged in an elaborate scheme to falsify records relating to separated food waste feedstocks that resulted in the fraudulent generation of 72 million RINs. *See* EPA, *Gen-X Energy Group*, Civil Enforcement of the RFS Program (last updated Oct. 18, 2023), https://www.epa.gov/enforcement/civil-enforcement-renewable-fuel-standard-program#genx; *United States v. Johnson*, 4:15-CR-06042, Doc. 15 at 4-7 (E.D. Wash. Nov. 24, 2015) (Plea Agreement). But even without citing specific instances of fraud, EPA is still permitted to promulgate regulations necessary to oversee the RFS program, so long as EPA provides a reasoned explanation. *See Stilwell*, *v. Off.*

*of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (An agency is not under a general obligation "to produce empirical evidence" in support of every rulemaking, and it is fully appropriate for an agency to "justify its rule with a reasoned explanation.").

In an effort to undermine this concern, Neste mischaracterizes a passage from EPA's Response to Comments and asserts that EPA has not identified fraud in the RFS program. Neste Br. 23 (citing JA-[RTC_212]). But the passage Neste cites refers to renewable fuel produced from biogas, which involves a completely different production process and set of considerations. *See* JA-[RTC_212] ("The lack of fraud being reported at present *under the previous biogas provisions* is not necessarily indicative of a lack of fraud occurring.") (emphasis added). As outlined above, EPA has articulated a reasoned explanation for the recordkeeping requirements and a connection between EPA's programmatic need for oversight and the functions performed by the regulatory provisions. *See Stilwell*, 569 F.3d at 519.

Neste also incorrectly contends that the recordkeeping requirements are arbitrary because EPA failed to consider "alternatives." Neste Br. 21-23. Neste first contends that EPA failed to consider concerns regarding the ability of renewable fuel producers to obtain location information from food waste aggregators. Neste Br. 21-22. But EPA specifically reopened 40 C.F.R. §

105

80.1454(j)(1)(ii) in order to consider these very concerns, which it heard from stakeholders following its 2020 rulemaking. In response, EPA proposed and finalized an alternative recordkeeping requirement under section 80.1479. *See* JA-[NPRM_80701-02]; JA-[FR_44548-49]. The alternative recordkeeping requirement reasonably addresses the concerns that Neste cites by allowing aggregators to register with EPA and to hold the records, obviating the need for aggregators to share their sources with renewable fuel producers. *See* 40 C.F.R. § 80.1479. Neste contends that "EPA has failed to explain why it rejected less burdensome alternatives" and further suggests, without citing evidence, that foreign aggregators will refuse to participate in the alternative recordkeeping requirement. Neste Br. 21-23. But aside from these generalized and unsupported assertions, Neste fails to identify which proposed alternative it contends would be less burdensome or an alternative to which EPA failed to adequately respond. As the record shows, EPA has satisfied its obligations by fully considering the public comments on how it should craft the alternative recordkeeping requirements and made changes in the finalized version of section 80.1479 in response to concerns raised by commenters. *See* JA-[RTC_359-78].

Accordingly, for the reasons stated, EPA's recordkeeping requirements are reasonable, and the Court should reject Neste's challenge.

**C.      EPA's RIN Generation Provisions Merely Clarify Existing Regulatory and Statutory Requirements and Are Reasonable.**

EPA's RIN generation regulations reasonably implement the statutory requirement that EPA's regulations ensure that "transportation fuel sold or introduced into commerce *in the United States*...contains at least the applicable volume of renewable fuel...." *See* 42 U.S.C. § 7545(*o*)(2)(A)(i). In the Set Rule, EPA finalized regulations clarifying that RINs must not be generated for renewable fuel that is not produced for use in the United States, 40 C.F.R. § 80.1426(c)(2), and that RINs corresponding to fuel that is not sold in the United States are invalid, *id.* § 80.1431(a)(1)(viii). Neste agrees that renewable fuel that is not sold or introduced into commerce in the United States cannot be used to satisfy the volume requirements under the RFS program. *See* Neste Br. 26-27. Neste further agrees that RINs generated on fuel that is not ultimately sold in the United States cannot be used for compliance. *See id.* at 28 (proposing that parties be allowed to "retire any RINs associated with fuel ultimately used elsewhere").

Neste contends that the RIN generation provisions are unreasonable and a change in policy because those provisions require foreign renewable fuel producers to "perfectly predict in advance and later prove that fuel is actually used in the United States." Neste Br. 24. Neste's argument is based on a mischaracterization of EPA's regulatory requirements and a misunderstanding of what EPA's regulations allow. EPA's regulations have long stated that RINs may only be generated for

fuel that is produced or imported for use in the United States. 40 C.F.R. § 80.1426(b)(1) (July 2010). It is unreasonable to read that requirement as stating that a RIN generated for fuel is valid so long as the producer *intended* that the fuel be used in the United States. Neste does not point to any regulatory provision or policy that would allow for such a result, and, indeed, such a policy would be inconsistent with the CAA and with EPA's longstanding regulation. EPA previously brought a civil enforcement action against a renewable fuel exporter who had exported 48.5 million gallons of biodiesel from the United States and failed to retire an associated 72.7 million biomass-based diesel RINs that were generated from 2011-2013. *See* EPA, *Chemoil Corporation*, Civil Enforcement of the RFS Program (last updated Oct. 18, 2023), https://www.epa.gov/enforcement/civil-enforcement-renewable-fuel-standard-program#chemoil, cited at JA-[FR_44525], n.264. Accordingly, EPA's promulgation of 40 C.F.R. § 80.1431(a)(1)(viii) is consistent with the prior regulatory text and EPA's own administration of the program. Neste has failed to identify any change in policy that triggers review under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

