[NOT YET SCHEDULED FOR ORAL ARGUMENT]

Nos. 23-1177 (lead), consolidated with 23-1240, 23-1243, 23-1246,
23-1247 and 23-1249

# In the United States Court of Appeals for the District of Columbia Circuit

CENTER FOR BIOLOGICAL DIVERSITY,
*Petitioner*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*.

On Petition for Review of an Action of the
United States Environmental Protection Agency

**BRIEF OF BIOFUEL INTERVENORS
IN RESPONSE TO ENVIRONMENTAL PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY &
NATIONAL WILDLIFE FEDERATION**

Ethan G. Shenkman
Samuel T. Pickerill
ARNOLD & PORTER
 KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
ethan.shenkman@arnoldporter.com
samuel.pickerill@arnoldporter.com

Sarah Grey
ARNOLD & PORTER
 KAYE SCHOLER LLP
1144 Fifteenth Street
Denver, CO 80202
(303) 863-2388
sarah.grey@arnoldporter.com

*Counsel for Intervenor
Growth Energy*

Matthew W. Morrison
Lauren E. Johnstone
PILLSBURY WINTHROP SHAW
 PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8306
matthew.morrison@pillsburylaw.com
lauren.johnstone@pillsburylaw.com

*Counsel for Intervenor
Renewable Fuels Association*

Bryan Killian
Douglas Hastings
MORGAN LEWIS &
 BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 739-3000
bryan.killian@morganlewis.com
douglas.hastings@morganlewis.com

*Counsel for Intervenor
Clean Fuels Alliance America*

## CERTIFICATES TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 15(c)(3) and 28(a)(1), Intervenors Growth Energy, Renewable Fuels Association, and Clean Fuels Alliance America respectfully submit this Certificate as to Parties, Rulings, and Related Cases.

### (A)    Petitioners

Center for Biological Diversity (No. 23-1177) and National Wildlife Federation (No. 23-1249) (collectively, "Environmental Petitioners"); Neste US, Inc. (No. 23-1240); American Refining Group, Inc. (No. 23-1243); Calumet Montana Refining, LLC (No. 23-1243); Calumet Shreveport Refining, LLC (No. 23-1243); Ergon Refining Inc. (No. 23-1243); Ergon-West Virginia, Inc. (No. 23-1243); Hunt Refining Company (No. 23-1243); Par Hawaii Refining, LLC (No. 23-1243); Placid Refining Company LLC (No. 23-1243); San Joaquin Refining Co., Inc. (No. 23-1243); U.S. Oil & Refining Company (No. 23-1243); Wyoming Refining Company (No. 23-1243); Countrymark Refining and Logistics, LLC (No. 23-1243); The San Antonio Refinery LLC (No. 23-1243); and Wynnewood Refining Co., LLC (No. 23-1243); REH Company (No. 23-1243); Sustainable Advanced Biofuel Refiners Coalition (No. 23-1246); American Fuel & Petrochemical Manufacturers (No. 23-1247).

### (B)    Respondents

U.S. Environmental Protection Agency (all cases); Fish and Wildlife Service

(No. 23-1177); National Marine Fisheries Service (No. 23-1177).

**(C)    Intervenors**

Growth Energy; Renewable Fuels Association; Clean Fuels Alliance America; Coalition for Renewable Natural Gas; American Petroleum Institute; and American Fuel & Petrochemical Manufacturers.

**(D)    Amicus Curiae**

Agricultural, Biomass, and Greenhouse Gas Lifecycle Scientists David Clay, Kenneth Copenhaver, Isaac Emery, Stephen Kaffka, Madhu Khanna, Keith Kline, Steffen Mueller, and Dev Shrestha.

**(E)    Action Under Review**

The final agency action under review in this case is Respondent Environmental Protection Agency's Final Rule entitled, "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44,468 (July 12, 2023) ("Set Rule"); Respondent U.S. Fish & Wildlife Service's August 3, 2023 Concurrence with EPA's "Not Likely to Adversely Affect" Determination for the Set Rule ("FWS Concurrence"); and Respondent National Marine Fisheries Service's July 27, 2023 Concurrence with EPA's "Not Likely to Adversely Affect" Determination for the Set Rule ("NMFS Concurrence").

**(F)    Related Cases**

The agency action challenged in these consolidated cases has not been before

this Court or any other court.

Case No. 23-1248 has been severed from this case and is being heard separately.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 26.1 and D.C. Cir. R. 26.1, Intervenors Growth Energy, Renewable Fuels Association, and Clean Fuels Alliance America respectfully submit their Corporate Disclosure Statements as follows:

1.      Growth Energy is a nonprofit trade association within the meaning of Circuit Rule 26.1(b). Its members are ethanol producers and supporters of the ethanol industry. It operates to promote the general commercial, legislative, and other common interests of its members. It does not have a parent company and no publicly held company has a 10% or greater ownership interest in it.

2.      The Renewable Fuels Association is a non-profit trade association.  Its members are ethanol producers and supporters of the ethanol industry.  It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members.  The Renewable Fuels Association does not have a parent company and issues no stock.

