ORAL ARGUMENT SCHEDULED FOR NOVEMBER 1, 2024

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Center for Biological Diversity, | |
| Petitioner, | Case No. 23-1177 |
| v. | (consolidated with Case Nos. 23-1240, 23-1243, 23-1244, 23-1246, 23-1247 and 23-1249) |
| United States Environmental Protection Agency, et al., | |
| Respondents. | |

## REPLY BRIEF FOR ENVIRONMENTAL PETITIONERS CENTER FOR BIOLOGICAL DIVERSITY & NATIONAL WILDLIFE FEDERATION

*/s/* Margaret A. Coulter
Margaret A. Coulter
Jason C. Rylander
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC  20005
202-961-4820
mcoulter@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Petitioner Center for Biological Diversity*

*/s/* Carrie Apfel
Carrie Apfel
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC  20001
202-797-4310
capfel@earthjustice.org

Peter Lehner
Ashley Ingram
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
212-845-7389
plehner@earthjustice.org
aingram@earthjustice.org

*Counsel for Petitioner National Wildlife Federation*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... ii

GLOSSARY OF ABBREVIATIONS .................................................... iv

INTRODUCTION ................................................................................1

ARGUMENT .......................................................................................2

   I.  EPA ARBITRARILY AND CAPRICIOUSLY ANALYZED THE SET
      FACTORS.................................................................................2

     A. EPA's Climate Analysis Was Fundamentally Flawed.....................................3

       1. EPA Never Concluded the Rule Had Climate Benefits. ............................3

       2. EPA Arbitrarily and Capriciously Ignored Its MCE. ..................................6

     B. EPA Arbitrarily Assessed the Rule's Environmental and Environmental
       Justice Impacts ...................................................................7

     C. Given EPA's Flawed Factor Analyses, the Rule Lacks Justification..............9

   II.  THE FEDERAL AGENCIES FAILED TO COMPLY WITH THE
      ENDANGERED SPECIES ACT...................................................11

     A. EPA's Biological Evaluation Was Arbitrary.................................................11

     B. NMFS's Concurrence Was Arbitrary. .........................................................13

     C. FWS's "No Effect" Concurrence Was Arbitrary...........................................16

CONCLUSION ....................................................................................18

# TABLE OF AUTHORITIES

## Cases

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ...................................................................9

*Butte Cnty. v. Hogan*,
  613 F.3d 190 (D.C. Cir. 2010) ................................................................7

*Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021) ................................................................8, 17

*In re Ctr. for Biological Diversity & Ctr. for Food Safety*,
  53 F. 4th 665 (D.C. Cir. 2022) ..............................................................12

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................1, 15

*NRDC v. Costle*,
  568 F.2d 1369 (D.C. Cir. 1977) ............................................................18

*Sinclair Wyo. Refin. Co. v. EPA*,
  101 F.4th 871 (D.C. Cir. 2024) ............................................................10

## Statutes

42 U.S.C. § 7545(o)(2)(B)(i)(I) .................................................................1

## Federal Register Notices

Federal Actions to Address Environmental Justice in Minority Populations and
  Low-Income Populations, 59 Fed. Reg. 7629 (February 16, 1994)......................9

Regulations for Interagency Cooperation, 89 Fed. Reg. 24,268 (Apr. 5, 2024)......17

Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes, 88 Fed. Reg. 44,468 (July 12, 2023) ............................................ 4, 7, 9

## Regulations

50 C.F.R. § 402.14(c)(1)(i)(F)...............................................................11

50 C.F.R. § 402.14(c)(1)(iv) ................................................................11

50 C.F.R. § 402.14(f) ........................................................................15

## Other Materials

Comments of Earthjustice & World Resource Institute, Dkt EPA-HQ-OAR-2021-0427 ............................................................................................5

EPA, *Biofuels and the Environment: Third Triennial Report to Congress*, Jan. 3, 2023, EPA-HQ-ORD-2020-0682 ......................................................6, 8

