**ORAL ARGUMENT SCHEDULED FOR NOVEMBER 1, 2024**

**No. 23-1177(L),**
*consolidated with* **Nos. 23-1240, 23-1243,
23-1244, 23-1246, 23-1247, 23-1249**

═══════════════════════════════════════════

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

───────────────

CENTER FOR BIOLOGICAL DIVERSITY,
*Petitioner*,

v.

ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES FISH AND
WILDLIFE SERVICE; NATIONAL MARINE FISHERIES SERVICE,
*Respondents.*

---------------------------------------

AMERICAN PETROLEUM INSTITUTE; CLEAN FUELS ALLIANCE
AMERICA; COALITION FOR RENEWABLE NATURAL GAS;
GROWTH ENERGY; RENEWABLE FUELS ASSOCIATION,
*Intervenors for Respondent.*

───────────────

On Petition for Review of an Order of the United States
Environmental Protection Agency, No. EPA-88FR44468

───────────────

**REPLY BRIEF FOR PETITIONER NESTE US, INC.**

───────────────

Amina Dammann
KING & SPALDING LLP
500 West 2nd Street
Suite 1800
Austin, TX 78701
(512) 457-2000

Ilana Saltzbart
Ashley C. Parrish
 *Counsel of Record*
Jeremy M. Bylund
K. Paige Tenkhoff
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

*Counsel for Neste US, Inc.*

Initial Reply Brief: August 20, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................... ii

GLOSSARY ................................................................................................ v

INTRODUCTION...................................................................................... 1

I.     EPA Changed the Recordkeeping Requirements Without
Reasoned Justifications ................................................................... 1

     A.     EPA Revisionist History Is Baseless ..................................... 2

     B.     EPA Did Not Reasonably Explain the Changes.................... 7

     C.     EPA Cannot Rely on Extra-Record Material to
Support Its Lack of Explanation........................................... 11

II.    EPA Failed to Justify Changing the RIN Generation
Requirements .................................................................................. 12

CONCLUSION ......................................................................................... 15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES*

## Cases

*Am. Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ................................................................ 8

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ........................................................ 12

*\*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................................ 7

*Gov't of Manitoba v. Bernhardt,*
    923 F.3d 173 (D.C. Cir. 2019) ........................................................ 11

*Grace v. Barr,*
    965 F.3d 883 (D.C. Cir. 2020) ............................................................ 8

*\*Kisor v. Wilkie,*
    588 U.S. 558 (2019) ................................................................................ 7

*Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.,*
    940 F.2d 685 (D.C. Cir. 1991) ........................................................ 11

*Waterkeepers Chesapeake v. FERC,*
    56 F.4th 45 (D.C. Cir. 2022) ............................................................ 15

## Regulations

40 C.F.R. § 80.1426 (July 2010) ............................................................ 13

40 C.F.R. § 80.1431 ........................................................................ 12, 13

*40 C.F.R. § 80.1454 (July 2010) ...................................................... 3, 4

40 C.F.R. § 80.1466 ................................................................................ 13

*85 Fed. Reg. 7016 (Feb. 6, 2020) ...................................................... 4, 6

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*87 Fed. Reg. 80,582 (Dec. 30, 2022) ...................................................... 10

## Agency Documents

*EPA Response to Comments
(Dkt. No. EPA-HQ-OAR-2021-0427-1114) .................................... 6, 10

*Neste Comment
(Dkt. No. EPA-HQ-OAR-2021-0427-0714) .................................... 9, 15

## Other Authorities

*EPA,
RFS Registration for Renewable Fuel Producers:
Separated Food Waste Plan Guidance (July 2015)
("2015 Guidance"),
https://www.epa.gov/sites/default/files/2015-
09/documents/rfs-sfwp-pres-2015-07.pdf............................................5

ECF 15, *United States v. Johnson*,
No. 4:15-CR-06042 (E.D. Wash. Nov. 24, 2015) ................................ 12

EPA,
*Civil Enforcement of the Renewable Fuel Standard
Program* (Oct. 18, 2023),
https://www.epa.gov/enforcement/civil-enforcement-
renewable-fuel-standard-program#genx............................................ 12

EPA,
*Enforcement, Chemoil Corporation Renewable Fuel
Standard Settlement: Violations* (Sept. 29, 2016),
https://www.epa.gov/enforcement/chemoil-corporation-
renewable-fuel-standard-settlement ................................................. 14

