**ORAL ARGUMENT SCHEDULED FOR NOVEMBER 1, 2024**
**No. 23-1177 and Consolidated Cases**
___

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY *et al.*,

*Respondents*.

ON PETITIONS FOR REVIEW OF FINAL AGENCY ACTION
OF THE ENVIRONMENTAL PROTECTION AGENCY

**FINAL REPLY BRIEF OF AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS; THE SMALL REFINERIES COALITION;
COUNTRYMARK REFINING AND LOGISTICS, LLC;
THE SAN ANTONIO REFINERY LLC;
AND WYNNEWOOD REFINING COMPANY, LLC**

Robert J. Meyers
Elizabeth B. Dawson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
(202) 624-2789

Richard S. Moskowitz
Tyler J. Kubik
American Fuel & Petrochemical
Manufacturers
1800 M Street, NW, Suite 900N
Washington, D.C. 20036

*Counsel for Petitioner American Fuel
& Petrochemical Manufacturers*

Jonathan G. Hardin
Alexandra Magill Bromer
Michael R. Huston
Karl J. Worsham
PERKINS COIE LLP
700 Thirteenth Street, NW, Suite 800
Washington, D.C. 20005-3960
(202) 654-6200

*Counsel for Petitioners Small
Refineries Coalition; Countrymark
Refining and Logistics, LLC; The
San Antonio Refinery LLC; and
Wynnewood Refining Company, LLC*

## TABLE OF CONTENTS

GLOSSARY ................................................................................................ vi

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 2

I.    EPA Misapplied the Statutory Criteria in Promulgating the
      2023-2025 RFS Standards. ............................................................... 2

      A.    EPA's thumb on the scale in favor of ever-increasing
            renewable-fuel volumes misreads the statute. .................... 2

      B.    EPA's advanced biofuel and total renewable fuel
            standards are arbitrary and capricious. .............................. 5

            1.    Total Renewable Fuel ............................................... 5

            2.    Advanced Biofuel ...................................................... 7

      C.    EPA fails to defend its unreachably-high cellulosic
            biofuel standard. ................................................................. 9

II.   EPA Erroneously Relied on Its "Implausible" and "Arbitrary
      and Capricious" Passthrough Theory. ........................................ 11

III.  EPA Failed to Comply with the Regulatory Flexibility Act ...... 14

IV.   EPA's Continual Flouting of Deadlines Is Unlawful. ............... 17

V.    The 2023 Supplemental Standard Is Arbitrary and Capricious. ............... 21

CONCLUSION ........................................................................................ 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ahn*,
  804 F. App'x 541 (9th Cir. 2020) ...................................................................15

*Alon Refining Krotz Springs, Inc. v. EPA*,
  936 F.3d 628 (D.C. Cir. 2019) .......................................................4, 13, 14

*Am. Petrol. Inst. v. EPA*,
  706 F.3d 474 (D.C. Cir. 2013) ..................................................................3, 5

*Ass'n of Am. R.R.s v. Costle*, 562 F.2d 1310 (D.C. Cir. 1977) ................................3

*Bd. of Miss. Levee Comm'rs v. EPA*,
  674 F.3d 409 (5th Cir. 2012) ......................................................................16

*Calumet Shreveport Refin., LLC v. EPA*,
  86 F.4th 1121 (5th Cir. 2023) ...............................................................13, 14

*Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*,
  788 F.3d 312 (D.C. Cir. 2015) ....................................................................15

*Fla. Bankers Ass'n v. U.S. Dep't of Treasury*,
  799 F.3d 1065 (D.C. Cir. 2015) ..................................................................15

*Grocery Mfrs. Ass'n v. EPA*,
  693 F.3d 169 (D.C. Cir. 2012) ...............................................................15, 16

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) ......................................................................16

*Lexmark Int'l , Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ....................................................................................15

*Lignite Energy Council v. EPA*,
  198 F.3d 930 (D.C. Cir. 1999) ....................................................................10

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ........................................................................2, 18, 19

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
  70 F.4th 582 (D.C. Cir. 2023)...................................................................4

*Michigan v. EPA*,
  576 U.S. 743 (2015)...........................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..........................................................................3, 13

*N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*,
  974 F.3d 486 (3d Cir. 2020) ...............................................................16

*Nasdaq Stock Market LLC v. SEC*,
  38 F.4th 1126 (D.C. Cir. 2022)...........................................................4

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024)........................................................................11

*Paulsen v. Remington Lodging & Hosp., LLC*,
  773 F.3d 462 (2d Cir. 2014) ................................................................15

*Rothe Dev., Inc. v. U.S. Dep't of Def.*,
  836 F.3d 57 (D.C. Cir. 2016) ................................................................3

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943).................................................................................4

*Sinclair Wyo. Refin. Co. LLC v. EPA*,
  No. 22-1073, 2024 WL 3801747 (D.C. Cir. Aug. 14, 2024)
  ..................................................................................12, 13, 14, 20

*Sinclair Wyo. Refin. Co. v. EPA*,
  101 F.4th 871 (D.C. Cir. 2024)...........................................2, 6, 21, 22

