**ORAL SCHEDULED:  NOVEMBER 1, 2024**
**No. 23-1177 and consolidated cases**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

---

ON PETITIONS FOR REVIEW OF FINAL AGENCY ACTION
OF THE ENVIRONMENTAL PROTECTION AGENCY

---

**Final Brief of Respondent-Intervenors Responding to
Petitioner Sustainable Advanced Biofuel Refiners Coalition**

---

Robert J. Meyers
Elizabeth B. Dawson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2789

Richard S. Moskowitz
Tyler Kubik
American Fuel & Petrochemical
Manufacturers
1800 M Street, NW, Suite 900N
Washington, DC 20036

*Counsel for American Fuel &
Petrochemical Manufacturers*

Robert A. Long, Jr.
Kevin F. King
Thomas R. Brugato
MaKade C. Claypool
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5488

Ryan Meyers
John Wagner
Michele Schoeppe
American Petroleum Institute
200 Massachusetts Ave. NW
Suite 1100
Washington, DC 20001

*Counsel for American Petroleum
Institute*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to Circuit Rule 28(a)(1), Respondent-Intervenors American Petroleum Institute and American Fuel & Petrochemical Manufacturers hereby certify as follows:

**A. Parties, Intervenors, and *Amici Curiae*:**

All parties, intervenors, and *amici curiae* appearing in this case are listed in the Brief of Petitioner Sustainable Advanced Biofuel Refiners Coalition (Doc. 2046447) at C-1 to C-2.

**B. Rulings Under Review:**

Pertinent to this brief, the action under review is the U.S. Environmental Protection Agency's ("EPA") final rule entitled Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes, 88 Fed. Reg. 44,468 (July 12, 2023).

**C. Related Cases:**

All cases pending before this and other courts that are related to this litigation are accurately identified in EPA's brief (Doc. 2062311) at ii–iii.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Respondent-Intervenors submit the following statements:

**American Petroleum Institute** ("API") is a nationwide, not-for-profit association representing approximately 600 member companies engaged in all aspects of the oil and gas industry, including science and research, exploration and production of oil and natural gas, transportation, refining of crude oil, and marketing of oil and gas products. API has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in API. API is a trade association within the meaning of Circuit Rule 26.1. API is a continuing association operating for the purpose of promoting the general commercial, professional, legislative, or other interests of its members.

**American Fuel & Petrochemical Manufacturers** ("AFPM") is a national trade association including most U.S. refining and petrochemical manufacturing capacity. AFPM has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in AFPM. AFPM is a trade association within the meaning of Circuit Rule 26.1. AFPM is a continuing association operating for the purpose of promoting the general commercial, professional, legislative, or other interests of its members.

## **TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 DISCLOSURE STATEMENT ............................................................ ii

TABLE OF AUTHORITIES ................................................................................ iv

GLOSSARY ........................................................................................................ vi

STATUTES AND REGULATIONS .................................................................... vi

INTRODUCTION ................................................................................................ 1

SUMMARY OF ARGUMENT ........................................................................... 1

ARGUMENT ....................................................................................................... 3

     I.     Renewable Diesel Is a Form of Biomass-Based Diesel. ...................... 3

     II.    EPA Adequately Considered Factors Relevant to the Biomass-Based Diesel Program. ........................................................................ 9

CONCLUSION .................................................................................................... 14

CERTIFICATE OF COMPLIANCE ................................................................... 15

CERTIFICATE OF SERVICE ............................................................................ 16

ADDENDUM ...................................................................................................... A1

# TABLE OF AUTHORITIES

**Page(s)**

*Alon Refin. Krotz Springs, Inc. v. EPA,*
  936 F.3d 628 (D.C. Cir. 2019)......................................................................10

*API v. EPA,*
  52 F.3d 1113 (D.C. Cir. 1995).......................................................................8

*Chao v. Day,*
  436 F.3d 234 (D.C. Cir. 2006).......................................................................5

*CREW v. FEC,*
  971 F.3d 340 (D.C. Cir. 2020).......................................................................4

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018)......................................................................................9

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
  545 U.S. 546 (2005)....................................................................................11

