**ORAL ARGUMENT SCHEDULED FOR NOVEMBER 1, 2024**

**No. 23-1177 and Consolidated Cases**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*.

On Petitions for Review of Final Agency Action
of the Environmental Protection Agency

**FINAL BRIEF OF BIOFUEL INTERVENORS
RESPONDING TO PETITIONERS AMERICAN FUEL &
PETROCHEMICAL MANUFACTURERS ET AL.**

MATTHEW W. MORRISON
SHELBY L. DYL
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8036

*Counsel for Renewable Fuels Association*

SANDRA P. FRANCO
FRANCO ENVIRONMENTAL LAW LLC
600 Pennsylvania Avenue SE
Unit 15577
Washington, DC 20003
(202) 256-6115

*Counsel for Coalition for Renewable Natural Gas*

DAVID M. LEHN
JAY SCHUFFENHAUER
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727

*Counsel for Growth Energy*

BRYAN KILLIAN
DOUGLAS HASTINGS
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 739-3000

*Counsel for Clean Fuels Alliance America*

September 6, 2024

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28, biofuels intervenors, through undersigned counsel, hereby certify the following as to parties, rulings, and related proceedings in this case:

**A.    Parties, Intervenors, And Amici**

EPA's brief provides a complete list of petitioners, respondents, and intervenors, except that REH Co.'s petition has been dismissed and several scientists have appeared as amici.

**B.    Rulings Under Review**

Renewable Fuel Standard Program: Renewable Fuel (RFS) Program: Standards for 2023-2025 and Other Changes, 88 Fed. Reg. 44,468 (July 12, 2023).

**C.    Related Cases**

None.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, intervenors certify that:

Growth Energy is a nonprofit trade association within the meaning of Circuit Rule 26.1(b).  It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members.  Growth Energy's members are ethanol producers and supporters of the ethanol industry.  Growth Energy does not have a parent company.  No publicly held company has a 10% or greater ownership interest in Growth Energy.

The Renewable Fuels Association is a non-profit trade association.  Its members are ethanol producers and supporters of the ethanol industry.  It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members.  The Renewable Fuels Association does not have a parent company and issues no stock.

Coalition for Renewable Natural Gas ("RNG Coalition") has no parent companies, and no publicly held company has a 10% or greater ownership interest. It has not issued shares or debt securities to the public.  RNG Coalition's membership includes companies throughout the value chain of waste feedstock conversion to transportation fuel under the Renewable Fuel Standard program.  It advocates on behalf of its members and provides education for the public in

support of the sustainable development, deployment, and utilization of renewable natural gas, including participating in regulatory proceedings and litigation involving implementation of the Renewable Fuel Standard program by EPA. It is a "trade association" as defined in Circuit Rule 26.1(b).

Clean Fuels Alliance America ("Clean Fuels") is a trade association as defined in Circuit Rule 26.1(b). It is the national trade association for the biomass-based diesel industry, and its mission is to advance the interests of its members by creating sustainable biodiesel and renewable diesel industry growth. Clean Fuels has no parent companies, and no publicly held company has a 10% or greater ownership interest. It has not issued shares or debt securities to the public.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF AUTHORITIES ...................................................vi

GLOSSARY.............................................................ix

STATUTES AND REGULATIONS...............................................1

SUMMARY OF ARGUMENT ................................................1

ARGUMENT ...........................................................3

    I.    THE 2023-2025 STANDARDS DO NOT VIOLATE THE CLEAN
        AIR ACT OR THE REGULATORY FLEXIBILITY ACT .................3

        A.    EPA's Volume Requirements Accord With the
            Clean Air Act ...............................................3

            1.    EPA Must Use the Set Authority to
                Continue Aggressively Forcing Increased
                Renewable-Fuel Use.......................................3

            2.    Refiners' Attacks on EPA's Total and
                Advanced Standards Are Flawed .................................11

            3.    EPA's Cellulosic Biofuel Requirements
                Must Be Upheld.............................................17

            4.    EPA Reasonably Accounted for Costs and
                Benefits ...........................................23

        B.    EPA's Reliance on Its RIN-Passthrough Finding
            Does Not Vitiate the 2023-2025 Standards .............................23

        C.    EPA Did Not Violate the Regulatory Flexibility
            Act ...........................................27

II.     The 2023-2024 Standards Are Not Invalidated by Their Lateness .................................................................28

III.    EPA's Supplemental Standard Is Lawful ...................................29

CONCLUSION ............................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alon Refining Krotz Springs, Inc. v. EPA*,
    936 F.3d 628 (D.C. Cir. 2019).........................................................6, 10, 13-14, 25

*Americans for Clean Energy v. EPA*,
    864 F.3d 691 (D.C. Cir. 2017)........................................................4-5, 7, 10, 28

*American Petroleum Institute v. EPA*,
    706 F.3d 474 (D.C. Cir. 2013)......................................................... 19-20

*Cox v. Kijakazi*,
    77 F.4th 983 (D.C. Cir. 2023)...............................................................29

*Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021).......................................................................9

*Johnson v. Copyright Royalty Board*,
    969 F.3d 363 (D.C. Cir. 2020)...............................................................29

*Monroe Energy, LLC v. EPA*,
    750 F.3d 909 (D.C. Cir. 2014)............................................................ 14, 28-29

*Sinclair Wyoming Refining Co., LLC v. EPA*,
    101 F.4th 871 (D.C. Cir. 2024).......................................... 4, 7-11, 23-24, 28-29

*United States v. Atlantic Research Corp.*,
    551 U.S. 128 (2007)...............................................................................4

*West Virginia v. EPA*,
    597 U.S. 697 (2022)...............................................................................4

*Authorities upon which we chiefly rely are marked with an asterisk.