Neste argues that EPA has changed the RIN generation requirements as they apply to foreign renewable fuel producers in a manner that is overly inflexible. But Neste has created a false dilemma that is not borne out by the Set Rule or by EPA's

other regulations. Nothing mandates that a foreign renewable fuel producer

"generate a RIN when the renewable fuel is first produced" as Neste asserts. *See*

Neste Br. 27. Neste cites 40 C.F.R. § 80.1466(c)(1) for this contention, but section

80.1466(c)(1) simply outlines additional requirements for how foreign producers

should designate fuel at the time of production, not that foreign producers *must*

generate a RIN at that point in time. *See* 40 C.F.R. § 80.1466(c)(1). What EPA's

regulations *do* require is that RIN generation, if and when it occurs, applies only to

the renewable fuel that is sold for use in the United States. Contrary to Neste's

assertions otherwise, EPA's regulations provide foreign renewable fuel producers

with the flexibility to decide when to generate RINs and a producer need not

generate RINs on fuel where it is uncertain on whether that fuel will be sold in the

United States. *See id* § 80.1426(a).

Further, Neste cites no evidence that any aspect of EPA's clarifying changes

to section 80.1431 will reduce RFS program participation or has altered the

existing avenues by which foreign producers may generate RINs. EPA's

regulations provide foreign producers with flexibility in generating RINs. To the

extent that a foreign producer does not want to use "dedicated storage tanks"—one

option explicitly considered by EPA, *see* JA-[RTC_358]—the foreign producer

may take a different approach, such as having a United States-based importer

generate RINs on fuel that actually arrives in the United States.

109

Neste further contends that EPA "failed to adequately consider" the alternative of allowing RIN generators to generate and later retire those RINs. Neste Br. 28.[25] But Neste failed to raise that alternative in its public comment to the Set Rule, waiving that argument. *See* 42 U.S.C. § 7607(d)(7)(B). Further, contrary to Neste's assertion otherwise, EPA does provide an avenue for relief where a foreign producer inadvertently generates RINs for fuel that is not used in the United States. *See* JA-[RTC_358]. As EPA explains on the record, a foreign producer may address this scenario through EPA's remedial action process. *Id.* Referring to non-binding guidance, Neste contends that the remedial action process "does not even contemplate this situation." Neste Br. 29. As EPA expressly stated in its Response to Comments, JA-[RTC_358], parties may request that EPA address situations where they inadvertently generate invalid RINs for foreign produced fuel through the remedial action process. Accordingly, Neste has failed

---

[25] Neste's brief posits that foreign renewable fuel producers should be allowed "to generate RINs for all fuel 'produced for use' in the United States and to subsequently retire any RINs associated with fuel ultimately used elsewhere." Neste Br. 28. Neste's interpretation would abrogate the regulatory language, "produced for use," and instead read the regulations to say RINs can be generated for any fuel "that might be used" in the United States. While EPA's regulations provide avenues for retiring invalid RINs, producers are not permitted to generate RINs on fuel that they do not have a plan to sell in the United States.

to establish that EPA's RIN generation provisions, as amended in the Set Rule, are arbitrary and Neste's petition for review should be denied.[26]

### D.    Any Remand Should Be Without Vacatur.

Finally, Neste's conclusory requests for vacatur are vague and unwarranted. Despite challenging a very narrow set of provisions in the Set Rule, Neste asks this Court to "set aside" the entirety of the Set Rule. Neste Br. 30. Neste fails to explain how its limited challenge warrants such a broad remedy. To the extent the Court determines that remand is appropriate, such should be without vacatur and limited to the challenged provisions.

## V.    The Set Rule and EPA's Informal Consultations with NMFS and FWS Comply with the Endangered Species Act.

### A.    EPA's Biological Evaluation Complies with the ESA.

EPA properly applied the ESA consultation regulations to identify the potential effects of the Set Rule and conclude that the rule is not likely to adversely affect any listed entities. Environmental Petitioners' theory that the regulatory term "environmental baseline" requires EPA to include in its ESA analysis of the Set Rule the effects of previous RFS volume-setting actions—or even all biofuel use regardless of RFS requirements—lacks merit for multiple reasons. Their

---

[26] The Court should decline to take up Neste's argument that EPA's interpretation should not apply to previously generated RINs. EPA has not created a new policy here. And further, there is no ripe dispute for the Court to resolve on this point.

interpretation of the appropriate analysis incorrectly ignores the limited scope of EPA's agency action here in promulgating the Set Rule. Moreover, the regulatory term on which they premise their legal theory is inapplicable in informal consultation. Regardless, EPA identified the potential effects of the Set Rule based on the best available scientific and commercial data.

The first step in EPA's Evaluation of the potential effects of the Set Rule demonstrates that the RFS program is *not* a main cause of increasing demand for renewable fuels and the crops used to produce biofuels. JA-[BE_6-9, 75-132, 231-32, 236-42]. Despite the limited role of the Set Rule in inducing market demand for the feedstock crops, in subsequent steps EPA analyzed a worst-case scenario to determine whether listed entities would be affected by its estimated maximum potential increases in cultivation of corn, soy, and other crops attributable to the Set Rule. JA-[BE_9-13, 133-235]. Finally, EPA provided a reasonable assessment of the best available information to identify whether the Set Rule impacts water pollution, a potential effect even more attenuated than the land-use changes that could result from the Set Rule volumes.