3.      Clean Fuels Alliance America ("Clean Fuels") is a trade association as defined in Circuit Rule 26.1(b).  It is the national trade association for the biomass-based diesel industry, and its mission is to advance the interests of its members by creating sustainable biodiesel and renewable diesel industry growth.  Clean Fuels has no parent companies, and no publicly held company has a 10% or greater ownership interest.  It has not issued shares or debt securities to the public.

# TABLE OF CONTENTS

**Page**

CERTIFICATES TO PARTIES, RULINGS, AND RELATED CASES ................. i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................................... iv

TABLE OF AUTHORITIES ................................................................... vii

GLOSSARY OF ABBREVIATIONS ....................................................... ix

RELEVANT STATUTORY AND REGULATORY PROVISIONS ..................... 1

SUMMARY OF ARGUMENT ................................................................. 1

ARGUMENT ..................................................................................... 4

I.     RESPONDENTS COMPLIED WITH THE ESA ........................................ 4

       A.     EPA's Biological Evaluation Was Sound ............................ 4

              i.     EPA adopted a reasonable baseline. ........................... 4

              ii.    EPA employed numerous conservative assumptions and still
                     found minimal impacts to species. ............................... 6

              iii.   EPA adequately considered alleged water quality impacts
                     including hypoxia. ................................................... 8

       B.     NMFS Reasonably Concluded that the Set Rule Is Not Likely to
              Adversely Affect Listed Species or Habitat. ......................... 9

              i.     NMFS gave "the benefit of the doubt to the species," going
                     beyond what the law requires. ................................... 9

       C.     FWS Reasonably Concluded that the Set Rule Will Not Affect
              Listed Species or Habitat. ............................................. 10

              i.     FWS appropriately based its findings on a "reasonable
                     certainty" standard. ............................................... 10

II.    EPA REASONABLY CONSIDERED THE STATUTORY FACTORS IN SETTING
       VOLUMES. ................................................................... 12

A.      The Climate Change Factor Supports Even Higher Renewable Fuel Volumes Than EPA Finalized ............................................................12

B.      EPA Appropriately Declined to Adjust Volumes Based on its Modeling Comparison Exercise .........................................................15

C.      Petitioners' Challenge to EPA's 2010 Determination that Ethanol Satisfies the 20% GHG Reduction Threshold is Untimely.................16

D.      EPA Properly Evaluated All Other Environmental Set Factors .........16

         i.      The Set Rule is unlikely to cause conversion of wetlands, ecosystems, and wildlife habitats..............................................16

         ii.      EPA adequately considered impacts to water quality and water supply. ...................................................................18

E.      EPA Sufficiently Considered Consumer Costs and Environmental Justice Impacts of the 2023-2025 Volumes .......................................18

         i.      Petitioners' consumer costs claims are overstated...................19

         ii.      The Rule is likely to result in benefits to environmental justice communities. ..........................................................20

III.      THE RULE HAS SUBSTANTIAL BENEFITS THAT EPA ANALYZED ON A QUALITATIVE BASIS .........................................................................20

CONCLUSION .......................................................................................21

CERTIFICATE OF COMPLIANCE .......................................................23

CERTIFICATE OF SERVICE .................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACE v. EPA*,
   864 F.3d 691 (D.C. Cir. 2017)...................................................................19

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   603 U.S. ___, No. 22-1008 (July 1, 2024).............................................16

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
   70 F.4th 582 (D.C. Cir. 2023)............................................................9, 10

*Med. Waste Inst. v. EPA*,
   645 F.3d 420 (D.C. Cir. 2011)........................................................16, 17

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017)...........................................................19

*Sinclair Wyo. Ref. Co. v. EPA*,
   101 F.4th 871 (D.C. Cir. 2024)...............................................3, 19, 20, 21

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*,
   2023 WL 7410730 (D. Alaska Nov. 9, 2023) ...................................11

## Statutes and Regulations

50 C.F.R. § 402.02 (2019).......................................................................6

75 Fed. Reg. 14,670 ..............................................................................16

75 Fed. Reg. 76,790 ..............................................................................16

87 Fed. Reg. 39,600 ..............................................................................16

16 U.S.C. § 1536(a)(2)........................................................................1, 11

42 U.S.C.
   § 7545(o)(2)(B)(ii)(I).....................................................................12

   § 7607............................................................................................16

§ 7607(b)(1) ............................................................................................16

## **Other Authorities**

Pritsolas & Pearson, *Critical Review of Supporting Literature on Land Use Change in the EPA's Second Triennial Report to Congress,* (July 2019) ...........................................................................................13

Taheripour, et al., *Comments on Environmental Outcomes of the U.S. Renewable Fuel Standard* (Mar. 21, 2022) ..........................................................1

Taheripour, et al., *Response to Comments from Lark et al. Regarding Taheripour et al. March 2022 Comments on Lark et. al. Original PNAS Paper* (May 25, 2022) .............................................................13

# GLOSSARY OF ABBREVIATIONS

Pursuant to DC Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| BE | Biological Evaluation |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| GHG | Greenhouse Gas |
| LCA | Lifecycle Analysis |
| MCE | Model Comparison Exercise |
| NMFS | U.S. National Marine Fisheries Service |
| RIA | Regulatory Impact Analysis |
| RFS | Renewable Fuel Standard |

**RELEVANT STATUTORY AND REGULATORY PROVISIONS**

All applicable statutes and regulatory provisions are contained in the separate statutory addendum to the principal briefs.