EPA, Biological Evaluation of the Renewable Fuel Standard Set Rule and Addendum, May 2023 .................................................................. passim

EPA, Model Comparison Exercise Tech. Doc., EPA-420-R23-017 ....................6, 7

EPA, Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes: Regulatory Impact Analysis, June 2023, EPA 420-R-23-015................................................................... 4, 5, 6, 8

FWS & NMFS, Endangered Species Consultation Handbook (1998), https://www.fws.gov/sites/default/files/ documents/endangered-species-consultation-handbook.pdf ................................................... 15, 16

Letter to Susan Dunham, EPA, from Tanya Dobrzynski, NMFS (July 7, 2023) ........................................................ 13, 14, 15

# GLOSSARY OF ABBREVIATIONS

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of

acronyms and abbreviations used in this brief:

| | |
|---|---|
| BE | EPA, Biological Evaluation of the Renewable Fuel Standard Set Rule and Addendum, May 2023 |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| GHG | Greenhouse Gas |
| Handbook | FWS & NMFS, Endangered Species Consultation Handbook (1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf |
| JA | Joint Appendix |
| MCE | EPA, Model Comparison Exercise Tech. Doc., EPA-420-R23-017 |
| NMFS | National Marine Fisheries Service |
| NMFS Concurrence | Letter to Susan Dunham, EPA, from Tanya Dobrzynski, NMFS (July 7, 2023) |
| RIA | EPA, Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes: Regulatory Impact Analysis, June 2023, EPA 420-R-23-015 |

| | |
|---|---|
| RFS | Renewable Fuel Standard |
| Rule | Renewable Fuel Standard Program: Standards for 2023-2025 And Other Changes, 88 Fed. Reg. 44,468 (July 12, 2023) |
| Services | National Marine Fisheries Service & U.S. Fish and Wildlife Service (collectively) |
| TR | EPA, *Biofuels and the Environment: Third Triennial Report to Congress*, Jan. 3, 2023, EPA-HQ-ORD-2020-0682 |

**INTRODUCTION**

The Renewable Fuel Standard ("RFS") Program profoundly affects the production of renewable biomass, as evidenced by annual litigation before this Court. Biofuels now consume a large portion of corn and soy production, occupying as much land as *all* of Illinois and Indiana combined. The Environmental Protection Agency's ("EPA's") volume-setting under the RFS thus represents one of the largest single federal agency actions in terms of consequences to the climate, environment, and economy. Aware of these impacts, Congress directed EPA when setting new volumes to consider "the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply." 42 U.S.C. § 7545(o)(2)(B)(i)(I).

Despite near universal acknowledgement of the RFS's profound effects on land use and food prices—which the parties' briefs and EPA itself recognize—EPA yet again ignored or discounted the detrimental climate, environmental, and environmental justice effects of increased crop production for biofuels. Notwithstanding *post hoc* contentions in the government's brief—which carry no weight with the Court, *see, e.g.*, *Motor Vehicle Manufacturers Ass'n. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 50 (1983)—in the rulemaking, EPA never determined the Rule had climate benefits and incorrectly assessed the

1

environmental and environmental justice impacts. EPA's volumes thus lack or even contradict record support, rendering the Rule arbitrary and capricious.

EPA's Endangered Species Act ("ESA") compliance fares no better. EPA waited until the very last moment—*after* transmitting the Rule to the White House for review—and then only provided a myopic Biological Evaluation ("BE") professing that all harmful impacts of the Rule were uncertain. Given only a handful of days to assess a fatally deficient document, the National Marine Fisheries Service ("NMFS") and Fish and Wildlife Service ("FWS") could only rubber stamp EPA's Rule, again citing uncertainty, turning their reviews into arbitrarily empty paperwork exercises.

In the end, none of the federal agencies properly assessed the Rule's climate and environmental impacts, arbitrarily permitting the biofuel juggernaut and its deleterious impacts to continue unabated.