*EPA,
Renewable Fuel Standard Program,
*Renewable Identification Numbers (RINs) under the
Renewable Fuel Standard Program* (Jan. 23, 2024),
https://www.epa.gov/renewable-fuel-
standardprogram/renewable-identification
-numbers-rins-underrenewable-fuel-standard................................. 13

Mot., *Clean Fuels All. Am. v. EPA*,
    No. 22-1201 (D.C. Cir. Dec. 15, 2022), Doc. 1977838............................6

# GLOSSARY

| | |
|---|---|
| 2015 Guidance | EPA, RFS Registration for Renewable Fuel Producers: Separated Food Waste Plan Guidance (July 2015) |
| 2020 Rule | Standards for 2020 and Biomass-Based Diesel Volume for 2021 and Other Changes, 85 Fed. Reg. 7016 (Feb. 6, 2020) |
| 2022 Proposed Rule | Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes, 87 Fed. Reg. 80,582 (Dec. 30, 2022) |
| 2023 Rule | Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes, 88 Fed. Reg. 44,468 (July 12, 2023) |
| 2023 Response to Comments | EPA Response to Comments (Dkt. No. EPA-HQ-OAR-2021-0427-1114) |
| Neste/Neste US | Neste US, Inc. |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |

## INTRODUCTION

EPA's response fails to rescue its recordkeeping and RIN generation requirements from their procedural and substantive failures. Although EPA asserts that the disputed requirements have been in place since 2010 and subsequent modifications are mere "clarifications," nothing supports that false revisionism. The reality is that EPA significantly changed the requirements that apply to producers (like Neste), undermining their reliance interests and imposing new and onerous regulatory burdens. The agency failed to provide a reasoned basis for its changed position, has not reasonably responded to objections, and failed to consider less burdensome alternatives. EPA's refusal even to acknowledge that it made a change, and its improper attempt to bolster the record on appeal, confirm that EPA has not satisfied the requirements of reasoned decision-making.

## I.    EPA Changed the Recordkeeping Requirements Without Reasoned Justifications.

EPA's final 2023 Rule is invalid because the agency has made three material changes without any reasoned explanation—(1) requiring producers to maintain records identifying the *location* of each of the many original sources (*e.g.*, individual restaurants) that generate the separated

food waste that is then commingled by an aggregating supplier for purchase by producers, (2) requiring producers to document the *amount* of food waste generated by each original source that is collected by the aggregating supplier and then commingled before it is purchased, and (3) disallowing the use of self-declarations to show that the separated food waste is renewable biomass. *See* Neste.Br.10-23. In making these unexplained changes, EPA failed to account for substantial reliance interests and did not address reasonable objections, including that the new requirements undermine Congress's statutory goals.

### A.   EPA Revisionist History Is Baseless.

EPA asserts that it has always required producers to record the *location* and *amount* of separated food waste (feedstock) collected at each individual restaurant or other establishment. But if that were true, the regulatory changes EPA has attempted to make would have been unnecessary. The development of the regulatory recordkeeping language in 2010, EPA's attempt to revise it in 2020, and EPA's additional attempt at revision in 2023 refute the agency's position.

1.    EPA's recitation of the regulatory history begins with a glaring mistake: Citing subjection (d)(1), EPA insists that "[s]ince 2010,

2

the regulatory text has required renewable fuel producers to maintain records of where the feedstocks are produced. *See* 40 C.F.R. § 80.1454(d)(1) (July 2010)." EPA.Br.94. But subsection (d) applies only to domestic producers, not foreign producers, which are governed by subsection (c). *See* Neste.Br.5 n.1. Moreover, in 2010, subsection (d)(1) applied only to "feedstocks that are planted trees or tree residue," which are not the feedstocks at issue in this case. 40 C.F.R. § 80.1454(d)(1) (July 2010).

The regulatory subsection in 2010 that applied to foreign producers required them to "keep records of feedstock purchases … associated with renewable fuel … sufficient to verify that feedstocks used are renewable biomass." *Id.* § 80.1454(c)(1) (July 2010). Subsection (c)(1) set the general requirement for documentation, while the only specific requirement thereunder for separated food waste was certification under (c)(1)(iii). Satisfying the specific requirement of (c)(1)(iii) also fulfilled the general requirement of (c)(1). Certification was complemented by subsection (j)(1)(i) requiring "[d]ocuments demonstrating the amounts, by weight, *purchased* of separated … food waste for use as a feedstock in

producing renewable fuel." *Id.* § 80.1454(j)(1)(i) (July 2010) (emphasis added).