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*,
  21 F.4th 1229 (10th Cir. 2021) ...........................................................16

iv

**Statutes**

42 U.S.C. §7412(d)(2)-(3) ...........................................................................5

42 U.S.C. §7429(a)(2)...................................................................................5

42 U.S.C. §7545(*o*)(2)(B)(ii) ..........................................................5, 9, 11, 14

42 U.S.C. §7545(*o*)(2)(B)(ii)(III)..................................................................6

42 U.S.C. §7545(*o*)(2)(B)(ii)(IV) .............................................................7, 11

**Regulations**

13 C.F.R. §121.201(324110) n.4 ...............................................................16

40 C.F.R. §80.1407 ....................................................................................21

**Other Authorities**

81 Fed. Reg. 89746 (Dec. 12, 2016) ...........................................................6

# GLOSSARY

| | |
|---|---|
| AFPM | American Fuel & Petrochemical Manufacturers |
| Biofuel.Br. | Final Brief of Biofuel Intervenors Responding to Petitioners American Fuel & Petrochemical Manufacturers et al. |
| EPA | Environmental Protection Agency |
| EPA.Br. | Final Brief for Respondents |
| GAO | Government Accountability Office |
| JA | Joint Appendix |
| Opening.Br. | Final Brief of American Fuel & Petrochemical Manufacturers, et al. |
| RFA | Regulatory Flexibility Act |
| RFS | Renewable Fuel Standard |
| RINs | Renewable Identification Numbers |
| 2023-2025 Rule, Rule, or Set Rule | "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44468 (July 12, 2023) (excluding the Biogas Regulatory Reform rule) |

## INTRODUCTION

EPA has no compelling response to Refiners'[1] core argument against the Set Rule: It was arbitrary and capricious for EPA to approach the rulemaking like any other RFS rule, because EPA's task for 2023 forward differs fundamentally from Congress's previous directive. From 2006 to 2022, *Congress* set annual applicable renewable-fuel volumes. For 2023-2025, *EPA* was to review how the program had worked in practice (including billions of gallons of renewable-fuel waivers every year from 2014-2022) and to promulgate requirements that reflected a fair consideration of the factors relevant to Congress once its ambitious (unrealistic) targets ended. In short, Congress required the RFS to be different beginning in 2023, but EPA continued to favor growth—a factor not included in the statute—above all else.

EPA invokes this Court's prior acquiescent rulings, expecting more of the same now. But those prior rulings adjudicated EPA's decisions under the superseded framework, rendering the issues at bar matters of first impression. EPA also glosses over commenters' very real concerns that EPA ignored small-business impacts, and misstates standing doctrine to avoid Refiners' Regulatory Flexibility Act ("RFA") arguments. Biofuel Intervenors, for their part, posit a maximum-achievable standard divorced from the text. None of these arguments salvages EPA's unlawful Rule.

---

[1] For consistency, Obligated-Party Petitioners use "Refiners." *See* EPA.Br. 1 n.1.

# ARGUMENT

## I.   EPA Misapplied the Statutory Criteria in Promulgating the 2023-2025 RFS Standards.

### A.   EPA's thumb on the scale in favor of ever-increasing renewable-fuel volumes misreads the statute.

Refiners explained how the Set Rule framework espouses no policy of renewable-fuel growth and how, by importing that policy into its analysis, EPA misinterpreted the statute. Opening.Br. 9, 13-15. EPA dismisses these concerns, asserting EPA "conduct[ed] the same type of analyses of the same series of statutory factors that this Court recently upheld for the 2020-2022 volumes[.]" EPA.Br. 1. But EPA ignores the unique posture of the 2023-2025 Rule—a partially-retroactive rule under a distinct framework separate from Congress' annually-increasing volumes. And this Court upheld EPA's analyses for the 2020-2022 compliance years because, unlike here, EPA *also* invoked the cellulosic waiver authority, which provides flexibility to waive additional renewable-fuel volumes considering factors outside the set criteria. *Sinclair Wyo. Refin. Co. v. EPA*, 101 F.4th 871, 888 (D.C. Cir. 2024) ("*Sinclair-Reset*").

Regardless, EPA no longer enjoys interpretive latitude over the RFS. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2557 (2024) (reminding that *courts* say "what the law is") (citation omitted). To reiterate, the operative statute itself does not contain *any* statement of purposes. Opening.Br. 15. So EPA cites not to the U.S. Code provisions for the RFS, but to general, prefatory language of the

2

entire Energy Independence and Security Act of 2007, to assert that a goal of increased renewable-fuel appropriately undergirds the statutory-factors review. EPA.Br. 29. But such statements cannot supersede the statutory text. *See Ass'n of Am. R.R.s v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977) (explaining preamble is "not an operative part of the statute and it does not enlarge or confer powers on administrative agencies"); *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 66 (D.C. Cir. 2016) (same for "findings"). Even were such a policy present in the RFS generally, "a broad programmatic objective cannot trump specific instructions." *Am. Petrol. Inst. v. EPA*, 706 F.3d 474, 479 (D.C. Cir. 2013) ("*API*"). Congress embedded no policy forcing ever-increasing volumes of renewable fuel in the set provision; EPA's unwavering commitment to that policy is legal error.