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)....................................................................................11

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021)....................................................................................12

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000)......................................................................................6

*Grayscale Invs., LLC v. SEC,*
  82 F.4th 1239 (D.C. Cir. 2023).....................................................................8

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
  583 U.S. 109 (2018)......................................................................................5

*New York v. EPA,*
  443 F.3d 880 (D.C. Cir. 2006)...................................................................2, 5

*SAS Inst., Inc. v. Iancu,*
  138 S. Ct. 1348 (2018)..................................................................................3

*United States v. Johnson*,
  4 F.4th 116 (D.C. Cir. 2021) ..................................................................4

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ...............................................................................8

**Statutes**

26 U.S.C. § 40A ............................................................................................6

42 U.S.C. § 7545 ................................................................ 1, 2, 4, 6, 9, 10, 12, 13

42 U.S.C. § 13220 .....................................................................................2, 4, 5

Energy Independence and Security Act of 2007,
  Pub. L. No. 110-140, 121 Stat. 1492 ......................................................6

Energy Policy Act of 2005,
  Pub. L. No. 109-58, 119 Stat. 594 ..........................................................5

**Regulations**

40 C.F.R. § 80.2 ..................................................................................5, 10, 12

72 Fed. Reg. 23,900 (May 1, 2007) ......................................................1, 5

75 Fed. Reg. 14,670 (Mar. 26, 2010) ..................................................5, 10

79 Fed. Reg. 42,078 (July 18, 2014) .........................................................5

88 Fed. Reg. 44,468 (July 12, 2023) ............................................1, 4, 9, 12

**Legislative Materials**

153 Cong. Rec. S8025-26 (June 20, 2007) .............................................11

S. Rep. No. 110-65 (2021) .........................................................................9

Roll Call Vote on S. Amend. 1800, 110th Cong. (June 20, 2007) ..........11

**Other Authorities**

*Regulation of Fuels and Fuel Additives: RFS Program, Summary and
  Analysis of Comments*,
  EPA420-R-07-006 (2007) .........................................................................5

# <u>GLOSSARY</u>

| | |
|---|---|
| 2005 Act | Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 |
| SABR | Sustainable Advanced Biofuel Refiners Coalition |
| SABR Br. | Final Brief for Petitioner SABR (Sept. 6, 2024) |
| EPA | Environmental Protection Agency |
| EPA Br. | Final Brief for Respondent EPA (Sept. 6, 2024) |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |
| Set Rule | Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes, 88 Fed. Reg. 44,468 (July 12, 2023) |

# <u>STATUTES AND REGULATIONS</u>

Except as included in the attached addendum, all applicable statutes and regulations are contained in the separate addenda submitted by EPA (Doc. 2062313) and SABR (Doc. 2046448).

## INTRODUCTION

Respondent-Intervenors American Petroleum Institute and American Fuel & Petrochemical Manufacturers submit this brief in response to the challenges raised by Petitioner Sustainable Advanced Biofuel Refiners Coalition to EPA's Set Rule. *See* Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes, 88 Fed. Reg. 44,468 (July 12, 2023). For the reasons given below, the Court should reject SABR's attempt to rewrite the statutory definition of biomass-based diesel to insulate its members from the competitive market structure established by Congress. *See* SABR Br. 9-21.[1]

## SUMMARY OF ARGUMENT

Since its creation nearly two decades ago, the RFS program has included volume requirements for "biomass-based diesel." *See* 42 U.S.C. § 7545(*o*)(2). And since 2007, EPA has consistently interpreted biomass-based diesel as encompassing two primary subtypes: (1) mono-alkyl ester biodiesel and (2) non-ester renewable diesel. 72 Fed. Reg. 23,900, 23,917 (May 1, 2007). Both fuels "are produced from animal fat and vegetable oils and are replacements for diesel fuel," differing only "in their production process and chemical composition." Set Rule at 44,484. SABR's members are "invested in building out" the first subtype and worry that it is being

---

[1] SABR raises additional challenges (at 22-27) that Respondent-Intervenors do not address in this brief.

crowded out of the biomass-based diesel market by renewable diesel, another subtype.  SABR Br. C-4.  Accordingly, SABR argues that EPA should have limited biomass-based diesel to mono-alkyl ester biodiesel alone.  This argument fails for two main reasons.