**Statutes and Other Legislative Materials**

5 U.S.C. §603

(c) ...................................................................................................27

(d)(1)(B) .......................................................................................27

5 U.S.C. §604(a)(6) ...........................................................................27

*42 U.S.C. §7545(*o*)

(1)(J) .................................................................................................4

(2)(B)(i) ...................................................................................4, 8, 17

(2)(B)(i)(III) ...................................................................................21

(2)(B)(ii) .......................................................................... 6, 14, 18, 20-21

(2)(B)(ii)(I) .....................................................................................5, 8

(2)(B)(ii)(II) ....................................................................................5, 8

(2)(B)(ii)(III) .......................................................................................7

(2)(B)(ii)(IV) .................................................................................... 7-8

(2)(B)(ii)(V) ........................................................................................8

(2)(B)(ii)(VI) ...................................................................................5, 8

(2)(B)(iii) ........................................................................................6, 12

(2)(B)(iv) ............................................................................. 18-19, 21

(3)(A) ...................................................................................................18

(5) .........................................................................................................27

(7)(A) ...................................................................................................20

(7)(A)(i)..................................................................................................9

(7)(A)(ii) ............................................................................................ 9-10

(7)(D) ............................................................................................... 18-20

(7)(D)(i)................................................................................................20

(7)(F) ....................................................................................................18

(9)(B).............................................................................................25, 27

Pub. L. No. 110-140, 121 Stat. 1492 (2007) ...........................................5

*Statement of Rep. John H. Dingell*,
    153 Cong. Rec. E2665 (Dec. 28, 2007)............................................19

## Regulations

40 C.F.R. §80.1405(c)............................................................................24

## GLOSSARY

| | |
|---|---|
| EPA | Environmental Protection Agency |
| GAO | Government Accountability Office |
| JA | Joint Appendix |
| Refiners.Br. | Opening Brief of Petitioners American Fuel & Petrochemical Manufacturers et al. |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |
| U.S.Br. | Opening Brief of Respondents |

## STATUTES AND REGULATIONS

All relevant statutes and regulations are contained in the principal parties' briefs.

## SUMMARY OF ARGUMENT

Intervenors—representatives of the biofuels industry—mostly agree with the government's defense of the Set Rule, and submit this brief to add or emphasize certain points.

I.     The 2023-2025 standards do not violate the Clean Air Act or the Regulatory Flexibility Act.

A.1.   EPA must set volume requirements for 2023 and beyond high enough to continue fulfilling Congress's objective of forcing the market to increase its renewable-fuel use.  Although EPA must do so based on its analysis of the various statutory Set factors, EPA does not have unfettered discretion to weigh and balance those factors.  Rather, based on its factor analysis, EPA must set the volume requirements to the maximum achievable level.  But EPA may (though is not required to) set lower volume requirements if achieving higher volumes would not yield any congressionally desired benefits or would likely severely harm the economy or environment and thus trigger EPA's waiver power later.  This framework best accounts for the statute's full structure and purpose.

2.      EPA has the statutory authority and duty to set a market-forcing implied conventional requirement.  And EPA set achievable volume requirements for total and advanced biofuel.  With respect to the implied conventional requirement, EPA correctly recognized that the RFS could incentivize increased use of higher-ethanol blends, such as E15 and E85.  Indeed, EPA's implied conventional requirements are based on modest increases in those fuels that align with historical trends.  Intervenors, however, agree with Refiners that EPA must set the advanced requirement equal to the full volume of achievable advanced biofuels.

3.      Refiners are also incorrect that EPA's cellulosic biofuel volumes are flawed.  EPA had no obligation to take a "neutral aim at accuracy" but was required to analyze the statutory factors to fulfill Congress's market-forcing policy. The record shows higher volumes were achievable.

4.      EPA reasonably accounted for costs and benefits.  EPA may compare monetized costs to unmonetized benefits.  Moreover, again, EPA's task is to analyze the statutory factors and set the maximum achievable requirements, unless EPA determines that it should set a lower requirement to avoid likely triggering its waiver power later.

B.      EPA's finding that obligated parties incur no net compliance costs because they can recoup their RIN costs did not lead to higher volume

- 2 -

requirements.  Regardless, that finding is sound as a matter of economic theory and the empirical record.

C.    The Rule does not violate the Regulatory Flexibility Act for reasons explained by the government, and because small obligated parties have adequate compliance flexibilities to avoid a significant impact.

II.    The 2023-2024 standards are not invalidated by their lateness as explained by the government.  Moreover, the 2023 standards are not retroactive at all because EPA gave obligated parties ample notice of their obligations.

III.    The 2023 supplemental standard is a valid remedy of EPA's unlawful 2016 waiver, as the government explains.  Additionally, EPA lacks statutory authority to use a cellulosic waiver as a pretext to avoid remedying its error.

## ARGUMENT

I.    **THE 2023-2025 STANDARDS DO NOT VIOLATE THE CLEAN AIR ACT OR THE REGULATORY FLEXIBILITY ACT**

A.    **EPA's Volume Requirements Accord With the Clean Air Act**

1.    *EPA Must Use the Set Authority to Continue Aggressively Forcing Increased Renewable-Fuel Use*

Refiners are wrong (Br.14) that EPA may not use the Set "to support ongoing growth in renewable fuels."  Indeed, forcing the market to increase renewable-fuel use remains the RFS's central objective.  But neither does the statute give EPA unfettered "discretion to weigh and balance the various [Set]

factors." U.S.Br.36 (cleaned up). Rather, when setting volume requirements for 2023 and beyond, EPA must analyze all the Set factors to assess: (1) the renewable-fuel volumes that are achievable; (2) the associated congressionally desired benefits; and (3) the associated costs. Based on that analysis, EPA must set the volume requirements consistent with the RFS's market-forcing objective. Specifically, EPA must set the volume requirements to the maximum achievable level it found. But EPA may (though is not required to) set lower volume requirements if achieving higher volumes would not yield any congressionally desired benefits or would likely severely harm the economy or environment and thus trigger EPA's waiver power later. This framework—compared to EPA's approach and especially Refiners'—best respects the "fundamental canon of statutory construction that the words of a statute be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up); *see United States v. Atlantic Research Corp.*, 551 U.S. 128, 135 (2007) ("Statutes must be read as a whole." (cleaned up)).

a. Congress created the RFS "to force the market" to "replace" fossil fuels with "increas[ing]" amounts of renewable fuel. *Americans for Clean Energy v. EPA*, 864 F.3d 691, 696-697 (D.C. Cir. 2017); *accord Sinclair Wyoming Refining Co., LLC v. EPA*, 101 F.4th 871, 876-877 (D.C. Cir. 2024) (cleaned up); *see* 42 U.S.C. §7545(*o*)(1)(J), (2)(B)(i). Congress's express purpose in adopting

- 4 -

this market-forcing policy was to "'move the United States toward greater energy independence and security,'" "to reduce greenhouse gas emissions," and to promote "job creation … [and] rural economic development." *Americans for Clean Energy*, 864 F.3d at 696-697 (quoting Energy Independence and Security Act, Pub. L. No. 110-140, preamble, 121 Stat. 1492 (2007)); §7545(*o*)(2)(B)(ii)(I)-(II) & (VI). As EPA says (Br.30), "[t]hese purposes animate and inform the extensive set of factors Congress requires EPA to consider when setting volumes" for 2023 and beyond.