### 1.    The Biological Evaluation Reasonably Identifies the Potential Effects of the Set Rule.

As discussed in Pt.I.A.2, *supra*, EPA reasonably determined the potential effects of the Set Rule on listed entities by comparing it to a scenario in which EPA did not establish volume requirements for any year beyond 2022. Using that

comparative analysis, EPA found that the Set Rule could induce modest increases in the production and use of certain biofuels that may increase feedstock crop production and land conversion in contrast to what would happen in the absence of the RFS program. Environmental Petitioners' narrative that the Set Rule is responsible for nearly all negative impacts from all biofuel production is exaggerated and ignores numerous non-RFS factors at play.

Misapplying the "environmental baseline" concept, Environmental Petitioners argue EPA should have analyzed the "land conversion impacts from previous RFS rules," based on their incorrect assumption that all land conversion impacts associated with renewable fuel are attributable to the "full discretionary choice EPA faced in setting new volumes." Env. Br. 19, 16. Not only is this argument factually incorrect, but it lacks merit for the more fundamental reason that the regulations require only that the "environmental baseline" be described and considered in formal consultations and Biological Opinions. 50 C.F.R. § 402.14(g)(2). In informal ESA consultation, as occurred here, neither the threshold identification of the "effects of the action" nor EPA's subsequent determinations whether the Set Rule "may affect" or is "not likely to adversely affect" any listed entity require consideration of the environmental baseline. 50 C.F.R. § 402.02 ("effects of the action"); JA-[Handbook_x-xvi, 3-1]; *Save Our Springs All., Inc. v. Tex. Dep't of Transp.*, No. 1:19-CV-762-RP, 2022 WL 1004776, at *8 (W.D. Tex.

Mar. 31, 2022) ("[T]he environmental baseline need not be determined during an informal consultation.").

EPA correctly described the "agency action" here as the Set Rule and its establishment of volume requirements for the use of renewable transportation fuel from 2023-2025 (plus other regulatory changes). JA-[BE_26]. The CAA mandates that EPA issue rules setting annual volumes of renewable fuels applicable for each year after 2022. 42 U.S.C. § 7545(*o*)(2)(B)(ii). The ESA does *not* mandate that EPA broaden its action in adopting the Set Rule to include evaluating prior years' volumes promulgated in previous rulemakings. *See Wildearth Guardians v. EPA*, 759 F.3d 1196, 1209 (10th Cir. 2014) ("When an agency action has clearly defined boundaries, we must respect those boundaries and not describe inaction outside those boundaries as merely a component of the agency action."). Environmental Petitioners thus err in conflating the Set Rule with the historic operation of the entire RFS program, Env. Br. 16, 18-19, 25. The sole action at issue is the Set Rule and its requirements for 2023-2025, and EPA's analysis is properly limited to consideration of any future effects that may be caused specifically by the Set Rule.[27]

---

[27] Environmental Petitioners also err in implying that EPA should have bundled its analysis of the Set Rule with a different agency action EPA finalized on February 29, 2024, facilitating year-round use of E15 in eight states. Env. Br. 19. They provide no support for this claim and incorrectly assert that this separate EPA

*Footnote continued on next page…*

Environmental Petitioners maintain that the "environmental baseline" should have assumed "volumes for corn and soy at zero," which would attribute all biofuel demand to the RFS program in contravention of all record evidence. Env. Br. at 18. However, such an assumption would unreasonably skew the assessment of the effects of the action. Not only were soy biodiesel and especially corn ethanol used before the existence of the RFS program, but as EPA explained, corn ethanol and soy biodiesel would be used even without the RFS program (*e.g.,* ethanol would still be produced and consumed as E10). JA-[FR_44496-44498]; JA-[RIA_62-98]; JA-[BE_28-31, 75-121]. Even assuming the Set Rule set volume requirements for 2023-2025 to zero, EPA found that the market would still supply approximately the same amount of corn ethanol (because of economics and other incentives), and a smaller amount of soy biodiesel. JA-[BE_75, 28, 30, 77, 84-89, 99-101, 107-08].

EPA assessed the only reasonable scenario when it analyzed biofuel consumption and production and calculated the maximum potential land-use

---

decision would increase demand for E15 beyond the volumes EPA considered here, which incorporated analyses of recent trends in E15 availability. JA-[RIA_79-82, 323-328]. EPA responded to this same assertion (at p. 24) when considering the separate E15 rulemaking under the CAA. EPA, Request from States for Removal of Gasoline Volatility Waiver Response to Comments, EPA-420-F-24-003 (Feb. 2024), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1019JIR.pdf.

changes for corn, soy, canola, and other major field crops that could be attributable to the Set Rule "relative to a scenario where there were no RFS volume requirements for these three years." JA-[BE_231, 7, 75-132]. EPA did not compare the Set Rule against a scenario in which zero renewable fuel is used because the best available information shows that the market would provide biofuels even in the absence of the 2023-2025 Set Rule volumes. In applying the two-part causation tests contained in the regulatory definition of "effects of the action" at 50 C.F.R. § 402.02 (2019), EPA properly considered the volume of renewable fuel the market would nonetheless supply and consume if EPA established renewable fuel volume obligations for 2023–2025 at zero. *See* JA-[BE_87-88, 105-07].

While Environmental Petitioners object (Env. Br. 18-19) to EPA's conclusions about the volumes of biofuel attributable to the Set Rule, they do not challenge any of EPA's specific technical methodologies or its choice of the best available scientific or commercial information, including EPA's analyses of the potential impacts of the RFS-attributable biofuel consumption on corn, soy, and canola production and land use. Environmental Petitioners' demand that EPA assume instead that the Set Rule causes all biofuel consumption and resulting land-use changes is inconsistent with the best available science and market data upon which EPA relied. Unlike the records for the 2018 and 2019 RFS annual rules reviewed in the *Growth Energy* and *AFPM* decisions on which the Environmental

116

Petitioners rely (*e.g.*, Env. Br. 7-8, 25, citing *Growth Energy*, 5 F.4th at 31, and *AFPM*, 937 F.3d at 593), EPA conducted extensive new analyses to distinguish the effects of the RFS program from other factors that affect biofuel consumption and production, which demonstrate the potential impacts that might be attributable to the Set Rule would be minor. JA-[BE_87-89]; JA-[3rd_TR_ES1-2]; JA-[RIA_62-98].