**SUMMARY OF ARGUMENT**

Pursuant to Section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), EPA issued a comprehensive, "*very* conservative" Biological Evaluation (BE) of the Set Rule's potential wildlife-related impacts. JATK[BE.11]. EPA concluded that, even under a "worst-case" scenario, the Rule is *not* likely to adversely affect any protected species or critical habitat. *Id.* Both the Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS) concurred in EPA's judgment. JATK[NMFS.25]; JATK[FWS.2].

EPA's "not likely to adversely affect" determination—and NMFS's and FWS's concurrences—are valid and well supported by the record. Environmental Petitioners (Petitioners) try to poke holes in the mutually-reinforcing findings of three expert federal agencies. But their critiques depend entirely on a small minority of outlier studies allegedly linking the RFS to land use change, which have been thoroughly refuted by credible scientists, including those from two other federal agencies. *See, e.g.*, Taheripour, et al., *Comments on Environmental Outcomes of the U.S. Renewable Fuel Standard* (Mar. 21, 2022) (cited in JATK[USDA.Comments.8]) (identifying "extreme" and "difficult to rationalize"

inconsistencies in Lark, et al., the study principally relied upon by Petitioners); Science *Amicus* 19 (98.2% of parcels characterized by "outlier" studies as "converted" to agriculture is actually preexisting farmland that rotates between crop and non-crop uses).[1]

Petitioners also invoke generic "economic principles" to assert the Set Rule will invariably lead to increased corn and soy production and thus conversion of land into agricultural production. Env. Br. 8. But the record shows that changes to U.S. renewable fuel production will be modest at most—there is little to no statistical correlation between RFS volumes and corn prices or corn acres planted, and any small increase in consumption can be fully satisfied with existing surplus renewable fuel production. JATK[BE.8, 30]; JATK[Growth.Comments.Ex.3.21-33]. Similarly, soy prices and planting are correlated with demand for soybean *meal*, which is highly valued as animal feed, rather than soy oil used for biomass-based diesel. JATK[Clean.Fuels.Comments.10]. Moreover, even if the Rule results in some small increase in renewable fuel production, improvements to agricultural efficiency and crop yield could meet this need without planting a single additional acre of corn, soy, or canola. JATK[BE.8]; JATK[Growth.Comments.Ex.1.Figs.1-

---

[1] "Science *Amicus*" refers to Doc. No. 2062981 (Brief of *Amici Curiae* Agricultural, Biomass, and Greenhouse Gas Lifecycle Scientists David Clay, Kenneth Copenhaver, Isaac Emery, Stephen Kaffka, Madhu Khanna, Keith Kline, Steffen Mueller, and Dev Shrestha).

2,Table.4]. Finally, Petitioners ignore unrebutted evidence that farmers' planting decisions are driven not by the RFS, but by wholly unrelated factors ranging from Conservation Reserve Program funding, to state and federal agricultural policies, to global commodity prices, and fuel and labor costs. JATK[Growth.Comments.Ex.3.7-33]; JATK[BE.Fig.III.A-1]; Science *Amicus* 15-18 (reviewing data in the record).

Petitioners' challenge to EPA's analysis of the statutory "Set" factors is equally unfounded. EPA's review of the scientific literature, buttressed by additional record evidence, supports the Agency's longstanding view that biofuels result in significantly lower lifecycle greenhouse gas (GHG) emissions compared with petroleum. JATK[RIA.128]; *see also* JATK[Growth.Comments.Ex.2.45] (46% reduction in lifecycle GHG emissions for corn ethanol); Science *Amicus* 24 (greater than 40% reduction for corn ethanol, based on evidence in the record); JATK[Clean.Fuels.Comments.24] (72% reduction for biomass-based diesel). Further, EPA's review of the evidence regarding land conversion, water supply, and water quality demonstrates that the Rule is anticipated to have little to no impact on these environmental parameters. EPA also performed an extensive analysis of consumer costs and found any increases to be negligible and consistent with the market-forcing goals of the program. *See Sinclair Wyo. Ref. Co. v. EPA*, 101 F.4th 871, 889 (D.C. Cir. 2024). Lastly, EPA's review of potential impacts to

environmental justice communities reasonably determined that any limited harms were outweighed by significant benefits relating to air quality and GHG emission reductions. *See* JATK[Final.Rule.44,472]. At each turn, EPA sufficiently addressed the environmental statutory factors and reasonably concluded that they did not warrant changes to volumes.

In short, Petitioners' loose collection of unsupported assertions and outlier science provide no grounds for setting aside the technical and scientific conclusions of the expert agencies in this case.