## ARGUMENT

### I. EPA ARBITRARILY AND CAPRICIOUSLY ANALYZED THE SET FACTORS.

In its brief, EPA claims it set volumes to "reap meaningful benefits— particularly in greenhouse gas emissions reductions and energy security." Gov't Br. at 30. However, in the rulemaking, EPA never demonstrates the Rule will have climate benefits, let alone that they are sufficient to justify the Rule's high costs. It also ignored the inexorable environmental and environmental justice harms that

will result from the Rule. These errors are the epitome of arbitrary and capricious rulemaking.

### A. EPA's Climate Analysis Was Fundamentally Flawed.

EPA's climate analysis is fatally flawed in two ways. *First*, EPA (as opposed to its counsel) never concluded the Rule had climate benefits. Instead, it uncritically and selectively relied on a literature review in which some studies found a climate benefit without assessing the quality of the studies, understanding their differences, or drawing any reasoned conclusions from them. At the same time, it ignored studies addressing the carbon opportunity cost ("COC") of land use and its climate impacts. *Second*, EPA failed to consider the results of its Model Comparison Exercise ("MCE"), which provided the most reliable evidence of the climate impact of soy biodiesel, the biofuel most affected by the Rule.

### 1. EPA Never Concluded the Rule Had Climate Benefits.

EPA's counsel attempts to justify EPA's greenhouse gas ("GHG") emissions analysis by providing new statistics about the studies included in the literature review. Gov't Br. at 39; *see also* Intervenors Br. in Response to Env't Pet'rs at 12-13. This *post hoc* rationalization misses the mark. Simply counting values or averaging numbers from these studies is a far cry from assessing the studies' relevance, quality, and data, how they relate to each other, and understanding and synthesizing their conclusions. EPA—not its counsel—had an independent duty to

3

do these assessments and then reach reasoned conclusions, particularly where the study results vary so widely and differ so greatly from the results of EPA's models. Yet EPA explicitly acknowledges it failed to perform these essential tasks. 88 Fed. Reg. 44,468, 44,500 (July 12, 2023) ("Rule"); RIA at 124-25, JA__. EPA's literature review was thus statutorily insufficient.

EPA's review was also blindered by its blanket disregard of the studies demonstrating the large COC of the crop-based biofuels. Despite EPA's and Intervenors' contrary characterization, Environmental Petitioners do not compare the RFS to some "purportedly environmentally idealized scenarios," Gov't Br. at 37; *see also* Intervenors Br. at 14, but rather rightly explain that the lost opportunity to store carbon is an ongoing GHG emission cost that must be factored into EPA's climate impact analysis. Assessing the full land use impact of biofuels includes not just the conversion of new land, but also the continuing impact of the use of prior converted land. It reflects the fact that a fuel requiring, for example, one acre of land for production has a very different climate impact than one with otherwise identical emissions but requires 100 acres for production. The land use itself has a climate impact.

This is neither hypothetical nor outlier science.[1] It is an essential part of the cost of biofuel production, reflecting what farmers could do with the land—without suggesting particular farmers will do it or that the RFS can make them do it. Nor does this prioritize environmental factors over climate factors, *contra* Gov't Br. at 38, because the COC is part of the climate analysis, and thus part of what EPA recognizes to be one of the primary statutory considerations. *Id*. EPA's failure to consider the COC was therefore unreasonable.

In the end, despite mentioning many studies, EPA itself never actually concluded crop-based biofuels sufficiently reduce GHG emissions. The assertion that they do is only in the briefs and not the rulemaking.

Amici's and Intervenor's efforts to rescue EPA by making similar arguments fall flat, for several reasons. *First*, amici point to studies only focused on U.S. land use. However, accurate climate assessments must consider global impacts because global food, fuel, and feed markets are closely linked. As EPA itself acknowledges, *see* RIA at 122, JA__, increased biofuel demand has diverted—and will continue to divert—soybean and corn from food and fuel markets, driving land conversion to produce the displaced goods. Comments of Earthjustice & World Res. Inst., Dkt EPA-HQ-OAR-2021-0427, at 10-14, JA__-__. *Second*, they ignore EPA's own

---

[1] *See* Comments of Earthjustice & World Res. Inst., Dkt EPA-HQ-OAR-2021-0427, at 12-14, JA__-__.