The *applicable* regulatory subsections thus confirm that EPA required foreign producers to maintain records showing the amount of feedstocks *purchased* from each supplier, and to obtain a certification from each supplier that the feedstock was qualifying biomass. *Id.* § 80.1454(c)(1), (c)(1)(iii), (j)(1)(i); Neste.Br.11-13. Nothing in the regulations—and nothing cited in EPA's brief—imposed the more burdensome requirement that producers track the amount of food waste collected by an aggregating supplier from *each* original source (*e.g.*, each restaurant from which a supplied has collected separated food waste). Indeed, because aggregating suppliers collect separated food waste from many different sources (e.g., restaurants) and then commingle what they collect, it would be impossible for a producer to isolate the precise amount provided by any particular source in any commingled batch of feedstock that the provider purchases from an aggregating supplier.

2.    In 2020, EPA moved the location requirement from the registration regulation to the recordkeeping regulation. JA__ (85 Fed. Reg. 7016, 7080 (Feb. 6, 2020)). EPA does not dispute that when the

location requirement was part of the registration regulation it did not require producers to report the address of each establishment where feedstock was originally collected.  That makes sense: As EPA concedes, "[r]egistration normally occurs before a facility begins producing renewable fuel, when that facility may not know every physical location from which their feedstocks will be sourced."  EPA.Br.95, 100-01 (EPA "did not require" location or amount information "at registration").  EPA also does not dispute that the regulatory language did not change when it was moved to subsection (j).  The same language should be given the same meaning—consistent with EPA's own 2015 Guidance.  That guidance required producers to provide *either* the location of the "aggregator" from which a producer purchased separated food waste *or* the location of the "[p]oint source … (e.g., restaurant)."  2015 Guidance at 3-4.

It was not until the preamble to the 2020 final rule that EPA offered its new interpretive gloss: "Since many renewable fuel producers receive wastes used as feedstocks from an aggregator, we interpret the term 'location' to mean the physical address that the aggregator obtained the wastes used as feedstocks from, not the physical or company address of

the aggregator." JA__ (85 Fed. Reg. at 7062). That unexpected switch led to litigation, and EPA reopened the provision for comment in the 2022-23 rulemaking. Neste.Br.6; Mot. 1-2, *Clean Fuels All. Am. v. EPA*, No. 22-1201 (D.C. Cir. Dec. 15, 2022), Doc. 1977838. If, as EPA now contends, the 2010 rule had already required producers to identify the *precise location* of each original source, no rulemaking would have been needed.

3. Even then, the 2020 Rule was silent on recording the *amount* collected from each original source. JA__ (85 Fed. Reg. at 7062). It was not until the 2022-23 rulemaking that EPA reinterpreted the amount requirement in subsection (j)(1)(i) to mean that producers would be required to track the amount provided by each source to an aggregating supplier. *See* JA__, Response to Comments 368-69 (discussing for the first time how to allocate used cooking oil from each individual restaurant based on the container size at each restaurant).

EPA cites to general language in provision § 80.1454(d)(1)— requiring that producers "keep documents associated with feedstock purchases and transfers that identify where the feedstocks were produced and are sufficient to verify that feedstocks used are renewable

biomass." EPA.Br.95 (emphasis omitted). But that vague language cannot be read as EPA now suggests, as doing so would make EPA's efforts to change the regulations meaningless.[1]

### B.   EPA Did Not Reasonably Explain the Changes.

1.   EPA's failure to recognize that it has changed the recordkeeping requirement is fatal. An agency must acknowledge regulatory changes and give reasons to disturb private reliance interests. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (it is arbitrary and capricious to "ignore" that a "prior policy has engendered serious reliance interests"). EPA contends that if the regulations are ambiguous, the Court should defer to EPA. EPA.Br.97. But no deference should be afforded to "a new interpretation that creates 'unfair surprise' to regulated parties." *Kisor v. Wilkie*, 588 U.S. 558, 559 (2019) (quotations omitted).

That is especially true where, as here, the agency has not explained the change or reasonably responded to objections. *Am. Wild Horse Pres.*

---

[1] Imagine recording the location of gas stations where you purchase gas, and then later being told to track down each of the individual tanker trucks that supply the station and how much of the purchased gas came from each truck. No one would think that those things are the same.

*Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (agency must "examine all relevant factors and record evidence" and "articulate a reasoned explanation for its decision"). EPA's new "interpretations" represent major changes—requiring producers to pivot from their longstanding relationships with aggregating suppliers and track down every original source from which the supplier collects renewable food waste. Not only is that impossible, but it is also impractical, as aggregating suppliers consider the information to be confidential and proprietary. It also undermines the statute's objectives. Congress wanted to promote the use of renewable biomass, not subject the industry to unexplained, burdensome, and costly requirements. *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (striking down agency action that "could undermine th[e] purpose" of the relevant statute). At a minimum, EPA should have reasonably explained why less burdensome alternatives would not have been sufficient to achieve Congress's objectives. Its failure to do so means that it has not complied with the requirements of reasoned decision-making.

2. EPA suggests that its lack of explanation should be excused because, "[a]lthough commenters referred to the 'amount' requirement,

they merely did so in association with substantive comments addressing the location requirement and did not challenge the requirement that renewable fuel producers keep records documenting the amount of feedstock purchased." EPA.Br.96 n.23. EPA's complaint is perplexing. Neste commented on EPA's proposed rule and raised objections to both the amount and location requirements. Neste specifically noted that "EPA's (unexpected and not proposed) announcement in 2020 that producers using separated food wastes must retain records showing the *volume* and *location* of *each* establishment (e.g., restaurant) from which separated food waste [is collected] requires UCO collectors to disclose confidential business information." JA__, Neste Comment 12 (emphasis altered).

EPA's position is also self-contradictory. Relying on the fallacy that it did not change the amount requirement, EPA states that subsection (j)(1)(i) was not open to comment or challenge. EPA.Br.95. But as explained above, the 2010 and 2020 rulemakings are silent about tracking the amount collected from each individual source (e.g., restaurant). In the 2022 Proposed Rule, EPA obliquely suggested that the regulations had always required producers to maintain records about

the amount and location.  JA__ (87 Fed. Reg. at 80,701).  Then, in its response to comments associated with the 2023 Rule, EPA for the first time stated that the amount at each individual restaurant had to be recorded under subsection (j)(1)(i).  JA __, Response to Comments 364-65.  EPA now complains about a lack of specificity in comments, but that is a product of EPA's strategy of rulemaking by surprise—imposing new requirements in the final rule that were not explicit in the proposed rule.

Only two conclusions are reasonable: either Neste's challenge invoking both amount and location are sufficient, or EPA did not put the public on notice that it was going to advance a new interpretation of (j)(1)(i) to elicit specific comments.  Either way, EPA's shell game is improper.  EPA cannot sneak dramatic changes into its final rule and then escape its obligation to engage in reasoned decision-making by pretending that nothing changed.

3.    EPA's failure to justify its changed position is especially glaring with respect to Neste's objection that the final rule unreasonably disallows self-declarations as a type of record sufficient to verify that separated food waste qualifies as renewable biomass.  Neste.Br.13-15.  EPA's brief devotes just one line to the argument, asserting that "self-

certifications are not an adequate means of ensuring compliance." EPA.Br.104. That bare response waives any defense to Neste's objection that EPA's new requirement goes beyond the regulatory text. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (noting a "party forfeits an argument by mentioning it only in the most skeletal way" (quotation omitted)). It is also contradictory: While EPA contends that foreign aggregator certifications cannot be trusted, EPA.Br.104, it also says that foreign aggregators should expect to register and maintain adequate records, *id*. at 106. EPA has no explanation for these seemingly inconsistent positions.

### C.   EPA Cannot Rely on Extra-Record Material to Support Its Lack of Explanation.

EPA also cannot save its new rule by relying on extra-record evidence. *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991) ("judicial review of informal agency rule-making is confined to the administrative record").

EPA suggests that imposing new and especially onerous regulatory requirements is justified because there is purportedly significant fraud in the industry. Nothing *in the record* supports that claim. EPA cites "its civil enforcement page outlining multiple instances of fraud,"

EPA.Br.104, but EPA's URL does not reference separated food waste. EPA, *Civil Enforcement of the Renewable Fuel Standard Program* (Oct. 18, 2023). EPA also cites a settlement agreement, but that document does not even mention separated food waste. ECF 15 at 4-7, *United States v. Johnson*, 4:15-CR-06042 (E.D. Wash. Nov. 24, 2015).

With no record support, EPA has no basis to suggest that widespread fraud warrants changing the regulatory requirements. Even if EPA's one case cited from nine years ago involved separated food waste, that is not evidence sufficient to justify an unexplained upending of substantial reliance interests.