Nor is this a matter of EPA's "evaluation of scientific data within its technical expertise" where EPA may claim to be owed an "extreme degree of deference." EPA.Br. 27 (citation omitted). Rather, EPA's error here is classic arbitrary-and-capricious action: by overlaying its policy preference on its statutory-factors application, EPA "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"). As to the factors EPA *was* supposed to consider, Congress could not have spoken more plainly, setting them apart from the pre-2023

3

RFS framework. Opening.Br. 13-15. EPA's unwavering dedication to its prior policy disregards the explicit statutory distinctions Congress prescribed.

EPA (at 30) denies that this policy drove the outcome, but its words belie its *post hoc* assertions. Opening.Br. 14 (citing EPA's description of the RFS as a "policy tool"). EPA fails to reconcile its preferred policy with the fact that Congress halted the increase in 2012 for biomass-based diesel and for all other renewable fuels in 2022. Nor does EPA explain how the requirement to evaluate the implementation of the program—a factor novel to the set provision—aligns with its view of the statute. At bottom, EPA must give effect to each of Congress's provisions, *Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 672 (D.C. Cir. 2019) (Williams, J., concurring) (citation omitted)—the set provision is a distinct construct and EPA must recognize it as such. In failing to do so, EPA has fundamentally "misconceived the law." *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597 (D.C. Cir. 2023) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)); *Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) (rejecting agency's statutory interpretation for reading absent authority into the statute).

As for Biofuel Intervenors, they locate their argument that "EPA must set the volume requirements to the maximum achievable level", Biofuel.Br. 1, nowhere in the statute. In contrast, Refiners pinpointed specific statutory language withholding from EPA any obligation (or authority) to set standards that prioritize growth at all

4

costs in 2023 and later years. Opening.Br. 13-15. If Congress wanted EPA to set the RFS at the maximum achievable level, it would have said just that—no multi-factor analysis is necessary to achieve that outcome. *See, e.g.*, 42 U.S.C. §§7412(d)(2)-(3), 7429(a)(2)[2] (specifying when EPA should regulate to "maximum" extent). But here, Congress directed EPA to consider a decidedly un-aspirational fact—"the expected annual rate of future commercial production of renewable fuels," along with other factors such as cost that suggest "maximum achievable" volumes are not what Congress intended. §7545(*o*)(2)(B)(ii); *see also API*, 706 F.3d at 479 ("not … every constitutive element of the RFS program should be understood to individually advance a technology-forcing agenda").

## B.   EPA's advanced biofuel and total renewable fuel standards are arbitrary and capricious.

EPA's reference to the number of pages of its analysis proves only that the analysis is lengthy, not weighty. EPA.Br. 29. Upon inspection, EPA's discursions collapse.

### 1.   Total Renewable Fuel

To begin, while EPA claims that the opening brief "incorrectly assert[s] that EPA set volumes for conventional renewable fuel," EPA.Br. 46, Refiners directly quoted EPA. Opening.Br. 16 ("EPA set an 'implied conventional renewable fuel

---

[2] Unless otherwise noted, all statutory citations are to Title 42, U.S. Code.

volume requirement' of 15 billion gallons. JA49-50. EPA may more carefully choose its language, but cannot fault others for repeating it. Nevertheless, EPA's *post hoc* recharacterization of the Rule fails. EPA erroneously asserts that this Court's ruling in *Sinclair-Reset* precludes further argument over implied requirements. But in *Sinclair-Reset*, this Court was tasked with evaluating EPA's administration of its duty to reset standards Congress set—in other words, there was a default "implied" volume (based on statutory volumes) to begin with. In the new context of the set provision, no such "implied" volume exists. And on that score, EPA *still* cannot explain why it uses a 15-billion-gallon default when it knows that number cannot be—and has *never* been—reached. EPA.Br. 48-50. This alone undermines any EPA claim of compliance with the statutory requirement to consider the "expected annual rate of future" renewable-fuel production. §7545(*o*)(2)(B)(ii)(III).

Nor does EPA provide any record evidence to support its argument (at 49) that artificial support for higher-level ethanol blends (via the increased mandate) actually fosters investment. EPA does not contest that higher-level blends "are not *yet* produced in significant amounts[.]" *Id.* Instead EPA defensively asserts that the actual production of higher-level blends does not matter because EPA specifically considered "projections of expanded offerings." *Id.* But EPA has been predicting such an expansion for the better part of a decade, 81 Fed. Reg. 89746, 89748 (Dec.

12, 2016), to no avail. *See* Opening.Br. 18.

Relatedly, EPA claims the statutory factor regarding the impact of renewable fuels on infrastructure justifies what it now recasts as a "15-billion-gallon difference between total renewable fuel and advanced biofuel" (instead of an implied mandate). EPA.Br. 49. EPA claims a high mandate encourages investment in infrastructure—but not only was that approach unsuccessful when EPA *was* supposed to increase requirements every year, *see* Opening.Br. 18 (discussing RFS failure to overcome blendwall), that is not at all what the statute asks EPA to do for 2023 and beyond. Rather, EPA is supposed to evaluate whether infrastructure is "sufficien[t]" to deliver the fuel EPA mandates. §7545(*o*)(2)(B)(ii)(IV). If anything, that supports a *lower* implied conventional fuel requirement.