*First*, renewable diesel qualifies as biomass-based diesel under the plain text of the statute.  The statute makes clear that *any* type of diesel fuel substitute derived from renewable resources can qualify as biomass-based diesel.  *See* 42 U.S.C. §§ 7545(*o*)(1)(D), 13220(f).  Specifically, the statute uses the open-ended phrase "a diesel fuel substitute" and includes criteria that apply equally to mono-alkyl ester biodiesel and non-ester renewable diesel.  *See New York v. EPA*, 443 F.3d 880, 885-86 (D.C. Cir. 2006) (rejecting attempt to narrow statutory phrase "any physical change" given its "expansive," "obvious," and "common-sense" meaning).  The statutory structure further confirms that biomass-based diesel is not limited in the way SABR prefers.  Despite previously having limited "biodiesel" to mono-alkyl ester biodiesel elsewhere in the U.S. Code, Congress chose broader language when defining biomass-based diesel in the RFS program.

*Second*, EPA adequately considered factors relevant to the biomass-based diesel component of the RFS program when declining to afford mono-alkyl ester biodiesel special treatment.  SABR asserts that EPA overlooked the unique benefits of that fuel over its competition.  That argument reduces to a plea for favoritism.

Neither the statute nor this Court's precedent requires EPA to take that extraordinary step.

At base, SABR's arguments are little more than dressed-up policy preferences—claims that EPA should have gone further to promote and subsidize the particular fuel subtype in which SABR's members have a financial interest. Given the statute's clear-cut terms, Congress, rather than this Court, is the proper forum for such policymaking pleas—and Congress has already addressed the issue. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (Congress "enact[s] policy" and courts "follow th[at] policy").[2]

## ARGUMENT

### I.    Renewable Diesel Is a Form of Biomass-Based Diesel.

SABR contends that EPA was statutorily obligated to limit biomass-based diesel to mono-alkyl ester biodiesel.  But the statutory text and structure foreclose that argument.

**1.**  SABR asserts (at 11) that biomass-based diesel is limited to "biodiesel" and that "[*t*]*he* diesel fuel substitute" addressed in the statute is "biodiesel (mono-alkyl esters), not renewable diesel."  That argument misconstrues the statute. Congress defined biomass-based diesel to mean "biodiesel as defined in" 42 U.S.C.

---

[2] EPA explains that SABR's arguments are time-barred, *see* EPA Br. 69-73, thus Respondent-Intervenors do not repeat that argument here.

3

§ 13220(f).    42 U.S.C. § 7545(*o*)(1)(D).    Section 13220(f), in turn, defines "biodiesel" as "*a* diesel fuel substitute produced from nonpetroleum renewable resources" that meets certain registration requirements (emphasis added). Congress's use of the "indefinite articl[e] 'a'" rather than the definite article "the" means that the statute is best read as "referring to something not specifically identified but instead treated as one *of a class*" and something that can be "applied to *more than one* individual object." *CREW v. FEC*, 971 F.3d 340, 354-55 (D.C. Cir. 2020) (cleaned up; emphases added); *see also United States v. Johnson*, 4 F.4th 116, 121-22 (D.C. Cir. 2021) (similar).    Thus, the statute's plain text makes clear that *any* diesel fuel substitute—so long as it meets statutory sourcing and registration requirements—counts as "biodiesel" under section 13220(f) and thus "biomass-based diesel" under section 7545(*o*)(1)(D).    SABR does not contest that renewable diesel satisfies this definition—an omission that dooms its argument.