Contrary to Refiners' assertion, this market-forcing policy did not evaporate when the statutory table of mandated volumes expired in 2022. If that were what Congress wanted, Congress would simply have sunset the RFS. Instead, Congress expressly stated that the RFS would persist indefinitely, and thus the RFS must continue to serve Congress's market-forcing objective. The obvious reason that Congress specified volumes only through 2022 was its recognition that predicting achievable volumes more than 15 years out was too difficult, and so it directed EPA to pick up the baton.

Refiners contend (Br.15) that "a broad programmatic objective cannot trump specific instructions," but they cite no specific statutory instructions countermanding this fundamental statutory objective, and there are none. The statute's command that EPA "base[]" the new volume requirements "on a review

- 5 -

of the implementation of the program during" past years, §7545(*o*)(2)(B)(ii),
merely means that EPA must "apply" "lessons learned" to its "prospective
analysis" of how best to further the program's market-forcing objective after 2022,
not to abandon that objective. *Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d
628, 666 (D.C. Cir. 2019). Moreover, this Court implicitly rejected the same
argument in *Sinclair*. *See* Brief of American Fuel & Petrochemical Manufacturers
et al. 13, No. 22-1210, ECF #2017798 (D.C. Cir. Sept. 19, 2023).

Nor does the statute "effectively limit[] conventional renewable fuel."
Refiners.Br.14. The statute merely requires that the post-2022 advanced
requirement "be at least the same percentage" of the total requirement as it was in
2022. §7545(*o*)(2)(B)(iii). Thus, the statute allows both the advanced and implied
conventional requirements to increase significantly after 2022 as long as the
implied conventional requirement does not increase proportionally more than the
advanced requirement relative to their 2022 levels.

b. The statute directs EPA to set volume requirements for 2023 and
beyond "based on … an analysis of" the various statutorily specified factors.
§7545(*o*)(2)(B)(ii). The statute comprehensively structures this analysis to answer
certain fundamental questions that determine appropriate volume requirements:
how much renewable-fuel use can be achieved and what are the benefits and costs
of doing so.

Based on EPA's factor analysis, EPA must determine how much renewable-fuel use can be achieved in response to RFS pressure for each renewable-fuel category during the relevant year. As EPA explains, "achievability" is a function of supply and demand for renewable fuel, from feedstocks, to production, distribution, and consumption capacity, to retail pricing. *See* JA13:2{Set.Rule.44480}. Various statutory factors relate to this inquiry, including "the expected annual rate of future commercial production of renewable fuels" and "the sufficiency of infrastructure to deliver and use renewable fuel." *Id.*; §7545(*o*)(2)(B)(ii)(III)-(IV).

EPA must also use its factor analysis to assess the "impact" of achieving that level of renewable-fuel use—both benefits and costs, for "Congress … did not pursue its purposes of increased renewable fuel generation at all costs." *Americans for Clean Energy*, 864 F.3d at 714 (cleaned up). As to benefits, EPA must determine whether the achievable level of renewable-fuel use would "yield" any of the "benefits" that Congress "designed" the RFS to yield—i.e., reduced greenhouse gas emissions, enhanced energy security and independence, and rural economic development. *Sinclair*, 101 F.4th at 889; *supra* pp.4-5. Various statutory factors relate directly to this inquiry, including "the impact of the production and use of renewable fuels on … air quality [and] climate change," on "energy security," and

on "job creation … [and] rural economic development."  §7545(*o*)(2)(B)(ii)(I)-(II) & (VI).

Likewise, various statutory factors relate directly to assessing the potential costs of the achievable level of renewable-fuel use.  The statute directs EPA to consider various economic costs, including "the impact" "on the infrastructure of the United States," on "the cost to consumers of transportation fuel and on the cost to transport goods," and on "the price and supply of agricultural commodities, rural economic development, and food prices."  §7545(*o*)(2)(B)(ii)(IV)-(VI).  And the statute directs EPA to consider various environmental costs, including "the impact of the production and use of renewable fuels on air quality, … conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply." §7545(*o*)(2)(B)(ii)(I).

Using the results of its analysis of the statutory factors, EPA must determine the proper volume requirements.  The statute, however, does not leave this determination to EPA's unfettered discretion.  Rather, the statute guides EPA to ensure that the benefits Congress sought are achieved through its market-forcing policy unless doing so would cause sufficiently serious problems.  Congress initially prescribed aggressive "mandatory and annually increasing quantities of renewable fuels that must be introduced into commerce in the United States each year."  *Sinclair*, 101 F.4th at 877 (cleaned up); *see* §7545(*o*)(2)(B)(i).  And

Congress granted EPA discretion to "reduce"—i.e., "waive"—those volume

requirements "only in limited circumstances." *Sinclair*, 101 F.4th at 896; *see*

*Growth Energy v. EPA*, 5 F.4th 1, 15, 17 (D.C. Cir. 2021). Specifically, Congress

authorized EPA to reduce the volume requirements if "there is an inadequate

domestic supply" of renewable fuel, §7545(*o*)(7)(A)(ii), or if meeting the volumes

"would severely harm the economy or environment of a State, a region, or the

United States," §7545(*o*)(7)(A)(i). The congressional policy judgments embodied

in this statutory structure were neither abandoned nor altered for post-2022 years

by the statute's Set provision. Rather, in performing its Set duty, EPA should

adhere to these policy judgments for years that were too far into the future for

Congress to have dictated when it created the current RFS in 2007.

Consistent with this statutory guidance, EPA must set post-2022 volume

requirements at the maximum level that it determines is achievable in response to

RFS pressure. This approach reflects Congress's prescription to continue forcing

the market to increase its renewable-fuel use. Starting from any lower level would

improperly bias the volume requirements against fulfilling the RFS's purposes.