Even if EPA had to consider the "environmental baseline" to delineate the effects of the Set Rule, Environmental Petitioners still misapply that term in arguing that EPA should have attributed the past and present effects of all past RFS actions to the Set Rule. Env. Br. 19. The definition of "environmental baseline" at 50 C.F.R. § 402.02 does not enlarge the scope of the agency action beyond the Set Rule. The baseline includes "the past and present impacts of *all* Federal, State, or private actions and other human activities in the action area," as well as several other categories of existing and anticipated impacts. 50 C.F.R. § 402.02 (2019) (emphasis added). The relevant framework for the environmental baseline thus includes effects already realized from prior actions, including prior EPA actions implementing the RFS program. The regulatory text refutes the argument (Env. Br.

6, 19) that alleged conversion impacts from previous RFS rules must also be considered as effects of this Set Rule.[28]

### 2. EPA Reasonably Evaluated Possible Effects from Potential Water Pollution

Environmental Petitioners claim that the Evaluation "fails to analyze any harms from water pollution." Env. Br. 19-20. But EPA devoted an entire section of the Evaluation to analyzing potential impacts on listed entities from water quality changes potentially attributable to the Set Rule. JA-[BE_172-84, 225-35]. EPA leveraged the best available information and concluded that, while listed entities may be affected (if the potential worst-case scenario land-use changes projected from the Set Rule occur), they are not likely to be adversely affected. *Id.*

EPA's analysis primarily relied on a recent study conducted in support of the upcoming Third Triennial Biofuels Report to Congress, which uses the Soil and Water Assessment Tool to model the water quality impacts from crop expansion in the Missouri River Basin. JA-[BE_173-75] (citing Chen, et al., 2021) ("Chen

---

[28] The cases Environmental Petitioners cite at page 18 are not on point. Those cases all address judicial review of biological opinions issued after formal consultation. Moreover, the facts in those cases—where agencies included the future operation of dams under an existing plan as within an environmental baseline (and, thus, not considered "effects of the action")—are the opposite of EPA's analysis here where it isolated the future effects of the Set Rule by estimating biofuel consumption and production from 2023-2025 both with and without the volumes identified in the Set Rule. JA-[BE_88] ("[A] scenario in which the RFS program ceased to exist in the future is not the same as a scenario in which the RFS program had never existed.").

model"). This model estimates downstream water quality impacts from similar types of changes (conversion of grassland to corn, corn/soybean rotation, or corn/wheat rotation) over a similar number of acres as the Evaluation projects could possibly be attributable to the Set Rule. JA-[BE_174-75].

Thus, EPA determined the Chen model was a "reasonable proxy" for possible effects from the Set Rule, and that it "provides the best information available." JA-[BE_175]; *see Am. Wildlands v. Kempthorne,* 530 F.3d 991, 998-1001 (D.C. Cir. 2008) (deferring to agency's determination of the best available science); *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 925 (9th Cir. 2020) (noting that "what constitutes the best scientific and commercial data available is itself a scientific determination" that "belongs to an agency's special expertise and warrants "substantial deference") (citation omitted). EPA further acknowledged that, when used to analyze possible effects attributable to the Set Rule, the Chen model likely *overestimates* possible effects. JA-[BE_175]. This is because it focuses on pollutant concentrations in only the Missouri River basin, whereas any pollutant concentrations from a similar amount of possible land-use change due to the Set Rule would be distributed over multiple river basins. JA-[BE_174-75]. Nonetheless, EPA extrapolated the Chen model's results to the Mississippi River basin and additional marine areas to conservatively estimate potential water quality

119

effects to listed entities, including from increased fertilizer use, JA-[BE_173-78], and increased pesticide use, JA-[BE_179-82].

Contrary to Environmental Petitioners' claim, Env. Br. 19-20, the Evaluation specifically assesses the potential impact of hypoxia in the Gulf of Mexico attributable to the Set Rule using the results from the Chen model. JA-[BE_178]. The model conservatively projected "an increase of 0.3%–0.8% and 0.9%–2.1% of total nitrogen and phosphorus respectively," which EPA determined would be "minor" if it occurred in the Gulf of Mexico compared to existing conditions. *See id.* Additionally, because the Chen model focuses on downstream effects, EPA collaborated with NMFS on a qualitative analysis to analyze potential effects to species closer to theoretical cropland conversions. JA-[BE_179, 226-30]; JA-[EPA-HQ-OAR-2021-0427-1110]; JA-[NMFS-LOC_21-24].

Environmental Petitioners also mischaracterize EPA's discussion of ongoing mitigation programs in the Evaluation. Env. Br. 20. But this discussion comes only after EPA analyzed and estimated effects to water quality. JA-[BE_182-84]. EPA did not discuss these programs in lieu of analyzing any potential effects. Nor does anything prohibit EPA from reasonably considering existing programs and laws "intended to reduce" the precise "types of impacts" to water quality potentially attributable to the Set Rule, such as requirements and funding to reduce non-point sources of water pollution. JA-[BE_182-84].