## ARGUMENT

I. **RESPONDENTS COMPLIED WITH THE ESA**

   A. **EPA's Biological Evaluation Was Sound**

      i. **EPA adopted a reasonable baseline.**

Petitioners complain that EPA, in analyzing potential environmental impacts, "should have" compared the Set Rule to a baseline of "the world without EPA's RFS program." Env. Br. 18. But EPA did precisely that: it established a "no-RFS" baseline representing a "hypothetical scenario where the RFS program does not exist," by projecting what U.S. renewable fuel production would have been if volumes were set to zero in 2023-2025, and comparing that hypothetical world to the Set Rule. JATK[BE.132; Table.VI.A-3].[2]

---

[2] EPA's "no RFS" baseline is merely theoretical as EPA could not lawfully set RFS volumes to zero.

Petitioners appear to argue that the baseline should have been the absence of *any* renewable fuels "because EPA had full statutory discretion to set volumes for corn and soy at zero." Env. Br. 18. This argument, however, reflects a gross misunderstanding of the statutory scheme. EPA does not set corn and soy production mandates; it sets volumes for categories of renewable fuel—which is but one of many end uses for corn and soy. Further, Petitioners confuse the absence of *RFS volumes* with the absence of *renewable fuel production*. EPA has no authority under the RFS to prevent renewable fuel production; all EPA can do is incentivize additional renewable fuel production beyond the amount that the market would otherwise produce. As EPA found, the vast majority of existing demand for renewable fuels results from factors unrelated to the RFS Program and thus would still be produced even if EPA set RFS volumes to zero. *See*, *e.g.*, JATK[BE.80-90](factors include demand for oxygenates in gasoline, state biofuel mandates, price advantages over gasoline, existing infrastructure and demand for exports).

To the extent Petitioners argue that EPA's baseline should be a hypothetical world where the RFS Program *never* existed, this interpretation is in direct conflict with the "environmental baseline" regulation they incorrectly invoke. *See* Resp. Br. 113-14 (regulations cited by Petitioners inapplicable to informal consultation). For example, Petitioners claim that EPA's baseline should have excluded the impacts of prior RFS rules for which EPA did not complete Section 7

5

consultation. Env. Br. 19. But "environmental baseline" is defined to include "the *past and present* impacts of *all* Federal, State, or private actions and other human activities in the action area." 50 C.F.R. § 402.02 (2019) (emphasis added). Past rules are expressly included. Further, the "environmental baseline" must include all actions not "within the agency's discretion to modify." *Id.* EPA simply does not have discretion to turn back time.[3]

### ii. EPA employed numerous conservative assumptions and still found minimal impacts to species.

Petitioners' simplistic assertions ignore the lengthy, attenuated chain of causation between setting RFS volumes and any theoretical harm to listed species from land use conversion. Specifically, for such harm to occur: (1) the RFS volumes would need to drive biofuel demand significantly beyond existing market factors; (2) causing producers to purchase more crops for biofuel production, rather than divert existing biofuel surplus from exports and other uses; (3) thereby causing a sufficient spike in crop prices to spur farmers to plant additional crops; (4) thus leading farmers to plant new acres instead of intensifying yields or diverting crop exports; (5) thereby resulting in farmers planting on uncultivated land rather than land already in cultivation for other crops; and (6) ultimately, causing land conversion to occur where species could be impacted. And EPA made conservative

---

[3] To the extent Petitioners are dissatisfied with EPA's ESA compliance in prior rules, such complaints are out of time and outside the scope of this case.

assumptions at each step in the causal chain where uncertainty arises. *See*, *e.g.*, JATK[BE.11] (deploying "worst-case," "hypothetical" scenario utilizing "conservative assumptions [that] compound upon one another resulting in an overall *very* conservative analysis"); JATK[BE.93, 232] (acknowledging estimates were "unreasonably high," "likely result[ing] in an over-projection of land use change").

For example, while recognizing that any increases in renewable fuel consumption caused by the Set Rule could be "met *fully*" by existing production volumes—in which case the RFS requirements would not have *any* marginal environmental effects—the BE nonetheless assumes that any such increases *would* result in proportional increases in renewable fuel production. JATK[BE.8]. Similarly, the BE attributed *100%* of recent increases in historical soybean production trends to the RFS, while acknowledging that this "very likely over-estimates" the impact because demand is also driven by soy used in food, soap, detergents, cosmetics and other products. JATK[BE.119]. Further, EPA assumed a "worst-case scenario" in which every new acre of corn and soy was planted on previously uncultivated land, which is a massive overestimate because it is far more efficient for farmers to simply convert former agricultural lands. JATK[BE.120]; Science *Amicus* 20-21 ("when markets incentivize farmers to increase crop production, the least costly option is to increase yields on previously farmed lands, which are most accessible and suitable for cultivation.").