Triennial Report, BE, and Regulatory Impact Analysis ("RIA"), which discuss land use change associated with biofuels and the climate and environmental effects of land conversion, at least some of which is attributable to the RFS. TR at ES-2, IS-2, JA__, __ (millions of acres of land converted since implementation of the RFS), BE at 9, JA__ ("Rule could potentially lead to an increase of as much as 2.65 million acres of cropland by 2025"); *See also* RIA at 115-16, 210-13, 218, JA__-__, __-__, __. *Third*, amici discuss only corn production and ignore soy production, which will significantly increase because of the Rule. And *fourth*, they ignore the COC—a necessary climate impact of *continued* land use for crop-based biofuel production—which significantly increases the climate change impacts of biofuel production, undermining the conclusions of most of the cited studies.

## 2. EPA Arbitrarily and Capriciously Ignored Its MCE.

EPA's unjustified decision to ignore its MCE further compounds the unreasonableness of its climate analysis. It is no defense that the MCE used "hypothetical" volumes; the literature review's "illustrative" scenarios are no less hypothetical, and EPA nonetheless relied on that. Gov't Br. at 39, 31. And while all models in the MCE use the same increase in demand for biofuels, EPA, Model Comparison Exercise Tech. Doc., EPA-420-R-23-017 ("MCE") at 45, JA__, the literature review papers used different demands and thus are not comparable.

6

EPA defends its decision to disregard the MCE by claiming it was merely a separate exercise to understand how different models worked and why they produced various GHG emissions results. Ironically, this is precisely the type of analysis EPA was required—but failed—to do with the literature review: understand the studies' differences and why they produced variable results, and then draw conclusions from those results. *See, e.g.*, *Butte Cnty. v. Hogan*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("agency's statement must be one of 'reasoning'; it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation' for its action) (citations omitted). EPA should have factored the MCE into its overall climate analysis, as it originally contemplated. Rule at 44,501. Had it done so, it would have been difficult, if not impossible, to find climate benefits from these crop-based biofuels or that they justified these high volumes, especially given that two of the three MCE models showed increased demand for soy biodiesel would drive significant net increases in GHG emissions—with one model showing increases of *more than 300 percent*. *See* MCE at 113, JA__. By ignoring the MCE, EPA avoided having to explain its divergent results—convenient, but not legal.

## B. EPA Arbitrarily Assessed the Rule's Environmental and Environmental Justice Impacts.

EPA maintains the Rule will have a "limited" or "relatively minor" impact on biofuel volumes and thus on the environment. Gov't Br. at 33-34. This is contradicted by biofuel producers' relentless efforts to protect and expand the RFS

in courts and Congress, as well as by EPA's findings in the record. *See, e.g.*, TR at ES-2, 6-60, JA__, __ (finding RFS has historically increased production of crop-based biofuels and associated land conversion, and "higher RFS volumes are likely to result in higher impacts attributable to the RFS program in future years"); BE at 9, JA__; RIA at 115, 116, 218, 238, 253, JA__, __, __, __, __ (finding the Rule's volumes could increase agricultural crop production and land conversion, resulting in negative air, water, and soil quality impacts); RIA at 115-116, JA__-__ (attributing over 100,000 tons of air pollutants to the Rule's volumes for corn ethanol, and noting air "emission[s] per BTU produced are much higher for ethanol" and biodiesel than for conventional gasoline and diesel); RIA at 218, 238, 253, JA__, __, __ ("compared to the No RFS baseline," production of crop-based biofuel resulting from the Rule "(notably soybean oil for renewable diesel)" could increase crop production and thus adversely affect "grassland and other non-wetland ecosystems," "soil and water quality," and water quantity). EPA ignored this substantial record evidence, evidence this Court earlier concluded shows the "likely future impacts" of the RFS and that using crop-based biomass will continue the "associated environmental and resource conservation impacts…in the near term." *Growth Energy v. EPA*, 5 F.4th 1, 32 (D.C. Cir. 2021).