## II. EPA Failed to Justify Changing the RIN Generation Requirements.

Under the 2023 Rule's new requirement, Neste is prohibited from generating RINs for fuel produced for use in the United States if circumstances change and the fuel is later sent elsewhere. 40 C.F.R. § 80.1431(a)(1)(viii). EPA again contends that the new provision is a mere clarification. As explained below, the record belies that position. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("an agency may not escape the notice and comment requirements ... by [mis]labeling a major substantive legal addition").

1.     EPA contends that generating RINs for fuel that ultimately is not used in the United States has always been prohibited by the regulatory language allowing for RIN generation for fuel that "is produced or imported for use" in the United States.  EPA.Br.107-08 (citing 40 C.F.R. § 80.1426(b)(1) (July 2010)).  But if the prior regulatory language had such a requirement, the new provision stating that a RIN is invalid if it "[w]as generated for fuel that was not used in the covered location," 40 C.F.R. § 80.1431(a)(1)(viii), would be unnecessary.  *See* Neste.Br.23.

2.     EPA also says nothing to blunt Neste's concern that the new requirement is unworkable because it requires predicting where all fuel will be used at the time it is produced, including before commercial delivery decisions are made and finalized.  EPA merely asserts that producers do not have to "generate RINs on fuel where it is uncertain whether that fuel will be sold in the United States." EPA.Br.109.  But as EPA's own website explains, RINs are generated at the time of fuel production.     EPA, Renewable Fuel Standard Program, *Renewable Identification Numbers (RINs) under the Renewable Fuel Standard Program* (Jan. 23, 2024); *see also* 40 C.F.R. § 80.1466(c), (d) (requiring

13

producers to designate fuel as RFS-FRRF and keep fuel segregated). Moreover, even under EPA's scenario, RINs would still be generated *before* a foreign producer determines the ultimate destination of the renewable fuel.

EPA cites *Chemoil* to argue that "§ 80.1431(a)(1)(viii) is consistent with the prior regulatory text and EPA's own administration of the program." EPA.Br.108. EPA brought a civil enforcement action alleging that "Chemoil exported at least 48.5 million gallons of biodiesel … without retiring the approximately 72.7 million biomass-based diesel RINs for that fuel." EPA, *Enforcement, Chemoil Corporation Renewable Fuel Standard Settlement: Violations* (Sept. 29, 2016). That case says nothing about whether EPA has always required that RINs can be *generated* only if the fuel is *actually used* in the United States—it shows only that RINs must be retired for fuel once they are not used in the United States.

3.    EPA is wrong to suggest that Neste did not raise a viable alternative in its comments. EPA.Br.10. Neste explicitly discussed retiring RINs for fuel not ultimately used in the United States. JA__,

Neste Comment 18. EPA unreasonably failed to address those arguments.

## CONCLUSION

EPA's failure to justify its dramatic changes in regulatory requirements reflects a broader problem—EPA's changes undermine Congress's objectives by creating massive disincentives to participating in the renewable fuel program. Vacating the rule and forcing EPA to respond to comments would force the agency to adopt a more reasonable position. Although EPA argues against vacatur, *see* EPA.Br.111, vacatur "is the normal remedy when [a court is] faced with unsustainable agency action." *Waterkeepers Chesapeake v. FERC*, 56 F.4th 45, 49 (D.C. Cir. 2022) (quotations omitted). At a minimum, the Court should vacate and set aside the recordkeeping and RIN generation requirements challenged by Neste.

Respectfully submitted,

*/s/ Ashley C. Parrish*

Amina Dammann                     Ilana Saltzbart
KING & SPALDING LLP               Ashley C. Parrish
500 West 2nd Street                *Counsel of Record*
Suite 1800                        Jeremy M. Bylund
Austin, TX 78701                  K. Paige Tenkhoff
(512) 457-2000                    KING & SPALDING LLP
                                  1700 Pennsylvania Avenue NW
                                  Washington, DC 20006
                                  (202) 737-0500
                                  aparrish@kslaw.com

*Counsel for Neste US, Inc.*

August 20, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of this Court's February 14, 2024 Order, Doc. 2040364, because it contains 2,748 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(a)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in the proportionally spaced typeface Century Schoolbook 14-point font using Microsoft Word 365 ProPlus.

Dated: August 20, 2024

*/s/ Ashley C. Parrish*
Ashley C. Parrish

*Counsel for Neste US, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Ashley C. Parrish*
Ashley C. Parrish

*Counsel for Neste US, Inc.*