While the issues above may be "technical" ones to which EPA claims deference, any level of deference to these obvious failings is inappropriate.

## 2.    *Advanced Biofuel*

The one category of renewable fuel where EPA did not overshoot the mark was advanced biofuel. But ironically, EPA erred even there. Rather than applying the six statutory factors (including the requirement to evaluate expected future production) to arrive at a reasonable estimate of achievable production and consumption, EPA set the mandate artificially low to force demand for *other*

7

renewable fuels to meet the total renewable fuel requirement. This was arbitrary and capricious, as Refiners explained. Opening.Br. 19-20.

EPA misunderstands Refiners' cost argument: It is the cost *to obligated parties* that increases when the difference between the total renewable fuel requirement and the advanced biofuel requirement cannot be met with conventional renewable fuel. The ethanol RIN price rises when more expensive advanced biofuel is needed to satisfy the implied conventional mandate. Opening.Br. 20. In turn, costs to consumers will be higher overall. Therefore, EPA must consider the former in evaluating the latter.

EPA claims that "RINs effect a cross-subsidy" and "[a]lthough the D6 RIN price may affect the price of a particular blend, they do not change the overall consumer cost across the market of all transportation fuel blends (E10, E15, E85, etc.). JA1859-60." EPA.Br. 50. Presumably EPA is choosing its words carefully, as it cannot assert that there is no cost at all to consumers where it concedes an increase in overall fuel costs because of the RFS. Opening.Br. 27. EPA does not contest that a higher D6 RIN price increases costs *to obligated parties*. And this is Refiners' point: EPA overlooks the *cost of compliance*. EPA's attempt to minimize the costs compared with a no-RFS scenario by quoting cents on the dollar is obtuse at best, EPA.Br. 30—according to the Energy Information Administration, U.S. gasoline consumption averaged approximately 376 million gallons *per day*,

8

https://www.eia.gov/tools/faqs/faq.php?id=23&t=10—in other words, between $7.5 and $15 million *per day* in additional costs, *billions* extra per year.

### C. EPA fails to defend its unreachably-high cellulosic biofuel standard.

In arguing that EPA's leap from a 13% to a 25% projected growth rate for cellulosic biofuel was arbitrary and capricious, Refiners pointed to the precipitous, sustained decline in growth during the majority of 2019 (before the pandemic) as indicating why a longer lookback period (when growth trended largely upward) was inappropriate. Opening.Br. 22-23. EPA responds by pointing the finger elsewhere. EPA conceded that the proposed metric (13%) "had proven fairly reliable" which, while debatable, still means that EPA had to justify departing from it—particularly where the statute requires EPA to evaluate both the program's past performance and "expected" future production. §7545(*o*)(2)(B)(ii). The only real reason EPA provides is that it spoke with cellulosic biogas producers—*i.e.*, the parties that stand to gain the most from a high mandate—who persuaded EPA to set the requirements higher. JA1601. So instead of fairly looking at how the industry actually performed and neutrally assessing projected volumes as the statutory factors require, *see* Opening.Br. 23 n.12 (describing 2023 shortfall), EPA took the cellulosic biofuel industry's word for it and used a higher growth rate.

As to the growth rate itself, EPA first claims that "the cellulosic biofuel market still grew by approximately 33% in December 2019." EPA.Br. 45. But the chart EPA

refers to shows the *rate* of growth year-over-year; in other words, how much the industry had grown compared to 12 months before. And following December 2019, that growth rate dropped to 10% by December 2021. JA1789. Moreover, the annual growth rate for RNG used as CNG/LNG (the majority of cellulosic RINs) had never returned to, much less exceeded, the rate of the first year. JA1599. EPA contends that the growth rate had begun increasing again by the Final Rule, but states only that "*if* the current trajectory continues the growth rate is projected to reach 25% by December 2023." JA1789 (emphasis added). EPA's optimism regarding the ability of the RFS program, "extension" of tax incentives, and "existing and potentially newly adopted state programs" to fill the gap between the proposed 13% growth rate and the finalized 25% growth rate, JA1600, is unfounded. All EPA can claim is that "[i]f additional states adopt programs similar to" those in California, Oregon, and Washington, they "could" also motivate increased production. *Id.* EPA's improper "speculation [and] conjecture[,]" *Lignite Energy Council v. EPA*, 198 F.3d 930, 934 (D.C. Cir. 1999), is particularly galling for 2023 since these programs could not possibly spark additional production in a partially-retroactive compliance year.

Particularly for years when EPA was providing no backstop in the way of cellulosic biofuel credits—and where it is instructed *specifically* to set the level at a rate that assumes it will not need to issue a waiver—EPA had a duty to err on the conservative side. Opening.Br. 21-23. EPA explains not at all how its conclusions

align with the statute in this respect.[3] EPA's decision instead to rely on biased third-party promises is not a "technical judgment" to which this Court owes any deference.