Further, other parts of section 13320(f) make clear that "biodiesel" is not limited to mono-alkyl ester biodiesel.    Mono-alkyl ester biodiesel is "produced from animal fat and vegetable oils," Set Rule at 44,484, yet section 13320(f) expressly enumerates additional resources that biodiesel can be "derived from," such as "municipal solid waste and sludges and oils derived from wastewater."    SABR ignores this statutory language.    Indeed, its interpretation would contravene the rule that courts (and agencies) must "give effect, if possible, to every word Congress

used." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128-29 (2018) (cleaned up).[3]

Thus, far from defining biomass-based diesel as one *specific* subtype—"*the type*" or mono-alkyl ester biodiesel, as SABR asserts—Congress defined biomass-based diesel to mean "a diesel fuel substitute," i.e., *any* type of diesel replacement that meets statutory requirements.  42 U.S.C. § 13220(f); *see also New York*, 443 F.3d at 885-86.  Accordingly, the statutory text resolves the issue.  *See Chao v. Day*, 436 F.3d 234, 235 (D.C. Cir. 2006) (Court's analysis "begins" and "ends" with "plain and unambiguous" text); *see also* EPA Br. 73-74.[4]

**2.**  SABR also argues (at 11) that the Court can infer from the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (which created the RFS program)

---

[3] SABR suggests (at 12) that because renewable diesel "must meet ATSM D975, which is the industry standard for diesel fuel," it is diesel rather than "biodiesel."  To start, not all renewable diesel must meet these standards.  *See Regulation of Fuels and Fuel Additives: RFS Program, Summary and Analysis of Comments* 3-10, EPA420-R-07-006 (2007); *see also* 40 C.F.R. § 80.2 (definition of "non-ester renewable diesel or renewable diesel").  And while some renewable diesel can meet ASTM D975 standards to qualify as biomass-based diesel, this simply ensures that the biofuel is "*suitable* for use in an engine designed to operate on conventional diesel," 79 Fed. Reg. 42,078, 42,105 (July 18, 2014) (emphasis added), i.e., is actually "a diesel fuel substitute," 42 U.S.C. § 13220(f); *see also* 73 Fed. Reg. 40,154, 40,154-55 (July 11, 2008) (acknowledging that renewable diesel meeting ASTM D975 is biomass-based diesel for purposes of fuel rating, certification, and point-of-sale posting).

[4] EPA has consistently (and correctly) maintained this "very broad definition of 'biodiesel'" since the RFS program was created. 75 Fed. Reg. 14,670, 14,686 (Mar. 26, 2010); *see also* 72 Fed. Reg. at 23,917.

that "biodiesel" excludes renewable diesel.  In fact, the statutory structure shows the opposite.

When Congress defined "biodiesel" in the 2005 Act, it could have incorporated a then-existing definition in 26 U.S.C. § 40A(d)(1), which defines "biodiesel" as "monoalkyl esters of long chain fatty acids derived from plant or animal matter," i.e., SABR's preferred definition of "biodiesel."  Congress was well-aware of this narrower definition:  The 2005 Act also amended section 40A to clarify that "renewable diesel shall be treated *in the same manner* as [mono-alkyl ester] biodiesel," and it defined renewable diesel as a "liquid fuel derived *from biomass*."  *Id.* § 40A(f)(1), (3).  The latter definition aligns perfectly with Congress's decision two years later to rename the "biodiesel" RFS category as "*biomass-based* diesel."  *See* Energy Independence and Security Act of 2007, Pub. L. No. 110-140, § 201, 121 Stat. 1492, 1520 (codified at 42 U.S.C. § 7545(*o*)(1)(D)) (emphasis added).  Congress's choice to incorporate section 13220(f)'s broader definition instead of section 40A's narrow one shows that the statutory biomass-based diesel category encompasses more than just mono-alkyl ester biodiesel.

Taken together with the additional contextual points made in EPA's brief (at 75-76), these structural inferences refute SABR's argument.  "Biodiesel" "must be read in … context and with a view to [its] place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (cleaned up).

6

Here, the broader statutory structure demonstrates that Congress did not limit "biomass-based diesel" to SABR's preferred subtype.