Based on its factor analysis, however, EPA may reduce the volume

requirements in limited circumstances. EPA has discretion to do so if higher

volumes would not yield any of the benefits that Congress intended to achieve

through the RFS. And EPA has discretion to do so if higher volumes would likely

trigger EPA's waiver authority later, such as if the higher volume would likely cause severe economic or environmental harm.[1]  This discretion enables EPA to provide "the market certainty so critical to the [RFS's] long term success." *Americans for Clean Energy*, 864 F.3d at 715 (cleaned up).

EPA may *not*, however, adopt lower volume requirements merely to avoid modest costs, including compliance costs or minimal environmental disruptions. The waiver provisions reflect Congress's judgment about when costs are significant enough to outweigh the benefits of additional renewable-fuel use.  Just as using a *waiver* to avoid "lesser degrees of … harm" would undermine the RFS, *Americans for Clean Energy*, 864 F.3d at 712 (cleaned up), so would *setting* lower volume requirements for 2023 and beyond to avoid such "harm."  Indeed, if EPA could set volume requirements below the maximum achievable level merely to avoid modest costs, the RFS would be pointless.  As this Court recently recognized, Congress established the RFS *knowing* that forcing the market to increase renewable-fuel use would have some cost.  *See Sinclair*, 101 F.4th at 889 ("in enacting the Renewable Fuel Standards Program, Congress made a policy choice to accept higher fuel prices"); *Alon*, 936 F.3d at 652 ("the increases in RIN

---

[1] Anticipation of a waiver based on "inadequate domestic supply," §7545(*o*)(7)(A)(ii), is subsumed by the assessment of achievable volumes.

prices are a completely understandable effect of the program's ever-increasing pressure to expand renewable volumes").

In sum, this framework ensures that EPA can reliably establish volume requirements for multiple future years that achieve the benefits Congress sought when it created the RFS, while preserving an appropriate safety valve in case EPA foresees that doing so will be excessively harmful.

2.    *Refiners' Attacks on EPA's Total and Advanced Standards Are Flawed*

Refiners attack the Set Rule's advanced and total standards on four principal grounds. Their arguments are meritless, except Intervenors agree with Refiners on one issue.

a.    Refiners' opening gambit (Br.16)—that "EPA lacks statutory authority to impose *any* 'implied' conventional renewable-fuel volume"—was rightly rejected in *Sinclair*. 101 F.4th at 887-888; *see* U.S.Br.47.

b.    Refiners argue (Br.17-18) that EPA also lacks statutory authority under the Set provision to incentivize the use of higher-ethanol blends, such as E15 and E85. As explained above, that is incorrect: EPA must set market-forcing volume requirements, *supra* pp.4-6, and the statute specifically allows EPA to do

so for conventional ethanol if the conventional growth is not disproportionately large compared to the growth in advanced biofuel, *supra* p.6; §7545(*o*)(2)(B)(iii).[2]

c.    Refiners are wrong (Br.18) that the projected ethanol volumes underlying EPA's 2023-2025 implied conventional requirements are "unrealistic." Refiners principally argue (Br.18) that the "E10 blendwall" is the "limit[]" on ethanol use because the RFS cannot "incentivize higher-ethanol blends," mainly E15 and E85.  However, "E10 blendwall" is merely a shorthand for the economic circumstance that absent external incentive, the market will use E10 but not higher-ethanol blends.  The RFS is designed to—and can—provide that external incentive.

Participants in the transportation-fuel industry—obligated parties and non-obligated blenders—use renewable fuel only to the extent they "find it economically advantageous to blend the biofuel into the petroleum fuel" that they make and sell.  JA30:1{Set.Rule.44497}.  In a no-RFS world, the gasoline supply would be almost entirely E10 (10% ethanol).  JA1347, JA1413, JA1722{RIA.39,105,414} ("E10 would be used regardless of the RFS program but there would not be any E15 or E85 use"); JA31:1{Set.Rule.44498}. Correspondingly, the nationwide (or "poolwide") ethanol concentration in gasoline

---

[2] Contrary to Refiners' assertion (Br.16-17), the statute also did not "cap" conventional renewable fuel at 15 billion gallons in 2022 or earlier years.  But the Court need not address that issue because, again, the statute expressly allows the implied conventional volume to exceed 15 billion gallons after 2022.

would be almost exactly 10% in a no-RFS world. JA23:2, JA50:1{Set.Rule.44490,44517}; JA1722{RIA.414}. Thus, the only way to increase ethanol use above the no-RFS level is by incentivizing the market to switch from E10 to higher-ethanol blends, mainly E15 and E85. JA23:1{Set.Rule.44490} ("The average ethanol concentration can exceed 10 percent only insofar as the ethanol in E15 and E85 exceeds the ethanol content of E10 and more than offsets the volume of E0."); JA1631, JA1647{RIA.323,339}; JA1852{RTC.161}.

Consumers "are more likely to purchase [E15 or] E85 if they believe that doing so reduces their fuel costs" relative to E10, JA1339{RIA.31}, and the RFS is designed to make that happen. RIN prices "generally represent the marginal cost of increasing renewable fuel use": if EPA sets the implied conventional requirement at or below the no-RFS level, RIN prices go to $0; as RFS requirements exceed no-RFS levels, RIN prices rise accordingly. JA1852, JA1854{RTC.161,163}; JA1347 & Figure 1.9.2-1{RIA.39}; JA302-JA303{EPA-HQ-OAR-2021-0427-0008.at.1-2}. Thus, contrary to Refiners' assertion (Br.20), high RIN prices are not "a bug" in EPA's implementation of the RFS. Rather, they are the mechanism by which the RFS "incentivize[s] the production and use of renewable fuels" beyond what the market would do otherwise. JA1347{RIA.39}; JA1854{RTC.163}; *see* U.S.Br.53; *Alon*, 936 F.3d at 652 ("higher RIN prices are

not indicative of a dysfunctional RIN market," but rather "a completely

understandable effect of the program's ever-increasing pressure to expand

renewable volumes" (cleaned up)); *Monroe Energy, LLC v. EPA*, 750 F.3d 909,

919 (D.C. Cir. 2014).