120

Finally, Environmental Petitioners claim that EPA finds water quality impacts "inevitable," which they argue clashes with their characterization of the Evaluation that "not a single individual of any listed species would be injured." Env. Br. 20. Neither assertion is true. EPA concludes in the Evaluation that while water quality impacts *may* affect listed species and critical habitat (if the land-use changes and increased fertilization occur due to the Set Rule), they are not likely to adversely affect listed entities because the effects are discountable or insignificant. JA-[BE_185, 234-35]; JA-[Handbook_xv-xvi].

Ultimately, Environmental Petitioners do not engage with EPA's analysis of effects to water quality or otherwise. They do not meet their heavy burden to show that EPA's analysis is arbitrary.

### B.    NMFS Reasonably Concurred with EPA's Determinations.

Environmental Petitioners fail to show any error in NMFS's concurrence with EPA's effects determinations for any listed entities, and instead rely on mischaracterizations of the record and misapprehensions of the law.

NMFS found that any potential effects from the Set Rule to its listed entities would be from potential additional crop production increasing three stressors— nutrients, sediments, and pesticides—in waterbodies. JA-[NMFS-LOC_3–10, 18]. NMFS noted that any water quality impacts from crop production would depend on many factors—like farming practices, soil type, and rainfall—which "vary

121

widely" based on location. JA-[NMFS-LOC_18]. Also, many areas that may potentially be converted to soy or corn cultivation already have existing adverse impacts to water quality due to current land-use practices. JA-[NMFS-LOC_21].

NMFS also considered "the uncertainties and assumptions" identified by EPA. JA-[NMFS-LOC_21]. For example, the crop production estimates in the Evaluation are the "maximum potential increase" if refiners meet the Set Rule's requirements only "using U.S.-grown feedstocks." JA-[NMFS-LOC_10]. But refiners may not entirely rely on increased domestic crop production to meet the Set Rule volumes, JA-[NMFS-LOC_21]; they may instead rely on biofuel or feedstock imports, increased yields, or non-crop based biofuels. JA-[NMFS-LOC_10]. NMFS explained that "[w]hile crop production is likely to play a role...the magnitude of the increase is uncertain." *Id.* Thus, NMFS considered the estimated changes in crop production associated with the Set Rule to be "upper estimates" and determined any actual changes from the Set Rule "would produce exposures that are less likely and smaller." JA-[NMFS-LOC_21].

Nonetheless, NMFS relied on EPA's calculations of the percentage of a listed species' range and critical habitat potentially impacted by the "upper estimate" of cropland conversions to qualitatively analyze the likelihood of their exposure and response to a potential increase in water quality stressors. JA-[NMFS-LOC_20-21]. For listed entities in "close proximity to potential crop

122

conversions," NMFS determined that any proximal water quality effects were "discountable because they are extremely unlikely to occur." JA-[NMFS-LOC_23-24]. This was partly based on NMFS's finding that conversions are unlikely to entirely be "in close proximity to aquatic habitats." *Id.* For listed entities "downstream of potential crop conversions," NMFS qualitatively relied on the estimates of pollution magnitudes in the Evaluation as the "best scientific and commercial data available." JA-[NMFS-LOC_24]. NMFS determined that any exposures would be "insignificant" because the individual responses would "not represent a measurable change." JA-[NMFS-LOC_24-25].

Contrary to Environmental Petitioners' assertions, NMFS did not conclude that the Set Rule "would impact" listed entities. Env. Br. 20-21. Rather, NMFS found any potential effects would either be discountable or insignificant, and applied its expertise to concur with EPA's "may affect, but are *not likely* to adversely affect" determinations. JA-[NMFS-LOC_25]; JA-[Handbook_3-12 (concurrence proper if effects are discountable or insignificant].

Environmental Petitioners also incorrectly assert that NMFS determined that all potential effects would be "insignificant." Env. Br. 21, 24-25. In fact, NMFS found only downstream effects insignificant; it found proximal effects discountable. JA-[NMFS-LOC_23-25].

Environmental Petitioners contend that NMFS should have given species "the benefit of the doubt" and refused to concur because EPA identifies uncertainties in assessing the Set Rule's effects. Env. Br. 21, 25-26. But the ESA Consultation Handbook (the "Handbook") recommends giving species the "benefit of the doubt" only when "the nature of the effects cannot be determined."[29] JA-[Handbook_3-12]. Here, NMFS was able to assess the nature of the effects possibly attributable to the Set Rule. JA-[NMFS-LOC_20 (explaining potential effects are increases in three stressors and the effects each could have on aquatic environments and species)]. NMFS then applied its expertise, considered the best available science, and found that these potential effects would be discountable or insignificant, concluding that listed entities are unlikely to be adversely affected.

Environmental Petitioners also suggest that, given the uncertainties identified in the Evaluation, NMFS should have speculated that the Set Rule is likely to adversely affect listed entities. Env. Br. 21. Such unsubstantiated analysis has no basis in the ESA. *See Bennett v. Spear*, 520 U.S. 154, 176 (1997) (best available science requirement "ensure[s]" the ESA is not implemented "on the basis of speculation or surmise"); *Maine Lobstermen's Ass'n v. Nat'l Marine*

---

[29] The Services jointly issued the Handbook in March 1998, after public notice and comment, to provide internal guidance and policy for conducting ESA consultations. 59 Fed. Reg. 65781 (Dec. 21, 1994); JA-[Handbook_Forward, xx-xxi].

*Fisheries Serv.*, 70 F.4th 582, 596 (D.C. Cir. 2023) ("Nothing in [ESA] § 7

requires 'distorting the decisionmaking process by overemphasizing highly

speculative harms' whenever the available data is wanting.") (citation omitted).