EPA also adopted a grossly overstated "action area" for its ESA analysis by identifying *all* cropland where corn, soy, and canola are currently grown, regardless of whether the crops are grown for food or other non-fuel uses.  JATK[BE.31-37].  On top of that, the BE examined potential impacts within a five-mile buffer zone from current agricultural fields, despite no evidence that farmers are likely to, or capable of, cultivating five additional miles of land in each direction.  *Id.*

If anything, the agency went too far in overstating potential impacts from land use change, yet still concluded the Set Rule was unlikely to adversely affect listed species.  There is simply no basis to argue, as Petitioners contend, that EPA should have been *more* conservative in its ESA analysis.

### iii.    EPA adequately considered alleged water quality impacts including hypoxia.

Contrary to Petitioners' claims, EPA thoroughly considered hypoxia and other alleged water quality impacts in its BE.  JATK[BE.178-82].  Indeed, EPA's analysis once again examined a "worst-case" scenario using a series of conservative assumptions significantly overestimating nutrient impacts.  JATK[BE.178].  Even under these conservative assumptions, EPA projected an extremely small impact on nutrient loading in the Gulf of Mexico, concluding that any impacts from the Set Rule on the hypoxic zone within the Gulf would be negligible.  *Id.*  EPA's finding is buttressed by additional record evidence, including data that nutrient loads in the Gulf have historically decreased even while RFS volumes have increased.

JATK[Growth.Comments.Ex.3.Fig.5-1].

### B. NMFS Reasonably Concluded that the Set Rule Is Not Likely to Adversely Affect Listed Species or Habitat.

#### i. NMFS gave "the benefit of the doubt to the species," going beyond what the law requires.

Petitioners attack NMFS's concurrence for "failing to give the benefit of the doubt to the species" in the face of uncertainty. Env. Br. 26 (citing ESA Consultation Handbook[4]). There is, however, no such requirement under the ESA, which "requires the Service to use the best available scientific data, not the most pessimistic." *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 599 (D.C. Cir. 2023). The "statute is focused upon 'likely' outcomes, not worst-case scenarios." *Id.*

In any event, NMFS, in fact, relied on the numerous conservative assumptions built into the BE—including the exaggerated estimates of potential land conversion discussed above. It would have been patently unreasonable for NMFS to apply any additional layers of conservatism.

Even under the worst-case scenarios it evaluated, NMFS reasonably concluded that the impacts of the Set Rule on species within its purview will be both "insignificant" and "discountable." JATK[Handbook.xv-xvi]. In particular, NMFS found that the most impacted population segment, the Chesapeake Bay Atlantic

---

[4] *See* Resp. Br. FN 29.

Sturgeon, was potentially affected in a maximum of only *0.132 percent* of its critical habitat.  JATK[NMFS.Table.11].[5]  And it explained that the true impacts are likely "substantially less" than this worst-case estimate, which included an assumption of land conversion occurring up to a half mile inland from aquatic habitats. JATK[NMFS.23-24].  At bottom, NMFS appropriately concluded the Rule's negligible impacts are unlikely to produce any species responses that could be "meaningfully measure[d], detect[ed], or evaluate[d]."  JATK[Handbook.xv-xvi].

### C.    FWS Reasonably Concluded that the Set Rule Will Not Affect Listed Species or Habitat

### i.    FWS appropriately based its findings on a "reasonable certainty" standard.

FWS concluded that it could not find any adverse impacts on species or habitat with "reasonable certainty."  Far from "novel," as Petitioners claim, FWS's approach is entirely consistent with this Court's precedent: "where [t]he Service lacks a clear and substantial basis for predicting an effect is reasonably certain to occur… the effect must be disregarded in evaluating the agency action."  *Maine Lobstermen's* at 600.  As this Court explained, the ESA does not "require scientific reasons or calculated probabilities when no reasons or calculations are possible."  *Id.*

---

[5] EPA reached similar conclusions, finding that no NMFS "species had 0.1 percent or more of its critical habitat potentially impacted."  JATK[BE.143, Table.VII.A-5].

FWS has applied a "reasonable certainty" standard when reviewing agency actions that are alleged to impact species through especially complex and attenuated causal chains. In *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 2023 WL 7410730, at *35 (D. Alaska Nov. 9, 2023), for example, FWS concluded that "an estimate of a project-caused decrease in sea ice occurring somewhere in the Arctic, without more specific information…, does not enable us to predict any 'effects of the action' to listed species." *Id.* at *38, *40. Because it "would not be able to determine precise effects to individual animals," the FWS found that "such consequences would not be reasonably certain to occur"—a finding the court found appropriate. *Id.* at *37.

Similarly here, FWS was unable to identify any reasonably certain effects on species in "*potential* areas where land use changes that *may* be attributable to the Set Rule *could* occur." JATK[FWS.6]. FWS's approach was fully consistent with its legal obligation, based on the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), to consider only those effects that are "reasonably certain to occur" and "would not occur but for the proposed action." 50 C.F.R. § 402.02 (2019).