Moreover, though EPA maintains it "considered environmental justice as part of its analysis," Gov't Br. at 42,[2] the unreasonable climate and environmental analyses upon which it is based undermine this assessment. EPA itself notes low-income communities are "disproportionately impacted by climate change," production of biomass creates "localized impacts on water and soil," and the Rule's increased food and fuel costs will disproportionately harm communities of concern. Rule at 44,472, 44,555. EPA ultimately finds no environmental justice impact worthy of note by ignoring the climate and environmental harms from increased biomass production and callously downplaying the *billions* of dollars of cost burden on disadvantaged communities. Ignoring or minimizing these impacts does not count as reasoned analysis.

### C. Given EPA's Flawed Factor Analyses, the Rule Lacks Justification.

EPA claims it analyzed each of the statutory factors and determined the GHG reduction and energy security benefits outweighed the allegedly modest increase in consumer cost and the "possibility" of environmental harm. Even if EPA did such an analysis, its balancing still fails because it erroneously assessed each factor.

---

[2] Environmental justice analyses are mandated, not discretionary, *see* Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629 (February 16, 1994); *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002), despite EPA's contrary contentions, Gov't Br. at 42.

On the benefits side, EPA's failure to determine the Rule has any climate benefits is fatal to its balancing analysis. On the costs side, EPA's failure to properly evaluate the environmental and environmental justice harms caused by the Rule—incorrectly deeming them "minor"—likewise undermines the reasonableness of any alleged balancing. Simply put, EPA could not have properly balanced benefits and costs when it found no climate benefits and overlooked or improperly minimized significant costs.

Perhaps recognizing the errors in its balancing analysis, EPA tries to hide behind this Court's decision in *Sinclair Wyoming Refining Co. v. EPA*, 101 F.4th 871 (D.C. Cir. 2024). Gov't Br. at 29-30; *see also* Intervenor Br. at 19. However, this decision is inapposite. As EPA notes, Gov't Br. at 36, *Sinclair* recognized that combining quantitative and qualitative assessments of the set factors was an acceptable methodology. Gov't Br. at 36. The Court did not evaluate the reasonableness of EPA's individual factor assessments. Here, Environmental Petitioners challenge EPA's underlying assessments and the lack thereof. We contend EPA never made qualitative or quantitative findings as to the key climate factor and its environmental and environmental justice factor findings were incorrect. Thus, even under *Sinclair*'s accepted methodology, EPA's assessment fails. Accordingly, *Sinclair* does not control here.

## II.    THE FEDERAL AGENCIES FAILED TO COMPLY WITH THE ENDANGERED SPECIES ACT.

Formal consultations through a biological opinion are *required* whenever any adverse effect is likely to harm or injure *just one individual* of any listed species. Despite a record that overwhelmingly demonstrates the RFS causes substantial land conversion, water pollution, and worsens hypoxic ocean dead zones, EPA, FWS and NMFS each shirked their ESA duties by repeatedly blaming uncertainty as an excuse for avoiding meaningful analysis of the Rule's impacts on protected species and habitat.

### A. EPA's Biological Evaluation Was Arbitrary.

Respondents would forever excuse EPA's past failures to comply with the ESA, or to address this Court's remands, because the "environmental baseline" is only considered in a biological opinion during formal consultation; and if EPA can forever avoid formal consultations, it is never obligated to consider the full scope of the RFS program. Gov't Br. at 113. This argument contravenes the ESA.