## II.    EPA Erroneously Relied on Its "Implausible" and "Arbitrary and Capricious" Passthrough Theory.

EPA is statutorily obligated to "base[]" its volumes on a "review of the implementation of the program", §7545(*o*)(2)(B)(ii), in a way that "account[s] for the problems that arose in past implementation and address[es] them[.]" Opening.Br. 25-26. EPA does not dispute that obligation, contending instead that invoking its RIN cost passthrough theory satisfied it. EPA.Br. 50-55.[4]

EPA used its passthrough theory like a crutch, explicitly relying on it "more than 10 times" in the Rule to avoid engaging with any argument that the Rule could cause harm due to the burden of compliance costs on obligated parties. Opening.Br.

---

[3] Refiners do not, as Biofuel Intervenors contend, argue that "EPA effectively exercises its cellulosic waiver authority when setting the volumes." Biofuel.Br. 20 n.6. Rather, Refiners maintain that EPA has a duty not to set cellulosic volumes "maximally" because that would risk circumstances requiring a waiver—a direct statutory violation. §7545(*o*)(2)(B)(II)(iv).

[4] EPA asserts that Refiners' comments did not include, and so waived, arguments about "the liquidity issues" and "inefficiencies of the RIN market" that "contribute[] to high RIN prices." EPA.Br. 53. EPA should recheck the record. *See, e.g.*, JA754-55 (discussing EPA's "refus[al] to admit" that its "actions caused the skyrocketing [RIN] prices," explaining how EPA created an illiquid, "cornered" RIN market, and insisting that EPA "consider the role the Agency itself has played in fostering a dysfunctional RIN market through its delays and other unlawful actions"). At best, EPA's waiver argument engages in the same "hair-splitting approach" that the Supreme Court recently condemned. *See Ohio v. EPA*, 144 S. Ct. 2040, 2055 (2024) (citation omitted).

26-27. For example, EPA justified refusing to decrease its "implied volume requirement" for conventional renewable fuel despite acknowledging the benefits of doing so because EPA "believe[d]" the net cost of compliance would be the same under the passthrough theory. JA1830; Opening.Br. 26-27.

But EPA's passthrough theory has been thoroughly debunked at every turn. Opening.Br. 27-29. In fact, this Court has now rejected it. *Sinclair Wyo. Refin. Co. LLC v. EPA*, No. 22-1073, 2024 WL 3801747, at *10-13 (D.C. Cir. Aug. 14, 2024) (holding that EPA's reliance on its "RIN cost passthrough theory" was "arbitrary and capricious") ("*Sinclair-Wyoming*"). Reviewing EPA's April and June 2022 denials of more than a hundred petitions for small refinery hardship exemptions, this Court found that the "central premise" of EPA's theory (*see* EPA.Br. 51-52)—that refineries "may purchase RINs 'ratably,' or contemporaneously with their fuel sales" and thereby "pass through the entire cost of [their] RINs"—is unsupported. *Sinclair-Wyoming*, 2024 WL 3801747, at *11-13. Thus, "EPA failed to support its assumption that RIN prices are immediately passed through to the refineries' customers" and its decisions relying on that unsupported assumption are "arbitrary and capricious."[5] *Id.* at *13. Because EPA's passthrough theory is arbitrary and

---

[5] This Court also noted that "EPA's position on [ratable] RIN purchases is the precise opposite of its prior stance on th[at] point" and that EPA did not adequately "explain its about-face on this critical assumption." *Sinclair-Wyoming*, 2024 WL 3801747, at *11-12. EPA did not provide that missing explanation in the Rule either. For this additional reason, EPA's reliance on passthrough here is arbitrary and capricious.

capricious, EPA's reliance on that theory to set the volumes at issue here is likewise arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Adding this Court's *Sinclair-Wyoming* decision to the GAO Report and the Fifth Circuit's *Calumet Shreveport* decision, there is a tsunami of authority rejecting EPA's passthrough theory. *Sinclair-Wyoming*, 2024 WL 3801747, at *13 ("EPA's failure to support the central premise of its economic theory renders the Denial Actions arbitrary and capricious."); *Calumet Shreveport Refin., LLC v. EPA*, 86 F.4th 1121, 1140 (5th Cir. 2023) (EPA's theory is "so implausible" that "it cannot be ascribed to a difference in view or agency expertise"); JA774 (EPA's theory relied on a "flawed assumption and an incomplete assessment"); *see also* Opening.Br. 27-29.

In its brief, EPA downplays the GAO Report and *Calumet Shreveport* as "narrow[]" and failing to assess "the market as a whole." EPA.Br. 53-54. But in the Rule, EPA set the volumes based on its assumption that "*all* obligated parties" fully pass through their RIN costs and so suffer no harm under the RFS. JA53-54 (emphasis added).