**3.**  SABR maintains (at 12-13) that by failing to exclude renewable diesel, EPA violated the canon against superfluity by effectively rendering the biomass-based diesel program "inoperative or, at best, insignificant."  But other than asserting (at 12) that the biomass-based diesel program has been "moribund" rather than "market forcing," SABR does not explain how the inclusion of renewable diesel is responsible for that asserted trend.  Indeed, because renewable diesel in 2022 "was nearly as large as the supply of biodiesel" and is "projected to exceed the supply of biodiesel in future years," excluding it would more likely harm, than help the biomass-based diesel program.  Moreover, SABR's superfluity argument collapses under its own weight.  As discussed above, renewable diesel *is* a type of "biomass-based diesel" under the statute.  So it remains unclear how EPA could render that program superfluous by including a type of biofuel that meets the statutory biomass-based diesel requirements.

Excluding renewable diesel might benefit SABR's members by reducing competition in the biomass-based diesel market.  But SABR has not identified any obligation for EPA to grant such preferential treatment.  Indeed, had EPA played favorites between subtypes of biomass-based diesel that equally satisfy the statutory requirements, it may well have violated settled principles of administrative law.  *Cf.*

*Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) ("[L]ike cases must receive like treatment," for "dissimilar treatment of evidently identical cases is the quintessence of arbitrariness and caprice." (cleaned up)).  At a minimum, Congress defined biomass-based diesel to include more than just SABR's preferred subtype, and EPA's role was to implement the RFS program as Congress enacted it. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."); *cf. API v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) (EPA cannot use general rulemaking power "to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area").  In sum, the statutory text and structure define biomass-based diesel in a way that encompasses both mono-alkyl ester biodiesel and renewable diesel.  The Court should therefore reject SABR's contrary statutory arguments.[5]

---

[5] SABR also argues (at 12-14) that "[n]othing prevents" EPA from creating a separate volume requirement for mono-alkyl ester biodiesel, and that doing so would "better ensure the biomass-based diesel volumes are met and the goals of the program achieved."  Even if that were true, SABR does not explain why EPA was required by law to take that step or why EPA otherwise erred in declining to do so.

## II.  EPA Adequately Considered Factors Relevant to the Biomass-Based Diesel Program.

Pivoting from its statutory arguments, SABR contends (at 14-18) that EPA *should* have limited biomass-based diesel to mono-alkyl ester biodiesel based on factors that, according to SABR, EPA failed to consider.  These arguments also fail.

*First*, SABR asserts (at 15) that Congress intended to "diversif[y] available biofuels nationwide" and that continuing to classify renewable diesel as a form of biomass-based diesel will undermine that objective.   The foundation for that argument is questionable, as SABR bases it on a Senate report rather than the text of the statute.  *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (rejecting approach of "divin[ing] messages from congressional commentary" because "legislative history is not the law"); *see also* EPA Br. 77.  Regardless, the report does not stand for the proposition SABR asserts.  *See* S. Rep. No. 110-65, at 2-3 (2021) ("Diversifying *feedstocks* to include a broader array of renewable *biomass* can promote regional diversity" and "improve national energy security" (emphases added)).  As for the factors the statute *does* require EPA to consider—such as "the expected annual rate of future commercial production of … biomass-based diesel," 42 U.S.C. § 7545(*o*)(2)(B)(ii)—SABR does not identify any error in EPA's analysis.  *See* Set Rule at 44,488 (addressing enumerated factors); *see also* EPA Br. 78-79 (underscoring "one of Congress's primary goals in establish the [RFS] program [was to] improv[e] the nation's energy independence and security" by "increasing *fuel*

9

diversity" (quoting *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 666 (D.C. Cir. 2019); cleaned up; emphasis added)).

*Second*, SABR says (at 15-16) that EPA ignored Congress's directive to exclude "co-processed" fuel from the biomass-based diesel category because "much of the new renewable diesel capacity stems from refinery conversions." But SABR relies on a mistaken premise. Co-processing occurs when a party uses renewable and non-renewable sources together in the same process. *See* 40 C.F.R. § 80.2 ("*Co-processed* means that renewable biomass … was simultaneously processed with fossil fuels or other non-renewable feedstock in the same unit or units to produce a fuel that is partially derived from renewable biomass or a biointermediate."). Co-processing does *not* occur when a party converts its petroleum refinery to produce renewable diesel, as SABR assumes.[6] Indeed, EPA considered and rejected the definition of co-processing on which SABR relies, explaining that "co-processing" occurs where "petroleum and biomass feedstock are processed in the same unit simultaneously," *not* where the two fuels are processed "sequentially." 75 Fed. Reg. at 14,686; *see also id.* (clarifying that "serial batch processing"—i.e., processing "vegetable oil" one week and "petroleum" the next—is not co-processing); EPA Br.