RIN prices incentivize increased renewable-fuel use by functioning as a

"cross-subsidy" for fuels with higher renewable-fuel concentrations relative to

fuels with lower renewable-fuel concentrations. The higher the gallon's

concentration of renewable fuel, the greater the associated RIN value and therefore

the greater the discount—RINs discount E15 relative to E10, and discount E85

even more. U.S.Br.49-50, 54-55; *Alon*, 936 F.3d at 651-652; JA1348{RIA.40}.

Consequently, the higher the RIN price, the bigger the discount and the more

consumers will prefer higher-ethanol blends, in turn pressuring refiners,

distributors, and retailers to make more higher-ethanol blends available. *Alon*, 936

F.3d at 651-652; U.S.Br.51, 52-53; JA303, JA313{EPA-HQ-OAR-2021-0427-

0008.at.2,12}; JA1811{RTC.93}.

The required "review of the implementation of" the RFS, §7545(*o*)(2)(B)(ii),

shows that "small but increasing volumes of E15 and E85" have been used under

the RFS so far. JA23:1{Set.Rule.44490}. The nationwide ethanol concentration

reached 10.02% in 2016 and then continued rising to 10.13% in 2017, 10.20% in

2019, 10.25% in 2020, 10.32% in 2021, and 10.36% in 2022.  JA23 Figure.III.B.5-1{Set.Rule.44490}.

The E15 and E85 projections underlying the 2023-2025 standards are consistent with this past growth under the RFS.  The nationwide ethanol concentrations would continue the trend with modest, eminently achievable increases: 10.41% in 2023; 10.46% in 2024; and 10.51% in 2025.  JA24 Table.III.B.5-1{Set.Rule.44491}.  The 2023-2025 standards' achievability can also be seen volumetrically: the E15 and E85 volumes actually used in 2022—which "represent the starting point for any adjustments that the market may need to make," JA31:3{Set.Rule.44498}—were *higher* than the projected 2023-2025 volumes by 189 million gallons, 79 million gallons, and 255 million gallons, respectively.  JA32 Table.III.E-2{Set.Rule.44499}; *see* JA1412-JA1413{RIA.104-105} (all expected conventional renewable fuel above no-RFS level is conventional ethanol as E15 and E85).  In a fuel market that will annually use about 138 *billion* gallons of gasoline, more than 20 *billion* gallons of renewable fuel, and about 14 *billion* gallons of ethanol, JA24 Table.III.B.5-1, JA54 Table VII.C-1{Set.Rule.44491,44521}, these increases are a drop in the bucket.

EPA backed up these modest increases with empirical analysis showing that the projected levels of E15 and E85 "could be consumed under the influence of the applicable standards" for 2023-2025—i.e., they are achievable in response to the

RFS. JA1830{RTC.121}. The market's ethanol-production capacity exceeds the entire 15-billion-gallon implied conventional annual requirement for 2023-2025. JA22:2{Set.Rule.44489}; JA24 Table III.B.5-1{Set.Rule.44491}. So does the market's capacity to consume E15 and E85 in compatible vehicles. JA1652 Figure 7.4.3-1{RIA.344}; JA1810{RTC.73}; JA594-JA595{EPA-HQ-OAR-2021-0427-0796.at.13-14}. In EPA's estimation, the limiting factor on E15 and E85 use would be retail stations. JA1631, JA1647{RIA.323,339}. Accordingly, EPA based its E15 and E85 projections on the assumption that the number of compatible stations would continue to increase at the recent rate (partially in response to separate governmental grant programs) and that those stations would deliver E15 and E85 volumes at the historical average for such stations. JA23:2-3{Set.Rule.44490}; JA1631-JA1633, JA1649-JA1656{RIA.323-325,341-348}; JA1816{RTC.107}; *see* U.S.Br.48-49.

Plainly, this was a very conservative approach because it disregarded the possibility that an even higher implied conventional requirement would increase RIN prices further, further discounting E15 and E85 relative to E10, and thereby incentivizing consumers to demand even more of those fuels and retailers to convert even more of their stations to sell those fuels. A detailed market analysis showed that, given higher RFS requirements, the market could achieve substantially more than 15 billion gallons of ethanol use annually in 2023-2025.

*See* JA1371, JA1652-JA1653{RIA.63,344-345}; JA594-JA598{EPA-HQ-OAR-2021-0427-0796.at.13-17}.[3]

      d.      Refiners contend (Br.19) that EPA erred by intentionally setting the advanced requirement below the volume of advanced biofuel that EPA determined was achievable, creating a "surplus" of advanced biofuel that EPA uses to cover the difference between the 15-billion-gallon implied conventional requirement and the projected achievable volume of conventional-ethanol use.  In Refiners' view, EPA should have set the advanced requirement equal to the achievable volume of advanced biofuel, and then set the implied conventional requirement equal to the achievable volume of conventional renewable fuel alone.  Intervenors agree with that view, but some of Refiners' subsidiary points—especially that high RIN prices are problematic and that high RIN prices raise retail fuel prices—are incorrect for reasons discussed above, *supra* pp.13-14, and in the government's brief (Br.49-50).

      3.     *EPA's Cellulosic Biofuel Requirements Must Be Upheld*

      Evidenced by the ambitious statutory volumes, Congress sought to promote cellulosic biofuels under the RFS.  §7545($o$)(2)(B)(i)(III).  While Refiners fault the

---

[3] That past sales of E85 in particular have been modest does not remotely suggest the limit of E85 sales because, as EPA knows, RIN prices have never been high enough to discount E85 enough relative to E10 to persuade consumers to switch given E85's lower energy content and consumer unfamiliarity.  JA1339{RIA.31}; JA596-JA598{EPA-HQ-OAR-2021-0427-0796.at.15-17}.  Consistent with Congress's intent, EPA should address this situation by raising RFS requirements further, not lowering them.

industry for still moving toward the mark Congress set for 2022—at least 16
billion gallons—the RFS works. Since EPA's 2014 approval of cellulosic RINs,
renewable natural gas in the transportation market increased by over 450% from
2015 to 2023. JA576{EPA-HQ-OAR-2021-0427-0756.at.8}; EPA, *RINs
Generated Transactions*.[4] That Congress may have preferred faster growth does
not mean it intended to remove the incentives Congress established come 2023.
Dismissing Congress's goals, Refiners attempt (Br.21-22) to equate EPA's volume
setting authority under §7545(*o*)(2)(B)(ii) with its cellulosic-waiver authority
under §7545(*o*)(7)(D) to nullify the RFS's market-forcing purpose for cellulosic
biofuel. Refiners misread the statute.