Environmental Petitioners identify no available information NMFS should have

considered in this consultation to resolve these uncertainties.[30]

Moreover, Environmental Petitioners ignore that EPA's "not likely to

adversely affect" determinations and NMFS's concurrence rested on conservative

assumptions. For example, NMFS assumed the Set Rule would increase crop

conversions to some extent, notwithstanding data showing that areas overlapping

with the ranges of NMFS listed entities "have seen a net decrease" in crop

conversions between 2008 and 2016. JA-[NMFS-LOC_10-11]. NMFS reasonably

exercised its discretion to determine that, even if the maximum potential crop

conversions possibly attributable to the Set Rule occurred as calculated in the

Evaluation, any impacts from increased water quality stressors on listed entities

would be discountable or insignificant. JA-[NMFS-LOC_22-25]; *San Luis &*

*Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014) (noting it

is within NMFS's "discretion" to be "conservative" in the face of uncertainties).

---

[30] Environmental Petitioners' claim that NMFS should have "extended the due date of the biological opinion" is also misplaced. Env. Br. 26. EPA requested informal consultation and NMFS agreed this was appropriate. There was no "due date" for a biological opinion, and 50 C.F.R. § 402.14(e) is not applicable.

Environmental Petitioners falsely claim that NMFS "ignored" possible water quality impacts by relying entirely on "uncertainty." Env. Br. 21, 25-26. NMFS assessed possible exposures to water pollution using the maximum projections in the Evaluation of the potential percentage of a listed entities' range and critical habitat impacted by cropland conversions. JA-[NMFS-LOC_20-21]. While NMFS considered the uncertainties involved, it used the best available information to qualitatively estimate the maximum possible effects and found them indistinguishable from existing conditions. JA-[NMFS-LOC_24 (proximal), 25 (downstream)]. Especially with the scientific uncertainties involved, NMFS's "choice of methodology" deserves "substantial deference." *See Pub. Emps. for Env't Resp. v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 26 (D.D.C. 2011); *see also Sinclair Wyoming*, 101 F.4th at 882-83.

Environmental Petitioners also argue that NMFS's consideration of the uncertain causal chain "contradicts" the Court's decision in *Growth Energy*, 5 F.4th at 31. Env. Br. 25. But *Growth Energy* reviewed EPA's no-effect determination for a different RFS rule and merely found *on that record* that certain causal evidence was unrebutted. *See* 5 F.4th at 31-32. And that Court recognized that informal consultation was available to EPA if it made the necessary "not likely to adversely affect" determinations. *Id*. at 32 (citing 50 C.F.R. § 402.14(b)(1) ). Nothing in *Growth Energy* prohibits NMFS from considering the significant

uncertainties associated with any effects from the Set Rule. Indeed, the Handbook indicates that, if NMFS concludes effects are discountable or "extremely unlikely to occur" as it did here for proximal effects, concurrence is appropriate. JA-[Handbook_B-55]. Ultimately, Environmental Petitioners' default reliance on *Growth Energy* betrays that they cannot dispute the various causal uncertainties documented *in this record*.

Environmental Petitioners also fault NMFS for concluding that downstream exposure effects are insignificant while also acknowledging it lacked more precise information. Env. Br. 25. NMFS explained that "existing models are not adequate or require detailed information that is not available," and thus considered EPA's "conservative" estimates "the best available information." JA-[NMFS-LOC_24]. This is all the ESA requires. 16 U.S.C. § 1536(a)(2) (requiring agencies use "best scientific and commercial data available"). Environmental Petitioners identify nothing that NMFS failed to consider. *See Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001) ("superior data" must be identified to challenge agency's best available science decision).

The only specific effects determination that Environmental Petitioners challenge is the Chesapeake Bay Distinct Population Segment of Atlantic Sturgeon

("Chesapeake Sturgeon"), for which NMFS found the effects insignificant.[31] Env. Br. 22-24. Specifically, Environmental Petitioners claim that NMFS does not explain how the Set Rule "will not harm" Chesapeake Sturgeon. Env. Br. 23-24. This is not the standard. To concur, NMFS must determine that listed entities are not likely to be adversely affected, a decision reached when any effects are expected to be "insignificant." JA-[Handbook_3-12 to 3-13]. Insignificant effects are those that cannot be meaningfully measured, detected, or evaluated and are not expected to reach the scale where take occurs.[32] *Id.*

Based on EPA's worst-case scenario, NMFS determined the upper extent of impacts to Chesapeake Sturgeon could result in only 0.139% of its range and 0.132% of its habitat being affected by conversion to soybean acres. JA-[NMFS-LOC_22]. As explained, NMFS used these percentages as qualitative surrogates to assess species' exposure to water quality stressors and found downstream effects on listed entities including to Chesapeake Sturgeon would be "insignificant" because they would "not represent a measurable change from baseline responses." JA-[NMFS-LOC_24-25]. This is a straightforward application of the Handbook's

---

[31] As explained, NMFS found only downstream effects for Chesapeake Sturgeon insignificant; it found proximal effects discountable. JA-[NMFS-LOC_23-25].

[32] While Environmental Petitioners misstate the standard, because the ESA defines "take" to include "harm," 16 U.S.C. § 1532(19), NMFS's conclusion that downstream effects would be insignificant means such effects are not expected to "harm" any species.

definition of "insignificant." Environmental Petitioners marshal nothing to substantively dispute NMFS's conclusions.