11

II.    **EPA REASONABLY CONSIDERED THE STATUTORY FACTORS IN SETTING VOLUMES**

    A.    **The Climate Change Factor Supports Even Higher Renewable Fuel Volumes Than EPA Finalized**

In exercising its volume-setting authority under 42 U.S.C. § 7545(o)(2)(B)(ii)(I), EPA first identified initial "candidate volumes" based on factors related to production and consumption of renewable fuel. JATK[Final.Rule.44,470]. EPA then evaluated those candidate volumes in light of the other statutory factors, finding no compelling basis to deviate in either direction. *Id.*

With respect to climate change, EPA confirmed the Set Rule "is projected to reduce GHG emissions" due to the lower lifecycle GHG emissions of renewable fuels compared with petroleum. JATK[Final.Rule.44,472]. EPA conducted an "intentionally broad" literature review regarding lifecycle GHG analysis, "inclusive of a wide range of estimates based on a variety of study types and assumptions." JATK[Final.Rule.44,500]. It also presented several illustrative scenarios of climate benefits, which ranged from millions to billions of tons of GHG reductions. JATK[Final.Rule.44,472]; JATK[RIA.164-79]. Petitioners criticize EPA for not giving dispositive weight to a small minority of studies at the far end of the literature review's range, Env. Br. 29, but it would have been arbitrary and capricious if EPA had allowed these aberrational studies to overshadow the clear weight of the record

evidence.  Indeed, a credible central estimate derived from the full range of studies in EPA's review shows that ethanol reduces GHG emissions by about 30-60% as compared to petroleum, and other renewable fuels similarly have robust GHG benefits.    JATK[Growth.Comments.Ex.2.43];  *see also*  Science *Amicus* 24 (cataloging best available science, including record evidence).

Moreover, the extreme end of EPA's literature review is dominated by a single 2022 study by Tyler Lark et al. which has been repeatedly debunked by scientists from USDA and the DOE-affiliated Argonne National Laboratory.  *See*, *e.g.*, Taheripour et al., *Response to Comments from Lark et al. Regarding Taheripour et al. March 2022 Comments on Lark et. al. Original PNAS Paper* (May 25, 2022) at 1 (cited in JATK[USDA.Comments.8]) (identifying "major deficiencies, problematic assessments, and misinterpretation"); JATK[USDA.Comments.1; 10] (identifying "major methodological flaws"; Lark's findings "cannot be corroborated with USDA site level, modeled, or national datasets."); Science *Amicus* 9-10, 12 (reviewing studies in the record and finding "much, if not all, land reported by Lark et al. as being 'converted to crop' between 2007 and 2019 was likely previously in crop, and therefore not 'converted'"); *see also* Pritsolas & Pearson, *Critical Review of Supporting Literature on Land Use Change in the EPA's Second Triennial Report to Congress,* (July 2019) (discussed in JATK[Growth.Triennial.Comments.Ex.1.4]) (finding similar misclassification errors throughout earlier Lark studies).

Much of the variability between lifecycle estimates for crop-based renewable fuels is the result of differing estimates of "indirect land use change" caused by the demand for crop-based renewable fuels. Recent models estimating indirect land use change for conventional ethanol, however, show a clear downward trend, converging around estimates roughly two to four times lower than EPA's. JATK[Growth.Comments.Ex.2.9, Fig.1] (comparing EPA's 2010 estimate with more recent studies). Thus, if anything, EPA should have projected far greater lifecycle GHG reductions than the overly conservative results it presented in the RIA.

Finally, Petitioners' "carbon opportunity cost" theory is fundamentally flawed, illustrating the sizable gulf between Petitioner's simplistic assumptions and the reality of agricultural land use decisions. Petitioners suggest that lifecycle GHG emissions analysis should include not only any GHG impacts from converting grassland into cropland, but also an "opportunity cost" for "not devoting the same land to regenerating forest." JATK[RIA.137]. But there is no evidence to suggest that, but for biofuels demand, farmers would altruistically devote their land to forest regeneration in the absence of an economic incentive to do so. Instead, the far more likely outcome is that farmers would put the land to another economic use, most likely through cultivating other crops or the same crop for non-fuel uses. Science *Amicus* 25-27 (reviewing multiple studies in the record).

14

**B.    EPA Appropriately Declined to Adjust Volumes Based on its Modeling Comparison Exercise**

Petitioners also contend that, because two out of the five models analyzed in EPA's Model Comparison Exercise (MCE) showed increased GHG emissions under a hypothetical scenario of increased biomass-based diesel demand, Env. Br. 30, EPA's entire rule is arbitrary.  That argument is baseless for several reasons.  For one, as EPA explained, the MCE assesses various lifecycle model outputs and variability in those outputs; the exercise did not purport to evaluate the GHG impacts of the Rule.  JATK[MCE.43-45].  Nor did the MCE reach any conclusions as to which model(s) best evaluate biofuel lifecycle GHG emissions.  EPA thus reasonably decided not to rely on this preliminary exercise in setting volumes.