First, all action agencies must include in any biological evaluation "any other available information related to the nature and scope of the proposed action" as well as "an analysis of any cumulative effects." 50 C.F.R. §§ 402.14(c)(1)(i)(F), (c)(1)(iv). Indeed, EPA itself discusses what it believes to be the "baseline" a dozen times throughout the BE. *See e.g.*, BE at 13, JA__. Even if EPA's no-RFS "baseline" assumptions—completed through its RIA—might be sufficient for

11

Clean Air Act purposes, the ESA requires more. EPA need not attribute "all biofuel demand to the RFS program" as Respondents alarm, Gov't Br. at 115; instead, the ESA requires cumulative impacts of the RFS program be included in the scope and baseline of its BE.

If EPA had consulted on all earlier iterations of the RFS, or even the subset of annual rules covered by prior remands, evaluating only the incremental impacts of the RFS rule could be proper. Typically, "[t]he relevant framework for the environmental baseline thus includes effects already realized from prior actions," Gov't Br. at 117, but that is only the case when an agency has a track record of compliance with the ESA. *C.f. In re Ctr. for Biological Diversity & Ctr. for Food Safety*, 53 F. 4th 665, 668 (D.C. Cir. 2022) ("EPA has long had a fraught relationship with the ESA."). If EPA is allowed to sweep away the cumulative impacts of prior years' RFS rules, including those from the unaddressed remands of this Court, then regardless of technical methodologies used, the output is fatally flawed. Env't Pet'rs Br. at 18-19.

With respect to water pollution, Respondents' arguments illustrate the arbitrary nature of EPA's BE. Respondents place substantial weight on the Chen 2021 study, even though the BE states, "[Chen 2021] does not address how upstream tributaries, including small rivers and streams, may be affected by nearby cropland conversion, and how species that occur in such freshwater ecosystems

12

may be impacted by potential effects." BE at 179, JA__. To the extent EPA did complete a "qualitative analysis in collaboration with NMFS" to address freshwater impacts for NMFS species, BE at 179, JA__, there is *nothing* in the record demonstrating EPA employed a similar approach for the 303 freshwater species under FWS jurisdiction, including the pallid sturgeon found in the Missouri and Mississippi Rivers.

**B. NMFS's Concurrence Was Arbitrary.**

Respondents wrongly blur the meaning of "discountable" versus "insignificant" effects to rationalize NMFS's categorical "not likely to adversely affect" concurrence based on pervasive uncertainty.

NMFS created two categories for species in its jurisdiction: those where downstream exposures were "likely" found in Table 1, NMFS Concurrence at 24, JA__, and those where *all* effects were discountable, such as whales and manta rays. Petitioners take no issue with NMFS' discountable determinations for oceanic species, nor with NMFS' findings that some proximal effects are discountable for non-oceanic species. Those determinations were reasonable.

However, NMFS' simultaneous findings that downstream exposure was "likely" yet "insignificant" was arbitrary because "insignificant" is not equivalent to relatively small or modest effects. Instead, as another EPA Office acknowledged, the "likely to adversely affect" threshold is a bright line: whether a single injury to

13

just one individual of any species will occur. *See*, *e.g.*, *EPA Releases Draft BE of 11 Rodenticides' Effects on Endangered Species* (Dec. 1, 2023) https://www.epa.gov/pesticides/epa-releases-draft-biological-evaluation-11-rodenticides-effects-endangered-species ("harm or death, of even one individual of a species, is enough to trigger an LAA [likely to adversely affect] determination"), JA__.

As noted in Environmental Petitioners' opening brief, the Rule affects species on a spectrum, with NMFS finding just 0.001% of the Atlantic salmon's range suffering habitat conversion at the low end, and 0.139% (or 15,301 acres) of Chesapeake Bay sturgeon habitat at the high end. Env't Pet'rs Br. at 24-26. But rather than separately assessing the potential of harm to individuals of each species, as Respondents acknowledge, Gov't Br. at 123, NMFS categorically concluded for *all* listed species that "overall pollutant concentrations within those areas following potential crop conversions due to the [Rule] would be extremely minor (<1%) and not represent a measurable increase over baseline conditions." NMFS Concurrence at 24, JA__. However, whether effects constitute a "measurable increase" compared to the baseline is *not* the inquiry the ESA requires, especially where EPA has *never* assessed the baseline harm to listed species. NMFS's construction of an arbitrary 1% cutoff allows NMFS to dodge the critical inquiry: whether *any* individuals are likely harmed by the Rule. NMFS's