EPA next tries to trump the GAO Report and *Calumet Shreveport* by asserting that this Court previously blessed its passthrough theory. EPA.Br. 50 (citing *Alon*, 936 F.3d at 652-53). Not so. As this Court recently explained in *Sinclair-Wyoming*, the *Alon* decision merely noted that "EPA relied on" a study "which concluded that

RIN prices generally are passed through[.]" 2024 WL 3801747, at *13 (emphasis omitted). The *Alon* petitioners did "not raise[]" criticisms of that study to the *Alon* Court, so the Court "d[id] not consider them." *Alon*, 936 F.3d at 650. All "EPA's macro-level analysis about fuel markets" could possibly establish is that "passthrough *can* occur in fuel markets generally" if those markets are perfectly efficient—"it does not rule out the existence of inefficient fuel markets. And those are the markets in which petitioners operate." *Calumet Shreveport*, 86 F.4th at 1141 (emphasis added); *see also Sinclair-Wyoming*, 2024 WL 3801747, at *11 (EPA's passthrough theory assumes that "markets are efficient"). Ultimately, EPA could not substantiate its passthrough theory in the real world. *Id.* at *10-13.

With EPA's passthrough theory now thoroughly discredited, it is clear that EPA's volumes are not "based" on an adequate "review of the implementation of the program[.]" §7545(*o*)(2)(B)(ii); Opening.Br. 24-29.

## III.   EPA Failed to Comply with the Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") requires agencies to "prepare a regulatory flexibility analysis" for its rules "unless" the rule "will not have a significant economic impact on a substantial number of small entities." Opening.Br. 29. Relying *solely* on its debunked passthrough theory, EPA concluded that the Rule would have no effect on small entities and refused to prepare the analysis. *Id.* 29-31. That analysis is required; the Rule must be remanded. *Id.*

14

EPA does not defend its decision on the merits. Instead, it responds with three procedural arguments. Each fails.

**First**, EPA argues that Refiners lack standing to challenge EPA's RFA determination because they have not demonstrated that they are "small entities" and have now missed their opportunity to do so. EPA.Br. 55-57. EPA confuses statutory standing with Article III standing. Whether Refiners have standing "under the [RFA]," EPA.Br. 56, is a question of statutory standing, *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127-28 & n.4 (2014); *Florida Bankers Association v. U.S. Department of Treasury*, 799 F.3d 1065, 1074 n.1 (D.C. Cir. 2015) (Henderson, J., dissenting). Statutory standing is not jurisdictional. *Lexmark*, 572 U.S. at 128, n.4. The obligation to establish standing in the "opening brief," applies only to parties wishing to "invoke the [court's] jurisdiction," that is, when the question is Article III standing. *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012).[6]

A different preservation rule makes perfect sense because, unlike jurisdictional doctrines, "statutory standing arguments may be forfeited or waived[.]" *In re Ahn*, 804 F. App'x 541, 543 (9th Cir. 2020); *Paulsen v. Remington*

---

[6] *Grocery* treated statutory standing as jurisdictional, *id.* at 179, but *Grocery* was pre-*Lexmark*. This Court has since recognized that statutory standing is non-jurisdictional. *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 319 (D.C. Cir. 2015) (citing *Lexmark*, 572 U.S. at 128, n.4))

*Lodging & Hosp., LLC*, 773 F.3d 462, 468 (2d Cir. 2014); *N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 492 n.2 (3d Cir. 2020); *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1249 (10th Cir. 2021); *Bd. of Miss. Levee Comm'rs v. EPA*, 674 F.3d 409, 417-18 (5th Cir. 2012); *Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013); *see also Grocery*, 693 F.3d at 183 (Kavanaugh, J., dissenting) ("Because EPA did not challenge the food group's prudential standing, any prudential standing objection is forfeited."). EPA asks for a nonexistent preservation doctrine: one that requires rebutting a waivable argument before it is even made.

Now that EPA has raised statutory standing, Refiners gladly address it. Most small-refinery Petitioners have standing as "small entities" under the RFA. *See* 13 C.F.R. §121.201(324110) n.4. For example, both CountryMark and San Joaquin have fewer than 1,500 employees. CountryMark Decl. ¶3; San Joaquin Decl. ¶3. And both Calumet Montana's and Ergon-West Virginia's total Operable Atmospheric Crude Oil distillation capacity is "less than 200,000 barrels per calendar day." Calumet Montana Decl. ¶3; Ergon-West Virginia Decl. ¶3.

**Second**, EPA again argues waiver. EPA.Br. 56-57. Its argument is again baseless. Refiners have always maintained that EPA cannot rely on its passthrough theory to justify these volumes. *See, e.g.*, JA757-58. Refiners were not required to "rehearse the identical argument[s] made before the agency;" EPA had "notice of

th[is] challenge … in substance, if not in form[.]" *Ohio*, 144 S. Ct. at 2055 (citation omitted).

**Finally**, EPA argues that Refiners have failed to argue that the Rule will "result in a *significant* economic impact on a *substantial* number of small entities." EPA.Br. 58. The record says otherwise. *See, e.g.*, JA755-57 (discussing EPA's "attempts to minimize the hardship that its proposed volumes will cause to small refineries" as a group). But even if Refiners had not, that would not save EPA from remand. This Court can affirm EPA's decisions "only on the grounds that the agency invoked[.]" *Michigan v. EPA*, 576 U.S. 743, 758 (2015). It is EPA who must justify its determination, not Refiners. Here, EPA concluded that no regulatory impact assessment was necessary because, under its passthrough theory, there was "*no* net cost to" *any* "small refiners" JA1773 (emphasis added). A remand is necessary to reassess that conclusion without relying on EPA's debunked passthrough theory.