---

[6] More broadly, the statute says nothing about where renewable fuels must be produced, focusing instead on renewable fuel "*sold* or *introduced* into commerce in the United States" and forbidding only attempts to "restrict geographic areas in which renewable fuel may be *used*." 42 U.S.C. § 7545(*o*)(2)(A)(i), (iii)(II)(aa).

81-82 (explaining why the hydrotreating process of producing renewable diesel does not meet the definition of "co-processing").[7]

*Third*, SABR lists (at 16-17) reasons why, in its view, mono-alkyl ester biodiesel is better than renewable diesel. SABR fails to explain how EPA committed a legal error by declining to favor one type of biomass-based diesel over another. Rather, EPA's longstanding approach, under which multiple fuel types qualify as biomass-based diesel, is firmly grounded in the statute. *See supra* section I.A; *see also* EPA Br. 80-81. SABR disagrees with that approach, but its disagreement is not a reason to vacate the Set Rule. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

*Fourth*, SABR asserts (at 17-18) that including renewable diesel creates a risk of "anti-competitive behavior and RIN market manipulation" because renewable diesel plants "are larger, fewer, and increasingly affiliated with obligated parties."

---

[7] SABR also cites (at 15) a Senator's floor argument advocating for an amendment to the bill that became the Energy Independence and Security Act of 2007. *See* 153 Cong. Rec. S8025-26 (June 20, 2007). Not only was that amendment not adopted, *see* Roll Call Vote on S. Amend. 1800, 110th Cong. (June 20, 2007) (rejected 45-49), but that single statement can hardly be considered evidence of statutory meaning, *see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 578 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history."). Moreover, rather than expressing concern with merely "us[ing] refinery resources to produce diesel fuel," SABR Br. 15, Senator Kyl expressed concern with refineries taking animal fat "and put[ting] that in with diesel fuel" to receive a renewable diesel tax credit. *See* 153 Cong. Rec. S8025.

In other words, SABR alleges that obligated parties' mere involvement in biomass-based diesel production risks misconduct. In addition to missing the irony of this argument given SABR's request for preferential treatment, SABR provides no evidence to support that allegation, and none exists—another fatal omission. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 425 (2021); EPA Br. 80-81 (making similar point). Moreover, SABR's assumption—that obligated parties should be walled off from biomass-based diesel production—is antithetical to the RFS program. The statute expressly allows obligated parties to produce renewable fuels and generate RINs: "[A]*ny* person that *refines*, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required" by statute can "generat[e] … credits." 42 U.S.C. § 7545(*o*)(5)(A)(i) (emphases added); *see also* 40 C.F.R. § 80.2 (defining "obligated party" as "any *refiner*" or "any *importer*" that "produces" or "imports" diesel fuel (emphases added)).

*Last*, SABR argues (at 18-19) that EPA should have created an "implied" set-aside for mono-alkyl ester biodiesel, akin to the approach EPA has taken for conventional biofuel. According to SABR, EPA created an implied conventional biofuel requirement "to ensure an ongoing role for ethanol," SABR Br. 18, and mono-alkyl ester biodiesel should be similarly favored. But the agency has not adopted "a requirement for ethanol"; rather, it has taken an approach under which a "portion of total renewable fuel … is not required to be advanced biofuel." Set Rule

12

at 44,517; *see also* EPA Br. 82. EPA acknowledged that this approach creates an "incentiv[e for] the domestic consumption of corn ethanol." *Id.* But EPA did not and could not create a new volume *requirement* for ethanol. Nor has SABR identified any statutory provision that could form the basis for such "implied" requirements for a subset of biomass-based diesel.[8] Thus, SABR's justification for asking EPA to establish a separate requirement—in reality, a subsidy—for mono-alkyl ester biodiesel falls short.