The basis of Refiners' claims is §7545(*o*)(2)(B)(iv), which says the
applicable cellulosic biofuel volume under the Set provision "shall be based on the
assumption that the Administrator will not need to issue a waiver for such years"
under §7545(*o*)(7)(D). The cellulosic waiver authority under §7545(*o*)(7)(D)
requires EPA, based on projections under §7545(*o*)(3)(A), to reduce the statutory
volumes to projected volumes available. The projections in §7545(*o*)(3)(A),
however, only apply to volumes through compliance year 2022, which implicates
*reset* authority, §7545(*o*)(7)(F), not post-2022 Set authority.

---

[4] https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rins-generated-transactions (data as of July 10, 2024).

- 18 -

Even if §7545(*o*)(2)(B)(iv) applies after 2022, EPA must merely make an *assumption* that a waiver will not be needed when it analyzes the factors to set volumes intended to be market-forcing.[5]  This does not mean, as Refiners contend, that EPA must or should set the cellulosic biofuel volumes as required when exercising its waiver authority under §7545(*o*)(7)(D).  Section 7545(*o*)(2)(B)(iv) does not require EPA to ensure against a waiver; it merely directs EPA "to set the mandate at a level that the administrator expects *can be* met without the use of the safety net provisions."  153 Cong. Rec. E2665, E2666 (Dec. 28, 2007) (statement of Rep. Dingell) (emphasis added).  That is, to effectuate the RFS's market-forcing purpose, EPA must set the volumes at what may be maximally *achieved* based on a review of the statutory factors.  Here, that review supported higher volumes to realize the numerous environmental, economic, and energy security benefits of cellulosic biofuels.  JA583-JA592{EPA-HQ-OAR-2021-0427-0756.at.29-38}.

Refiners nonetheless seek (Br.21-22) to rely on *American Petroleum Institute v. EPA*, 706 F.3d 474 (D.C. Cir. 2013), without grappling with the "differences between the statutory requirements for setting and waiving cellulosic volumes (and differences in the context between reducing the statutory volumes for one year and setting standards in the first instance for 3 years)."

---

[5] Assumptions are facts taken for granted, https://www.merriam-webster.com/dictionary/assumption.

JA1783{RTC.20}. Section 7545(*o*)(7)(D) requires EPA to project the volume available for one year by November of the prior year, which the Court found called for "a neutral methodology" to predict what will actually happen. *American Petroleum*, 706 F.3d at 479. But EPA's Set authority requires consideration of numerous factors and does not restrict EPA to assessing one year only, but to set rules for the future, which can involve more difficult multi-year projections. Had Congress wanted EPA just to set the cellulosic biofuel volumes after 2022 at projected volumes available as in §7545(*o*)(7)(D)(i), it could easily have said so. It did not.

Nor would Refiners' reading of the statute be the "best" one, as it would render the review required under §7545(*o*)(2)(B)(ii) meaningless for cellulosic biofuels and remove the statute's market-forcing purpose, despite Congress's focus on cellulosic biofuels due to their numerous benefits. Merely requiring EPA to assume the waiver will not be needed, at a minimum, allows EPA to "advance a technology-forcing agenda" when setting the volumes post 2022. *American Petroleum*, 706 F.3d at 479. Moreover, there is a remedy if EPA's cellulosic biofuel volumes turn out to be too high—later waivers under §7545(*o*)(7)(A).[6]

---

[6] Under Refiners' theory, EPA effectively exercises any cellulosic waiver authority when setting the volumes. Yet, Refiners reference (Br.23 n.12) AFPM's extra-record waiver request for 2023, which is based, in part, on a claim that such waiver should occur again. Nonetheless, EPA properly denied the request, finding

Instead, Refiners claim (Br.22) more caution is required because "EPA is *also* supposed to review what *has actually happened.*"  As explained, that misreads the requirement that EPA review "implementation of the program" through 2022 in §7545(*o*)(2)(B)(ii).  *See supra* pp.5-6.  Given the proven record of significant growth of renewable natural gas under the RFS, any argument that EPA's consideration of this record was arbitrary must be rejected.

Setting maximum achievable volumes under §7545(*o*)(2)(B)(iv) by definition means the requirements are *not* "unreachably high applicable volumes for cellulosic biofuel."  Refiners.Br.21.  The factors to be assessed include review of expected annual rate of production and other factors that may lead EPA to conclude that higher volumes are not achievable.  Neither Refiners comments nor their brief identifies any bases to reject EPA's conclusion that the 2023-2025 volumes are achievable.[7]

---

"obligated parties will be able to readily comply with the existing cellulosic biofuel standard." JA2280-JA2281{89.Fed.Reg.20961-20962}.  Further, Refiners (Br.23 n.12) complaints are not at issue here and are irrelevant to whether the cellulosic biofuel volumes are arbitrary.

[7] Refiners' comments complained of the rule's timing for 2023 and 2024.  JA850-JA851{EPA-HQ-OAR-2021-0427-0812.at.12-13}; Refiners.Br.22, 31-37.  As EPA explains, its actions were consistent with prior case law.  U.S.Br.58-61.  This is true for cellulosic biofuels where the final volumes are less than the statutory volumes Congress sought, were easily anticipated for 2023 based on the proposal, and less than the proposed volume for 2024, which included additional volumes for renewable electricity—an additional biogas-derived fuel.  §7545(o)(2)(B)(i)(III);

Refiners note (Br.22) that they "cautiously agreed" to using a 13.1% growth rate for renewable natural gas for 2025. But the record shows that rate would be arbitrarily low, especially for 2025, because it overplays the impact of COVID-19—"unique circumstances" that EPA did not "expect to recur on a regular or periodic basis."[8] JA2275:3{87.Fed.Reg.39632}. That rate in no way reflects what the industry can achieve. Apparently recognizing this, Refiners claim (Br.22) that "EPA does not account for the precipitous decline in growth rate that occurred *before* the pandemic." That is untrue. *See* U.S.Br.45. Regardless, Refiners do not explain why this renders EPA's cellulosic requirements arbitrary. The record shows that the 25% growth rate EPA used is less than the investments that were underway and less than what the industry can do. JA575-JA576{EPA-HQ-OAR-2021-0427-0756.at.7-8}.