Instead, myopically focusing on the acres potentially impacted in the maximal scenario contemplated in the Evaluation, Environmental Petitioners misleadingly cite a few inapt cases to argue that NMFS should have insisted on formal consultation for Chesapeake Sturgeon. Env. Br. 23-24. For example, they cite *Sierra Club v. Van Antwerp* claiming it held that a "biological opinion [was] required for impacts to 54 acres" of critical habitat. *Id.* But that Court expressly did "not reach the issue of whether" a biological opinion was required. *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1150, 1156-57 (D.C. Cir. 2011). Moreover, the Court remanded because it found the action agency and FWS failed to address habitat fragmentation risk. *Id.* at 1157. Environmental Petitioners do not claim that any similar issue was overlooked here.

More fundamentally, the cases Environmental Petitioners cite involved different actions with different possible effects. However, the number of acres implicated by an action does not drive whether formal or informal consultation is appropriate. Such reasoning confuses *exposure* to a stressor with an entities' *response* to the stressor. And Environmental Petitioners' proffered list of cases and acreages does not cast doubt on NMFS's conclusion that the Set Rule is "not likely to adversely affect" listed entities. This conclusion was based on expert analysis

and consideration of the best available science, to which Environmental Petitioners lodge no meaningful challenge.

Environmental Petitioners then argue that potential acres of conversion are not the only "relevant factor" that NMFS should have considered, and that NMFS should have done an "individualized analysis" for each species. Env. Br. 24-25. But NMFS did not consider acreage alone; again, it used acreage as a qualitative surrogate to analyze the likelihood of exposure to specific water quality stressors. JA-[NMFS-LOC_20-24]. Aside from invoking unidentified "unique conservation challenges," Environmental Petitioners do not explain what "individualized" analysis they seek, nor do they identify any record support for how such an analysis could be undertaken when the location and extent of any cropland conversions due to the Set Rule are uncertain.[33] Env. Br. 24-25.

In sum, Environmental Petitioners mischaracterize nearly every facet of NMFS's Concurrence, and therefore do not even engage with its actual analysis and conclusions. Thus, they fail to meet their "heavy burden" to show NMFS's Concurrence is arbitrary or capricious. *Village of Bensenville v. FAA*, 457 F.3d 52, 70-71 (D.C. Cir. 2006).

---

[33] Contrary to Environmental Petitioners' implication (Env. Br. 25), the ESA does not require mitigation measures where the Services concur that an agency action is not likely to adversely affect listed entities.

C.    FWS Reasonably Concurred with EPA's Determinations.

Like NMFS, FWS concurred with EPA's finding that the Set Rule was not likely to adversely affect any of the listed entities under its jurisdiction, and further explained its view that the Set Rule is unlikely to adversely affect any of its listed entities because no "effects of the action" can be identified. JA-[FWS-LOC_1, 8]. FWS' approach is based on a long-standing legal interpretation of the Department of the Interior. Applying that interpretation here, FWS explained that the available information and analyses in the Evaluation led to its conclusion that there were no environmental changes stemming from the Set Rule that met the regulatory definition of "effects of the action." 50 C.F.R. § 402.02 (2019). FWS explained that there was no information to "identify locations with any specificity in which land use changes are attributable to the Set Rule alone," or "the location of general environmental changes that are reasonably certain to occur." JA-[FWS-LOC_6, 8]. FWS' rationale is based on the many confounding factors at play in each of the complex causal chains leading from the Set Rule volumes to possible land-use changes, as well as the lack of information identifying any parcels of land subject to land-use changes that would not occur but for the Set Rule. JA-[FWS-LOC_2, 6-9]; JA-[BE_all]. Notably, Environmental Petitioners do not identify anything FWS should have considered to address those gaps. Rather, their approach wrongfully insists that FWS must ignore uncertainty, including EPA's conclusion

that the Set Rule could possibly result in cropland increases ranging from zero to 2.65 million acres by 2025, and there is no information indicating where those increases are reasonably certain to occur and would not occur but for the Set Rule. JA-[FWS-LOC_9]; JA-[BE_9].

FWS' concurrence is a reasonable application of the dual causation principles—that effects be "reasonably certain to occur" and a "but for" consequence of the action—required to identify "effects of the action" and, provides a rational basis for FWS' conclusion that the Set Rule would have no effect on listed entities, in concurrence with EPA's determinations. 50 C.F.R. § 402.02; JA-[FWS-LOC_1]. This finding is consistent with EPA's alternative explanation that the uncertainty as to any consequences could support "no-effect" determinations, though EPA opted to obtain the Services' concurrences after consultation on its "worst-case scenario." JA-[BE_185]. FWS' approach is not a novel application of the ESA's regulatory requirements.[34] In a 2008 "M-

---

[34] Environmental Petitioners' extra-record declaration of Ms. Tortorici, Doc. 2046438 at 58, is irrelevant. At the outset, because this declaration was not before the agency when making its decision, this Court cannot consider it here. *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) (citations omitted) (reviewing ESA claims based on administrative record review). Moreover, Ms. Tortorici's legal opinions are not relevant evidence appropriate for this Court's consideration. *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, No. C11-2044-RSM, 2014 WL 5449859, at *8-9 (W.D. Wash. Oct. 24, 2014) (Extra-record opinion on agency compliance with Biological Opinion is inadmissible).

Opinion,"[35] the Department of the Interior Solicitor explained and applied the same analytical approach. JA-[RFS_306-312]. Although it applied to a different factual situation, this M-Opinion describes the Department of the Interior's interpretation of the proper analytical approach for rendering "may affect" determinations, in general, by applying the causation standards contained in the regulatory definition of "effects of the action."[36] *See also* 84 Fed. Reg. 44976, 44986 (Aug. 27, 2019) ("The first inquiry—even before consultation begins—is whether any *effect of an action* 'may affect' critical habitat.") (emphasis added). Following that M-Opinion, FWS concluded here that the necessary causation was missing because of the many factors precluding a reasonably certain and "but for" causal connection between the Set Rule and localized impacts to any listed entity.