Moreover, Petitioners ignore several models showing that biofuels have dramatic benefits.  In particular, using the Argonne National Laboratory's GREET model, biomass-based diesel reduces GHG emissions by about 72% on average relative to petroleum diesel.  JATK[Clean.Fuels.Comments.24].  The GREET model is particularly relevant for RFS purposes because, unlike the two price-equilibrium models that Petitioners highlight, it provides a lifecycle emissions output that can be used to directly compare the well-to-wheel GHG impacts of biofuels relative to petroleum.  Further, each of the models in the MCE projected global GHG benefits from corn ethanol.  JATK[MCE.86.Table.6.7-1].

### C.    Petitioners' Challenge to EPA's 2010 Determination that Ethanol Satisfies the 20% GHG Reduction Threshold is Untimely

Petitioners argue that EPA arbitrarily failed to demonstrate that "the Rule's volumes meet the CAA's 20% GHG reduction mandates." Env. Br. 9. This argument is both wrong and untimely. EPA initially determined that a lifecycle analysis of biofuels yields emissions reductions of at least 20% in the 2010 RFS rule, 75 Fed. Reg. 14,670, and has maintained that finding in all RFS annual rulemakings since. *See supra* Section II.A; *see, e.g.,* 75 Fed. Reg. 76,790; 87 Fed. Reg. 39,600. The appropriate time to challenge this determination was more than 14 years ago, within 60 days after EPA promulgated its 2010 rule, *see* 42 U.S.C. § 7607, and Petitioners do not—and cannot—assert that any exceptions to the 60-day review period apply.[6] This Court therefore lacks jurisdiction to address this argument. *See Med. Waste Inst. v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011).

### D.    EPA Properly Evaluated All Other Environmental Set Factors

#### i.    The Set Rule is unlikely to cause conversion of wetlands, ecosystems, and wildlife habitats.

As explained above, *supra* Section I.A.2, EPA sufficiently assessed—and conservatively overstated—the Set Rule's impacts on the conversion of wetlands,

---

[6] The Supreme Court's recent holding decision in *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,* 603 U.S.___, No. 22-1008 (slip op.) (July 1, 2024), does not affect the time bar in 42 U.S.C. § 7607(b)(1), because that bar is based on a statutorily specified date certain (60 days from publication in the Federal Register) rather than the moment a cause of action first "accrues" upon the suffering of an injury, *see* slip op. at 13.

ecosystems, and wildlife habitat. EPA's review found that any specific impacts are highly uncertain, including whether the Rule would have any impact at all on conversion of wetlands, ecosystems, and wildlife habitat. Resp. Br. 32-34. Indeed, contrary to Petitioners' claim that EPA's Draft Triennial Report "acknowledges past harms," Env. Br. 34, the Report's estimated range of land use change attributable to the RFS is as low as zero. JATK[Draft.Triennial.Report.IS-3]. Still, the Draft Report significantly overstates potential impacts as there is no single study underlying EPA's high-end estimate of the range of possible land conversion. *See* JATK[Growth.Triennial.Comments.Ex.1.4-6]. Rather, EPA improperly generates a value by isolating the highest of high-end factors from studies that differ substantially in methodology, scope and purpose, and then assembling these factors into a final estimate that is far higher than any underlying study supports. *Id.* Moreover, the Draft Report investigated historical impacts of the RFS Program, not the specific impacts of the Set Rule. JATK[Draft.Triennial.Report.6-59-60; 7-24-25]. Consequently, EPA's review of the scientific literature overstated the impacts of the RFS program on the conversion of wetlands, ecosystems, and wildlife habitats, but nevertheless found that even these conservative results were insufficient to warrant any deviation from the candidate volumes.

### ii. EPA adequately considered impacts to water quality and water supply.

Petitioners further assert that EPA's review of the Set Rule's impacts on water quality and water supply was insufficient. Env. Br. 34. As with the other environmental impacts, however, the record shows that EPA thoroughly reviewed the Rule's impact on water quality and water supply, determining that "there would be little impact" compared to the status quo, JATK[RIA.238], and that any such impacts were "highly uncertain due to how the RFS program operates." Resp. Br. 34. EPA also notes that most water quality impacts are related to potential land conversion, JATK[RIA.238], which is not likely to be caused by the Rule. *See supra* Section 1.A.2; Science *Amicus* 17. EPA's findings are further buttressed by additional record evidence, including a detailed study concluding that the Rule will likely have minimal to no effects on water quantity or quality. *See* JATK[Growth.Comments.Ex.3.40-50]. In sum, EPA appropriately determined that the "small increase in renewable fuel attributable to the 2023-2025 volume requirements" was likely to have a similarly negligible impact on water quality and supply. Resp. Br. 34.

### E. EPA Sufficiently Considered Consumer Costs and Environmental Justice Impacts of the 2023-2025 Volumes

Congress did not include environmental justice as one of the statutory factors. *See* Resp. Br. 42. Nevertheless, EPA's review of the Set Rule's potential impact on

18

environmental justice communities was reasonable. *See Sierra Club v. FERC*, 867 F.3d 1357, 1368-69 (D.C. Cir. 2017).