14

alternate approach is not rationally explained in the record and is "so implausible that it cannot be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

Respondents' flimsy excuse that "Petitioners identify no available information NMFS should have considered," Gov't Br. at 125, distracts from NMFS's core failures to follow its own policies related to scientific uncertainty and ignoring its own definition of "insignificant" effects. Discussing impacts to *all* species where downstream exposure was likely, NMFS conceded it "lacks available information specific to the Mississippi River Basin, other stressors (e.g., pesticides), and other regions (e.g., Chesapeake Bay). As discussed earlier, existing models are not adequate or require detailed information that is not available." NMFS Concurrence at 24, JA__. This asserted total *lack* of scientific information is *not* the best available science. Contrary to Respondents' assertion, Gov't Br. at 127, the ESA requires more.

For example, the Services' consultation regulations allow for additional information collection to "provide a better information base from which to formulate a biological opinion," and extending the consultation process. 50 C.F.R. § 402.14(f). Similarly, the Consultation Handbook provides a template for when an incomplete formal consultation request has been received. *See* Handbook at 4-9, JA__. Where significant data gaps exist, the Handbook provides two choices: (1)

"extend the due date of the biological opinion until sufficient information is developed for a more complete analysis; or (2) develop the biological opinion with the available information giving the benefit of the doubt to the species." *Id*. at 1-7, JA__. Given NMFS did not even receive the BE until after the Rule was at the White House, it is nearly certain EPA would never agree to an extension. Thus, NMFS was forced to finalize its concurrence with extraordinarily limited information, and no assessment whatsoever of the RFS baseline by EPA.

**C. FWS's "No Effect" Concurrence Was Arbitrary.**

To defend the FWS's decision, Respondents argue "agencies can rationally articulate different analytical approaches" because the ESA does not require uniformity. Gov't Br. at 135. Petitioners do not dispute FWS and NMFS may utilize differing *scientific* approaches. However, as evidenced by its skeletal record, FWS did not employ *any* analytical approach, and instead offered a purely legal rationale—one that directly conflicts with the ESA and approaches taken by NMFS and EPA—to avoid undertaking any scientific analysis whatsoever.

As the Services *jointly* explained in April 2024, *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582 (D.C. Cir 2023), stands for the unremarkable proposition that the Services must "strive to resolve or characterize the uncertainty through accepted scientific techniques." *See* Regulations for Interagency Cooperation, 89 Fed. Reg. 24,268, 24,270 (Apr. 5, 2024), JA__. Neither *Maine Lobstermen* nor the

16

ESA itself greenlight FWS's refusal to utilize any accepted scientific techniques—and utilizing science is certainly not "speculation or surmise," as Respondents argue, Gov't Br. at 124.

Nor does Respondents' *post hoc* rationalization about FWS's self-serving "longstanding interpretation" of the "effects of the action" fare better through their invocation of the 2008 Solicitor's GHG "M-Opinion." Gov't Br. at 133, 135. In 2008, the Solicitor of the Interior Department wrote "[b]ased on the USGS statement, and its *continued scientific validity*…a proposed action that will involve the emission of GHG cannot pass the 'may affect' test…." GHG M-Opinion at 7, JA__ (emphasis added). Even if valid, the GHG M-Opinion, *requires* some modicum of scientific analysis to determine whether an action crosses the "may affect" threshold. It is not a blanket excuse in perpetuity to avoid utilizing accepted scientific techniques to resolve uncertainty. *See Growth Energy*, 5 F.4th at 32 ("To the extent EPA questions the causal connection between the 2019 Rule and specific land use changes, this alone does not excuse the failure to engage in *formal* consultation.") (emphasis added).