## IV.    EPA's Continual Flouting of Deadlines Is Unlawful.

Refiners agree with EPA that EPA was required to promulgate the Set Rule, EPA.Br. 58—indeed, EPA has had that duty, and has known of it, for well over a decade. Where we part ways is the consequence that should flow from EPA's chronic failure to comply with Congress's direction in the statute. AFPM suggested an elegant solution to EPA's chronic lateness—maintain the standard from the prior year until EPA can get "back on track"—as EPA claims to want to do. Opening.Br.

34-35. This would provide regulatory certainty to all participants in the RFS, ensuring a continued market without unduly burdening obligated parties. But EPA does not even acknowledge that mitigation in its response. Now that the RFS is in a new era, this Court should fully enforce EPA's statutory duty and direct EPA to provide meaningful relief to Refiners.

EPA has no legal defense to its unlawfully late promulgation of the 2023 and 2024 RFS. Indeed, EPA has no response at all for Refiners' argument that, by continuing to violate the statute, EPA has effectively rewritten it. Opening.Br. 31-33. Instead, EPA relies on this Court's equitable leniency as allowing broad leeway to fashion rules that suit its purposes while disregarding how RFS compliance works in the real world. For example, rather than refer to the actual statutory deadline to describe just how late it promulgated the requirements for 2024, EPA cites "this Court's precedent" as allowing EPA to focus only on the amount of *notice* provided. EPA.Br. 59 (describing "somewhat-shortened notice" provided for the 2024 RFS). That is not the law. In this regard, EPA has made the "mistake" of "read[ing] judicial opinions like statutes." *Loper*, 144 S. Ct. at 2281 (Gorsuch, J., concurring).

The Court may not allow EPA to rely on notice as compliance where the statute provides a concrete deadline for promulgating RFS requirements. The Court owes no deference whatsoever to EPA's claim that its unlawfully late rule accords with the statute. Rather, this Court must exercise its "independent judgment in

deciding whether an agency has acted within its statutory [and delegated] authority[.]" *Id.* at 2273. Indeed, "[a] later court assessing a past decision must … appreciate the possibility that different facts and different legal arguments may dictate a different outcome." *Id.* at 2281 (Gorsuch, J., concurring). While in past years the Court has determined EPA reasonably mitigated burdens on obligated parties, each time EPA acts, the Court must adjudicate EPA's behavior anew. For 2023 and 2024, EPA's disregard for the reality of what it is imposing on obligated parties has reached its unlawful zenith.

Separately, EPA claims an intent to get "back on track" with the deadlines Congress prescribed, as though that compensates for EPA's unlawful behavior this go-round. EPA.Br. 58. Not only does EPA cite nothing to support that claim, but its recent actions belie its protestations: EPA has already announced that it will not promulgate the 2026 RFS on time. RIN: 2060-AW23, Renewable Fuel Standard (RFS)        Program:        Standards        and        Other        Changes, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202404&RIN=2060 -AW23 (most recent regulatory agenda setting a date of 12/00/2025 for the 2026 RFS final rule, a full 13 months late for 2026 requirements, and at least 1 month late for 2027 requirements). Promulgating one out of three requirements on time for the 2023-2025 rule is not "mitigation"—it is disregarding the law, two-thirds of the time.

EPA also repeatedly invokes the time between proposal and promulgation of RFS and the deadline for demonstrating compliance as though that helps obligated parties. *E.g.*, EPA.Br. 60. The problem for EPA is that compliance demonstration is a paper requirement—but to demonstrate compliance, the fuel has to be produced in the calendar year specified. Therefore, the leadtime before *compliance* is not what is important. Rather, it is the leadtime *before the year begins.* Refiners cannot manifest additional renewable fuel (produced mainly by third parties) into being just because EPA provides additional time for RIN-trading after the compliance year— that does not mitigate the harm. Refiners cannot alter their production of gasoline and diesel (on which their annual compliance is calculated) after it has been produced. *See generally Sinclair-Wyoming*, 2024 WL 3801747, at *11-12 (recognizing complexity of compliance (and need for flexibility) due to lack of temporal alignment between RIN generation and fuel demand and production). While carryover RINs and carryforward deficits remain compliance possibilities, they are not panaceas and in fact, increase compliance costs for obligated parties. Carryover and other surplus RINs are not always available to those obligated parties that need them; for example, some obligated parties with surplus RINs may choose to hold them for the next compliance year. And an obligated party that carried forward a deficit into 2023 *must* make a complete compliance demonstration for that year that addresses the full amount of any 2022 deficit plus their current year

obligations, no matter the cost. 40 C.F.R. §80.1407. When EPA sets the RFS unreachably high—and worse still, unreachably high *and* retroactively—EPA jeopardizes obligated parties' ability to comply.