---

[8] Indeed, the *only* statutory provision for biomass-based diesel for 2023 and later years is the minimum applicable volume of 1 billion gallons. 42 U.S.C. § 7545(*o*)(2)(B)(i)(IV), (v).

## <u>CONCLUSION</u>

There is no basis, in the statute or precedent, for EPA to exclude renewable diesel from the RFS statute's biomass-based diesel category.  As a result, the Court should reject SABR's arguments in favor of such an exclusion and deny that aspect of its petition for review.

Respectfully submitted,

*/s/  Robert J. Meyers*
Robert J. Meyers
Elizabeth B. Dawson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2789

Richard S. Moskowitz
Tyler Kubik
American Fuel & Petrochemical Manufacturers
1800 M Street, NW, Suite 900N
Washington, DC 20036

*Counsel for American Fuel & Petrochemical Manufacturers*

September 6, 2024

*/s/  Kevin F. King*
Robert A. Long, Jr.
Kevin F. King
Thomas R. Brugato
MaKade C. Claypool
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5488

Ryan Meyers
John Wagner
Michele Schoeppe
American Petroleum Institute
200 Massachusetts Ave. NW
Suite 1100
Washington, DC 20001

*Counsel for American Petroleum Institute*

14

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with this Court's February 14, 2024 order (Doc. 2040364) because it contains 3,005 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Times New Roman font.

*/s/ Kevin F. King*

September 6, 2024                          Kevin F. King

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 6, 2024, I caused copies of the foregoing brief to be served by the Court's CM/ECF system, which will send a notice of the filing to all registered CM/ECF users.

<em>/s/ Kevin F. King</em>

Kevin F. King

# ADDENDUM

## <u>**TABLE OF CONTENTS**</u>

**Statute**                                                                **Addendum Page**

26 U.S.C. § 40A (Excerpts) ......................................................................A1

40 C.F.R. § 80.2 (Excerpts) ......................................................................A2

## 26 U.S.C. § 40A – Biodiesel and Renewable Diesel Used as Fuel

\*\*\*

**(d) Definitions and special rules**

For purposes of this section—

**(1) Biodiesel**

The term "biodiesel" means the monoalkyl esters of long chain fatty acids derived from plant or animal matter which meet—

(A) the registration requirements for fuels and fuel additives established by the Environmental Protection Agency under section 211 of the Clean Air Act (42 U.S.C. § 7545), and

(B) the requirements of the American Society of Testing and Materials D6751.

\*\*\*

**(f) Renewable diesel**

For purposes of this title—

**(1) Treatment in the same manner as biodiesel**

Except as provided in paragraph (2), renewable diesel shall be treated in the same manner as biodiesel.

\*\*\*

**(3) Renewable diesel defined**

The term "renewable diesel" means liquid fuel derived from biomass which meets—

(A) the registration requirements for fuels and fuel additives established by the Environmental Protection Agency under section 211 of the Clean Air Act (42 U.S.C. 7545), and

(B) the requirements of the American Society of Testing and Materials D975 or D396, or other equivalent standard approved by the Secretary.

\*\*\* Such term does not include any fuel derived from coprocessing biomass with a feedstock which is not biomass. For purposes of this paragraph, the term ''biomass'' has the meaning given such term by section 45K(c)(3).

A1

**40 C.F.R. § 80.2 – Definitions**

The definitions of this section apply in this part unless otherwise specified. Note that many terms defined here are common terms that have specific meanings under this part.

\*\*\*

*Co-processed* means that renewable biomass or a biointermediate was simultaneously processed with fossil fuels or other non-renewable feedstock in the same unit or units to produce a fuel that is partially derived from renewable biomass or a biointermediate.

\*\*\*

*Obligated party* means any refiner that produces gasoline or diesel fuel within the covered location, or any importer that imports gasoline or diesel fuel into the covered location, during a compliance period. A party that simply blends renewable fuel into gasoline or diesel fuel, as specified in § 80.1407(c) or (e), is not an obligated party.