---

JA146, JA168{87.Fed.Reg.80601,80623}. Refiners had ample notice of their potential obligations.

[8] Comments explained why using only a 24-month lookback was flawed. JA576-JA579{EPA-HQ-OAR-2021-0427-0756.at.8-11}; JA15:3-JA16:1{Set.Rule.44482-44483}. The record also showed that cellulosic biofuel investments that have been made and were being made would be undermined if EPA set the volumes too low. JA580-JA582{EPA-HQ-OAR-2021-0427-0756.at.20-22}; JA46:3-JA47:1{88.Fed.Reg.44513-44514} (acknowledging "negative impacts related to a potential surplus" of cellulosic RINs).

4.     *EPA Reasonably Accounted for Costs and Benefits*

Refiners argue (Br.23) that EPA erroneously "brushed off" monetized costs in favor of unmonetized benefits.  As the government explains (Br.35), this Court has already rejected Refiners' objection.  *Sinclair*, 101 F.4th at 888-890.

Moreover, as explained above, EPA's task was not to balance costs and benefits but to set the volume requirements at the maximum achievable level, unless doing so would not yield congressionally desired benefits or would likely trigger a waiver power later.  And EPA's analysis shows that the requirements will yield "the primary benefits for which Congress created the Program," *Sinclair*, 101 F.4th at 889, and are unlikely to trigger a wavier power later, JA7:3{Set.Rule.44474}; JA1419-JA1584, JA1699-JA1769{RIA.111-276,391-461}.

**B.     EPA's Reliance on Its RIN-Passthrough Finding Does Not Vitiate the 2023-2025 Standards**

Refiners contend (Br.26) that EPA "magic[ally]" solves the RFS's supposed "past (and ongoing) problems" by invoking its finding that all obligated parties have no net compliance costs because they can pass through (i.e., recoup) their RIN costs.  Refiners' objection is incorrect in several ways.

1.     If EPA's RIN-passthrough finding were removed from its analysis— i.e., if obligated parties could not recoup their RIN costs—the 2023-2025 standards would be the same or higher, not lower as Refiners want.

- 23 -

As Refineries' citations show (Br.26-27), EPA relied on RIN passthrough in only two ways when setting the 2023-2025 standards. First, EPA accounted for RIN passthrough when calculating the percentage standards. EPA's formula subtracts from the denominator the total projected volume of gasoline and diesel produced by exempt small refineries. 40 C.F.R. §80.1405(c); JA52:2{Set.Rule.44519}; *see Sinclair*, 101 F.4th at 890-891. In calculating the 2023-2025 standards, EPA projected that there would be zero exemptions because of RIN passthrough and, therefore, EPA did not subtract any gallons from the denominator. JA53:2-JA54:1 & Table VII.C-1{Set.Rule.44520-21}. If EPA were wrong about RIN passthrough, it might project some exempt volumes, in which case it would have to reduce the denominator, in turn *raising* the 2023-2025 standards.

Second, EPA relied on RIN passthrough in parrying some commenters' contention that higher standards would increase obligated parties' compliance costs: because of RIN passthrough, obligated parties have no net compliance cost regardless of RIN prices. *See, e.g.*, JA1811{RTC.93}. But even if obligated parties had to absorb their compliance costs, that would not justify lowering the 2023-2025 requirements. As this Court recently recognized, those costs—whether they fall on obligated parties or consumers—are an inherent and unavoidable

consequence of the RFS and thus are costs that Congress already determined do not outweigh the program's benefits. *Supra* pp.10-11.

Plus, even if Refiners were right that a subclass of obligated parties—small refineries—cannot recoup their RIN costs (Br.28), the proper response would not be to reduce the *national* volume requirements set in the Rule, but to grant exemptions to those specific refineries (assuming their RIN costs cause them "disproportionate economic hardship"). §7545(*o*)(9)(B).

Finally, Refiners assert (Br.26) that EPA "acknowledg[ed]" that decreasing the implied conventional requirement would encourage investment in low-carbon fuels. That is false; that notion came from a *commenter*, and EPA recited it only to reject it (correctly). JA1830{RTC.121}.

2.    Refiners' attack on EPA's RIN-passthrough is also wrong because that finding is well-supported by both basic economic theory and EPA's many detailed empirical studies over the years. This Court previously upheld EPA's RIN-passthrough finding because it was "grounded … in studies and data in the record." *Alon*, 936 F.3d at 649. In the 2023-2025 rulemaking, EPA relied on its recent confirmation of that finding based on newer and more extensive empirical studies. JA1836-JA1837, JA1855, JA1862-JA1863, JA1867-JA1868{RTC.135-136,164,179-180,184-185}; JA382-

JA411{June.2022.Denial.of.Petitions.for.RFS.Small.Refinery.Exemptions.30-59};

JA996{EPA-HQ-OAR-2021-0427-1020}.

Refiners mistakenly argue (Br.27-28) that EPA's RIN-passthrough finding

was refuted by GAO's alternative analysis.  As the government points out (Br.54),

GAO was focused on "different questions."  In any event, as EPA has explained,

GAO's analysis was flawed because it relied on several "not reasonable"

assumptions that "increase[d] the estimate of the prices that small refineries paid."

JA1008{EPA-HQ-OAR-2021-0427-1020.at.10}.  Refiners counter (Br.28) that in

responding to GAO, EPA "used cherry-picked data from an unidentified subset of

small refineries and then excluded actual market transactions it labeled as

'outliers.'"  That is incorrect.  EPA used the largest dataset available—indeed, the

same dataset that GAO used plus data from earlier years, which makes more sense

because obligated parties can use older (i.e., carryover) RINs to comply.  JA1000,

JA1004, JA1008{EPA-HQ-OAR-2021-0427-1020.at.2,6,10}.  The only "filters"

EPA used to remove "outliers" were (1) EPA's standard filters to remove prices

that do not reflect accurate open-market transactions and (2) a filter that

"matche[d]" GAO's own filter.  JA1001-JA1002, JA1008{EPA-HQ-OAR-2021-

0427-1020.at.3-4,10}.