The Handbook supports FWS' approach with its instruction that FWS has the final responsibility to make the "biological determination" of the "action area" and the "effects of the action," and that informal consultation based on an action

---

[35] M-Opinions set out the Department of the Interior's formal legal analysis that must be applied in subsequent agency decisions unless withdrawn by the Secretary or the Solicitor. *See* 209 DM 3.1 A and 3.2 A (11). DOI, Electronic Library of the Interior Policies, available at https://www.doi.gov/document-library. (last visited June 27, 2024).

[36] Despite amendments to the regulatory definition of "effects of the action" in 2019, the definition referenced in the M-Opinion did not substantively change; both recognized that indirect effects must be reasonably certain to occur and must be caused by the proposed action. *See. e.g.*, 84 Fed. Reg. at 44977 ("[T]he Services have applied the 'but for' test to determine causation for decades.").

agency's initial "may affect" determination can conclude with a final "no-effect" determination. JA-[Handbook_4-15 to 4-16, 3-3]. The Handbook is otherwise silent on *how* to determine if an action "may affect" any species.

Environmental Petitioners fail to identify anything in the consultation regulations precluding FWS' approach. Environmental Petitioners' argument lacks weight because they do not even acknowledge, let alone raise, any interpretive questions about the regulatory definition of "effects of the action" that applies to FWS' analysis in both formal and informal consultation. Critically, Environmental Petitioners challenge FWS' analysis of whether the Set Rule will have any "effects," and FWS is entitled to deference for these primarily factual determinations. *City of Tacoma,* 460 F.3d at 75 (FWS receives deference for its "discretionary factual determinations about whether a proposed agency action will create a problem for a listed species."). Based upon EPA's Evaluation and the best available information, FWS' concurrence is based on a reasonable application of the ESA regulations. Environmental Petitioners fail to identify any factual or legal defects with the concurrence, and, therefore, fail to establish FWS' concurrence is arbitrary.

Nor is it relevant that NMFS and FWS rested their concurrences on different rationales. The two agencies approached the issue in different permissible ways. NMFS gave greater weight to whether listed entities within its purview could be

adversely affected given the available information on the maximum potential land-use and water quality changes that could be attributed to the Set Rule. FWS rested its concurrence on the lack of reasonable certainty in whether and where any land-use changes that could impact species within its purview would occur but for the Set Rule. These agencies can rationally articulate different analytical approaches because neither the ESA, its regulations, nor the Handbook mandate a uniform methodology for making no-effect/may-affect determinations. FWS simply applied its longstanding interpretation here.

Moreover, there is no meaningful contradiction between the Services' findings that the Set Rule is not likely to adversely affect listed entities. Both Services concurred with the same EPA determinations. Like FWS, NMFS also agreed with EPA that the extent of potential land-use changes EPA estimated for each species were "unlikely to occur," and concurred because NMFS found listed entities' exposure to water quality stressors were ultimately discountable or insignificant *even if* they occurred. JA-[NMFS-LOC_23-24]. NMFS's acceptance of EPA's worst-case scenarios does not undermine the weight FWS gave to other of EPA findings, especially the inability to identify locations of reasonably certain land-use changes that would not occur but for the Set Rule. JA-[FWS-LOC_6-9].

Especially when assessing effects of an action on different species, there is no legal obligation for FWS and NMFS to give the same weight to information

135

presented by the action agency or to reach the same conclusion. Contrary to Environmental Petitioners' request, this Court may not impose additional procedural requirements not present in the ESA. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Such a requirement would also undermine the Services' role in ESA consultation to each provide their independent technical judgment.

Nor is *AFPM* to the contrary in rejecting EPA's argument that it had made a "no effect" finding for its 2018 Rule because it could not attribute environmental harms with reasonable certainty to that Rule. Env. Br. 26-27 (citing *AFPM*, 937 F.3d at 598). At most, *AFPM* holds that an agency does not satisfy its obligation to make an ESA effects determination by conclusorily responding to a public comment regarding a different legal issue, at least where the agency also conceded that it had not fully reviewed the available commercial and scientific information. *AFPM*, 937 F.3d at 598. *AFPM* does not discuss the "effects of the action" definition and does not support Petitioners' demand here to reject the agencies' extensive ESA consultation, including EPA's detailed evaluation of the best information now available in support of its findings and FWS' explanation of its own analytical approach and concurrence with the ultimate determinations, as NMFS did, that the Set Rule is not likely to adversely affect listed entities. Petitioners' challenge to FWS' concurrence lacks merit and should be rejected.

136

## CONCLUSION

For the reasons stated, the Court should deny the petitions for review.

Respectfully submitted,

TODD KIM
  *Assistant Attorney General*

KIMERE J. KIMBALL
ALEXANDER PURPURO
JOHN H. MARTIN
JOSEPH CRUSHAM
  *U.S. DOJ/ENRD*
  *P.O. Box 7611*
  *Washington, D.C. 20044*
  *(202) 514-2285/9771*
  kimere.kimball@usdoj.gov
  alexander.purpuro@usdoj.gov
  john.h.martin@usdoj.gov
  joseph.crusham@usdoj.gov

*Of Counsel:*
LUCAS MAY, NORA
GREENGLASS, MONICA DERBES
GIBSON & MEREDITH MILLER
  *U.S. EPA*
REBECCA FINLEY
  *U.S. DOI*
JENNIFER DOUGLAS
  *NOAA*

137

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 29,708 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

*/s/ Alexander Purpuro*
ALEXANDER PURPURO

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed through the ECF filing system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

*/s/ Alexander Purpuro*
ALEXANDER PURPURO