### i.    Petitioners' consumer costs claims are overstated.

Petitioners significantly overstate the Set Rule's food and fuel costs for consumers.  Env. Br. 36.  Extensive modeling of market conditions and food prices shows that biofuel production and policy have a negligible effect on food prices, *see* JATK[RFA.Comments.21] (citing Taheripour et al., (May 25, 2022) at 10), and EPA projects the Rule is not likely to result in *any* increase in fuel prices compared with 2022 prices.  JATK[Final.Rule.Table.IV.C.3-1].  Only when the Rule is compared to a hypothetical scenario in which the RFS program ceases to exist does EPA project modest increases of two to four cents per-gallon gasoline and 10-11 cents per-gallon diesel.  *Id*.

In any event, although EPA projects some increases in food and fuel costs when compared to the hypothetical "no-RFS" scenario, Congress established the RFS "in full recognition that it may increase the cost of transportation fuel to consumers."  JATK[RTC.168].  And, as this Court explained, "Congress made a policy choice to accept higher fuel prices in order to reap the benefits of 'greater energy independence and ... reduce[d] greenhouse gas emissions.'"  *See Sinclair Wyo.,* 101 F.4th at 889 (quoting *ACE v. EPA*, 864 F.3d 691, 696 (D.C. Cir. 2017)).

ii.    **The Rule is likely to result in benefits to environmental justice communities.**

EPA not only appropriately concluded that the Set Rule would not significantly harm environmental justice communities, it reasonably concluded that these communities would experience benefits.  For example, EPA projected that the 2023-2025 volumes will reduce GHG emissions, which will significantly benefit environmental justice communities because they "are disproportionately impacted by climate change." JATK[Final.Rule.44,472].  EPA's analysis also understates the Rule's significant air quality benefits and related positive impact on environmental justice communities.  *See* JATK[RFA.Comments.22] (collecting studies citing ethanol's emissions benefits for particulate matter, nitrogen oxide, and toxic compounds).  These reductions in air pollutants will be beneficial to public health, especially in urban communities with high traffic congestion.  *See* JATK[Growth.Comments.Ex.2.48-57].

## III.    THE RULE HAS SUBSTANTIAL BENEFITS THAT EPA ANALYZED ON A QUALITATIVE BASIS

EPA appropriately analyzed both the quantitative and qualitative benefits of the Set Rule.  Contrary to Petitioners' arguments, Env. Br. 29, Congress intended EPA's analysis to include not only those impacts of the Rule that can be quantified, but also those that cannot.  *Sinclair Wyo.* at 889 ("the statute Congress drafted is designed to yield benefits that it deemed important but understood are not easily

monetizable."). Indeed, given the significant nature of the qualitative benefits that EPA assessed, it would have been unreasonable for EPA to ignore those benefits and focus only on benefits that could be easily quantified. *Id.* (comparing "monetizable costs against the monetizable benefits … will yield a misleading result."). For this reason, this Court explained that even if the GHG-reduction benefits of the RFS "are not easily monetizable," that "does not mean they are less valuable." *Id.* In sum, having carefully studied all of the relevant factors and reviewed the voluminous record evidence, EPA reasonably concluded that the Rule's substantial climate, energy security, and other benefits outweigh the costs.

## CONCLUSION

The petition for review should be denied.

Dated: July 19, 2024                           Respectfully submitted,


                                               /s/ Ethan G. Shenkman
Matthew W. Morrison                            Ethan G. Shenkman
Lauren E. Johnstone                            Samuel T. Pickerill
PILLSBURY WINTHROP SHAW                        ARNOLD & PORTER
  PITTMAN LLP                                     KAYE SCHOLER LLP
1200 Seventeenth Street, NW                    601 Massachusetts Ave., NW
Washington, DC 20036                           Washington, DC 20001
(202) 663-8306                                 (202) 942-5000
matthew.morrison@pillsburylaw.com              ethan.shenkman@arnoldporter.com
lauren.johnstone@pillsburylaw.com              samuel.pickerill@arnoldporter.com

*Counsel for Intervenor*                       Sarah Grey
*Renewable Fuels Association*                   ARNOLD & PORTER
                                                  KAYE SCHOLER LLP
                                               1144 Fifteenth Street
Bryan Killian                                  Denver, CO 80202
Douglas Hastings                               (303) 863-2388
MORGAN LEWIS &                                 sarah.grey@arnoldporter.com
  BOCKIUS LLP
1111 Pennsylvania Avenue NW                    *Counsel for Intervenor*
Washington, DC 20004                           *Growth Energy*
(202) 739-3000
bryan.killian@morganlewis.com
douglas.hastings@morganlewis.com

*Counsel for Intervenor*
*Clean Fuels Alliance America*

22

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations pursuant to this Court's Order of February 14, 2024 because it contains 4,396 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B) and D.C. Cir. Rule 32(e)(1). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

Dated: July 19, 2024                    */s/ Ethan G. Shenkman*
                                        Ethan G. Shenkman

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2024, I filed the foregoing Intervenor Brief with the Clerk for the United States Court of Appeals for the D.C. Circuit using the Court's CM/ECF system, which will serve notice of the filing on all parties in this case. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Ethan G. Shenkman*
Ethan G. Shenkman