Respondents argue "FWS rested its concurrence on the lack of reasonable certainty in whether and where any land-use changes that could impact species." Gov't Br. at 135. This across-the-board denial as to "whether" impacts will occur, based on no science or record support, ignores EPA's assessment that land-use

17

impacts *will* occur. Indeed, EPA highlighted the "Top Ten" species where it predicted land conversion will happen, including 4.5 percent of the Salt Creek Tiger Beetle's critical habitat and 13.6 percent of the Neosho Madtom fish's occupied habitat. BE at 169-70, Excel Suppl., JA__-__. As to "where" harms occur, for the 303 listed freshwater species in FWS's jurisdiction, Respondents cannot explain why, unlike NMFS, FWS completely failed to assess water pollution impacts through accepted scientific techniques, as all pollution inexorably flows downstream. BE at 41, JA_. Indeed, in *City of Tacoma v. FERC*, *Maine Lobstermen,* and *every* case Respondents cite, Gov't Br. at 125-35, the FWS completed a biological opinion using science, rather than merely employing a legal rationalization to not use any science, let alone the best available science.

## CONCLUSION

Like other ambitious environmental laws, neither the Clean Air Act nor ESA are "hospitable to the concept that the appropriate response to a difficult pollution problem is not to try at all." *C.f. NRDC v. Costle*, 568 F.2d 1369, 1380 (D.C. Cir. 1977). Yet that is exactly what occurred throughout the agencies' evaluation of the Rule. Given the significance of these errors, the Court should vacate and set aside the corn and soy biofuel targets.

Respectfully submitted this 20th day of August 2024,

| | |
|---|---|
| */s/ Margaret A. Coulter* | */s/ Carrie Apfel* |
| Margaret A. Coulter | Carrie Apfel |
| Jason C. Rylander | Earthjustice |
| Center for Biological Diversity | 1001 G Street, NW, Suite. 1000 |
| 1411 K Street, NW, Suite 1300 | Washington, DC  20001 |
| Washington, DC  20005 | 202-797-4310 |
| 202-961-4820 | capfel@earthjustice.org |
| mcoulter@biologicaldiversity.org | |
| jrylander@biologicaldiversity.org | Peter Lehner |
| | Ashley Ingram |
| *Counsel for Petitioner Center for* | Earthjustice |
| *Biological Diversity* | 48 Wall Street, 15th Fl. |
| | New York, NY 10005 |
| | 212-845-7389 |
| | plehner@earthjustice.org |
| | aingram@earthjustice.org |
| | |
| | *Counsel for Petitioner* |
| | *National Wildlife Federation* |

19

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations in this Court's Order of February 14, 2024 because it contains 3,992 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B) and D.C. Cir. Rule 32(e)(1). Microsoft Word 2021 computed the word count.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface (Microsoft Word 2021 Times New Roman) in 14-point font.

Dated: August 20, 2024

*/s/* Margaret A. Coulter
Margaret A. Coulter
Jason C. Rylander
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC  20005
202-961-4820
mcoulter@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Petitioner Center for Biological Diversity*

*/s/* Carrie Apfel
Carrie Apfel
Earthjustice
1001 G Street, NW, Suite. 1000
Washington, DC  20001
202-797-4310
capfel@earthjustice.org

Peter Lehner
Ashley Ingram
Earthjustice
48 Wall Street, 15th Fl.
New York, NY 10005
212-845-7389
plehner@earthjustice.org
aingram@earthjustice.org

*Counsel for Petitioner National Wildlife Federation*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2024, I filed the foregoing Reply brief using the

Court's CM/ECF system, which will serve notice of the filing on all parties in this

case.


Respectfully submitted,

*/s/* Margaret A. Coulter
Margaret A. Coulter
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
202-961-4820
mcoulter@biologicaldiversity.org

*Counsel for Petitioner Center for Biological Diversity*