EPA at best fails to fully respond to concerns over the lack of carryover RINs to facilitate compliance. EPA merely points to a few pages of the Regulatory Impact Analysis that (incorrectly) describe the potential for *only* cellulosic biofuel to meet the standard, despite the lack of carryover RINs. EPA.Br. 60; JA1599-1603. But the advanced biofuel category's requirements are much larger, and EPA anticipated no carryover RINs for that category, either. JA1355-56. The upshot is that EPA anticipated a compliance year in 2023 with less compliance flexibility due to the absence of carryover RINs and set historically high requirements anyway, even though half the compliance year was already over. In the face of this reality, EPA cannot seriously claim it mitigated the burdens on obligated parties.

## V.     The 2023 Supplemental Standard Is Arbitrary and Capricious.

EPA had a duty to justify the 2023 supplemental standard on its own terms, in the context of the Set Rule, and under the unique circumstances of 2023. EPA failed in that task. While this Court has ruled the statute permits a supplemental standard, *Sinclair-Reset*, 101 F.4th at 893-94, that does not resolve the question whether EPA's decision to implement a *second* supplemental standard for 2023 was arbitrary and capricious—it was.

First, by characterizing the 2023 supplemental standard as "the second half of the supplemental standard upheld in *Sinclair*," EPA gives up the game. EPA.Br. 61. EPA acknowledges it did not independently consider the wisdom of a 250-million-gallon supplemental standard in 2023, where the promulgated standard was already more ambitious than in 2022. *Compare* JA31, JA42 (20.88B RINs for 2022 including supplemental) *with* JA3 (21.19B RINs for 2023). EPA's treatment of the 2023 supplemental standard as a *fait accompli* is fully revealed when EPA characterizes it as a "market condition"—that is, an assumed fact—rather than EPA's affirmative choice. EPA.Br. 66.

Second, while this Court held that EPA "had no obligation to consider the statutory factors [applied to a supplemental standard] as if it were devising a volume requirement anew," *Sinclair-Reset*, 101 F.4th at 896, EPA must still articulate a non-arbitrary, statutorily-grounded rationale for adding to the 2023 obligated parties' compliance burden. EPA did not. EPA claims it considered obligated parties' ability to comply, but the preamble summarily concludes the supplemental standard is "feasible and achievable." JA43. EPA claims (at 63-64) that the preamble, Response to Comments, and Regulatory Impact Analysis also discuss the market's ability to meet the added burden, but these references provide no substantiating data; they merely reference more conclusory assumptions. *E.g.*, JA1417 (asserting "there would be sufficient quantities of biodiesel and renewable diesel available to satisfy

the supplemental volume requirement"); JA1841-42 ("We … find that the standards, including the supplemental standard can be met."). EPA also responds that it "anticipate[s] that the standard will be met with advanced biofuels, and recognize[s] the possibility that this may result in increased D6 RIN prices[.]" JA1841. But EPA chalks that up to the cost of doing business, *id.*, even though EPA is requiring obligated parties to shoulder the responsibility for *EPA's* legal error. Reasoned decisionmaking requires more.

Third, EPA's claim it mitigated the supplemental standard's added burden on obligated parties, EPA.Br. 64, falls flat. As with the late annual obligations, the untimely supplemental standard is arbitrary and capricious. EPA's reliance on leadtime from a *proposal* when it ultimately promulgates requirements not only later than the statute requires, but also partially retroactively, *id.*, is misplaced. Advance notice of a *proposed* requirement, when the *actual* requirement is promulgated halfway through the period required for compliance-planning (and renewable-fuel blending), mitigates nothing. This Court's prior acquiescence in such a rationale does not warrant repetition. *See supra* 18-20. Finalizing the requirement "nine months before the 2023 compliance deadline," when EPA's duty was to finalize the 2023 requirements *twenty-three months earlier*, is not mitigation.

## CONCLUSION

This Court should (1) remand the 2023-2025 Rule for revision in accordance with this Court's opinion, including an instruction to set standards for 2023 and 2024 no higher than the 2022 standard; and (2) vacate the supplemental standard.

September 6, 2024                         Respectfully submitted,

/s/ Jonathan G. Hardin                    /s/ Robert J. Meyers
Jonathan G. Hardin                        Robert J. Meyers
Alexandra Magill Bromer                   Elizabeth B. Dawson
Michael R. Huston                         CROWELL & MORING LLP
Karl J. Worsham                           1001 Pennsylvania Avenue, NW
PERKINS COIE LLP                          Washington, DC 20004
700 Thirteenth Street, N.W.,              (202) 624-2789
Suite 800                                 rmeyers@crowell.com
Washington, D.C. 20005
(202) 654-6200                            Richard S. Moskowitz
jhardin@perkinscoie.com                   Tyler Kubik
                                          American Fuel &
*Counsel for Petitioners Small*           Petrochemical Manufacturers
*Refineries Coalition; Countrymark*       1800 M Street, NW
*Refining and Logistics, LLC; The*        Suite 900 North
*San Antonio Refinery LLC; and*           Washington, DC 20036
*Wynnewood Refining Company, LLC*         (202) 844-5474

                                          *Counsel for Petitioner American Fuel &*
                                          *Petrochemical Manufacturers*

24

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's briefing order because this brief contains 5,490 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated: September 6, 2024                    */s/ Robert J. Meyers*
                                              Robert J. Meyers

25

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2024, I have caused this brief to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Robert J. Meyers*
Robert J. Meyers