Refiners also contend (Br.28) that EPA's post-GAO analysis found "many

small refineries pay 7.5% more for RINs compared with the daily average price."

That is also false.  The 7.5% figure resulted when EPA added GAO's various *unreasonable* assumptions to EPA's model, and thus EPA *rejected* that figure. JA999, JA1007-JA1008{EPA-HQ-OAR-2021-0427-1020.at.1,9-10}.  Without GAO's unreasonable assumptions, EPA found that small refineries paid 1.1% more when buying and received 3.2% less when selling compared to average prices. JA999, JA1005, JA1008{EPA-HQ-OAR-2021-0427-1020.at.1,7,10}.  Those differences, EPA concluded, were insignificant because they were so small and were based on unavoidably imperfect data.  JA999, JA1002{EPA-HQ-OAR-2021-0427-1020.at.1,4}.

## C.    EPA Did Not Violate the Regulatory Flexibility Act

Refiners' challenge (Br.29-31) under the Regulatory Flexibility Act fails for reasons already stated here, *supra* I.B, and by the government (Br.55-58).  It also fails because, as EPA found, the RFS already provides small refineries with various "compliance flexibilities" to ensure that the 2023-2025 requirements will not have "significant" impact on them, including tradeable RINs, deficit carryforward, and (where supported) exemption from their RFS obligations. JA85:2-3{Set.Rule.44552}; §7545(*o*)(5), (9)(B).  The further "flexibility" that Refiners evidently want—reducing the volume requirements to or below the no-RFS level—is not "consistent" with Congress's "stated objective[]" of forcing increased renewable-fuel use.  5 U.S.C. §604(a)(6); *see* §603(c), (d)(1)(B); *supra*

pp.4-5. Therefore, a full regulatory flexibility analysis was unnecessary because it could not have altered the final rule.

## II.    THE 2023-2024 STANDARDS ARE NOT INVALIDATED BY THEIR LATENESS

Refiners argue (Br.31-37) that the 2023-2024 standards are invalid because EPA issued them after the statutory deadlines. The government adequately refutes (Br.58-61) this challenge. Further, Refiners are wrong (Br.37) to call the 2023 standards "retroactive" with respect to the portion of 2023 that had passed before they were finalized. EPA publicly proposed the standards on December 1, *2022*, and published them on December 30, 2022—before 2023 began. JA12:1, JA44:1{Set.Rule.44479,44511}. And the proposed 2023 standards were very close to the final standards on both volumetric and percentage bases. *Compare* JA129 Table.I.A.1-1{87.Fed.Reg.80584} *and* JA130 Table.I.A.2-1{87.Fed.Reg.80585} *with* JA3 Table.I.A.1-1{Set.Rule.44470} *and* JA4 Table.I.A.2-1{Set.Rule.44471}. Thus, as this Court has repeatedly recognized, EPA's advance issuance of proposed RFS standards provided obligated parties sufficient "notice" of their 2023 obligations. *See Sinclair*, 101 F.4th at 887; *Americans for Clean Energy*, 864 F.3d at 721-722 (proposed standards provided ample notice even though final volume requirements were higher). Under these circumstances, obligated parties "had no legally settled expectation" of, or reasonable reliance interest in, lower standards and therefore the 2023 standards were not "retroactive" at all. *Monroe*

*Energy*, 750 F.3d at 920; *see Cox v. Kijakazi*, 77 F.4th 983, 991, 993 (D.C. Cir. 2023); *Johnson v. Copyright Royalty Board*, 969 F.3d 363, 380 (D.C. Cir. 2020).

## III.    EPA'S SUPPLEMENTAL STANDARD IS LAWFUL

The government refutes (Br.61-68) Refiners' challenges to the 2023 supplemental standard.  Additionally, Refiners' contention (Br.42) that EPA should have "invoked the full extent of its cellulosic waiver authority to lower the total renewable fuel standard for 2016 by 380 million"—which was rejected in *Sinclair*, 101 F.4th at 893-896—is also incorrect because EPA lacked statutory authority to do so.

In originally establishing the 2016 standards, EPA did not max out the cellulosic waiver of the advanced and total requirements because it determined that 380 million gallons of the cellulosic shortfall could be made up by non-cellulosic advanced biofuel.  JA2271:2{87.Fed.Reg.39627}; JA2162:2, JA2163:2, JA2164:3, JA2167:1-JA2173:1{80.Fed.Reg.77423,77426,77434,77476-77482}.  Therefore, the cellulosic waiver cannot be used to reduce the advanced and total requirements by that last 380 million.  The purpose of the cellulosic waiver is to relieve shortfalls in advanced and total renewable fuel created by a cellulosic shortfall, but the 380 million did not create one.  Especially given the RFS's objective of forcing the market to replace fossil fuel with renewable fuel, Refiners' notion that the cellulosic waiver supplies EPA with a pretext for using fossil fuels to make up a

cellulosic shortfall despite the availability of other qualifying renewable fuel

makes no sense.

## CONCLUSION

The Court should deny Refiners' petitions.

Respectfully submitted,

/s/ Matthew W. Morrison
MATTHEW W. MORRISON
SHELBY L. DYL
PILLSBURY WINTHROP SHAW PITTMAN
LLP
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8036

*Counsel for Renewable Fuels
Association*

/s/ Sandra P. Franco
SANDRA P. FRANCO
FRANCO ENVIRONMENTAL LAW LLC
600 Pennsylvania Ave SE
Washington, DC 20003
Unit 15577
(202) 256-6115

*Counsel for Coalition for Renewable
Natural Gas*

/s/ David M. Lehn
DAVID M. LEHN
JAY SCHUFFENHAUER
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727

*Counsel for Growth Energy*

/s/ Bryan Killian
BRYAN KILLIAN
DOUGLAS HASTINGS
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave NW
Washington, DC 20004
(202) 739-3000

*Counsel for Clean Fuels Alliance
America*

September 6, 2024

- 30 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,054 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ David M. Lehn
DAVID M. LEHN

September 6, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ David M. Lehn
DAVID M. LEHN